# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| PPS DATA, LLC,<br><br>                          Plaintiff,<br><br>         vs.<br><br>JACK HENRY & ASSOCIATES, INC.,<br><br>                          Defendant. | Civil Action No. 2:18-cv-00007-JRG |

### DEFENDANT JACK HENRY & ASSOCIATES, INC.'S
### RESPONSIVE CLAIM CONSTRUCTION BRIEF PURSUANT TO P.R. 4-5(b)

## TABLE OF CONTENTS

I.      INTRODUCTION ......................................................................................... 1

II.     PROCEDURAL BACKGROUND.................................................................. 1

III.    BACKGROUND AND SCOPE OF THE ASSERTED PATENTS................................... 2

        A.      The Genesis of Modern Check Deposit Processing Systems and the
                Asserted Patents ...................................................................................... 2

        B.      Legislative Changes During Prosecution of the Asserted Patents—The
                Check 21 Act.......................................................................................... 4

        C.      The Scope of the Asserted Patents.......................................................... 6

IV.     APPLICABLE LEGAL PRINCIPLES............................................................ 7

        A.      Claim Construction ................................................................................. 7

        B.      Indefiniteness ......................................................................................... 7

        C.      Level of Ordinary Skill in the Art........................................................... 8

V.      PROPOSED CONSTRUCTIONS .................................................................. 9

        A.      The asserted claims are indefinite........................................................... 9

                1.      Because the term "central system" is indefinite, claim term
                        "separate from" is also indefinite.............................................. 9

                        a.      "central system" .......................................................... 9

                        b.      "separate from" ......................................................... 13

                2.      The data/image transmission limitations do not find support in the
                        specifications of the asserted patents. ...................................... 13

                        a.      "a transmission having a transmission path that bypasses
                                the MICR capture, deposit accounting, cash management,
                                and float processing systems of the bank of first deposit for
                                that deposit transaction"............................................. 13

                        b.      "a transmission path that bypasses the MICR capture
                                system of the bank of first deposit" ............................ 14

                        c.      "transmitting bypassing the MICR capture, deposit
                                accounting, cash management, float processing or other
                                systems of the bank of first deposit"........................... 14

                        d.      The "bypassing/bypasses" step found in each of these
                                phrases renders them indefinite. ................................. 14

                        e.      "but not through the MICR capture, deposit accounting,
                                cash management, and float processing systems of the bank
                                of first deposit" ......................................................... 16

i

3.    The various data-related limitations are used inconsistently and without the necessary support, and are thus indefinite. ........................... 17

    a.    "a deposit account designation [[in]/[to] a bank of first deposit], electronic check data and [original] check image data" .................................................................................. 17

    b.    "electronic deposit data" .............................................. 18

    c.    "image information data" ............................................. 18

B.    JHA's constructions are otherwise consistent with the intrinsic record and the understanding of a POSA, and should be adopted by the Court. .................... 19

    1.    The components of the data/image processing system are defined by their spatial (as remote from a remote site), relational (as to the other system components), and functional facets. ................................... 19

    a.    "remote site" .............................................. 19

    b.    "bank(s) of first deposit/different bank(s) of first deposit" .......... 24

    c.    "central system" ....................................... 26

    2.    Any proposed meanings of the data limitations cannot be rectified. ........ 27

    a.    PPS Data misses the mark in its argument against JHA's proposed construction. ................................................. 27

    b.    "a deposit account designation [[in]/[to] a bank of first deposit], electronic check data and [original] check image data" .................................................................................. 28

    3.    The common meaning of the endorsement-related terms is apparent from the specification. ................................................. 31

    a.    "endorsing and/or voiding the one or more checks" .................... 31

    b.    "bank endorsement/endorsement information" ........................... 32

VI.    CONCLUSION .......................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alza Corp. v. Mylan Labs., Inc.*,
391 F.3d 1365 (Fed. Cir. 2004)............................................................................7

*Bell Communications Research, Inc. v. Vitalink Communications Corp.*,
55 F.3d 615 (Fed. Cir. 1995)................................................................................7

*Energizer Holdings Inc. v. Int'l Trade Comm'n*,
435 F.3d 1366 (Fed. Cir. 2006)..........................................................................18

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
796 F.3d 1312 (Fed. Cir. 2015)............................................................................8

*Freeny v. Apple Inc.*,
No. 13-361, 2014 WL 4294505 (E.D. Tex. Aug. 28, 2014) ................................8

*Lockwood v. Am. Airlines, Inc.*,
107 F.3d 1565 (Fed. Cir. 1997)..................................................................8, 12, 16

*Markman v. Westview Instruments, Inc.*,
517 U.S. 370 (1996)..............................................................................................7

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
134 S. Ct. 2120 (2014)....................................................................................7, 16

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)....................................................................7, 8, 9

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
522 F.3d 1299 (Fed. Cir. 2008)......................................................................8, 12

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
789 F.3d 1335 (Fed. Cir. 2015)............................................................................8

*TurboCare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.*,
264 F.3d 1111 (Fed. Cir. 2001)......................................................................8, 12

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996)..............................................................................7

**Statutes**

Check 21 Act., Clearing for the 21st Century Act, Pub. L. No. 108-100, 117 Stat.
1177 (2003) ..........................................................................................................4

Pursuant to P.R. 4-5(b), Defendant Jack Henry & Associates, Inc. (JHA) files its responsive claim construction brief as follows:

## I.        INTRODUCTION

Disclosure is the backbone of our patent system.  In exchange for disclosing an invention to the public, an inventor earns the right to exclude others from practicing the invention claimed for a limited period of time.  A fundamental precept underlying this bargain, though, is the requirement that the inventor unambiguously articulates the metes and bounds of the invention so that the public has notice of what will or will not infringe the inventor's rights.  Put differently, the patent claims must be definite.

The claims of the asserted patents violate this fundamental rule by failing to set forth with reasonable certainty the scope of the claimed invention.  More specifically, the patent applicants made amendments during prosecution in an effort to capture then rapidly evolving check processing processes.  But while the claims were amended, in significant part, the original patent disclosure remained stagnant.  In short, the patent applicants made a mess during prosecution, and the claims no longer square with the original patent specification.  As such, the claims run afoul of 35 U.S.C. § 112(b).  These issues are global, and similarly affect groups of related terms.

Along similar lines, PPS Data forgets that the claims must be construed in light of the claim language *and* the specification.  PPS Data's proposed constructions reflect this, and are improper.

## II.        PROCEDURAL BACKGROUND

On January 10, 2018, PPS Data filed its complaint against JHA alleging infringement of United States Patent Nos. 7,181,430 (the '430 patent) (Dkt. 1-2); 7,216,106 (the '106 patent) (Dkt. 1-3); 7,440,924 (the '924 patent) (Dkt. 1-4); 7,624,071 (the '071 patent) (Dkt. 1-5); and

8,660,956 (the '956 patent) (Dkt. 1-6) (collectively, the asserted patents).  (Compl. for Patent Infringement (Dkt. 1).)  On May 4, 2018, JHA filed its answer and counterclaim for a declaratory judgment of noninfringement and invalidity of the asserted patents, pleading, in part, that the asserted patents are invalid under 35 U.S.C. § 101 as being drawn to ineligible subject matter. (Answer to Compl. for Patent Infringement & Countercl. (Dkt. 10).)  PPS Data filed its opening claim construction brief on January 17, 2019.  (Pl.'s Opening Claim Construction Br. (Dkt. 43).)

JHA has also filed a motion under Federal Rue of Civil Procedure 12(c), urging the Court to find that the asserted patents are invalid under 35 U.S.C. § 101 for failing to claim patentable subject matter.  (Def.'s Rule 12(c) Mot. for J. of Invalidity Under 35 U.S.C. § 101 (Dkt. 28).) All briefing has been submitted, and the motion is currently pending.

### III.    BACKGROUND AND SCOPE OF THE ASSERTED PATENTS

**A.    The Genesis of Modern Check Deposit Processing Systems and the Asserted Patents**

To better grasp the issues presented in this claim construction proceeding, it is helpful to understand the backdrop in which the claimed check clearing processes arose.  In that regard, the computerization of standard check clearing practices traces back to at least the 1980s and 1990s, when the financial services industry recognized the potential for improved efficiency and cost savings through the utilization of electronic check imaging technology to exchange electronic check image data over electronic data interchange networks.[1]  Indeed, by the mid-1990s, the Financial Services Technology Consortium, which included a large consortium of banks, universities and research laboratories, developed and tested an Interbank Check Imaging system

---

[1](*See* <u>Ex. 1</u>, *Image Systems Garner NOAC Spotlight*, American Bankers' Association's National Operations and Automation Conference, Computers in Banking, Vol. 6, No. 7, p. 8 (Jul. 1989); <u>Ex. 2</u>, *A Proposal for an Image-Based Return Item Processing System*, Unisys & New York Clearing House (June 1991) ("The next few years will be revolutionary as financial institutions begin to explore the potential of image technology.  Those who implement an image system early in this era will have a competitive advantage in the marketplace.").)

for processing and exchanging electronic check image data in lieu of physical paper checks.[2]  In view of these rapidly evolving financial technologies, in 1996, the Federal Reserve undertook to examine its payment services.[3]  In a corresponding report, the Federal Reserve noted that "digital imaging of checks and storage of these images is likely to be a necessary feature of a check collection system based on electronic presentment . . . .  Such images could replace canceled checks as proof of payment and facilitate the return process of dishonored checks, but they would require additional investment."[4]

It is no surprise, then, that during the time leading up to the priority date of the asserted patents, a number of banks and clearinghouses, as well as the Federal Reserve, supported paperless electronic check imaging and corresponding processing technologies, generally referred to as electronic check presentment or, ECP.[5]  Thus, the asserted patents describe "computer-based software" for processing electronic deposits.  ('430 patent (Dkt. 43-1) at 2:12-15; 4:32-64; 7:33-46.)

Given its proper context, the '430 patent was initially directed to methods and systems for electronically "processing a check" by a financial institution, such as a bank.  (Ex. 8, '430 patent file history, Specification dated 4/28/2000 at 8-37 to 8-51.)  During the early stages of

---

[2](Ex. 3, *FSTC Interbank Check Imaging Project - Interbank Check Imaging Project White Paper* (June 20, 1994); Ex. 4, *FSTC Check Imager InterChange Project - Archive Storage and Retrieval Component Decomposition* (May 23, 1995); Ex. 5, *FSTC Check Image Interchange Project Pilot Phase-1A - Preliminary Architecture and Project Plan*, Robert J. Brown, (June 30, 1995).)

[3](*See* Ex. 6, *The Federal Reserve in the Payments Mechanism*, Committee on the Federal Reserve in the Payments Mechanism, Alice M. Rivlin, et al. (January 1998).)

[4](*Id.*)

[5](*See* Ex. 7, *Payments, Clearance, and Settlement - A guide to the Systems, Risks and Issues*, Report to the Chairman Committee on Banking and Financial Services House of Representatives, United States General Accounting Office (June 1997) (notably, ECP could include electronic MICR-line data and/or electronic check image data).)

prosecution, the applicants introduced new claims directed to two distinct inventions, namely, "new claims directed to the operations at *a remote site*, and new claims directed to the operations *at a central site*." (*Id*., Amendment dated 9/4/2002 at 8-73 (emphasis added).) Then, in response to a restriction requirement, the patent applicants elected the claims "drawn to a method for processing checks *at a central site*." (*Id*., Restriction Requirement dated 12/4/2002 at 8-84 (emphasis added); *see also id*., Amendment dated 12/20/2002 at 8-89). Consistent with the specification of the '430 patent, the applicants initially characterized the central site as part of a bank of first deposit. (*Id*., Specification dated 4/28/2000 at 8-5 ("Once deposit data is received by the central site processor at the bank of first deposit's central site, it is passed to the central site's check processing, deposit, and cash management, etc., systems for processing.").) The claims corresponding to the central site ultimately matured into the issued claims of the '430 patent.

**B.     Legislative Changes During Prosecution of the Asserted Patents—The Check 21 Act**

In 2003, three years *after* the filing date of the application that led to the '430 patent, Congress passed the Check 21 Act.[6] The Check 21 Act created a new, legally negotiable instrument called a substitute check, to facilitate automated electronic check truncation.[7] The substitute check eliminated the requirement of collecting physical paper checks in the check clearing process.[8] Under Check 21, the substitute check includes electronic images of the front and back of the original check, which serve as a legal equivalent of the original physical check.[9]

---

[6]Clearing for the 21st Century Act, Pub. L. No. 108-100, 117 Stat. 1177 (2003).

[7]*Id*.

[8]*Id*.

[9]*Id*.

Shortly thereafter, the patent applicants began making significant, but unsupported claim amendments in an attempt to shoehorn aspects of Check 21's automated electronic check processing into the claims. [10]  Indeed, these amendments introduced unsupported claim language that goes beyond the scope of the originally filed patent application, which all of the asserted patents claim priority to.

As discussed below with respect to specific terms, many of these amendments relate to 1) the evolving and ambiguous characterization of a "central site," also referred to as a central system, "separate and distinct from a standard main accounting functionality in a bank"; 2) a "remote site"; and 3) inter-operational relationships between these system components and a "bank of first deposit."  This resulted in claims that attempt to distinguish functions performed by the "central site" from those performed by or on behalf of a "bank of first deposit."  (Ex. 8, '430 patent file history, Amendment dated 11/20/2003 at 8-221; *see also id*. Amendment dated 4/27/2004 at 8-235 ("wherein the central site is not a bank of first deposit" and "with the transmitting not being via the bank of first deposit for that deposit transaction"); Amendment dated 3/4/2005 at 8-284 ("wherein the central site is separate from internal deposit or cash management systems for a bank" and "with the transmitting not being through the internal deposit or cash management systems of the bank of first deposit for that transaction"); Supplemental Amendment dated 5/6/2005 at 8-348 ("wherein the central system is separate from MICR capture, deposit accounting, cash management, and float processing systems for a bank of

---

[10]In a recent litigation, PPS Data alleged that the lead inventor of the '430 patent, Daniel Buchanan, was involved in the legislative process surrounding the Check 21 Act.  *PPS Data, LLC. v. VSoft Corp*., No. 1:15-cv-00084 (N.D. Ga. Jan. 9, 2015) (Dkt. 22 at 5) ("Mr. Buchanan . . . represented the five major banking and financial services trade associations . . . before the Senate Banking Committee on the Check 21 Act.").  PPS Data also asserts that its patents encompass Check 21 processing applications.  *Id*. ("[P]assage of the Check 21 Act facilitated financial institutions' more rapid adoption of PPS Data's patented remote deposit technologies.").

first deposit" and "with the transmitting being in advance of the MICR capture, deposit

accounting, cash management, and float processing systems of the bank of first deposit for that

deposit transaction"); Amendment dated 5/10/2006 at 8-422 ("the central system transmitting

electronic check data and the check image data directly or indirectly to a maker bank of a Federal

Reserve Bank or a correspondent bank in a transmission having a transmission path that bypasses

the MICR capture, deposit accounting, cash management, and float processing systems of the

bank of first deposit for that deposit transaction.").)

## C.    The Scope of the Asserted Patents

The '430 patent has the earliest priority date of the asserted patents.  The '106, '924, '071

and '956 patents each claim priority to the '430 patent.  The '106 patent sets forth the additional

Figures 8-10.  The various portions of the '106 patent's specification that discuss these figures

likewise add additional disclosure to what is found in the other asserted patents.  The respective

specifications of the asserted patents are otherwise identical.  For ease of reference, all citations

to the specification herein are to that of the '430 patent.

The asserted patents are directed to what were, at the time of the alleged invention,

computerized systems implementing commonplace and well-known check processing processes

and concepts.  For example, representative claim 1 of the '430 patent requires that a central

system (i) receive check information, such as electronic check and/or check image data, through

the use of conventional scanners and processors; (ii) transmit the check information to respective

banks of first deposit for each deposit transaction using conventional computer networking

technology; (iii) perform conventional check data processing operations on that information,

such as sorting or error checking; and/or (iv) transmit that information to a maker bank, the

Federal Reserve Bank or another correspondent clearing bank, using the same conventional data

communication technology.  As specifically stated by the patent applicants during prosecution,

the "main focus" of the claims is "the processing of the checks once they are stored." (*Id.*, Amendment dated 8/5/2003 at 8-155.)

These same general elements are fundamental to all of the asserted claims. These are generic, conventional computing steps related to data processing—i.e. sending, receiving, reading, and storing data.

## IV.    APPLICABLE LEGAL PRINCIPLES

### A.    Claim Construction

The interpretation of a patent claim is a legal conclusion based on underlying facts. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996). Claim terms are generally given their plain and ordinary meaning to one of ordinary skill in the art when read in the context of the specification and prosecution history. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). Additionally, terms that appear in more than one claim should be construed consistently throughout a patent. *Id.* at 1314.

The claim language is the most important source in determining the meaning of the claims. *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 619 (Fed. Cir. 1995). To construe a claim, a "court looks first to the intrinsic evidence of record, examining, in order, the claim language itself, the specification, and the prosecution history." *Alza Corp. v. Mylan Labs., Inc.*, 391 F.3d 1365, 1370 (Fed. Cir. 2004). After considering the intrinsic record, a court may consider extrinsic evidence if there is "genuine ambiguity" in the claims. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996).

### B.    Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134

S. Ct. 2120, 2124 (2014).  The patent must apprise a person of ordinary skill in the art (POSA) of the scope of the invention.  *Freeny v. Apple Inc.*, No. 13-361, 2014 WL 4294505, at *5 (E.D. Tex. Aug. 28, 2014).  "Indefiniteness is a question of law for the court."  *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1317 (Fed. Cir. 2015).  A claim is indefinite if it fails to convey "with reasonable certainty the scope of the invention claimed" to a POSA.  *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015).  It is not enough for an expert to simply opine that a claim limitation not disclosed in a patent application was obvious and known to a POSA.  As the Federal Circuit has stated:

> While the meaning of terms, phrases, or diagrams in a disclosure is to be explained or interpreted from the vantage point of one skilled in the art, all the limitations must appear in the specification.  The question is not whether a claimed invention is an obvious variant of that which is disclosed in the specification.  Rather, a[n] . . . application itself must describe an invention, and do so in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought.

*Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997); *see also PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1310 (Fed. Cir. 2008) ("Obviousness simply is not enough; the subject matter must be disclosed to establish possession."); *TurboCare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.*, 264 F.3d 1111, 1119 (Fed. Cir. 2001) (rejecting expert's conclusory statement that disclosure was inherent or obvious to one skilled in the art).

## C.      Level of Ordinary Skill in the Art

The inquiry into how a POSA understands a claim term provides an objective baseline from which to begin claim interpretation.  *Phillips*, 415 F.3d at 1313.  "That starting point is based on the well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the

pertinent art." *Id*.  The POSA is deemed to read the claim in the context of the particular claim in which the disputed term appears, and also in the context of the entire patent.  *Id*.

For the invention claimed in the asserted patents, the intrinsic record dictates that a POSA is a person with education and/or experience, generally, in the applicable fields of computer science, database systems, computer or electrical engineering or computer software and hardware.  The education and experience levels of a POSA may vary, with some persons holding basic degrees and many years of experience and some persons holding more advanced degrees, such as MS or Ph.D., or having advanced certifications, but having fewer years of experience.  For purposes of determining the indefiniteness of the claims of the asserted patents, it does not matter which of PPS Data's or JHA's identification of the POSA is adopted.  In either case, the claims are indefinite.

## V.      PROPOSED CONSTRUCTIONS

**A.      The asserted claims are indefinite.**

**1.      Because the term "central system" is indefinite, claim term "separate from" is also indefinite.**

**a.      "central system"**

| JHA's Proposed Construction | PPS Data's Proposed Construction |
|---|---|
| *indefinite*<br><br>alternatively, "a site owned or employed by a financial institution other than a bank of first deposit for the particular check(s) in the deposit transaction(s) covered by the claim" | Processing system at a central site electronically interacting with the remote site for reviewing and processing electronic check data, and electronically interacting with a maker bank site for completing the clearing process relating to the check. |

All of the independent claims include the term "central system," and define it as somehow being "*separate from* MICR capture, deposit accounting, cash management, and float processing systems for a bank of first deposit."  But the term "central system" does not appear anywhere in the specifications of the asserted patents, and in the file history, the term "central

system" is interchangeable with the term "central site."  (*See*, *e.g.*, <u>Ex. 8</u>, Amendment dated 5/6/2005 at 8-348 (changing the term "central site" to "central system" in the claims); *see also id*. at 8-378 (referring to the "central site 102" in FIG. 1 as the "central system 102").)

The specification is clear that the central site is part of the bank of first deposit.  ('430 patent (Dkt. 43-1) at 2:29-34 ("central site of the financial institution"); 2:61-64 ("[o]nce complete deposit data is received by the central site processor at the bank of first deposit's central site"); 3:23-29 ("[t]he information on these database(s) will be available to the depositor and research personnel at the bank of first deposit's central site").)  Specifically, the specification teaches that the "central site" operates as the MICR capture system, deposit system, and/or cash management system for the bank of first deposit.  (*Id*. at 6:1-10.)  Notably, Figure 1 shows the "bank of first deposit check capture system 102" as part of "central site 102."  (*Id*. at Fig. 1; *see also id.* at Fig. 4 (showing the central site 198 as including a cash management system 104, and a deposit accounting system (deposit system 114); 10:49-53 ("In either case, the check image capture system 205 interfaces with the central site 198 deposit systems 103, cash management systems 104, etc. for posting information.").)

In sum, the specification only characterizes the term "central site" by its relationship to a bank of first deposit, i.e. the central cite is owned or employed by the bank of first deposit.  (*Id*. at 5:60-63 ("Additionally, the term "bank of first deposit" means the financial institution sponsoring the remote site and which owns or employs a central site for processing financial transactions.").)

But despite these express teachings, the applicants amended the claims and argued that "the central site is *not* a bank of first deposit for these checks and . . . the deposit account designation for each of a plurality of the checks is to *a different remote bank of first deposit*."

(Ex. 8, '430 patent file history, Amendment dated April 27, 2004 at 8-235 (emphasis added).)
And in doing so, they created a fatal and irreconcilable defect.

The applicants clearly and unambiguously disclaimed the central site from even acting as
a bank of first deposit: "the claimed central site is *not acting as a bank of first deposit for the
particular checks in the deposit transactions covered by the claim*." (*Id*. at 8-265 (emphasis
added).)  Throughout the remaining prosecution record, the applicants consistently attempted to
reinforce this negative relationship. (*Id*., Amendment dated 3/4/2005 at 8-316 (applicants
amended the negative limitation "is not" to recite "is separate from" to "thereby clarify that the
central site is not operating within the internal deposit or cash management systems for a bank,
whether or not it is co-located with a bank"); Amendment dated May 6, 2005 at 8-348
(applicants changed the term "central site" to "central system," and further amended the negative
relationship to specify additional systems the central site is "not," i.e. "wherein the central
system is *separate from* MICR capture, deposit accounting, cash management, and float
processing systems for a bank of first deposit") (emphasis added).)

Perhaps most significant are the emphatic statements by inventor Buchanan in a
declaration submitted to the Patent Office, where he asserted "*[i]n all circumstances*, whether or
not there is co-location, the central system *does not include* the bank of first deposit MICR
capture, deposit accounting, cash management, and float processing systems," and "*in all cases
the central system is *different from* the bank of first deposit MICR capture and accounting
systems." (*Id*., Supplemental Amendment dated May 6, 2005 at 8-395 (emphasis added).)

In the end, if the "central system" is the "central site," then the specification directly
contradicts the later prosecution history and is indefinite.  If the "central system" is different
from the "central site," then there is no support in the specification as to what the "central

11

system" is, where it is located or what it does, as the only descriptions in the specification and prosecution history are of the "central site."  The gist of all of this is that due to the patent applicants' overreaching claim amendments, the claims of the asserted patents are not supported by the patents' specifications.

PPS Data acknowledges that the term "central system" does not appear in the specifications.  Although PPS Data argues that "the specification plainly discloses what the 'central system' is and does" and that "the specification provides further details regarding specific functions performed by the central system as recited in the claims," PPS Data does not provide a single citation to the specification or prosecution history to support these statements. (*See* Pl.'s Opening Claim Construction Br. (Dkt. 43) at 18.)  Instead, it relies entirely on the declaration of its expert who claims the term would be known to one skilled in the art as a "system" that is "central."  *Id*.  But this bears the question, central to what?

PPS Data appears to claim that the site is simply a location and does not perform a function.  But this is clearly not the case, as PPS Data concedes that the "remote site" identified in the patent is described not only as a location but also through its functionality.  There is zero clarity from the specification, the file history or PPS Data's brief as to what the central system is, where it is located, or how it operates within the claimed invention.  PPS Data cannot rely on its expert as a substitute for this deficiency.  *Lockwood*, 107 F.3d at 1572; *TurboCare Div. of Demag Delaval Turbomachinery Corp.*, 264 F.3d at 1119; *PowerOasis, Inc.*, 522 F.3d at 1310.

Finally, PPS Data's construction is improper because nowhere do the patents or file history require that the "central system" be located at the central site or at any site.  In particular, the "central system" cannot be located at the central site because, as noted above, the specification states that the "central site" is part of the bank of first deposit, but the claims clearly

state that the "central system" is separate from various systems of the bank of first deposit.Claim

term "central system" is indefinite, and the Court should find accordingly in its claim

construction order.

> **b.      "separate from"**

| JHA's Proposed Construction | PPS Data's Proposed Construction |
|---|---|
| indefinite | No construction necessary |

Claim term "separate from" should be found to be indefinite for the same reasons that

"central site" is indefinite.  The term "separate" is not mentioned anywhere in the specifications

of the asserted patents, nor do the asserted patents specify any degree of separation between the

"central system" and a bank of first deposit, or any other component of the check clearing

system.  It is impossible to determine whether the claims refer to the "central system" as being

physically separate, electronically separate, financially separate, or separate in some other way.

Moreover, because the term "central system" is indefinite, it is therefore impossible to determine

how the "central system" is "separate from" anything, in any manner.

**2.      The data/image transmission limitations do not find support in the specifications of the asserted patents.**

> **a.      "a transmission having a transmission path that bypasses the MICR capture, deposit accounting, cash management, and float processing systems of the bank of first deposit for that deposit transaction"**

| JHA's Proposed Construction | PPS Data's Proposed Construction |
|---|---|
| *indefinite*<br><br>JHA here withdraws its alternate construction.<br><br>~~alternatively, "transmission in advance of MICR capture, deposit accounting, cash management, and float processing at a bank of first deposit, and using normal check clearing paths (i.e., directly to clearing and correspondent banks) or through the FRB~~ | a transmission that is not received by the magnetic ink character recognition capture, deposit accounting, cash management, or float processing systems of the bank of first deposit while en route from the central system to the maker bank, Federal Reserve Bank, or correspondent bank |

| | |
|---|---|
| electrical clearing process" | |

**b.**  **"a transmission path that bypasses the MICR capture system of the bank of first deposit"**

| JHA's Proposed Construction | PPS Data's Proposed Construction |
|---|---|
| *indefinite*<br><br>JHA here withdraws its alternate construction.<br><br>~~alternatively, "transmission in advance of MICR capture at a bank of first deposit, and using normal check clearing paths (i.e., directly to clearing and correspondent banks) or through the FRB electronic clearing process"~~ | a transmission that is not received by the magnetic ink character recognition capture system of the bank of first deposit |

**c.**  **"transmitting bypassing the MICR capture, deposit accounting, cash management, float processing or other systems of the bank of first deposit"**

| JHA's Proposed Construction | PPS Data's Proposed Construction |
|---|---|
| *indefinite*<br><br>JHA here withdraws its alternate construction.<br><br>~~alternatively, "transmitting in advance of transmission to the MICR capture, deposit accounting, cash management, and float processing systems of the bank of first deposit, and using normal check clearing paths (i.e., directly to clearing and correspondent banks) or through the FRB electronic clearing process"~~ | a transmission that is not received by the magnetic ink character recognition capture, deposit accounting, cash management, float processing or other systems of the bank of first deposit while en route from the central system to the maker bank, Federal Reserve Bank, or correspondent bank |

**d.**  **The "bypassing/bypasses" step found in each of these phrases renders them indefinite.**

All of the independent claims of the asserted patents include the terms "bypasses" or "bypassing."  As with the term central system, the "bypass" terms are also characterized by a negative or exclusionary relationship with respect to a transmitting step and systems at a bank of first deposit.  Although PPS Data stresses the importance of these terms as the point of novelty

over the prior art, these terms do not appear anywhere in the disclosure of the asserted patents. (*See* Pls.'s Surreply in Opp'n to Mot. for J. of Invalidity Under 35 U.S.C. § 101 (Dkt. 32) at 6 ("The advance is a novel system where the transmission path bypasses MICR capture, deposit accounting, cash management, and float processing systems of the bank of first deposit."); *see also id*. at 5 ("In this case, it was the transmission path bypassing limitation that the Patent Office found distinguished the invention from the prior art.").)

With respect to clearing checks over a transmission path, the asserted patents only disclose a transmission path where the path taken by the check is determined by the working agreement that the bank of first deposit has with a maker bank.  ('430 patent (Dkt. 43-1) at 6:19-26; *see also id.* at 3:4-7 ("The image of the checks can be . . . routed through the normal check clearing paths (i.e. directly to clearing and correspondent banks or through the FRB electronic clearing process)."; 10:49-58 ("The central site then forwards either the printed duplicate check or check image to the maker bank 108.  This can be done directly through path 208 if the bank of first deposit's central site 198 has an agreement with maker bank 108 to exchange checks directly, or if the maker bank and the central site bank of first deposit do not have an exchange agreement then through FRBs 106, 107 through path 207.").)  The asserted patents therefore clearly and consistently disclose a relationship where the central site does not bypass the systems at the bank of first deposit because, as discussed in detail above, the central site *is part of the bank of first deposit*.

PPS Data's proposed construction of "central system" further illustrates that the terms "bypass" and "bypasses" in the claims of the asserted patents are not supported by the specifications.  The specifications state that the central site is at the bank of first deposit.  PPS Data asserts that the central system is located at a central site making the central system part of

the bank of first deposit.  This would mean that when the central system transmits various data bypassing the systems of the bank of first deposit, that the central system is bypassing itself, which is wholly illogical given that the central system cannot transmit data from itself while at the same time bypassing itself.  Nowhere does the specification disclose how the central system performs the various check processing functions and then transmits the data in such a "bypassing" manner.  The patents therefore "fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention" and the terms are indefinite.  *See Nautilus, Inc.*, 134 S. Ct. at 2124.

PPS Data again wholly relies upon its expert to claim the "bypass" function—although not described in the specification—is not indefinite because it is clearly known to one of skill in the art.  But as noted above, indefiniteness cannot be cured by simply arguing the meaning is obvious.  There must be some disclosure and support.  *Lockwood*, 107 F.3d at 1572.  Moreover, it is notable that while PPS Data claims the "bypassing" function is the key inventive concept for its patents, it also claims (with the support of its expert) that this key inventive concept was so well known to those in the art that it does not need to be disclosed in the patents' specification.  This is a perfect illustration that there is no true "invention" here.

e. **"but not through the MICR capture, deposit accounting, cash management, and float processing systems of the bank of first deposit"**

| JHA's Proposed Construction | PPS Data's Proposed Construction |
| --- | --- |
| indefinite | not received by the magnetic ink character recognition capture, deposit accounting, cash management, or float processing systems of the bank of first deposit while en route from the central system to the maker bank, Federal Reserve Bank, or correspondent bank |

16

In line with the same trend detailed above, the "but not through" limitation is not disclosed in the specifications of the asserted patents.  This phrase was introduced during prosecution without explanation, characterization, or support.  (Ex. 8, '430 patent file history, Amendment dated 5/6/2005 at 8-349.)  The phrase "but not through" is further indefinite for reasons similar to the "bypass/bypassing" phrases.

3.     **The various data-related limitations are used inconsistently and without the necessary support, and are thus indefinite.**

a.     **"a deposit account designation [[in]/[to] a bank of first deposit], electronic check data and [original] check image data"**[11]

| JHA's Proposed Construction | PPS Data's Proposed Construction |
|---|---|
| *indefinite*<br><br>alternatively, "the deposit information including for each of the different deposit transactions a deposit account number in a bank of first deposit, informational data including MICR encoding OR non-image data representing information on a paper check, and data representing an image of a physical check for at least one check to be deposited" | No construction necessary/plain and ordinary meaning |

The operative terms that render this phrase indefinite are "electronic check data" and "check image data."  The specifications of the asserted patens teach that checks are processed into "electronic check data," partly in the form of "image data."  ('430 patent (Dkt. 43-1) at 6:49-58, 8:45-61.)  By definition, "image data" must therefore be something different than "check image data."  But the specifications of the asserted patents do not disclose what that difference is.  Because of this discrepancy, a POSA has no way to know or understand the difference between "electronic check data" (which includes image data) and "check image data."  This renders the claims indefinite.

---

[11]As addressed below, this term was properly raised in JHA's invalidity contentions.

### b. "electronic deposit data"

| JHA's Proposed Construction | PPS Data's Proposed Construction |
|---|---|
| indefinite | No construction necessary/plain and ordinary meaning |

The term "electronic deposit data" first appears in the claims of the '430 patent without proper antecedent basis.  In some cases, antecedent basis can be implicit.  *See Energizer Holdings Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1371 (Fed. Cir. 2006).  However, as becomes clear from the claim language, this is not such a case.

The claims recite operations by the central system for "transmitting the electronic deposit data and optionally the check image data for each different deposit transaction . . . to a respective different one of the banks of first deposit."  ('430 patent (Dkt. 43-1) at 18:32-36.)  However, it cannot be determined with any reasonable degree of certainty what "electronic deposit data" refers to, since it can ambiguously refer to "deposit information," "a deposit account designation," "electronic check data," and/or "check image data."

Moreover, the term "electronic deposit data" does not find any clarifying support in the corresponding patent specifications.  For example, the specifications describe how "scanner/reader/printer 309 performs the functions of scanning check 303 to create electronic check data comprised of image data, [sic] information data including MICR encoding."  (*Id*. at 8:45-50.)

For these reasons, the term "electronic deposit data" is indefinite.  The Court should find accordingly.

### c. "image information data"

| JHA's Proposed Construction | PPS Data's Proposed Construction |
|---|---|
| indefinite | data obtained from check image data |

The term "image information data" also appears for the first time in the claims of the '430 patent without proper antecedent basis. ('430 patent (Dkt. 43-1) at 52-57.)  As with the previously discussed data-related terms, it cannot be determined with reasonable certainty what exactly "image information data" is, as it appears to be created from, but also different than, "check image data."

Again, the specification describes processing by a "scanner/reader/printer 309" which "create[s] electronic check data comprised of image data, [sic] information data including MICR encoding."  (*Id.* at 8:45-50.)  But "image information data" appears to be different than both "electronic check data" and "information data" since it is somehow created from "check image data," which is already created/existing data for a corresponding check.  Nor does "image information data" refer to other types of data properly recited by independent claim 1, such as "deposit information," "a deposit account designation," "electronic check data," or "check image data."  Accordingly, the ambiguous reference to "image information data" in its various forms lacks any clarifying support and is indefinite.

**B.    JHA's constructions are otherwise consistent with the intrinsic record and the understanding of a POSA, and should be adopted by the Court.**

**1.    The components of the data/image processing system are defined by their spatial (as remote from a remote site), relational (as to the other system components), and functional facets.**

**a.    "remote site"[12]**

| JHA's Proposed Construction | PPS Data's Proposed Construction |
| --- | --- |
| "a site sponsored by, or affiliated or associated with, a bank of first deposit that is remote from | Processing entity that performs functions relating to the physical check |

[12]While the term "remote site" may indeed by indefinite in the context of the claims, particularly in view of the indefinites of claim term "central site," JHA has not asked the Court to find the term indefinite.  (*See* Joint Claim Construction and Prehearing Statement (Dkt. 34).)  Therefore, JHA has not addressed PPS Data's indefiniteness argument for this term.

| a central system, that performs at least the functions of scanning, reading, and printing on a physical check to create electronic check data comprised of image data and informational data" | |
|---|---|

*First*, the term itself dictates that the "remote site" must be "remote" from something. The construction of the term should reflect what this something is.

Turning to the specification of the '430 patent, the title of the patent is instructive— "Method and System for Processing Financial Instrument Deposits Physically Remote from a Financial Institution."  ('430 patent (Dkt. 43-1) at cover page.)  Thus, from the outset, a POSA reading the '430 patent will understand that the patent relates to deposits made and processed "physically remote" from some financial institution, such as a bank.

The Abstract next explains that the patent is for "[a] system . . . that enables . . . capture and secure[] transmi[sion] [of] check images . . . from remote locations."  (*Id.*; *see also id.* at 3:30-45.)  So, we again see that the capture and transmission of check images, i.e. processing, occurs at a remote location, i.e. a "remote site."

Each of Figures 2, 3 and 4 of the asserted patents makes clear that in addition to their respective relational and functional aspects, the "remote site" and "central site" are spatially defined, with the "remote site" positioned "remote" from a "central site":



FIG. 2



FIG. 3



FIG. 4

('430 patent (Dkt. 43-1) at Figs. 2-4; 4:1-11; *see also id.* at 1:8-13; 1:43-47; 2:12-16; 2:20-34; 2:36-49; 4:29-32; 6:40-63; 7:18-32; 7:33-46; 7:52-59; 8:62-9:1; 11:44-57; 12:1-9; 12:32-36.)

The specifications make clear that the "remote site" must be "remote" from a "central site," or, as recited in the claims, a "central system":

| **JHA's Proposed Construction** |
| --- |
| "*a site* sponsored by, or affiliated or associated with, a bank of first deposit *that is remote from a central system*, that performs at least the functions of scanning, reading, and printing on a physical check to create electronic check data comprised of image data and informational data" |

*Second*, integral to the foundation of its claim construction positions, PPS Data explains that the asserted patents contemplate three separate entities, one of which is the "remote site." (Pl.'s Opening Claim Construction Br. (Dkt. 43) at 3, 8.)  PPS Data's proposed construction then goes on to define the "remote site," in part, as a "processing entity."  ('430 patent (Dkt. 43-1) at 8-10.)  But what kind of entity?  And how is this so-called processing entity related to the other entities identified by PPS Data?  PPS Data's proposed construction improperly leaves these key aspects of the construction out.

In looking at how and where the stated "processing entity" relates to the other components of the processing system, the specification characterizes the "remote site" in relation to a bank of first deposit.  More specifically, the '430 patent expressly states that the "remote site" is sponsored by a bank of first deposit.  (*Id.* at 5:60-63.)  The specification also states that the "remote site" is affiliated with a bank of first deposit.[13]  (*Id.* at 8:14-17.)  Additionally, the '430 patent discloses that the "remote site" is associated with a "bank of first deposit."  (*Id.* at 9:54-63.)  PPS Data's proposed construction of "remote site" ignores the express language of the underlying specifications, resulting in an overly-broad and purposefully open-ended construction.  JHA's construction, on the other hand, draws direct support from the specifications and fully accounts for how the "remote site" fits into the hierarchy of the deposit processing system that is the subject of the claims.

Accordingly, the "remote site" must be sponsored, affiliated, or associated with a bank of first deposit:

---

[13]It is not JHA's position that the "remote site" must be legally related to a bank of first deposit. (*See* Pl.'s Opening Claim Construction Br. (Dkt. 43) at 9.)  The specification is clear that the "remote site" is affiliated with a bank of first deposit, and that such affiliation could be a legal relationship, or not.  ('430 patent (Dkt. 43-1) at 9:58-63.)

| JHA's Proposed Construction |
|---|
| "*a site sponsored by, or affiliated or associated with, a bank of first deposit* that is remote from a central system, that performs at least the functions of scanning, reading, and printing on a physical check to create electronic check data comprised of image data and informational data" |

*Third*, because the patents claim functional steps performed by general purpose computer hardware components, as properly explained by PPS Data, the construction of "remote site" should also include the function performed by it.  (*See* Pl.'s Opening Claim Construction Br. (Dkt. 43) at 3-4.)  PPS Data acknowledges and incorporates functionality into its proposed construction, setting forth that the "remote site" "performs functions."  (*Id*. at 8-10.)  But such an ambiguous construction stops short and does not get to the heart of the matter.  As opposed to giving the claims clarity, PPS Data's proposed construction renders the claims less definite, if not outright indefinite under § 112.[14]

Again, the specification tells us what these functions are, namely, that the "remote site" "performs functions relating to the physical check, including scanning, reading, and printing on checks."  ('430 patent (Dkt. 43-1) at 6:59-61.)  In performing these functions, the "remote site" "remotely 'processes' a physical check into electronic check data both in the form of image data and informational data."  (*Id*. at 6:49-53.)

JHA's proposed construction takes into account the actual functions performed by the "remote site":

---

[14]PPS Data's proposed construction means that a "remote site" would be anywhere a general computer performs any "function" on a check.  This again calls into question the patentability of the claimed invention under 35 U.S.C. § 101.

| JHA's Proposed Construction |
| --- |
| "*a site* sponsored by, or affiliated or associated with, a bank of first deposit that is remote from a central system, *that performs at least the functions of scanning, reading, and printing on a physical check to create electronic check data comprised of image data and informational data*" |

JHA's proposed construction of "remote site" accurately accounts for 1) what the "remote site is "remote" from in the check processing system, 2) the relationship between the "remote site" and the other components of the check processing system, and 3) the functions performed by the "remote site."  The Court should therefore adopt JHA's proposed construction.

> **b.**     **"bank(s) of first deposit/different bank(s) of first deposit"**

| JHA's Proposed Construction | PPS Data's Proposed Construction |
| --- | --- |
| "a financial institution sponsoring a remote site and which owns or employs a central site for processing financial transactions" where a "different bank of first deposit is unrelated to the 'bank of first deposit'" | The first bank to which a check is transferred; as used in the Patents, this is also the financial institution sponsoring the site and which owns or employs a central system for processing financial transactions/banks of first deposit having different routing numbers (with "bank of first deposit" construed above.) |

The proper construction of claim term "bank(s) of first deposit" is expressly defined in the specification of the '430 patent, which teaches that "the term bank of first deposit means the financial institution sponsoring the remote site and which owns or employs a central site for processing financial transactions."  (*Id*. at 5:60-63.)  Nowhere does the '430 patent instruct that the "bank of first deposit" is "the first bank to which a check is transferred," as proposed by PPS Data.  If anything, the "bank of first deposit" is the first bank in which a check is deposited, but a "deposit" and "transfer" should not be universally equated or confused as PPS Data suggests. The fact remains, the patent applicants specifically defined what a "bank of first deposit" is in the context of the claims of the '430 patent, and there is no reason to deviate from that definition.

Further, a "bank of first deposit" is not synonymous with a "depositary bank."  While in some instances a "bank of first deposit" could also be a depositary bank as defined by the Treasury, that is not always the case.  For example, a check could first be deposited in a bank that is not also the "paying bank or the payee," and thus while such bank may be a "bank of first deposit," it would not also be a depositary bank."  (*See* Pl.'s Opening Claim Construction Br. (Dkt. 43) at 10-11.)  Regardless, PPS Data did not list the cited Treasury Regulation in its supporting evidence submitted with the joint claim construction and prehearing statement.  (Joint Claim Construction and Prehearing Statement (Dkt. 34) & PPS Data's Proposed Claim Constructions and Supporting Evidence (Dkt. 34-1).)  PPS Data's reliance on this extrinsic evidence is therefore improper.  The patent applicants' express definition of the term is the correct construction:

| JHA's Proposed Construction |
| --- |
| "*a financial institution sponsoring a remote site and which owns or employs a central site for processing financial transactions*" where a "different bank of first deposit is unrelated to the 'bank of first deposit'" |

Turning to "different bank(s) of first deposit," it is important to recognize that the specification of the '430 patent only discusses a "bank of first deposit," singular.  There is no discussion or teaching as to what a "different bank of first deposit" is.  The only thing that is clear is that a "different bank of first deposit" must of course be "different" than "a bank of first deposit."  Simply put, a "different bank of first deposit" is not the same bank as the "bank of first deposit."  Given the specification's lack of support for the term "different bank(s) of first deposit," JHA has proposed a construction that tracks the plain meaning of different, i.e. "unrelated":

| JHA's Proposed Construction |
| --- |
| "a financial institution sponsoring a remote site and which owns or employs a central site for processing financial transactions" *where a "different bank of first deposit is unrelated to the 'bank of first deposit'"* |

c.    "central system"[15]

| JHA's Proposed Construction | PPS Data's Proposed Construction |
| --- | --- |
| indefinite<br><br>alternatively, "*a site owned or employed by a financial institution other than a bank of first deposit for the particular check(s) in the deposit transaction(s) covered by the claim*" | Processing system at a central site electronically interacting with the remote site for reviewing and processing electronic check data, and electronically interacting with a maker bank site for completing the clearing process relating to the check. |

PPS Data correctly recognizes that the term "central system" is defined in the claims by the functions it performs.  (*See* Pl.'s Opening Claim Construction Br. (Dkt. 43) at 14.)  But PPS Data then construes the term relative to functions that are different in scope than the functions dictated by the claims themselves.  In view of this, PPS Data's proposed construction should be rejected.

Additionally, PPS Data admits that the asserted patents use the term "central site" to distinguish it from other "systems" such as the "remote site."  (*Id.*)  Yet, PPS Data's proposed construction does not take this into consideration.

Given that the claims themselves set forth the functions to be performed by the "central system," JHA's construction properly distinguishes the "central system" within the subject deposit processing system.  Here again, the specification teaches that the "central site" is owned

---

[15]As discussed above, claim term "central system" is indefinite.  To the extent the Court finds that the term can be construed consistent with the specification, JHA has offered an alternate construction.  It is JHA's position that any construction of the term is itself indefinite in line with JHA's invalidity contentions in this case.

or employed by a bank of first deposit.  ('430 patent (Dkt. 43-1) at 5:60-63.)  To gain allowance

of the claims during prosecution, the applicants amended issued claim 1 and represented that

"[issued claim 1] has been amended to clarify that the claimed central site is not acting as a bank

of first deposit for the particular check in the deposit transactions covered by the claim."  (Ex. 8,

'430 patent prosecution history, Amendment dated 4/27/2004 at 8-265.)  The applicants further

stated:

> [I]t is clear that the central site is being used to process deposit transactions for a
> plurality of different remote banks of first deposit.  It is now clear the central site
> is remote from the banks of first deposit in these deposit transactions and there is
> a sending step to these different remote banks of first deposit.  Note that it is
> possible that a bank of first deposit could be located at the central site, but in that
> case, these claims would not cover transactions with that co-located bank of first
> deposit, but would only cover transactions with remote banks of first deposit.

(*Id.*)

Again, JHA asserts that this term cannot be properly construed.  JHA has nonetheless

proposed an alternate construction that at least attempts to follow the teachings of the

specification and the applicants' statements during prosecution:

| JHA's Proposed Construction |
|---|
| indefinite |
| alternatively, "*a site owned or employed by a financial institution other than a bank of first deposit for the particular check(s) in the deposit transaction(s) covered by the claim*" |

## 2.    Any proposed meanings of the data limitations cannot be rectified.

### a.    PPS Data misses the mark in its argument against JHA's proposed construction.

PPS Data's protestations aside, JHA seeks a construction that includes interpretation of

the operative terms "deposit account designation," "electronic check data," and "check image

data."  (*See* Pl.'s Opening Claim Construction Br. (Dkt. 43) at 20-21.)  And JHA included the

subject claim phrase in its list of claim terms for construction.  (Ex. 9, Def.'s Proposed Claim Terms Pursuant to P.R. 4-1.)  While the full recitation of the claim language makes this clear— "the deposit information including for each of the different deposit transactions a *deposit account designation [[in]/[to] a bank of first deposit], electronic check data and [original] check image data* for at least one check to be deposited"—PPS Data's parsing in this regard is inconsequential, as the phrase to be construed clearly contemplates the terms "deposit account designation," "electronic check data" and "check image data."  (*See* '430 patent (Dkt. 43-1) at 18:21-24.)  This is the exact phrase that JHA disclosed to PPS Data in its P.R. 4-1 disclosures.  (Ex. 9, Def.'s Proposed Claim Terms Pursuant to P.R. 4-1.)  Any construction of the phrase accounts for the meanings of those terms as a matter of course.

        **b.**    **"a deposit account designation [[in]/[to] a bank of first deposit], electronic check data and [original] check image data"[16]**

| JHA's Proposed Construction | PPS Data's Proposed Construction |
|---|---|
| indefinite<br><br>alternatively, "***the deposit information including for each of the different deposit transactions a deposit account number in a bank of first deposit, informational data including MICR encoding OR non-image data representing information on a paper check, and data representing an image of a physical check for at least one check to be deposited***" | No construction necessary/plain and ordinary meaning |

      With respect to the "deposit account designation" portion of the phrase, JHA's position is that the plain and ordinary meaning applies.  Bank accounts, such as accounts of deposit, are

---

[16]JHA asserts that this phrase is additionally indefinite.  To the extent it can be construed consistent with the specification, JHA has once again offered an alternate construction.  It is, however, JHA's position, that any construction of the term is itself indefinite in line with JHA's invalidity contentions in this case.

commonly and routinely identified by a number, i.e. an account number or a "deposit account number."  This is reflected in JHA's proposed construction of the larger phrase:

| JHA's Proposed Construction |
| --- |
| indefinite<br><br>alternatively, "***the deposit information including for each of the different deposit transactions a deposit account number in a bank of first deposit***, informational data including MICR encoding OR non-image data representing information on a paper check, and data representing an image of a physical check ***for at least one check to be deposited***" |

The next operative phrases that must be considered are "electronic check data" and "check image data."  Again, JHA maintains that these terms are indecipherable, and are therefore indefinite.  Any attempt to reconcile these two terms makes this clear.

First, the specification teaches that checks are processed into "electronic check data both in the form of image data and information data."  ('430 patent (Dkt. 43-1) at 6:49-58.)  The specification further teaches that "electronic check data [is] comprised of image data, [sic] informational data including MICR encoding."  (*Id*. at 8:45-61.)  Breaking this down further is necessary to try and explicate the terms.

"Electronic check data" includes "image data."  By definition, "image data" must be something different than "check image data."  The only thing that makes any sense at all is if one of either "image data" or "check image data" includes an image, and the other is strictly data extracted from the image of a check, i.e. non-image data.  As such, in its tortured attempt to construe the terms, JHA has interpreted "image data" as "non-image data representing information on a paper check."

"Electronic check data" also includes "information data."  And "information," or "informational," data includes MICR encoding.  Thus, "electronic check data" is:

| JHA's Proposed Construction |
| --- |
| indefinite<br><br>alternatively, "the deposit information including for each of the different deposit transactions a deposit account number in a bank of first deposit, *informational data including MICR encoding OR non-image data representing information on a paper check*, and data representing an image of a physical check for at least one check to be deposited" |

Again, if "image data" is subsumed by, and part of, "electronic check data," then what is "check image data?"  Although far from clear, and a reach at best, the specification references "check image data" in the same general passage as a "check image."  (*Id*. at 6:49-58.)  So, to account for the separate terms "image data" and "check image data," JHA has construed "check image data" relative to an actual image of a check, as:

| JHA's Proposed Construction |
| --- |
| indefinite<br><br>alternatively, "the deposit information including for each of the different deposit transactions a deposit account number in a bank of first deposit, informational data including MICR encoding OR non-image data representing information on a paper check, and *data representing an image of a physical check* for at least one check to be deposited" |

### 3. The common meaning of the endorsement-related terms is apparent from the specification.

#### a. "endorsing and/or voiding the one or more checks"

| JHA's Proposed Construction | PPS Data's Proposed Construction |
|---|---|
| "printing an endorsement mark or void mark or both on one or more physical checks" | No construction necessary/plain and ordinary meaning |

The construction of "endorsing and/or voiding the one or more checks" is dictated by the specification. The '430 patent discloses that "during the practice of the invention, scanner/reader printer 309 encodes check 303 with endorsement and voiding information in order to physically 'void' check 303." (*Id*. at 8:35-44.) It also discloses that the "[s]canner/reader/printer 309 'voids' check 303 by endorsing check 303 and printing tracking data thereon" (*id*. at 8:50-52) and "[i]f check 303 is rescanned, scanner/reader/printer 309 does not reprint the endorsement, voiding and item numbering information on check 303." (*Id*. at 8:58-61; *see also id*. at 11:63-12:1; 15:60-64.)

There is no disputing that in the asserted patents, the "endorsing/voiding" requires the endorsement information to be printed on the physical check, despite any ordinary meaning of the term alleged by PPS Data. PPS Data goes out of its way to ignore this, and each of its arguments on this point is inapposite.

For example, no matter what claims 14, 17 and 35 of the '430 patent recite, the claims must be interpreted in view of the specification, which teaches that the endorsement is printed on the check. With respect to claim 14, PPS Data's argument is a stretch too far, as even the claim itself dictates that the endorsement information is printed on the check. (*See* Pl.'s Opening Claim Construction Br. (Dkt. 43) at 27.) Likewise, claims 17 and 35 do not support PPS Data's position. It does not make any difference whether or not endorsement information may be sent electronically, the endorsement information itself is ultimately printed on the physical check.

(*Id.*)  PPS Data's argument regarding processing performed by the remote site is completely irrelevant, and again, regardless of what happens to endorsement information prior to it being printed on the checks, it is still printed on the checks.  (*Id.*)

      b.     **"bank endorsement/endorsement information"**

| JHA's Proposed Construction | PPS Data's Proposed Construction ruction |
|---|---|
| "an endorsement printed on a physical check" | No construction necessary/plain and ordinary meaning |

The construction of "bank endorsement/endorsement information" follows naturally from the construction of "endorsing and/or voiding the one or more check," and the same arguments apply here as well.  Accordingly, JHA's proposed construction should be adopted.

## VI.    CONCLUSION

For the above reasons, JHA requests that the Court determine as a matter of law that the asserted claims are indefinite, and construe the disputed claim terms consistent with JHA's proposed constructions, and further requests any other relief to which it may be entitled.

Dated:  January 31, 2019.

Respectfully submitted,

By:  s/Jason A. Wietjes
Jason A. Wietjes
Texas Bar No. 24042154
jwietjes@polsinelli.com

POLSINELLI PC
2950 N. Harwood St., Ste. 2100
Dallas, TX 75201
Telephone:  (214) 661-5519
Facsimile:  (214) 594-5540

Russell S. Jones
Kansas Bar No. 26636
Missouri Bar No. 30814
rjones@polsinelli.com
Jay E. Heidrick
Kansas Bar No. 20770
Missouri Bar No. 54699
jheidrick@polsinelli.com

POLSINELLI PC
900 W. 48th Place
Kansas City, MO 64112
Telephone:  (816) 753-1000
Facsimile:  (816) 753-1356

Adam Daniels
California Bar No. 296466
adaniels@polsinelli.com

POLSINELLI LLC
2049 Century Park E., Ste. 2900
Los Angeles, CA 90067
Telephone:  (310) 556-6754
Facsimile:  (310) 556-1802

Jason D. Mazingo
Texas Bar No. 24055925
jason@mazingofirm.com

The Mazingo Firm, P.C.
102 N. College, Ste. 1033
Tyler, TX 75702
Telephone:  (903) 630 7123
Facsimile:  (903) 218-7849

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this document was served on all counsel who are deemed to have consented to electronic service.  Local Rule CV-5(a)(3)(A).  Pursuant to Federal Rule Civil Procedure 5(d) and Local Rule CV-5(d) and (e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by e-mail on January 31, 2019.

By:  <u>s/Jason A. Wietjes</u>
Jason A. Wietjes

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| PPS DATA, LLC, <br><br> Plaintiff, <br><br> vs. <br><br> JACK HENRY & ASSOCIATES, INC., <br><br> Defendant. | Civil Action No. 2:18-cv-00007-JRG |

**DECLARATION OF JASON A. WIETJES IN SUPPORT OF**
**DEFENDANT JACK HENRY & ASSOCIATES, INC.'S**
**RESPONSIVE CLAIM CONSTRUCTION BRIEF PURSUANT TO P.R. 4-5(b)**

I, Jason A. Wietjes, hereby declare as follows:

1.      I am an attorney for Defendant Jack Henry & Associates, Inc. (JHA).

2.      I am a member in good standing of the State Bar of Texas.

3.      I submit this declaration in support of JHA's responsive claim construction brief pursuant to P.R. 4-5(b).

4.      I have personal knowledge of the facts stated herein, am competent to testify to same.

5.      I submit this declaration to authenticate certain documents cited to and referenced in JHA's responsive claim construction brief.

6.      Attached as Exhibit 1 is a true and correct copy of *Image Systems Garner NOAC Spotlight*, American Bankers' Association's National Operations and Automation Conference, Computers in Banking, Vol. 6, No. 7 (Jul. 1989).

1

7.      Attached as Exhibit 2 is a true and correct copy of *A Proposal for an Image-Based Return Item Processing System*, Unisys & New York Clearing House (June 1991), pp. 9-11.

8.      Attached as Exhibit 3 is a true and correct copy of *FSTC Interbank Check Imaging Project - Interbank Check Imaging Project White Paper* (June 20, 1994).

9.      Attached as Exhibit 4 is a true and correct copy of *FSTC Check Imager InterChange Project - Archive Storage and Retrieval Component Decomposition* (May 23, 1995).

10.     Attached as Exhibit 5 is a true and correct copy of *FSTC Check Image Interchange Project Pilot Phase-1A - Preliminary Architecture and Project Plan*, Robert J. Brown, (June 30, 1995).

11.     Attached as Exhibit 6 is a true and correct copy of *The Federal Reserve in the Payments Mechanism*, Committee on the Federal Reserve in the Payments Mechanism, Alice M. Rivlin, et al. (January 1998).

12.     Attached as Exhibit 7 is a true and correct copy of *Payments, Clearance, and Settlement - A guide to the Systems, Risks and Issues*, Report to the Chairman Committee on Banking and Financial Services House of Representatives, United States General Accounting Office (June 1997), pp. 102-06.

13.     Attached as Exhibit 8 is a true and correct copy of the cited excerpts of the '430 patent file history.

14.     Attached as Exhibit 9 is a true and correct copy of Defendant's Proposed Claim Terms Pursuant to P.R. 4-1.

I, Jason A. Wietjes, hereby declare pursuant to 28 U.S.C. § 1746, under penalty of perjury under the laws of the United States, that the foregoing is true and correct.

Dated:  January 31, 2019

*/s/Jason A. Wietjes*
Jason A. Wietjes

3

67127280.2