**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| PPS DATA, LLC, | § | |
| | § | |
| v. | § | Case No. 2:18-CV-00007-JRG |
| | § | |
| JACK HENRY & ASSOCIATES, INC. | § | |
| | § | |
| | § | |

## CLAIM CONSTRUCTION MEMORANDUM AND ORDER

On February 21, 2019, the Court held a hearing to determine the proper construction of disputed claim terms in United States Patents No. 7,181,430, 7,216,106, 7,440,924, 7,624,071, and 8,660,956.  Having reviewed the arguments made by the parties in their claim construction briefing (Dkt. Nos. 43, 45 & 46),[1] having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Memorandum and Order.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). Further, Plaintiff's Motion to Strike Untimely Disclosed Extrinsic Evidence (Dkt. No. 47) is **DENIED** as set forth herein.

---

[1] Citations to documents (such as the parties' briefs and exhibits) refer to the page numbers of the original documents rather than the page numbers assigned by the Court's electronic docket unless otherwise indicated.

**Table of Contents**

I.  BACKGROUND.................................................................................................. 3

II.  LEGAL PRINCIPLES ...................................................................................... 4

III.  THE PARTIES' STIPULATED TERMS ........................................................ 7

IV.  PLAINTIFF'S MOTION TO STRIKE ........................................................... 8

V.  CONSTRUCTION OF DISPUTED TERMS ................................................... 8

   A.  "remote site" .............................................................................................. 8

   B.  "bank(s) of first deposit" and "different bank(s) of first deposit" ...................................... 12

   C.  "central system" ....................................................................................... 17

   D.   "transmission having a transmission path that bypasses the MICR capture, deposit accounting, cash management, and float processing systems of the bank of first deposit for that deposit transaction," "transmission path that bypasses the MICR capture system of the bank of first deposit," and "transmitting bypassing the MICR capture, deposit accounting, cash management, float processing or other systems of the bank of first deposit" ............................................................................. 23

   E.  "but not through the MICR capture, deposit accounting, cash management, and float processing systems of the bank of first deposit"................. 28

   F.  "deposit account designation [[in]/[to] a bank of first deposit], electronic check data and [original] check image data"........................................ 29

   G.  "electronic deposit data" .......................................................................... 33

   H.  "image information data".......................................................................... 36

   I.  "separate from"......................................................................................... 38

   J.  "endorsing and/or voiding the one or more checks" .......................... 40

   K.  "bank endorsement" and "endorsement information" ........................ 41

VI.  CONCLUSION................................................................................................. 44

# I. BACKGROUND

Plaintiff PPS Data, LLC ("Plaintiff" or "PPS") has alleged infringement of United States Patents No. 7,181,430 ("'430 Patent"), 7,216,106 ("'106 Patent"), 7,440,924 ("'924 Patent"), 7,624,071 ("'071 Patent"), and 8,660,956 ("'956 Patent") (collectively the "patents-in-suit") (Dkt. No. 43, Exs. 1–5) by Defendant Jack Henry & Associates, Inc. ("Defendant," "Jack Henry," or "JHA").  Plaintiff submits that "the patents-in-suit relate to processes and technologies involved in remote deposit presentment of all types of checks."  Dkt. No. 43 at 3.

The '430 Patent, titled "Method and System for Processing Financial Instrument Deposits Physically Remote from a Financial Institution," issued on February 20, 2007, and bears a filing date of April 28, 2000.  The Abstract of the '430 Patent states:

> A system that includes computer hardware, computer software, apparatus, and methodology that enables individuals, businesses, and all types of organizations (both for profit and non-profit) to capture and securely transmit check images (including, but not limited to, personal checks, business checks, travelers checks, money orders, merchant coupons, food coupons, line of credit checks, etc.), deposit information, and other information from remote locations (i.e., locations that could include the financial institution's remote locations, other financial institution's locations, businesses, private residences, etc.), for the purpose of having those checks credited to the depositing individual's or organization's bank account(s) and having the check images (and/or physical checks) entered into the bank check clearing channels for ultimate delivery to the maker bank for payment out of the maker's account.

The '106 Patent resulted from a continuation of the '430 Patent, and the '924 Patent resulted from a division of the '430 Patent.  The '071 Patent resulted from a division of the '924 Patent.  The '956 Patent resulted from a continuation of a continuation of the '071 Patent.  Plaintiff submits that the specifications of the patents-in-suit are identical for purposes of the present claim construction proceedings.  Dkt. No. 43 at 2–3.[2]

---

[2] Defendant submits: "The '106, '924, '071 and '956 patents each claim priority to the '430 patent.  The '106 patent sets forth the additional Figures 8–10.  The various portions of the '106 patent's specification that discuss these figures

Plaintiff has asserted Claims 1–8, 12, 15, 18–26, 30, 33, and 36 of the '430 Patent, Claims 1–12 and 15 of the '106 Patent, Claims 1–6, 10–17, 21, and 22 of the '924 Patent, Claims 1–6, 10, and 12 of the '071 Patent, and Claims 1–6, 10, and 12 of the '071 Patent.  Dkt. No. 43 at 2 n.2.

Shortly before the start of the February 21, 2019 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion.  Those preliminary constructions are noted below within the discussion for each term.

## II.  LEGAL PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  Claim construction is clearly an issue of law for the court to decide.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  "In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period."  *Teva*, 135 S. Ct. at 841 (citation omitted).  "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence.  These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal."  *Id.* (citing 517 U.S. 370).

To determine the meaning of the claims, courts start by considering the intrinsic evidence.  *See Phillips*, 415 F.3d at 1313; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861

---

likewise add additional disclosure to what is found in the other asserted patents.  The respective specifications of the asserted patents are otherwise identical."

(Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).  The intrinsic evidence includes the claims themselves, the specification, and the prosecution history.  *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861.  Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent.  *Phillips*, 415 F.3d at 1312–13; *accord Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms.  *Phillips*, 415 F.3d at 1314.  First, a term's context in the asserted claim can be very instructive.  *Id.*  Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent.  *Id.*  Differences among the claim terms can also assist in understanding a term's meaning.  *Id.*  For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation.  *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'"  *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979).  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope.  *Phillips*, 415 F.3d at 1316.  In these situations, the inventor's lexicography governs.  *Id.*  The specification may also resolve the meaning of ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of

the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325.  But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent.  *Home Diagnostics, Inc. v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").  "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance."  *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language."  *Phillips*, 415 F.3d at 1317 (citations and internal quotation marks omitted).  Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent.  *Id.* at 1318.  Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court.  *Id.*  Generally, extrinsic

6

evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Nautilus,* 134 S. Ct. 2120. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## III.  THE PARTIES' STIPULATED TERMS

"The parties have agreed, for the purposes of this litigation only, that the Court should construe the preambles of the asserted claims of the Patents-in-Suit as being limiting." Dkt. No. 34 at 1.  The parties have also agreed on the following construction, as set forth in their February 11, 2019 Joint Claim Construction Chart (Dkt. No. 51, Ex. A at 4):

| Term | Construction |
|---|---|
| before transmission/before transmission to any of the MICR capture, deposit accounting, cash management, and float processing systems of each of the [different] bank[s] of first deposit<br><br>'430 Patent, Claims 1, 19 & 37;<br>'924 Patent, Claims 1 and 12 | plain and ordinary meaning, "in advance of transmitting received deposit information to any of the MICR capture, deposit accounting, cash management, and float processing systems of the bank of first deposit" |

## IV.  PLAINTIFF'S MOTION TO STRIKE

Plaintiff's Motion to Strike Untimely Disclosed Extrinsic Evidence (Dkt. No. 47) requests that the Court strike Exhibits 1–7 attached to Defendant's Responsive Claim Construction Brief (Dkt. No. 45).  Plaintiff argues that Defendant did not timely disclose this extrinsic evidence as required by Local Patent Rules 4-2 and 4-3.  Dkt. No. 47 at 2–4.  Plaintiff also argues that it has suffered unfair prejudice because the late disclosure prevented Plaintiff from addressing this evidence it is Opening Claim Construction Brief (Dkt. No. 43).  Dkt. No. 47 at 4.

The evidence at issue has not affected the Court's claim construction analysis, as set forth herein.  Plaintiff's Motion to Strike (Dkt. No. 47) is therefore **DENIED**.

## V.  CONSTRUCTION OF DISPUTED TERMS

### A.  "remote site"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| Processing entity that performs functions relating to the physical check | "a site sponsored by, or affiliated or associated with, a bank of first deposit that is remote from a central system, that performs at least the functions of scanning, reading, and printing on a physical check to create electronic check data comprised of image data and informational data" |

Dkt. No. 34 at 2–3; Dkt. No. 43 at 8; Dkt. No. 45 at 19–20; Dkt. No. 51, Ex. A at 1.  The parties submit that this term appears in Claims 1–2, 6–7, 12, 18–20, 24–25, 30, and 36 of the '430 Patent, Claim 15 of the '106 Patent, Claims 1–2, 10, 12, and 21 of the '924 Patent, Claims 1–2, 10 & 12 of the '071 Patent, and Claims 1–2 and 10–11 of the '956 Patent.  Dkt. No. 34 at 2.

Shortly before the start of the February 21, 2019 hearing, the Court provided the parties with the following preliminary construction: "a site that is associated with a financial institution and that is at a location physically separate from a central system."

(1)  The Parties' Positions

Plaintiff submits that "the 'remote site' is the place at which the physical check is processed," but Plaintiff argues that this term "does not imply any geographical distance or presence or lack of relationship between banks or other entities."  Dkt. No. 43 at 8.  Plaintiff also argues that Defendant's proposed construction "improperly reads additional unnecessary limitations into the claims."  *Id.* at 9.

Defendant responds that its proposed construction "accurately accounts for 1) what the 'remote site['] is 'remote' from in the check processing system, 2) the relationship between the 'remote site' and the other components of the check processing system, and 3) the functions performed by the 'remote site.'"  Dkt. No. 45 at 24; *see id.* at 20–24.

Plaintiff replies that Defendant's proposal of "remote from a central system" "has no support in the claims, specification, or the file history."  Dkt. No. 46 at 1–2.  Plaintiff also argues that "[t]he '430 specification discloses that the 'remote site' may be sponsored by the 'bank of first deposit,' but that is different than being 'affiliated or associated['] with the 'bank of first deposit.'"  *Id.* at 2 (citing '430 Patent at 5:60–63).  Further, Plaintiff argues that "[a]ll of the functions that Defendant attempts to read into the claim term as a limitation are already properly captured in PPS Data's proposed construction."  *Id.*

(2)  Analysis

Claim 1 of the '430 Patent, for example, recites (emphasis added): "A method for deposit processing at a central system a plurality of checks deposited at a *remote site* with accompanying deposit information . . .."  The parties present multiple disputes, as apparent in the following requirements in Defendant's construction: (1) "sponsored by, or affiliated or associated with, a bank of first deposit"; (2) "remote from a central system"; and (3) "that performs at least the

functions of scanning, reading, and printing on a physical check to create electronic check data comprised of image data and informational data."

As to whether the remote site must be "sponsored by, or affiliated or associated with, a bank of first deposit," the specification discloses:

> [T]he term "bank of first deposit" means the financial institution *sponsoring* the remote site and which owns or employs a central site for processing financial transactions.

'430 Patent at 5:60–63 (emphasis added).  This disclosure does not establish that all remote sites must necessarily be sponsored by a bank of first deposit.  Also, Plaintiff noted disclosure that there may or may not be any legal relationship:

> The remote site may be a branch extension of the financial institution or may be a person, or other entity *with or without a legal relationship* to the financial institution that provides the access services to the financial institution.  Such an *affiliated* financial institution is still known as the bank of first deposit.

*Id.* at 9:58–63 (emphasis added).  Although these disclosures suggest that the presence or absence of a legal relationship does not affect whether a financial institution is "affiliated," no clear definition or disclaimer is apparent that would warrant defining "remote site" in terms of being "sponsored" or "affiliated."  Instead, the specification provides context in terms of the remote site being "associated" with a financial institution for purposes of accepting checks:

> It should be pointed out that because of present banking processes, the remote site should still be *associated* with a chartered financial institution that is authorized to accept the checks from the remote site and process them through normal check clearing paths.

*Id.* at 9:54–58 (emphasis added).

As to whether a "remote site" must be remote from a central system, Plaintiff has urged that the "remote site" must be distinct from the "central system" but need not be geographically separated.  Dkt. No. 43 at 8.

The Background of the Invention, in a subsection titled "The Field of the Invention," refers to separate physical locations:

> The present invention relates to physical financial instrument processing.  More particularly, the present invention relates to a method and system for remotely processing checks through electronic interaction between the *physical location* of the instrument and a financial institution.

'430 Patent at 1:8–13 (emphasis added).  A section titled "Summary and Objects of the Invention" likewise states:

> This new process involves inventive computer-based software that can be used at financial institution locations and *locations remote from financial institution offices* for capturing deposits, together herein referred to as remote locations.

*Id.* at 2:12–16 (emphasis added); *see id.* at 7:38–46 (referring to transmission over "wired or wireless media such as public switched lines, Internet or wide-area network connection, microwave, satellite, digital phone, private leased lines, or any other current or future acceptable communications facility and may further employ include [*sic*] encryption over the interface").

Also, the Title of the '430 Patent refers to processing that is "*Physically* Remote," and the Abstract refers to transmitting images captured at "remote *locations*."  Although the Title and Abstract of a patent are generally not limiting, the patentee's uses of "physically" and "locations" in the Title and Abstract further reinforce that the specification frames the remote site of the claimed invention as being at a physically separate location.

Plaintiff's expert opines: "The word 'remote' has no significance in the Patents other than to differentiate the place of deposit from a 'central site.'  That is, a 'remote site' is a site that is distinct from a central site.  'Remote,' as used in the Patents does not imply any geographical distance or presence or lack of relationship between banks or other entities, as these issues are not relevant to infringement and do not affect the meaning of the claims."  Dkt. No. 43, Ex. 12, Jan.

17, 2019 Shamos Decl. at ¶ 82.  Plaintiff's expert's opinions in this regard are conclusory and are unpersuasive.  *See Phillips*, 415 F.3d at 1318.

> As to the functions performed by the remote site, the specification discloses:

> In the present invention, a remote site processor 201 (further detailed in FIG. 3) either autonomously, or under operator/depositor control initially remotely "processes" a check into electronic check data both in the form of image data and informational data which can be further processed and approved at subsequent portions of the overall process.  In essence, the remote site provides a processing front-end that electronically interacts via interface 202 with central site 198 through the transfer of electronic check data for review and processing by electronic means at a central site.  Remote site 197 performs functions relating to the physical check including scanning, reading, and printing on the checks.  Remote site 197 also exchanges image and/or authorization data with the other entities as further described below.

'430 Patent at 6:49–63.  Although the functions proposed by Defendant find support in the specification, Defendant has not shown any definition or disclaimer in this regard.  Instead, these functions are specific features of a particular disclosed embodiment that should not be imported into the claims.  *See Phillips*, 415 F.3d at 1323.

The Court therefore hereby construes **"remote site"** to mean **"a site that is associated with a financial institution and that is at a location physically separate from a central system."**

## B.  "bank(s) of first deposit" and "different bank(s) of first deposit"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| The first bank to which a check is transferred; as used in the Patents, this is also the financial institution sponsoring the remote site and which owns or employs a central system for processing financial transactions/banks of first deposit having different routing numbers (with "bank of first deposit" construed above.) | "a financial institution sponsoring a remote site and which owns or employs a central site for processing financial transactions" where a "different bank of first deposit is unrelated to the 'bank of first deposit'" |

Dkt. No. 34 at 3; Dkt. No. 43 at 10; Dkt. No. 45 at 24; Dkt. No. 51, Ex. A at 1.  The parties submit

that this term appears in all asserted independent Claims.  Dkt. No. 34 at 3.

Shortly before the start of the February 21, 2019 hearing, the Court provided the parties

with the following preliminary constructions:

| Term | Preliminary Construction |
|---|---|
| "bank(s) of first deposit" | "financial institution(s) sponsoring the remote site and which owns or employs a central site for processing financial transactions" |
| "different bank(s) of first deposit" | Plain meaning (apart from the Court's construction of "bank(s) of first deposit") (Expressly rejects Defendant's proposal of "unrelated") |

(1)  The Parties' Positions

Plaintiff argues that "Defendant's proposed construction ignores the significance of the

term 'bank of first deposit' as used in the claims and [as] well-known and customarily understood

by one of ordinary skill in the art."  Dkt. No. 43 at 10.  Plaintiff explains "in addition to the

customary meaning of 'bank of first deposit' as a term of art (i.e., the first bank to which a check

is transferred), the term has an additional meaning as used in the Patents" as explained by the

written description.  *Id.* at 11.

Defendant responds that the specification expressly defines "bank(s) of first deposit."  Dkt.

No. 45 at 24 (citing '430 Patent at 5:60–63).  Defendant also argues: "There is no discussion or

teaching as to what a 'different bank of first deposit' is.  The only thing that is clear is that a

'different bank of first deposit' must of course be 'different' than 'a bank of first deposit.'"  Dkt.

No. 45 at 25.

Plaintiff replies that "this term 'bank of first deposit' is a term of art in the banking industry that is well-known and understood by one of ordinary skill in the art."  Dkt. No. 46 at 2.

(2)  Analysis

The specification discloses:

> Additionally, *the term "bank of first deposit" means* the financial institution sponsoring the remote site and which owns or employs a central site for processing financial transactions.

'430 Patent at 5:60–63 (emphasis added).

This passage explicitly refers to "the term," places quotation marks around the term, and sets forth what the term "means."  This amounts to a clear lexicography.  *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002).  Moreover, the paragraph that precedes this passage explicitly discusses how the word "check" is "used herein," "both in the specification and in the claims":

> It should also be pointed out that while the term "check" may be generically used *herein*, it is contemplated by the inventors that other financial instruments are also contemplated within this meaning and therefore, the use of the term "check" is assumed to have the broader meaning, *both in the specification and the claims*.

'430 Patent at 5:54–59 (emphasis added).  This discussion reinforces that the patentee intended this portion of the specification to define terms for purposes of the entire specification, not just a particular embodiment.

The specification also discloses:

> [T]he depositing and clearing of checks has heretofore involved individuals or organizations physically taking their deposit, such as in the form of a check, to financial institutions or trusted remote institutional branches, *otherwise known as the bank of first deposit*, where the deposit may be accepted, and credited to the bank customer's account, of course, subject to the check "clearing" with the maker financial institution.

*Id.* at 1:20–27 (emphasis added).   Nothing in this disclosure is inconsistent with the above-discussed lexicography.

Plaintiff has cited a federal regulation that defines "depositary bank" as "the first bank to which a check is transferred even though it is also the paying bank or the payee," but Plaintiff has not shown how this federal regulation purportedly overrides the inventor's lexicography.   12 C.F.R. § 229.2; *see Phillips*, 415 F.3d at 1316 ("[O]ur cases recognize that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.   In such cases, the inventor's lexicography governs.").

The term "different bank(s) of first deposit," however, is used in a different context in the claims, so the above-discussed lexicography does not directly apply to the term "different bank(s) of first deposit."   The parties' proposed constructions appear to acknowledge this difference in usage.

As to Defendant's proposal that a "different bank of first deposit" must be "unrelated," Defendant emphasized at the February 21, 2019 hearing that the patentee stated as follows during prosecution regarding the "Geer" reference (United States Patent No. 5,930,778):

> In all circumstances, whether or not there is co-location, the central site system and the bank of first deposit system are different.   Thus, for the purposes of this amended claim it is possible that a bank of first deposit could be co-located with the central site, but it would operate separate from the bank of first deposit, with different program systems.
>
> Note that even assuming that the examiner was correct (which she is not) that the central site is merely a bank of first deposit (which the specification makes clear it is not, i.e., in all cases the central site program system is different from the bank of first deposit program system), none of the prior art used by the examiner discloses a bank of first deposit that operates as a receiving site for multiple *other* banks of first deposit.   *In other words, the claim is patentable even with the examiner's incorrect assertion.*
>
> The examiner states at page 5 of her office action that Geer does not disclose the situation where the central site is not a bank of first deposit for these checks.   The

15

> examiner then argues that employing a central site to handle deposited checks is well known in the art, so that it "would have been obvious to one of ordinary skill in the art at the time the invention was made to modify Geer's system to incorporate the feature above for the purpose of providing more efficiency in processing the deposited checks."  However, there is no possible reason why a bank of first deposit would set up a central site to process checks for *other unrelated* banks of first deposit.  Thus, such a modification is not obvious in Geer and would not provide "more efficiency on processing the deposited checks" in the Geer operation.

Dkt. No. 43, Ex. 6F, May 4, 2005 Amendment and Reply Under 37 C.F.R. § 1.111 at 47 (PPS-JHA001864) (p. 263 of 281 of Dkt. No. 43-11) (emphasis in original); *see id.*, Ex. 6G, May 2, 2005 Decl. of Danne Buchanan at 6 (PPS-JHA001953) (p. 72 of 281 of Dkt. No. 43-12) (similar).

On balance, Defendant has not shown sufficient support for including "unrelated" as part of the Court's construction.  No definition or disclaimer is apparent in the above-cited prosecution history.  *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on *definitive* statements made during prosecution.") (emphasis added).  Moreover, introducing the word "unrelated" would tend to confuse rather than clarify the scope of the claims, particularly as to what type of relationships between financial institutions would preclude them from being "unrelated."  The Court therefore expressly rejects Defendant's proposal in that regard.

Finally, as to Plaintiff's proposal that a bank can be "different" merely by having a different routing number,[3] Plaintiff has not shown sufficient support in the intrinsic record.[4]  Particularly in light of the above-discussed lexicography, in which the word "bank" refers to a "financial

---

[3] Plaintiff submitted at the February 21, 2019 hearing that a particular bank may use different routing numbers in different geographic regions.

[4] Plaintiff has cited a 46-page section of vthe prosecution history (Dkt. No. 43, Ex. 6C, PPS-JHA000808–54 (pp. 47–93 of Dkt. No. 43-8) that Plaintiff characterizes as relating to a capability to recognize different destinations and a capability of routing data to different banks of first deposit.  *See* Dkt. No. 43 at 12.  Plaintiff has not pin cited any portion of this 46-page section, let alone shown any disclaimer or definitive statement that refers to routing numbers.

institution" rather than a branch or particular physical location, the term "different bank of first deposit" refers to a different financial institution.  To be clear, identifying a difference in routing number is not necessarily sufficient, by itself, to meet the claim limitation.

The Court accordingly hereby construes these disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| **"bank(s) of first deposit"** | **"financial institution(s) sponsoring the remote site and which owns or employs a central site for processing financial transactions"** |
| **"different bank(s) of first deposit"** | **"different financial institution(s)"** |

## C.  "central system"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Processing system at a central site electronically interacting with the remote site for reviewing and processing electronic check data, and electronically interacting with a maker bank site for completing the clearing process relating to the check. | Indefinite<br><br>alternatively, "a site owned or employed by a financial institution other than a bank of first deposit for the particular check(s) in the deposit transaction(s) covered by the claim" |

Dkt. No. 34 at 3; Dkt. No. 43 at 13; Dkt. No. 45 at 9; Dkt. No. 51, Ex. A at 1–2.  The parties submit that this term appears in all asserted independent Claims.  Dkt. No. 34 at 3.

Shortly before the start of the February 21, 2019 hearing, the Court provided the parties with the following preliminary construction: "processing system located at a central site."

(1)  The Parties' Positions

Plaintiff argues that "[t]he plain language of the claims and the specification clearly defines the term 'central system' to a person of ordinary skill in the art."  Dkt. No. 43 at 13.  Plaintiff urges that "[a]lthough the claim term 'central system' itself does not appear in the specification, *ipsa*

*verba*, the specification plainly discloses what the 'central system' (a 'system' at a 'central site') is and does, and thus erasing any notion that the term might be indefinite." (*Id.* at 14.)

Defendant responds that an irreconcilable inconsistency arose during prosecution because "if the 'central system' is the 'central site,' then the specification directly contradicts the later prosecution history and is indefinite" and "[i]f the 'central system' is different from the 'central site,' then there is no support in the specification as to what the 'central system' is, where it is located or what it does, as the only descriptions in the specification and prosecution history are of the 'central site.'" (Dkt. No. 45 at 11–12.) Defendant argues that "[t]here is zero clarity from the specification, the file history or PPS Data's brief as to what the central system is, where it is located, or how it operates within the claimed invention." (*Id.* at 12.) Alternatively, Defendant responds that Plaintiff's proposed construction should be rejected because Plaintiff "construes the term relative to functions that are different in scope than the functions dictated by the claims themselves." *Id.* at 26.

Plaintiff replies that "[t]he intrinsic evidence clearly defines the term 'central system' to a person of ordinary skill in the art." Dkt. No. 46 at 4. Plaintiff also submits that Defendant cannot meet its burden to show indefiniteness because Defendant has not presented any factual evidence of whether a person of ordinary skill in the art would be able to understand this claim term. *Id.* at 5–6.

(2)  Analysis

Defendant emphasizes that the specification does not explicitly refer to a "central system," but explicit use of the term at issue is not necessarily required. *See, e.g., Dow Chem. Co. v. Nova Chems. Corp. (Canada)*, 809 F.3d 1223, 1225 (Fed. Cir. 2015); *Capital Sec. Sys., Inc. v. NCR Corp.*, 725 F. App'x 952, 956–57 (Fed. Cir. Mar. 7, 2018) (agreeing that "although the term . . .

does not appear verbatim in the specification, the term is not indefinite when considered in the context of the claims and the specification").

The specification supports Plaintiff's proposal that a "central system" is a "processing system" because the specification refers to "a central site" as one of "three primary processing entities" and as one of the "entities involved in the overall financial processing of the present invention," each of which "enlists specific processing techniques which furthers the novel financial instrument processing technique of the present invention." '430 Patent at 6:40–48.

> As to the remainder of Plaintiff's proposed construction, the specification further discloses:
>
> In essence, the remote site provides a processing front-end that electronically interacts via interface 202 with central site 198 through the transfer of electronic check data for *review and processing* by electronic means at a central site.
>
> * * *
>
> Central site 198 of FIG. 2 interacts via interfaces 207, 208 with maker bank site 199 for *completing the clearing process* relating to the check or related instrument.

*Id.* at 6:55–58 & 6:64–66 (emphasis added).  Claim 1 of the '430 Patent, for example, recites details regarding operations performed by the "central system," amounting to roughly half a column in the patent, including as to "the central system receiving deposit information . . .," "the central system transmitting . . .," and "the central system performing . . . sorting . . . and error checking . . . ."  Thus, although the specification refers to "review and processing" and "completing the clearing process" (*id.*), including this language in the construction would be redundant and potentially confusing in light of the relevant explicit recitals in the claims.  The Court therefore hereby expressly rejects Plaintiff's proposal in this regard.

As to Defendant's indefiniteness argument, Defendant urges that the patentee created an inconsistency by amending the claims to require that, in the patentee's words, "the claimed central site it [*sic*] is not acting as a bank of first deposit for the particular checks in the deposit transactions

covered by the claim." Dkt. No. 45, Ex. 8B, Apr. 27, 2004 Amendment and Reply Under 37

C.F.R. § 1.111 (8-265) (p. 11 of 253 of Ex. 8B). Defendant notes that Figure 1 of the '430 Patent

illustrates "Bank of First Deposit Check Capture System" located at "Central Site," and Figure 4

illustrates a "Central Site" that includes, for example, a "Deposit System." The specification refers

to a central site processor at the bank of first deposit's central site:

> Once complete deposit data is received by the central site processor at the bank of
> first deposit's central site, it is passed to the central site's check processing, deposit,
> and cash management, etc., systems for processing.
>
> * * *
>
> The physical check is processed at central site 102 using a reader/sorter (not
> separately shown but included in 102) to acquire information such as the
> information stored on the Magnetic Ink Character Recognition (MICR) line. This
> information includes the maker bank number, the account number, a check serial
> number, etc. The information from the check is then sent to an in-house computer
> system (included in 102) for posting in steps 114, 115 to the appropriate bearer
> account(s) 103, 104 in the bank of first deposit 101.
>
> * * *
>
> After the deposit(s) from a specific remote site are complete, the central site formats
> deposit information for processing in the accounting systems of the bank of first
> deposit's central site in a step 619, including sending the image and other
> appropriate information for application processing in step 620 (including deposit
> accounting systems, MICR capture, cash management processing, float processing,
> etc.,).

'430 Patent at 2:61–64, 6:1–10 & 13:5–12. The specification also discloses that "the term 'bank

of first deposit' means the financial institution sponsoring the remote site and which owns or

employs a *central site for processing financial transactions*." '430 Patent at 5:60–63 (emphasis

added); *see id.* at 2:29–34. Further, the specification discloses that "the check image capture

system 205 interfaces with the central site 198 deposit systems 103, cash management systems

104, etc. for posting information." *Id.* at 10:49–53; *see id.* at 3:23–29 ("The information on these

database(s) will be available to the depositor and research personnel at the bank of first deposit's central site.").

As a general matter, a claim can be found indefinite as a result of being internally inconsistent or "nonsensical." *Trustees of Columbia Univ. in City of N.Y. v. Symantec Corp.*, 811 F.3d 1359, 1367 (Fed. Cir. 2016) ("The claims are nonsensical in the way a claim to extracting orange juice from apples would be, and are thus indefinite.").

No internal inconsistency is apparent, however, because Defendant has not shown that the claim precludes the central system from being co-located with a bank of first deposit.  Indeed, the patentee explained during prosecution:

> These claims have also been amended to remove the language "is not a bank of first deposit for these checks," and "remote" and replacing it with —is separate from the internal deposit or cash management systems for a bank—, to thereby clarify that the central site is not operating within the internal deposit or cash management systems for a bank, *whether or not it is co-located with a bank*.

Dkt. No. 45, Ex. 8B, Mar. 4, 2005 Amendment and Reply Under 37 C.F.R. § 1.111 at 44 (8-316) (p. 62 of 253 of Ex. 8B) (emphasis added).

> These claims have also been amended to remove the language "is not a bank of first deposit for these checks," and "remote" and replacing it with —is separate from the MICR capture, deposit accounting, cash management, and float processing systems for a bank of first deposit---, to thereby clarify that the central system is not operating within the MICR capture, deposit accounting, cash management, and float processing systems for a bank of first deposit, whether or not it is co-located with a bank.  Rather, *it is a separate service system* that is not a part of the MICR capture, deposit accounting, cash management, and float processing systems of the bank of first deposit.
>
> * * *
>
> In one embodiment of the invention the central system may be co-located at a bank. Whether or not there is co-location with a bank of first deposit has no bearing on the invention.  The systems are separate. * * * In all circumstances, *whether or not there is colocation*, the central system and the bank of first deposit system are different.  Thus, for the purposes of this amended claim it is possible that a bank of

21

first deposit could be co-located with the central system, but *it would operate separate from the bank of first deposit*, with different program systems.

*Id.*, Ex. 8B, May 6, 2005 Substitute Amendment and Reply Under 37 C.F.R. § 1.111 at 42 & 45 (8-378) (pp. 124 & 127 of 253 of Ex. 8B) (emphasis added).  Thus, the claim language at issue merely requires that the central system must be separate from the deposit systems of a bank of first deposit.

Defendant's arguments as to purported inconsistency perhaps may bear upon issues of enablement or written description but do not demonstrate any internal inconsistency within the claims.  The Court therefore hereby expressly rejects Defendant's indefiniteness argument.  *See Sonix*, 844 F.3d at 1377 ("Indefiniteness must be proven by clear and convincing evidence.").

The remaining issue is whether Defendant's alternative proposed construction is appropriate.  Defendant has cited an instance in the prosecution history in which, Defendant argues, the patentee used "central system" and "central site" interchangeably by changing "site" to "system."  *See* Dkt. No. 45, Ex. 8B, May 6, 2005 Substitute Amendment and Reply Under 37 C.F.R. § 1.111 at 12 (8-348) (p. 94 of 253 of Ex. 8B); *see also id.* at 42 (8-378) (p. 124 of 253 of Ex. 8B) (discussing "central system" in the amended claims).  This amendment, however, could just as well be interpreted as demonstrating that the patentee understood "site" and "system" to have different meanings.  That is, if the terms were indeed interchangeable, Defendant has not shown why there would have been any reason to change from one to the other.  Moreover, Defendant has not shown that any issued claim uses "system" and "site" interchangeably.  Finally, Defendant has not identified any definition or disclaimer in the specification or the prosecution history that would warrant defining "system" as "site."

The Court therefore hereby construes **"central system"** to mean **"processing system located at a central site."**

22

**D.  "transmission having a transmission path that bypasses the MICR capture, deposit accounting, cash management, and float processing systems of the bank of first deposit for that deposit transaction," "transmission path that bypasses the MICR capture system of the bank of first deposit," and "transmitting bypassing the MICR capture, deposit accounting, cash management, float processing or other systems of the bank of first deposit"**

| "transmission having a transmission path that bypasses the MICR capture, deposit accounting, cash management, and float processing systems of the bank of first deposit for that deposit transaction" ('430 Patent, Claims 1, 19; '924 Patent, Claims 1, 12; '071 Patent, Claims 1, 12) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| a transmission that is not received by the magnetic ink character recognition capture, deposit accounting, cash management, or float processing systems of the bank of first deposit while en route from the central system to the maker bank, Federal Reserve Bank, or correspondent bank | Indefinite[5] |

| "transmission path that bypasses the MICR capture system of the bank of first deposit" ('956 Patent, Claim 1) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| a transmission that is not received by the magnetic ink character recognition capture system of the bank of first deposit | Indefinite[6] |

---

[5] In its response brief, Defendant withdrew its alternative proposed construction, which was: "transmission in advance of MICR capture, deposit accounting, cash management, and float processing at a bank of first deposit, and using normal check clearing paths (i.e., directly to clearing and correspondent banks) or through the FRB electronic clearing process."  Dkt. No. 45 at 13–14.

[6] In its response brief, Defendant withdrew its alternative proposed construction, which was: "transmission in advance of MICR capture at a bank of first deposit, and using normal check clearing paths (i.e., directly to clearing and correspondent banks) or through the FRB electronic clearing process."  Dkt. No. 45 at 14.

| "transmitting bypassing the MICR capture, deposit accounting, cash management, float processing or other systems of the bank of first deposit" ('106 Patent, Claim 1) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendant's Proposed Construction** |
| a transmission that is not received by the magnetic ink character recognition capture, deposit accounting, cash management, float processing or other systems of the bank of first deposit while en route from the central system to the maker bank, Federal Reserve Bank, or correspondent bank | Indefinite[7] |

Dkt. No. 34 at 3–4; Dkt. No. 51, Ex. A at 2.

Shortly before the start of the February 21, 2019 hearing, the Court provided the parties with the following preliminary constructions:

| <u>Term</u> | <u>Preliminary Construction</u> |
| --- | --- |
| "transmission having a transmission path that bypasses the MICR capture, deposit accounting, cash management, and float processing systems of the bank of first deposit for that deposit transaction" | "a transmission that is not received by the magnetic ink character recognition capture, deposit accounting, cash management, or float processing systems of the bank of first deposit while en route from the central system to the maker bank, Federal Reserve Bank, or correspondent bank" |
| "transmission path that bypasses the MICR capture system of the bank of first deposit" | "a transmission that is not received by the magnetic ink character recognition capture system of the bank of first deposit" |

---

[7] In its response brief, Defendant withdrew its alternative proposed construction, which was: "transmitting in advance of transmission to the MICR capture, deposit accounting, cash management, and float processing systems of the bank of first deposit, and using normal check clearing paths (i.e., directly to clearing and correspondent banks) or through the FRB electronic clearing process."  Dkt. No. 45 at 14.

| "transmitting bypassing the MICR capture, deposit accounting, cash management, float processing or other systems of the bank of first deposit" | "transmitting that is not received by the magnetic ink character recognition capture, deposit accounting, cash management, float processing or other systems of the bank of first deposit while en route from the central system to the maker bank, Federal Reserve Bank, or correspondent bank" |
| --- | --- |

(1)  The Parties' Positions

Plaintiff argues that these three terms present a common issue as to the meaning of "bypasses" and "bypassing," and "the intrinsic record makes clear that the 'bypasses/bypassing' term was added to clarify that the transmission path to the maker bank is not through the bank of first deposit."  Dkt. No. 43 at 16.

Defendant responds that "these terms do not appear anywhere in the disclosure of the asserted patents."  Dkt. No. 45 at 15.  Defendant also argues that, under Plaintiff's interpretation of "central system": "This would mean that when the central system transmits various data bypassing the systems of the bank of first deposit, that the central system is bypassing itself, which is wholly illogical given that the central system cannot transmit data from itself while at the same time bypassing itself.  Nowhere does the specification disclose how the central system performs the various check processing functions and then transmits the data in such a 'bypassing' manner."  Dkt. No. 45 at 16.

Plaintiff replies that "this bypass limitation was explained in the '430 prosecution history . . . ."  Dkt. No. 46 at 7.

(2)  Analysis

The prosecution history includes a declaration in which one of the inventors explained as follows when the language at issue recited "being in advance of" instead of "bypasses":

> [T]he concept of *bypassing* the bank of first deposit MICR capture, deposit accounting, cash management, and float processing systems in a transmitting step that transmits both the electronic check and the check image data to the maker bank is not done in the banking industry and is counter-intuitive because the bank of first deposit MICR capture and/or accounting programs . . . control most aspects of the check clearing process.  The advantage of the "being in advance of MICR capture, deposit accounting, cash management, and float processing systems of the bank of first deposit" limitation is that it not only significantly reduces delay in the processing by the maker bank, but it also enhances security by eliminating the possibility of the insertion of virus,[] Trojan horses, or other malicious code while the image and attendant data is *passing through* the computer links and processing of these systems in the bank of first deposit.

Dkt. No. 43, Ex. 6G, May 2, 2005 Decl. of Danne Buchanan at 7 (PPS-JHA001954) (p. 73 of 281 of Dkt. No. 43-12) (emphasis modified).

Later during prosecution, the patentee amended the claims and stated:

> Claims 47, 75, 103, 119 and 124 have been amended to further clarify that the transmission to the maker bank is *not through* the bank of first deposit for the check, using the words --in a transmission having a transmission path that bypasses-- in place of "being in advance of."

*Id.*, Ex. 6G, May 10, 2006 Amendment at 41 (PPS-JHA002045) (p. 164 of 281 of Dkt. No. 43-12) (emphasis added).

Defendant argues that the claims are "wholly illogical given that the central system cannot transmit data from itself while at the same time bypassing itself."  Dkt. No. 45 at 16.  The Court, above, does not interpret "central system" as necessarily being part of "the bank of first deposit," so no inconsistency arises in terms such as "transmission having a transmission path that bypasses the MICR capture, deposit accounting, cash management, and float processing systems of the bank of first deposit for that deposit transaction."   Defendant argues that "[n]owhere does the specification disclose how the central system performs the various check processing functions and then transmits the data in such a 'bypassing' manner."  *Id.*  Defendant thus argues that the specification fails to describe or explain how this bypassing occurs.

While Defendant's argument may perhaps bear upon issues of written description or enablement, Defendant has not persuasively shown that the claims lack reasonable clarity as to the recited bypassing.  *See Sonix*, 844 F.3d at 1377 ("Indefiniteness must be proven by clear and convincing evidence.").  Indeed, the *Lockwood* case cited by Defendant pertains to lack of written description, not indefiniteness.  *See* Dkt. No. 45 at 16 (citing *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997)).  The Court therefore hereby expressly rejects Defendant's indefiniteness argument.

The Court accordingly hereby construes these disputed terms as set forth in the following chart:

| <u>Term</u> | <u>Construction</u> |
|---|---|
| **"transmission having a transmission path that bypasses the MICR capture, deposit accounting, cash management, and float processing systems of the bank of first deposit for that deposit transaction"** | **"a transmission that is not received by the magnetic ink character recognition capture, deposit accounting, cash management, or float processing systems of the bank of first deposit while en route from the central system to the maker bank, Federal Reserve Bank, or correspondent bank"** |
| **"transmission path that bypasses the MICR capture system of the bank of first deposit"** | **"a transmission that is not received by the magnetic ink character recognition capture system of the bank of first deposit"** |
| **"transmitting bypassing the MICR capture, deposit accounting, cash management, float processing or other systems of the bank of first deposit"** | **"transmitting that is not received by the magnetic ink character recognition capture, deposit accounting, cash management, float processing or other systems of the bank of first deposit while en route from the central system to the maker bank, Federal Reserve Bank, or correspondent bank"** |

**E.  "but not through the MICR capture, deposit accounting, cash management, and float processing systems of the bank of first deposit"**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| not received by the magnetic ink character recognition capture, deposit accounting, cash management, or float processing systems of the bank of first deposit while en route from the central system to the maker bank, Federal Reserve Bank, or correspondent bank | Indefinite |

Dkt. No. 34 at 5–6; Dkt. No. 43 at 19; Dkt. No. 51, Ex. A at 3.  The parties submit that this term appears in Claims 4, 5, 22, and 23 of the '430 Patent.  Dkt. No. 34 at 5–6; Dkt. No. 51, Ex. A at 3.

Shortly before the start of the February 21, 2019 hearing, the Court provided the parties with the following preliminary construction: "not received by the magnetic ink character recognition capture, deposit accounting, cash management, or float processing systems of the bank of first deposit while en route from the central system to the maker bank, Federal Reserve Bank, or correspondent bank."

(1)  The Parties' Positions

Plaintiff submits that the arguments presented as to "bypasses" and "bypassing," above, apply also to the phrase "but not through" in the present disputed term.  Dkt. No. 43 at 19.  Plaintiff argues that "the intrinsic record makes it abundantly clear for one of ordinary skill in the art to understand the scope of this claim term with reasonable certainty."  *Id.*

Defendant responds that "the 'but not through' limitation is not disclosed in the specifications of the asserted patents" and "is further indefinite for reasons similar to the 'bypass/bypassing' phrases."  Dkt. No. 45 at 17.

Plaintiff replies that "[t]he same arguments as discussed above with respect to the 'bypass' limitation appl[y] here and it is clear to one of ordinary skill in the art what is meant by the claim term 'but not through.'" Dkt. No. 46 at 7.

(2)  Analysis

The parties agree that this term presents substantially the same issues as the ". . . bypasses . . ." terms discussed above.

The Court therefore hereby rejects Defendant's indefiniteness argument and hereby construes **"but not through the MICR capture, deposit accounting, cash management, and float processing systems of the bank of first deposit"** to mean **"not received by the magnetic ink character recognition capture, deposit accounting, cash management, or float processing systems of the bank of first deposit while en route from the central system to the maker bank, Federal Reserve Bank, or correspondent bank."**

## F.  "deposit account designation [[in]/[to] a bank of first deposit], electronic check data and [original] check image data"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction necessary/plain and ordinary meaning | Indefinite<br><br>Alternatively:<br>    "the deposit information including for each of the different deposit transactions a deposit account number in a bank of first deposit, informational data including MICR encoding OR non-image data representing information on a paper check, and data representing an image of a physical check for at least one check to be deposited" |

Dkt. No. 34 at 4–5; Dkt. No. 43 at 20; Dkt. No. 45 at 17; Dkt. No. 51, Ex. A at 3–4.  The parties submit that this term appears in all asserted independent Claims.  Dkt. No. 34 at 4–5; Dkt. No. 51, Ex. A at 3.

Shortly before the start of the February 21, 2019 hearing, the Court provided the parties

with the following preliminary constructions:

| Term | Preliminary Construction |
|------|--------------------------|
| "check image data" | "data representing an image of a physical check for at least one check to be deposited" |
| "deposit account designation [[in]/[to] a bank of first deposit], electronic check data and [original] check image data" | Plain meaning (apart from the Court's construction of "check image data") |

(1) The Parties' Positions

Plaintiff argues that the meaning of this term is plain, and "[i]t is well known that depositing

a check at a bank (bank of first deposit) involves designating an account to which the amount of

the check is to be credited." Dkt. No. 43 at 20.  Plaintiff also argues that there is no support for

Defendant's proposal of "informational data including MICR encoding OR non-image data

representing information on a paper check," and Plaintiff further urges that "check images are not

limited to paper checks."  *Id.* at 21.

Defendant responds that "electronic check data" and "image data" must be different from

one another because the specification discloses that "image data" is a part of "electronic check

data," but "the specifications of the asserted patents do not disclose what that difference is."  Dkt.

No. 45 at 17.  Alternatively, Defendant argues that "[t]he only thing that makes any sense at all is

if one of either 'image data' or 'check image data' includes an image, and the other is strictly data

extracted from the image of a check, i.e. non-image data."  Dkt. No. 45 at 29.  Defendant also

argues that "to account for the separate terms 'image data' and 'check image data,' JHA has

construed 'check image data' relative to an actual image of a check . . . ."  *Id.* at 30.

Plaintiff replies that "Defendant's proposed construction of 'electronic check data' and 'check image data' is an attempt to import improper limitations, which is not supported by the intrinsic evidence."  Dkt. No. 46 at 8.

(2)  Analysis

The parties dispute whether the terms "electronic check data" and "check image data" are reasonably clear.  The specification discloses that information may be acquired from a check:

> The physical check is processed at central site 102 using a reader/sorter (not separately shown but included in 102) to acquire *information* such as the information stored on the Magnetic Ink Character Recognition (MICR) line.

'430 Patent at 6:1–5 (emphasis added).  Processing can also obtain "electronic check data" including "image data":

> In the present invention, a remote site processor 201 (further detailed in FIG. 3) either autonomously, or under operator/depositor control initially remotely *"processes" a check into electronic check data both in the form of image data and informational data* which can be further processed and approved at subsequent portions of the overall process.  In essence, the remote site provides a processing front-end that electronically interacts via interface 202 with central site 198 through the transfer of *electronic check data* for review and processing by electronic means at a central site.
>
> * * *
>
> The process of the present invention continues when scanner/reader/printer 309 performs the functions of scanning check 303 to create *electronic check data comprised of image data, informational data* including MICR encoding (using either MICR, Optical Character Recognition (OCR) or other like techniques).  Scanner/reader/printer 309 "voids" check 303 by endorsing check 303 and printing tracking data thereon.  The *electronic image data and informational data* such as MICR information of the voided and endorsed check 303 is transferred over interface 310 to remote site processor 201 for processing which includes image integrity verification.  When the image integrity is suspect, the integrity is enhance [*sic*] by either rescanning check 303 or, alternatively, by manual intervention by an operator at terminal 301.  If check 303 is rescanned, scanner/reader/printer 309 does not reprint the endorsement, voiding and item numbering information on check 303.

*Id.* at 6:49–58 & 8:45–61 (emphasis added).  These disclosures in the specification contrast with the recital in the disputed term of "electronic check data *and* check image data" (rather than electronic check data *including* check image data).

Although the recital of both "electronic check data" and "check image data" therefore appears to be redundant, "[t]he Court disagrees that redundancy of limitations in a claim necessarily renders the claim invalid."  *Team Worldwide Corp. v. Wal-Mart Stores, Inc.*, No. 2:17-CV-00235-JRG, 2018 WL 1353116, at *12 (E.D. Tex. Mar. 15, 2018) (discussing authorities).  The Court hereby expressly rejects Defendant's indefiniteness argument.

As to Defendant's alternative proposed construction, Defendant has not shown sufficient support for its proposal of "for each of the different deposit transactions," and Defendant also has not demonstrated that the parties have any real dispute as to the "deposit account designation" portion of the term here at issue.  The Court therefore hereby expressly rejects Defendant's alternative proposed construction.  Still, as to the term "check image data," "some construction of the disputed claim language will assist the jury to understand the claims" based on the above-discussed disclosures in the specification.  *TQP Dev., LLC v. Merrill Lynch & Co., Inc.*, No. 2:08-CV-471, 2012 WL 1940849, at *2 (E.D. Tex. May 29, 2012) (Bryson, J., sitting by designation).

The Court hereby construes **"check image data"** to mean **"data representing an image of a physical check for at least one check to be deposited."**  No further construction is necessary.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).  The Court accordingly hereby construes **"deposit account designation [[in]/[to] a bank of first deposit], electronic check data and [original] check image data"** to have its **plain meaning** (apart from the Court's construction of "check image data").

### G.  "electronic deposit data"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| No construction necessary/plain and ordinary meaning | Indefinite |

Dkt. No. 34 at 5; Dkt. No. 43 at 22; Dkt. No. 45 at 18; Dkt. No. 51, Ex. A at 4.  The parties submit that this term appears in Claims 1, 12, 19, 30, 37, and 49 of the '430 Patent, Claims 1, 10, 12, 21, 24, and 33 of the '924 Patent, Claims 10 and 22 of the '071 Patent, and Claim 10 of the '956 Patent.  Dkt. No. 34 at 5; Dkt. No. 51, Ex. A at 4.

(1)  The Parties' Positions

Plaintiff argues that "[t]he term is not indefinite, despite the lack of an explicit antecedent basis."  Dkt. No. 43 at 22.

Defendant responds that "it cannot be determined with any reasonable degree of certainty what 'electronic deposit data' refers to, since it can ambiguously refer to 'deposit information,' 'a deposit account designation,' 'electronic check data,' and/or 'check image data.'"  Dkt. No. 45 at 18.  Defendant also argues that "the term 'electronic deposit data' does not find any clarifying support in the corresponding patent specifications."  *Id.*

Plaintiff replies that "'electronic deposit data' is simply the information used to process the deposit."  Dkt. No. 46 at 8.  Plaintiff also submits that Defendant has presented no evidence to rebut the opinions of Plaintiff's expert that a person of ordinary skill in the art would understand the scope of the claim with reasonable certainty.  *Id.*

(2)  Analysis

In some cases, a lack of antecedent basis can result in indefiniteness.  *See Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) ("a claim could be indefinite if a term does not have proper antecedent basis where such basis is not otherwise present by

implication or the meaning is not reasonably ascertainable").  Still, antecedent basis can be implicit rather than explicit.  *See Energizer Holdings Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1371 (Fed. Cir. 2006).

Claim 1 of the '430 Patent recites, in relevant part (emphasis added):

1.   A method for deposit processing at a central system a plurality of checks deposited at a remote site with accompanying deposit information, comprising:
   the central system receiving deposit information for a plurality of different deposit transactions, with the deposit information including for each of the different deposit transactions a deposit account designation, *electronic check data and check image data* for at least one check to be deposited, wherein the central system is separate from MICR capture, deposit accounting, cash management, and float processing systems for a bank of first deposit and wherein the deposit account designation for each of at least a subset of the plurality of the deposit transactions is to a different bank of first deposit;
   the central system transmitting *the electronic deposit data and optionally the check image data* for each different deposit transaction of the subset of the plurality of the deposit transactions to a respective different one of the banks of first deposit; . . . .

The term "the electronic deposit data" lacks explicit antecedent basis.  At first blush, the recital of "transmitting the electronic deposit data and optionally the check image data" appears to align with the recital of "deposit information including . . . electronic check data and check image data."  The repeated usage of the word "electronic," together with the repeated accompanying recital of "check image data," suggests that "electronic deposit data" refers to "electronic check data."

Yet, Claim 12 of the '430 Patent, which depends from Claim 1, recites (emphasis added):

12.  The method as defined in claim 1, further comprising a system with a plurality of different remote sites, the following steps being performed at each of the plurality of remote sites:
   the remote site *obtaining electronic deposit data* for the one or more checks;
   the remote site *converting data for each of the one or more checks into electronic check data*;
   the remote site creating an image of the one or more checks to obtain original check image data;

the remote site endorsing and/or voiding the one or more checks with a bank endorsement to obtain endorsed and/or voided checks;

the remote site creating an image of each of a plurality of the endorsed and/or voided checks to obtain endorsed and/or voided check image data;

the remote site electronically associating *the electronic deposit data*, *the electronic check data* and the original check image data and the endorsed and/or voided check image data; and

the remote site transmitting the electronically associated electronic check data and the original check image data and/or the endorsed and/or voided check image to the central system.

Because Claim 12 of the '430 Patent thus recites both "the electronic deposit data" and "the electronic check data," and particularly because these recitals are adjacent to one another, "the electronic deposit data" cannot reasonably be interpreted as referring back to "electronic check data" for antecedent basis.

Nonetheless, the first limitation of Claim 1 of the '430 Patent recites "the central system receiving *deposit information*," "the *deposit information* including for each of the different deposit transactions a deposit account designation, electronic check data and check image data for at least one check to be deposited . . . ."  Also, a subsequent limitation refers to "the received deposit information."  This surrounding claim language provides sufficient context for understanding that "the electronic deposit data" refers to the preceding recital of "deposit information," and disclosure in the specification as to "complete deposit data" and "deposit information" ('430 Patent at 2:61–3:2) reinforces this understanding.  *See Energizer*, 435 F.3d at 1371 (holding that "an anode gel comprised of zinc as the active anode component" provided implicit antecedent basis for "said zinc anode"); *see also Ex Parte Porter*, 25 U.S.P.Q. 2d (BNA) 1144, 1145 (B.P.A.I. 1992) ("The term 'the controlled fluid' . . . finds reasonable antecedent basis in the previously recited 'controlled stream of fluid . . . .'").

Thus, Defendant has failed to demonstrate that the claim is indefinite.  *See Sonix*, 844 F.3d at 1377 ("Indefiniteness must be proven by clear and convincing evidence.").  A similar analysis

applies to the other claims in the '430 Patent and the '924 Patent in which the term "the electronic deposit data" appears.

Claims 10 and 22 of the '071 Patent recite "obtaining electronic deposit data" and Claim 10 of the '956 Patent recites "obtain electronic deposit data" (without the definite article, "the"), so Defendant's argument as to lack of antecedent basis is inapplicable as to those claims.  Defendant has not presented any alternative proposed construction, and no construction is necessary.

The Court accordingly hereby construes this disputed term as set forth in the following chart:

| Term | Construction |
|---|---|
| **"the electronic deposit data"** <br><br> '430 Patent, Claims 1, 12, 19, 30, 37, and 49; <br> '924 Patent, Claims 1, 10, 12, 21, 24, and 33 | **The antecedent basis for "the electronic deposit data" is "deposit information."** |
| **"electronic deposit data"** <br><br> '071 Patent, Claims 10 and 22; <br> '956 Patent, Claim 10 | **Plain meaning** |

## H.  "image information data"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| data obtained from check image data | Indefinite |

Dkt. No. 34 at 5; Dkt. No. 43 at 23; Dkt. No. 45 at 18; Dkt. No. 51, Ex. A at 4.  The parties submit that this term appears in Claims 2 and 20 of the '430 Patent.  Dkt. No. 34 at 5; Dkt. No. 51, Ex. A at 4.

Shortly before the start of the February 21, 2019 hearing, the Court provided the parties with the following preliminary construction: "data obtained from check image data."

<u>(1)  The Parties' Positions</u>

Plaintiff argues that "[b]ased on the plain language of the claims and the teachings in the specification, one of ordinary skill in the art would readily understand this claim term with reasonable certainty."  Dkt. No. 43 at 24.

Defendant responds that "it cannot be determined with reasonable certainty what exactly 'image information data' is, as it appears to be created from, but also different than, 'check image data.'"  Dkt. No. 45 at 19.

Plaintiff argues that "'image information data' is 'data obtained from check image data' that simply represents an image in digital pixel form, from which useful information has yet to be extracted."  Dkt. No. 46 at 9.

<u>(2)  Analysis</u>

Claim 2 of the '430 Patent is representative and recites (emphasis added):

> 2.  The method as defined in claim 1, further comprising at the remote site:
>       reading said check image data to create image information data; and
>       comparing the image information data to the electronic check data.

The specification provides context by disclosing that data can be obtained from sources other than check image data.  In particular, the specification discloses obtaining information by magnetic ink character recognition ("MICR"):

> The physical check is processed at central site 102 using a reader/sorter (not separately shown but included in 102) to acquire information such as the information stored on the Magnetic Ink Character Recognition (MICR) line.  This information includes the maker bank number, the account number, a check serial number, etc.
>
> * * *
>
> The process of the present invention continues when scanner/reader/printer 309 performs the functions of scanning check 303 to create electronic check data comprised of image data, informational data including MICR encoding (using either MICR, Optical Character Recognition (OCR) or other like techniques).

'430 Patent at 6:1–7 & 8:45–50.  Thus, whereas "image information data" is data obtained from check image data, "electronic check data" could include other types of data such as data obtained by MICR.

The Court therefore hereby construes **"image information data"** to mean **"data obtained from check image data."**

## I.  "separate from"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction necessary/plain and ordinary meaning | Indefinite |

Dkt. No. 34 at 5; Dkt. No. 43 at 24; Dkt. No. 45 at 13; Dkt. No. 51, Ex. A at 4.  The parties submit that this term appears in all asserted independent Claims.  Dkt. No. 34 at 5; Dkt. No. 51, Ex. A at 4.

Shortly before the start of the February 21, 2019 hearing, the Court provided the parties with the following preliminary construction: "plain meaning."

(1)  The Parties' Positions

Plaintiff argues that no construction is necessary because "[a]s the plain language of the claim makes clear, the plain and ordinary meaning of the claim term 'separate from' simply means that the central system does not include any of the following systems for a bank of first deposit: MICR capture, deposit accounting, cash management, float processing."  Dkt. No. 43 at 24.

Defendant responds that "separate from" should be found to be indefinite because "[t]he term 'separate' is not mentioned anywhere in the specifications of the asserted patents," and "[i]t is impossible to determine whether the claims refer to the 'central system' as being physically

separate, electronically separate, financially separate, or separate in some other way."  Dkt. No. 45 at 13.

Plaintiff replies that "Defendant's indefiniteness assertion runs afoul with the plain and ordinary meaning of the claim term 'separate from' as it simply means that the central system does not include any of the following systems for a bank of first deposit: MICR capture, deposit accounting, cash management, float processing."  Dkt. No. 46 at 9–10.

<u>(2)  Analysis</u>

Claim 1 of the '430 Patent, for example, recites in relevant part (emphasis added):

> 1.  A method for deposit processing at a central system a plurality of checks deposited at a remote site with accompanying deposit information, comprising:
> the central system receiving deposit information for a plurality of different deposit transactions, with the deposit information including for each of the different deposit transactions a deposit account designation, electronic check data and check image data for at least one check to be deposited, wherein the central system is *separate from* MICR capture, deposit accounting, cash management, and float processing systems for a bank of first deposit and wherein the deposit account designation for each of at least a subset of the plurality of the deposit transactions is to a different bank of first deposit; . . . .

Defendant has not shown that the claims or the specification attribute any special meaning to the word "separate" or that the precise degree of separation has any special significance.

The Court therefore hereby expressly rejects Defendant's indefiniteness argument, and no further construction is necessary.  *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise in redundancy."); *see also O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the

parties' quarrel, the district court rejected Defendants' construction."); *ActiveVideo Networks, Inc. v. Verizon Commc'n's, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012); *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015).

The Court accordingly hereby construes **"separate from"** to have its **plain meaning**.

## J.  "endorsing and/or voiding the one or more checks"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction necessary / plain and ordinary meaning | "printing an endorsement mark or void mark or both on one or more physical checks" |

Dkt. No. 34 at 6; Dkt. No. 43 at 28; Dkt. No. 45 at 31; *see* Dkt. No. 51, Ex. A at 4.  The parties submit that this term appears in Claims 12 and 30 of the '430 Patent.  Dkt. No. 34 at 6; Dkt. No. 51, Ex. A at 4.

Shortly before the start of the February 21, 2019 hearing, the Court provided the parties with the following preliminary construction: "applying an endorsement mark or void mark, or both, on one or more physical checks."

### (1)  The Parties' Positions

Plaintiff argues that "there is no requirement in the plain language of the claims nor any disclosure in the specification that requires printing on a physical check."  Dkt. No. 43 at 28.

Defendant responds that "the claims must be interpreted in view of the specification, which teaches that the endorsement is printed on the check."  Dkt. No. 45 at 31.

Plaintiff replies that "the specification makes clear that endorsing or voiding may be accomplished electronically without printing on a physical check."  Dkt. No. 46 at 10 (citing '430 Patent at 2:24–29).

### (2)  Analysis

The specification discloses:

> [D]uring the practice of the invention, scanner/reader/printer 309 encodes check 303 with endorsement and voiding information in order to *physically* "void" check 303 . . . .
>
> * * *
>
> Scanner/reader/printer 309 "voids" check 303 by *endorsing check 303 and printing tracking data thereon.* The electronic image data and informational data such as MICR information of the voided and *endorsed check 303* is transferred over interface 310 to remote site processor 201 for processing which includes image integrity verification. When the image integrity is suspect, the integrity is enhance [sic] by either rescanning check 303 or, alternatively, by manual intervention by an operator at terminal 301. If check 303 is rescanned, scanner/reader/printer 309 does not reprint the endorsement, voiding and item numbering information on check 303.

*Id.* at 8:35–38 & 8:50–61 (emphasis added). This disclosure demonstrates that "endorsing" and "voiding" are physical acts because the "check 303" is a physical item. This understanding is confirmed by, for example, disclosure that "check 303 is placed into the scanner/reader/printer 309 . . . ." *Id.* at 10:23–24; *see id.* at Fig. 3; *see also id.* at 8:46–47 ("scanning check 303").

The Court therefore hereby construes **"endorsing and/or voiding the one or more checks"** to mean **"applying an endorsement mark or void mark, or both, on one or more physical checks."**

## K.  "bank endorsement" and "endorsement information"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction necessary / plain and ordinary meaning | "an endorsement printed on a physical check" |

Dkt. No. 34 at 6; Dkt. No. 43 at 25; Dkt. No. 45 at 32; Dkt. No. 51, Ex. A at 4. The term "bank endorsement" appears in Claims 12, 30, and 49 of the '430 Patent. The term "endorsement information" appears in Claims 14, 17, 32, 35, 51, and 54 of the '430 Patent.

Shortly before the start of the February 21, 2019 hearing, the Court provided the parties with the following preliminary constructions:

41

| Term | Preliminary Construction |
|---|---|
| "bank endorsement" | "an endorsement that is applied to a physical check by or on behalf of a bank" |
| "endorsement information" | Plain meaning (not limited to being printed on a physical check) |

### (1)  The Parties' Positions

Plaintiff argues that "bank endorsement" "has a commonly understood meaning" and "simply means an endorsement by a bank."  Dkt. No. 43 at 26.  Plaintiff also argues that "[t]he specification however makes clear that the endorsement is not required to be printed on a physical check."  *Id.*  Plaintiff similarly argues that "'endorsement information' is simply data derived from an endorsement," and "[t]he '430 patent makes it clear that the 'endorsement information' can be electronic and not printed on a physical check."  *Id.* at 26–27.

Defendant responds that "[t]he construction of 'bank endorsement/endorsement information' follows naturally from the construction of 'endorsing and/or voiding the one or more check[s],' and the same arguments apply here as well."  Dkt. No. 45 at 32.

Plaintiff replies that "[t]he claim terms 'bank endorsement' and 'endorsement information' should be accorded their plain and ordinary meaning and not read in limitations that require printing on a physical check."  Dkt. No. 46 at 10.

### (2)  Analysis

Claims 12 and 14 of the '430 Patent, for example, recite (emphasis added):

12.  The method as defined in claim 1, further comprising a system with a plurality of different remote sites, the following steps being performed at each of the plurality of remote sites:
> the remote site obtaining electronic deposit data for the one or more checks;
> the remote site converting data for each of the one or more checks into electronic check data;

the remote site creating an image of the one or more checks to obtain original check image data;

the remote site endorsing and/or voiding the one or more checks with a *bank endorsement* to obtain endorsed and/or voided checks;

the remote site creating an image of each of a plurality of the endorsed and/or voided checks to obtain endorsed and/or voided check image data;

the remote site electronically associating the electronic deposit data, the electronic check data and the original check image data and the endorsed and/or voided check image data; and

the remote site transmitting the electronically associated electronic check data and the original check image data and/or the endorsed and/or voided check image to the central system.

\* \* \*

14.  The method as defined in claim 12, further comprising:

determining if *endorsement information* at one of the remote sites *for printing* on the check is up-to-date; and

if the *endorsement information* at the remote site is not up-to-date, then *downloading updated endorsement information* from the central system.

The recitals in Claim 14 of the '430 Patent of "for printing" and "downloading" demonstrate that "endorsement information" is not limited to existing only in printed form.  This understanding is consistent with disclosure in the specification of passing information from one computer to another.  *See* '430 Patent at 2:24–29 ("The financial institution computer verifies the *information* received, stores the image of the items, and passes back to the remote site computer information that is used by the remote site computer to *endorse*, cancel, and item number, and otherwise mark, void, and identify the check.") (emphasis added); *see also id.* at 14:16–22 ("Query step 900 determines if deposit processing criteria, (e.g., deposit limit and endorsement information) are present at the remote site processor . . . .").  Claims 17 and 35 of the '430 Patent likewise recite "the central system sending endorsement information to the remote site to be used to add an endorsement."

The Court therefore hereby expressly rejects Defendant's proposal that "endorsement information" must be printed on a physical check.  No further construction is required as to "endorsement information."  *See, e.g., ActiveVideo*, 694 F.3d at 1326.

As to "bank endorsement," a fair reading of the claim language is that a "bank endorsement" is created by an act of "endorsing."  Above-discussed evidence demonstrates that "endorsing" refers to applying an endorsement to a physical check.  *See* '430 Patent at 8:35–38, 8:46–61 & 10:23–24.  The term "bank endorsement" therefore refers to an endorsement applied to a physical check by or on behalf of a bank.  *See* Dkt. No. 43, Ex. 12, Jan. 17, 2019 Shamos Decl. at ¶ 38 ("The jury will readily understand what a bank endorsement is, namely an endorsement *by* a bank.") (emphasis added).

The Court accordingly hereby construes these disputed terms as set forth in the following chart:

| Term | Construction |
| --- | --- |
| **"bank endorsement"** | **"an endorsement that is applied to a physical check by or on behalf of a bank"** |
| **"endorsement information"** | **Plain meaning** |

## VI.  CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patents-in-suit.

The parties are ordered to not refer to each other's claim construction positions in the presence of the jury.  Likewise, in the presence of the jury, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court.  The

Court's reasoning in this order binds the testimony of any witnesses, and any reference to the claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

Further, as set forth above, Plaintiff's Motion to Strike Untimely Disclosed Extrinsic Evidence (Dkt. No. 47) is hereby **DENIED**.

**SIGNED this 4th day of March, 2019.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE