```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF TEXAS

 3                      MARSHALL DIVISION

 4  PPS DATA, LLC                )(

 5                               )(   CIVIL ACTION NO.

 6                               )(   2:18-CV-07-JRG

 7  VS.                          )(   MARSHALL, TEXAS

 8                               )(

 9  JACK HENRY & ASSOCIATES,     )(   AUGUST 26, 2019

10  ET AL.                       )(   1:47 P.M.
```

11                  <u>PRE-TRIAL HEARING</u>

12       <u>BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP</u>

13          <u>UNITED STATES CHIEF DISTRICT JUDGE</u>

14

15  APPEARANCES:

16  FOR THE PLAINTIFF: (See Attorney Attendance Sheet docketed
                        in minutes of this hearing.)
17

18  FOR THE DEFENDANTS:(See Attorney Attendance Sheet docketed
                        in minutes of this hearing.)
19

```
20  COURT REPORTER:    Shelly Holmes, CSR, TCRR
                       Official Reporter
21                     United States District Court
                       Eastern District of Texas
22                     Marshall Division
                       100 E. Houston Street
23                     Marshall, Texas  75670
                       (903) 923-7464
24
```

25  (Proceedings recorded by mechanical stenography, transcript
    produced on a CAT system.)

1                              I N D E X

2

3  August 26, 2019

4                                              Page

5        Appearances                            1

6        Hearing                                3

7        Court Reporter's Certificate          72

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          COURT SECURITY OFFICER:  All rise.

2          THE COURT:  Be seated, please.

3          All right.  Counsel, this is a second pre-trial

4   hearing in the PPS Data versus Jack Henry & Associates

5   matter.  This is Civil Case No. 2:18-CV-007.

6          Let me call for announcements on the record at

7   this time.

8          What says the Plaintiff, PPS Data?

9          MR. SON:  Good afternoon, Your Honor.  Anthony Son

10  from Maddox Edwards on behalf of Plaintiff, PPS Data.  I'm

11  joined here today by my colleagues, Mr. Steven Maddox and

12  Mr. Kaveh Saba.

13         THE COURT:  You're ready to proceed?

14         MR. SON:  We are, Your Honor.

15         THE COURT:  What's the announcement from the

16  Defendant, Jack Henry & Associates?

17         MR. MAZINGO:  Your Honor, Jason Mazingo here on

18  behalf of Jack Henry & Associates, along with Jay Heidrick

19  and Jason Wietjes, Your Honor.  And we also have our client

20  representative, Assistant General Counsel for Jack Henry,

21  Andy Wimmer.

22         THE COURT:  And you, too, are ready to proceed?

23         MR. MAZINGO:  We are, Your Honor.

24         THE COURT:  All right.  Counsel, I have filed

25  earlier today -- you probably have just received it

1   electronically -- a preliminary order regarding the 101

2   motion where I've indicated to you that the Court's

3   completed its review and analysis but hasn't completed the

4   drafting of the order itself with the Court's reasoning set

5   forth therein.  But given the timeline that we're on, the

6   Court felt it would be beneficial to both sides to know

7   what the ultimate decision with that -- with regard to that

8   matter was from the Court's standpoint.

9           And, therefore, I've issued this one-page order

10  today indicating that all things considered and for the

11  reasons that will be set forth in the Court's more fulsome

12  order to be filed hopefully by the end of this week, I'm

13  going to deny the 101 motion.

14          That said, I've previously heard the Defendant's

15  summary judgment motion for non-infringement and denied

16  that.

17          I've heard the Daubert motion with regard to

18  Dr. Michalson, and I've denied that, as well.

19          And I've heard the motion to strike portions of

20  Dr. Michalson's expert report brought by PPS Data, and I've

21  granted that in part and denied that in part as previously

22  announced at the prior pre-trial hearing.

23          Based on that, together with the recent indication

24  I just addressed concerning the 101 matter, it appears to

25  the Court that that takes us through the dispositive

1  motions and gets us to the disputed motions in limine.

2        With regard to the motions in limine, there are

3  certain agreed-to motions in limine the Court's aware of,

4  and there has been a narrowing since the last pre-trial of

5  the disputed motions in limine between the parties.  And

6  I'm going to attempt to go through all of those with you

7  now.

8        This has been somewhat of a moving target, given

9  the late-breaking accommodations and withdrawals that have

10  been indicated to the Court from the parties.  And that's

11  not a negative in any way.  I want to commend the parties

12  for their continuing efforts to meet and confer and narrow

13  these issues.  I simply say that to say if I should get any

14  of these wrong today, somebody stand up and correct me, and

15  we'll make sure we get the record as it should be and

16  maintain it in an accurate manner.

17        With regard to the agreed MILs, it appears that

18  there are seven agreed MILs that would be granted,

19  including characterizing the parties, disparaging

20  characteristics, disparaging the U.S. Patent and Trademark

21  Office, mentioning the Court's prior rulings, mentioning

22  the localized effect of the judgment, obeying and

23  discussing the Court's claim constructions, and any

24  arguments regarding Ensenta.  All those appear to be agreed

25  to by both Plaintiff and the Defendant.  And to my reading

1    of the parties' agreements is that those seven motions in

2    limine by agreement of the parties would all be granted.

3          Do Plaintiff and Defendant concur with that?

4          MR. SON:  On behalf -- Anthony Son on behalf of

5    PPS Data, yes, Your Honor, we agree to that.

6          THE COURT:  Defendants, is that your view of it?

7          MR. HEIDRICK:  Yes, Your Honor.  This is Jay

8    Heidrick on behalf of Defendant.

9          THE COURT:  Okay.  Then those seven identified

10   agreed motions in limine are granted by agreement.

11         That moves us to what remains in dispute.  Let's

12   begin with Plaintiff's Motion in Limine No. 1, which has to

13   do with the 14/185,667 application.  And let me hear from

14   Plaintiff on this first.

15         From the podium, please, Mr. Maddox.

16         MR. MADDOX:  Sure.  The -- if I may call it, the

17   '667 application is not part of the prosecution history in

18   this case.  It's a subsequent application that Defendants

19   don't say the claims are the same.  In fact, they don't

20   compare the claims at all.

21         There was a rejection in that -- that case --

22   those claims, under 101.  And the patentee decided to

23   abandon the application, rather than proceed forward with

24   it and go with the patents we've got.

25         We raised this motion because in their 101 summary

1  judgment motion, they seem to be arguing that this

2  subsequent and a different application 101 rejection and

3  abandonment is evidence that the claims at issue in this

4  case have only conventional and routine well-known steps.

5  And we think that's -- we think it's totally irrelevant,

6  but at -- at worst, we think its relevance would be far

7  outweighed by the risk of confusion.

8        And we think a very similar situation came up in

9  L.C. Eldridge Sales where the Court excluded this time a

10  final rejection from a continuation of the patents-in-suit

11  for that very reason.

12       THE COURT:  Well, I understand your 403 argument.

13  In addition to the 403 argument, tell me, again, why you

14  think this should be -- this particular motion should be

15  granted.

16       MR. MADDOX:  Because it's irrelevant.  The claims

17  are different.  There's been no comparison with claims.

18  They're not even saying they're similar or whatever --

19  whatever software you would use.  It's different claims,

20  and an incomplete application.  It -- it seems to have no

21  relevance at all.

22       THE COURT:  So 402 and 403?

23       MR. MADDOX:  Yes, sir.

24       THE COURT:  All right.  What's the response from

25  Defendants -- or Defendant, I should say?

1          MR. WIETJES:  Your Honor, Jason Wietjes for

2    Defendant.

3          Contrary to Plaintiff's position on this, we do

4    believe that this application and the record regarding this

5    application before the Patent Office is relevant,

6    particularly given the Court's determination that there's a

7    fact question as to the routine and conventional nature of

8    the claims asserted in this case.

9          During prosecution, it's important to note that

10   the '667 application claims priority to the same

11   application that issued as the '430 patent.  The '430

12   patent is asserted in this litigation.

13         The patent examiner denied the claims of the '667

14   application in part based upon a determination that the --

15   the claims were directed to routine and conventional

16   subject matter.  In that sense, it's that routine and

17   conventional subject matter that this application is

18   directly on point.

19         It's not a question of whether or not the '667

20   application and the record at the Patent Office is somehow

21   prima facia evidence of the invalidity under Section 101 of

22   the asserted claims.  It's not.  And that's not what we're

23   saying.  But it does go directly to the heart of the matter

24   on the 101 issue, which is whether or not the subject

25   matter of the claims is routine and conventional.

1          We also --

2          THE COURT:  How -- how does it -- how does it

3    avoid boiling down in the final analysis to this

4    application was routine and conventional?  It's kind of

5    like what's before you, so what's before you is routine and

6    conventional.

7          MR. WIETJES:  Well, I think that would be

8    Defendant's burden would be to show that the claims that

9    were rejected as part of the '667 application cover the

10   same subject matter as the claims asserted in this

11   litigation.  If it's a fact question, Your Honor, we

12   believe it's a fact question, and that would be subsumed in

13   that analysis.

14         THE COURT:  Well, the fact question before the

15   jury, though, is going to be, are the claims asserted in

16   this case well-understood, routine, and conventional, not

17   the claims in some other application routine, conventional,

18   and well-understood.

19         MR. WIETJES:  Understood.

20         THE COURT:  I mean, that's where the -- that's

21   where the -- at least in my view, that's where the

22   possibility of confusion comes in.

23         MR. WIETJES:  I think that's a fair question to

24   ask, Your Honor, but I think that to the extent that

25   there's testimony elicited during trial, that would be

1   subject to an objection by the Plaintiff, and that the jury

2   is entitled to weigh the full record before the Patent

3   Office in making its determination as to the routine and

4   conventional nature of these claims.

5        And the fact that the Patent Office determined

6   that very similar claims, we believe, that we'll be able to

7   show at trial cover the same subject matter, the fact that

8   the Patent Office found those claims to be rejected as

9   routine and conventional is certainly something that the

10  jury is entitled to consider in reaching its determination

11  on that issue.

12       THE COURT:  And it's true in this case that the

13  claims of the '667 were rejected as well-understood,

14  routine, and conventional pre-BASCOM and pre-Berkheimer

15  based on the field of the invention-type analysis, correct?

16       MR. WIETJES:  That -- I believe that's correct,

17  Your Honor.

18       THE COURT:  All right.  Do you have anything else

19  for me on this?

20       MR. WIETJES:  Nothing further on this particular

21  issue.

22       THE COURT:  All right.  Well, with regard to

23  Plaintiff's disputed Motion in Limine No. 1, based on Rule

24  11's 403, I'm going to grant this.  I think there is a real

25  risk of confusion before the jury.  I'm concerned about the

1    fact that the '667 application was a pre-BASCOM,

2    pre-Berkheimer rejection.

3          As with any grant of a motion in limine and as

4    Defense counsel well understands, this is not an absolute

5    prohibition.  And in the course of the trial if either the

6    door is opened or there's a basis that develops that you

7    believe would support me granting you leave to go into

8    this, you certainly have the right to approach the bench

9    and ask for that leave at that time.  But you're precluded

10   from mentioning it in the presence the jury without advance

11   leave from the Court.

12         MR. WIETJES:  Understood, Your Honor.

13         THE COURT:  Okay.  Let's go on to Plaintiff's

14   Motion in Limine No. 2.  This has to do with dropped

15   claims.  Let me hear from Plaintiff on this, please.

16         And this also has to do with Dr. Ugone's damages

17   testimony.  And that reminds the Court, I'm going to direct

18   both sides to email to the Court, through its staff,

19   complete copies of all the expert reports in PDF-searchable

20   format, and do that probably within the next 48 hours.

21         MR. SABA:  Yes, Your Honor.

22         THE COURT:  All right.  Let's -- let's talk about

23   Plaintiff's MIL No. 2.

24         MR. SABA:  Good afternoon, Your Honor.  Kaveh Saba

25   from the Maddox Edwards firm on behalf of the Plaintiff,

1  PPS Data.

2         With respect to this motion, we don't -- first of

3  all, we don't believe that Jack Henry has put forth any

4  relevance of mentioning previously asserted but now dropped

5  claims and patents.  What Jack Henry says is that, well,

6  it's -- it's relevant to apportionment of reasonable

7  royalty damages.

8         We don't think that can be true, at least because

9  the experts in this case agreed that the hypothetical

10 negotiation is as of 2007 as to the existing patents and

11 the future patents within that family.

12        Further, Jack Henry's expert didn't even offer an

13 apportionment theory between the patents that are asserted

14 from the family in this case and the several that were

15 never asserted in this case.

16        So their expert never even had an apportionment

17 theory in that sense at all.  And we think that even if

18 Jack Henry wanted to raise such an apportionment theory, if

19 their expert had talked about it, they could simply say

20 that, for example, the dropped '956 patent is unasserted

21 just like those other two patents in the family that aren't

22 asserted.  It's simply not relevant whether the claim was

23 asserted at the beginning and then later dropped for

24 purposes of the -- the alleged relevance that they raised.

25        The only reason to present the fact that a patent

1   was dropped and further, as Jack Henry wants to do, to

2   raise a covenant not to sue before the jury is frankly to

3   put some doubt about the other patents and their

4   infringement and invalidity.

5          Secondly, if there were any relevance, we think

6   the risk of undue prejudice and jury confusion should lead

7   to exclusion under Rule 403.  We cited several cases from

8   this Court and other Courts that we think make clear on

9   this point that -- that 403 is a basis for exclusion of --

10  of dropped claims and patents.

11         Jack Henry's response offered nothing to the

12  contrary.

13         And we think that, finally, preclusion makes sense

14  just as a matter of encouraging parties to streamline the

15  case, as we have done here, and, frankly, as we intend to

16  further look at and consider doing with respect to the

17  number of patents and number of claims we have in this

18  case.

19         I think if the type of argument or evidence that

20  Jack Henry is proposing to -- to bring forward about

21  dropped claims, dropped patents, covenants not to sue is

22  allowed, it strongly discourages patentees to -- to limit

23  the number of claims, to limit the number of patents as the

24  case proceeds to avoid having patents viewed as weak.

25         THE COURT:  Let me -- let me interrupt you,

1    Mr. Saba.

2          MR. SABA:  Sure.

3          THE COURT:  I think it's important for the Court

4    to have a clear understanding of the context here.  The

5    report generated by Dr. Ugone, who's Plaintiff's damages

6    expert, included references to claims to patents that

7    subsequent to the issuance of that report have been dropped

8    from the case.  And notwithstanding that, there was never

9    an amended report brought forward by Dr. Ugone, nor was

10   there a Daubert motion challenging his original report

11   brought forward by Defendants.

12         And so for whatever reason, we have an expert

13   report on the eve of trial that addresses claims in the

14   patents that are no longer in the case, and it's never been

15   cleaned up or -- or updated.  And so we now have the

16   dilemma of what do we do about the portions of those

17   expert -- of that expert report that are no longer

18   relevant, given that those claims and patents have been

19   dropped.

20         And I don't know if the fault lies on the

21   Defendant's side for failing to bring a Daubert motion,

22   which I would have expected, or if the fault lies on the

23   Plaintiff's side for failure to seek leave to amend the

24   report in light of the dropped claims.

25         But the problem we have is a problem of the

1  parties' making because everybody saw the report in its

2  original state, knew as we moved forward that those claims

3  are no longer in the case, knew that the report hadn't been

4  updated, and now here we are.

5        So do you have some explanation -- I know -- I

6  know where we started, and I know where we are.  Do you

7  have some explanation as to why it didn't get fixed along

8  the way and why we still have this problem on the eve of

9  trial?

10        MR. SABA:  Yes, Your Honor.  I believe that, as I

11  mentioned, the -- the damages experts, the way that the

12  issues had been presented was the hypothetical negotiation,

13  as of 2007, as to whatever would exist in the family of

14  patents, and that's the issuance of the '430 patent.  So

15  the analysis was done on the patent family as a whole.

16        THE COURT:  So your position is if there's any

17  part of these there, you would have paid the same to get

18  past the family as a whole and so it doesn't change the

19  damages number from the Plaintiff's standpoint?

20        MR. SABA:  Correct, Your Honor.  If -- if I have

21  eight patents, it doesn't really do me much good if --

22  if -- or if someone else has eight patents, it doesn't do

23  me much good to get a license to seven of them.  There's

24  still a right to exclude with respect to the eighth patent.

25        And so this is a -- a patent family issue, and

1  that's frankly how it's been treated in the damages

2  context.

3          THE COURT:  Was there some rationale as to why in

4  understanding that that the Plaintiff didn't seek to amend

5  the report of its expert or have its expert amend the

6  report rather than move for this Daubert motion in

7  pre-trial?

8          I mean, if Dr. Ugone had come forward and amended

9  his report, kept the same result, kept the same final

10  opinion but carved out those now irrelevant portions that

11  relate to claims that are no longer asserted in the case,

12  we probably wouldn't be having this motion in limine

13  argument right now.

14          Was there a rationale on your side of the docket

15  that said, we're not going to ask leave of the Court to

16  have Dr. Ugone amend his report and clean it up in advance?

17  We'll just wait until pre-trial, and we'll try to limine

18  out any reference to those portions of the report that now

19  are irrelevant.

20          MR. SABA:  Well, I think it goes back to --

21          THE COURT:  I mean, was there a conscious decision

22  made here?

23          MR. SABA:  Yes, the -- the fact that it goes to

24  the patent family, our view is that whether certain claims

25  are dropped for purposes of trial, the reports are not

1  dependent on all of those claims being asserted.  They're

2  referencing the family, and I think that goes for both sets

3  of expert reports in this case.

4       THE COURT:  That just explains why the end result

5  is the same.  It doesn't explain why there wouldn't have

6  been an effort to clean up the portions that relate to

7  dropped claims so that they're not hanging out there, for

8  lack of a better phrase, within the report.

9       MR. SABA:  Fair enough.  Fair enough, Your Honor.

10  And -- and I suppose if -- if -- it would make sense to

11  have a -- a short amendment to say that these are the

12  currently asserted claims, and my opinions are the same,

13  that -- you know, that would clean up the -- the record on

14  this.

15       THE COURT:  I'm -- I'm not soliciting a motion to

16  amend the report on the eve of trial.  I'm trying to get --

17  figure out -- I know where we are.  I know where we started

18  out.  I'm trying to figure out what the thought analysis,

19  if any, was that got us from Point A to Point B.

20       MR. SABA:  Right.  And I would just say that --

21  that the -- if -- if we look at the hypothetical

22  negotiation as of 2007, I think that creates some confusion

23  that in 2007, there's one patent out there, there's the

24  expectation of a family, and the hypothetical negotiation

25  would be for that patent portfolio.

1          You know, what happens later in time in terms of

2    certain patents at trial being dropped doesn't affect what

3    that hypothetical negotiation would look like in 2007.

4          The '956 patent didn't even exist for five years

5    in 2007, so it -- it wouldn't even be one of the patents

6    that would be addressed.

7          THE COURT:  What else?

8          MR. SABA:  And I would just say that part of the

9    purpose of this is simply to narrow the case for trial.

10   And that's what we were trying to accomplish.  We didn't

11   expect that narrowing would -- would raise this issue, but

12   I do take the Court's point on that, so thank you.

13         THE COURT:  All right.  Let me hear from the

14   Defendant in response, please.

15         MR. HEIDRICK:  May it please the Court, Your

16   Honor.  Jay Heidrick on behalf of Defendant, Jack Henry &

17   Associates.

18         THE COURT:  Go ahead.

19         MR. HEIDRICK:  I think that we have a couple of

20   different issues here that I want to clarify.  One is that

21   the issue isn't just a dropped patent.  The issue is that

22   we have a dropped patent and a covenant not to sue with it.

23         And Dr. Ugone's report not only talks about how

24   they're -- how Jack Henry supposedly needs a license to

25   each of the originally five asserted patents, but it also

1   discusses the value that he gave to prior settlement

2   agreements.

3           And so the fact that we have a patent that was

4   asserted and a covenant not to sue that has been given to

5   Jack Henry at no cost, we believe is relevant evidence for

6   the jury to determine what is a reasonable royalty, because

7   they have previously asserted that their expert says that

8   Jack Henry needs this patent to practice its remote deposit

9   captured products.

10          So the fact that there is a covenant not to sue

11  that has been granted on that -- on that previously

12  asserted patent, the value of that is something that the

13  jury should consider.  What weight they want to give to

14  that is for the jury to -- to determine.

15          But just to have a damages model that says you

16  need five patents, and we want X amount of dollars, and

17  part of the basis on that is my analysis on -- of prior

18  license agreements and then just say, well, we're just

19  going to drop one, give you a covenant not to sue for free,

20  and then say, well, that has no bearing on it, and you

21  can't talk about this patent that was dropped, and you have

22  a covenant not to sue on it, that -- that's improper.  It's

23  relevant evidence directly to Dr. Ugone's opinion on

24  damages, Your Honor.

25          THE COURT:  How does that square with the

1   Plaintiff's argument that this is a family of patents, and

2   you either have a license on all of them, or you're

3   effectively in the same boat?  In other words, if you have

4   all of them asserted and potentially infringed or half of

5   them asserted and potentially infringed or only one of them

6   asserted and potentially infringed, you've got to pay the

7   same amount and a reasonable royalty to get the right to

8   practice what's covered by the family.  And so it's

9   effectively the same thing, whether it's one of them, half

10  of them, all of them?

11          MR. HEIDRICK:  Yes, Your Honor.  I think two

12  things.

13          First is the previous licenses that are at issue

14  vary with -- as to what patents are granted for the various

15  licenses.  So that would be no different than this case

16  here, is that if Dr. Ugone is going to analyze previous

17  licenses that have a varying number of patents in that --

18  in that portfolio and rely on that and give value to that

19  for a reasonable royalty, it would be the same thing here

20  is to analyze, yes, we have a certain number of patents

21  that are part of the family, but how -- how does the fact

22  that there's a covenant not to sue given for zero value on

23  one of those patents affect the -- the royalty rate that --

24  that we should opine on?

25          And that is especially true, and his opinion was

1   that we need five patents to -- to practice this.  That was

2   his assumption, that we need five patents to practice -- to

3   practice this invention.

4        So when -- when the Plaintiff's argument is you

5   need a license to the whole family, that's fine.  But if

6   you have a license to the whole family, what is the value

7   of that license to the whole family?  And if one patent in

8   that family is given what is a de facto license for free,

9   then that's relevant evidence for the jury to consider as

10  to what the -- as to what any alleged damages are and what

11  the reasonable royalty is.

12       Now, we're not going to -- if I may, Your Honor, I

13  want to be clear that we're not going to stand up and say

14  the fact that they dropped the '956 patent shows that their

15  case is garbage and that we don't -- we don't infringe

16  that.  We're not going to do that.  We're not going to say

17  that their granting us a covenant not to sue somehow goes

18  to the -- the validity or the strength of their

19  infringement case.

20       It is just a very simple question of damages.  If

21  Dr. Ugone is going to take prior licenses of prior asserted

22  patents and prior litigation into account for his analysis,

23  then this is no different than that, as well, Your Honor.

24       THE COURT:  Is this covenant not to sue addressed

25  and covered in your damages expert's report?

 1        MR. HEIDRICK:  No, Your Honor, because it was --

 2   they dropped the '956 patent after the -- the summary

 3   judgment deadline.  And although we have communication back

 4   and forth, we do not have a finalized document, but both

 5   parties agree there is a covenant not to sue in place, and

 6   we're just waiting for the signatures to -- to occur on

 7   that.

 8        THE COURT:  No, I'm not talking about whether the

 9   covenant not to sue has actually been executed.  I'm

10   talking about does your damages expert talk about the fact

11   that a covenant not to sue has been given by the Plaintiffs

12   and how that impacts your expert's view of what the damages

13   should be?

14        MR. HEIDRICK:  No, Your Honor, it doesn't, because

15   a covenant not to sue was given after our report was

16   issued.

17        THE COURT:  All right.  Anything further?

18        MR. HEIDRICK:  No, Your Honor.  Thank you.

19        THE COURT:  All right.  Considering the argument

20   on this point, I will say that this could have been avoided

21   by either the Defendant's raising this under Daubert

22   practice earlier or the Plaintiffs unilaterally seeking to

23   update their expert's report with a supplemental report to

24   exercise the '956 references and any other references that

25   relate to matters that have now been dropped.

1        But on a 403 basis, if nothing else, I can see

2    certainly a lot of prospects for confusion if claims and

3    patents that are no longer asserted in the case are talked

4    about either in cross-examination of Plaintiff's damages

5    expert or in some way cut into the case.

6        To avoid that risk of confusion, which the Court

7    sees as real and material, I'm going to grant this motion

8    in limine and exclude under the limine practice any

9    reference to dropped or dismissed claims or patents as a

10   part of the testimony related to Dr. Ugone or the damages

11   case.  I think that's especially appropriate in light of

12   the fact that Defendants want to bring up the covenant not

13   to sue with regard to Dr. Ugone, but their own expert

14   doesn't address it, and there's been no amendment there.

15   This is going to be a grant.

16       Let's move next to Plaintiff's Motion in Limine

17   No. 4, which also appears to be disputed.

18       This has to do with testimony of an individual

19   witness identified as Jerry Garrett and whether his

20   testimony is lay testimony or expert testimony, what should

21   be allowed, what should not be allowed with regard to his

22   knowledge concerning the state of the art.

23       Let me hear from Plaintiff first on this.

24       MR. SON:  Anthony Son on behalf of the Plaintiff,

25   PPS Data.

1        Mr. -- Mr. Garrett was identified in the initial

2   disclosures -- actually a supplemental Rule 26 disclosure

3   where he was identified as someone having personal

4   knowledge of JHA prior art systems disclosed in JHA's

5   invalidity contentions.

6        They did not identify him as someone with

7   knowledge with any -- anything that would be of the state

8   of the art or something that would be directed to what's

9   being routine and conventional.

10       This is an important distinction here because

11  rather than simply having Mr. Garrett testify with respect

12  to the prior art systems, keep in mind that these JHA prior

13  art systems are not at issue in this litigation.  They are

14  not a anticipatory reference.  It is not being relied upon

15  for obviousness, which was out of this case.

16       The sole purpose now would be to supplement their

17  lack of evidence on whether something is well-understood,

18  routine, and conventional.

19       With respect to that issue, the question before

20  the Court is whether -- the fact issue is whether something

21  is well-understood, routine, and conventional to a skilled

22  artisan.  And that is an issue for an expert.

23       Mr. Garrett cannot testify that this is something

24  that would be known to someone skilled in the art.  He

25  can't say that this would be something that would be

1  well-understood.  And the mere fact that he may have done

2  this in the past is not of itself relevant to whether it's

3  something well-understood, routine, and conventional.

4       THE COURT:  Is there a dispute here, counsel,

5  about whether Mr. Garrett would be a person of ordinary

6  skill in the art?

7       MR. SON:  I -- we don't have a position as to

8  whether he would be.  But based on their representation as

9  to what he has done in the past, I would say that he may be

10  somebody of a person skill in the art, yes.  He may qualify

11  for that.

12       But even if he was someone of -- a person of

13  ordinary skill in the art, that does not answer the

14  question, because for him to testify as to what a person of

15  ordinary skill in the art would have known, that gets into

16  the area of expert testimony under the Rule 70 -- 702.

17       And we cited a case for that proposition, Your

18  Honor, in our -- in our brief, we cited Sundance,

19  Incorporated, versus DeMonte Fabricating, 550 F.3d 1356 at

20  1353.  There, what the Federal Circuit said, that where an

21  issue calls for consideration of evidence from the

22  perspective of one of ordinary skill in the art, it is

23  contrary to Rule 702 to allow a witness to testify on that

24  issue not qualified as an expert.

25       So to the extent that they want him to testify to

1   that issue as a person of ordinary skill in the art, they

2   would have, under Rule 26, been required to provide us with

3   an expert report.  They did not disclose him as an expert

4   within the Court's docket control order guidelines for when

5   an expert report had to be disclosed.

6           We believe that he should be excluded because the

7   testimony that he proposed to offer is -- goes to Rule 402

8   is irrelevant.  It's not -- the requisite Jack Henry system

9   is not relevant here for -- as a prior art defense.

10          And then as to what they're trying to use him for

11  under -- for 101 purpose -- Step 2 of the 101 analysis, we

12  think that brings in the specter of 403.

13          What's going to end up happening here is that

14  Mr. Garrett, if he gets to -- allowed to testify as a fact

15  witness -- fact witness as to what he did with respect the

16  Jack Henry system, there is no one -- no expert has given

17  an opinion in this matter in any of their expert reports

18  discussing the Jack Henry system.  No one is going to be

19  able to testify or should be allowed to testify to tie that

20  together for a jury to say that that Jack Henry system

21  shows or is evidence of it being well-understood, routine,

22  and conventional to a skilled artisan.

23          And that's really the point that has to be made

24  here.  Otherwise, what's going to end up happening is the

25  jury is going to hear this testimony about a Jack Henry

1   system and be confused or misled that there may be relevant

2   prior art -- prior art defense.  We're not understanding

3   why it's even being discussed in the case.

4            THE COURT:  Let me ask you this, Mr. Son.

5   Mr. Garrett's clearly not been designated as an expert

6   witness, and he's not an expert witness.  He, as you

7   acknowledge, may be a person of ordinary skill in the art.

8   As such and as a fact witness, he could testify as to what

9   he did and what he knows and his personal experience and

10  knowledge.

11           I -- I agree with you, as a fact witness, he can't

12  testify as to what others would know, either based on what

13  he knows or what he supposes.  He can't testify about what

14  others did or would do because of what he did or would do.

15           But why -- why can't he not properly testify about

16  his own knowledge, his own experience, and his own facts,

17  understanding that he can't opine as to others and he can't

18  offer opinions of his own based on his own experiences, but

19  he can tell this jury what he did and what he knew as a

20  person of ordinary skill?

21           Is there some reason why within those prescribed

22  parameters as a fact witness, as long as the Court acts as

23  a gatekeeper to keep him from straying into areas of

24  opinion or comments about others besides himself, that you

25  would have an objection?

1          MR. SON:  Yes, Your Honor.  I think that goes to

2    Rule 403.  I think that would be very confusing and

3    potentially misleading to a -- to a jury.

4          THE COURT:  Tell me -- tell me how his testimony

5    about what he knows and what he's done, without attributing

6    it to others, without offering an opinion but merely giving

7    factual testimony about his personal experiences and his

8    personal knowledge, tell me how that would be confusing or

9    prejudicial to your side of the case, such that any

10   relevance would -- or probative value would be outweighed.

11         MR. SON:  Your Honor, for two reasons.

12         First, it may confuse and mislead the jury to

13   believe that the Jack Henry prior art system is either

14   anticipatory or somehow renders a -- renders our patent

15   invalid based on a prior art defense that does not exist

16   with respect to some of the claims and patents here.

17         So that's one reason why I think it could be

18   confusing and misleading.

19         Secondly, with respect to the real issue that

20   they're trying to use this for, those facts that

21   Mr. Garrett could establish at trial would be completely

22   untethered to the question that needed to be decided by the

23   jury, whether the claim elements or the combination of

24   claim elements are well-understood, routine, and

25   conventional to a skilled artisan.

1          And the reason for that, Your Honor, is because

2     Dr. Michalson never mentions the Jack Henry system in his

3     expert report.  They never talk about the Jack Henry system

4     as being evidence of it being well-understood, routine, and

5     conventional with respect to any of the claims or the

6     combination of claim elements that are asserted here.

7          So even if --

8          THE COURT:  You're saying Dr. Michalson doesn't do

9     that?

10         MR. SON:  He does not do that.  Nowhere within

11    Dr. Michalson's expert report on invalidity does he talk

12    about the Jack Henry system, nor does he mention

13    Mr. Garrett.

14         THE COURT:  All right.  Let me hear from the

15    Defendant in response, please.

16         MR. HEIDRICK:  Thank you, Your Honor.  Jay

17    Heidrick on behalf of Jack Henry & Associates.

18         As to the Dr. Michalson report, I was going to

19    pull that up.  I'm not sure that that's completely

20    accurate, Your Honor, but we'll set that aside for now.

21         THE COURT:  Well, I -- I'd like to get to the

22    bottom of that, because quite honestly, if Dr. Michalson

23    doesn't establish in any way the Jack Henry system as

24    relevant, then Mr. Garrett's testimony, even as a fact

25    witness about that system and his personal knowledge of it,

1  could seem to fall under Rule 402 as being something that

2  would be irrelevant here.

3       MR. HEIDRICK:  I can pull that up.  And that's the

4  first I've heard of that argument.  So I can pull it up if

5  you give me just a minute, Your Honor.

6       THE COURT:  Take a minute.  I think this is

7  something we need to get to the bottom of.

8       I tell you what, counsel, to facilitate you doing

9  this without me sitting here staring at you, we're going to

10  take about a five-minute recess.

11       MR. HEIDRICK:  Thank you, Your Honor.

12       THE COURT:  Run your traps on this expert report

13  with Dr. Michalson in the meantime, and we'll take this up

14  when I come back.

15       MR. HEIDRICK:  Certainly.  Thank you, Your Honor.

16       THE COURT:  The Court stands in recess.

17       COURT SECURITY OFFICER:  All rise.

18       (Recess.)

19       COURT SECURITY OFFICER:  All rise.

20       THE COURT:  Be seated, please.

21       All right.  Counsel, where are we on this issue

22  that was being investigated when I took a recess?

23       MR. HEIDRICK:  Thank you, Your Honor.  Jay

24  Heidrick for Jack Henry & Associates.

25       Dr. Michalson does opine as to the routine and

1   conventional aspects in his report.  He does not reference

2   specifically the GG Pulley material or Mr. Garrett in his

3   opinion -- in his opinions.

4        But that does not -- still does not preclude

5   Mr. Garrett from testifying as a fact witness, as you said

6   earlier, Your Honor, for the jury consider those facts,

7   especially as it relates to Dr. Shamos's cross-examination,

8   as well.

9        But in multiple paragraphs, Dr. Michalson opines

10  that the claimed invention was not routine and conventional

11  as to Step 2 of Alice.

12       THE COURT:  Does Dr. Michalson offer an opinion

13  about the state of the art of the Jack Henry system that

14  Mr. Garrett has personal knowledge of and could testify as

15  to his own personal knowledge and experience?

16       MR. HEIDRICK:  He does not, Your Honor, as to that

17  system.

18       THE COURT:  Then why would his testimony, lay

19  testimony, though it be, be relevant under Rule 402?

20       MR. HEIDRICK:  Yes.  Because under 402 of -- being

21  relevant as -- the issue of fact, Your Honor, is whether or

22  not the claimed invention was routine and conventional so

23  as PPS Data has articulated it in its briefing, whether or

24  not it was routine and conventional to process checks at a

25  different location, and all of the exhibits that are

1  subject to this, Your Honor, the GG Pulley materials are

2  unobjected to.  They're on our exhibit list.  They're

3  unobjected to.

4        And so if that evidence has already been agreed to

5  by the Plaintiff, then Mr. Garrett's testimony talking

6  about that evidence is also admissible under the same

7  standard.

8        And it would be factually relevant, Your Honor,

9  because if Dr. Shamos is going to say nowhere before have

10  banks in the industry processed checks at a location that

11  is separate from the prohibited systems of the bank of

12  first deposit, then factual testimony of -- of

13  Mr. Garrett's personal experiences, personal knowledge, and

14  personal testimony dealing with exhibits that are

15  unobjected to that go to that same factual issue for the

16  jury to determine is relevant and admissible, Your Honor.

17        THE COURT:  Anything further?

18        MR. HEIDRICK:  No, Your Honor.

19        THE COURT:  All right.  Well, I'm going to -- I'm

20  going to do this, counsel.  I'm going to grant this motion

21  in limine, but I want to do it with an explanation.

22        I don't anticipate that Mr. Garrett would be

23  allowed with a grant of leave from the Court to offer

24  testimony about any other person or -- or knowledge outside

25  of his own personal knowledge and his own personal

1  experience.

2         It is possible that I might grant leave for him to

3  testify with regard to his own personal knowledge and

4  experience, perhaps depending on what Dr. Shamos's

5  testimony is if the door is opened.  But as it stands now

6  with Dr. Michalson's report not identifying the Jack Henry

7  system as relevant to these issues and Mr. Garrett's

8  knowledge being with regard to the Jack Henry system, it

9  appears to me that the Court needs to diligently exercise

10  its role as a gatekeeper here and that there is a risk that

11  if Mr. Garrett is allowed to testify without any

12  constraints, he may easily stray into improper testimony

13  or, at a minimum, areas that will generate confusion with

14  the jury.

15         I'm not telling the Defendant there's no basis

16  upon which I'll allow him to testify.  I'm telling you,

17  you're going to have to approach the bench and persuade me

18  at the time, given the other testimony, what's been raised,

19  how the case has developed, that his own personal knowledge

20  is relevant.

21         And if -- if you can do that, then there's a

22  likelihood that I'm going to let him testify about what he

23  knows.  But I can't imagine any circumstances where I'll

24  allow him to effectively be an expert witness without

25  proper designation or report and testify about what others

1   might know, what others might do, what everybody else does.

2   I can't envision any circumstances where he would be

3   permitted to do that.

4       But to allow the Court to diligently discharge its

5   gatekeeping function, I'm going to grant the motion in

6   limine across the board, but I do it with this explanation

7   so Defendants and Plaintiffs will have some idea of where

8   there might be an opportunity for leave to be granted, all

9   right?

10      Okay.  That brings us to Plaintiff's Motion in

11  Limine No. 5.  This has to do with the issue of terminal

12  disclaimer.

13      Let me hear from Plaintiff on this first, please.

14      MR. MADDOX:  Beg your pardon.

15      Steven Maddox for PPS Data, Your Honor.

16      This terminal disclaimer issue came up in the

17  context of the 101.  It was the -- one of the bases that

18  they argued that the claims must be -- that Claim 1 of the

19  '430 must be representative of all claims because -- and

20  they pointed to terminal disclaimers in some of the other

21  applications.

22      In light of the Court's ruling, it seems we have a

23  live issue as to whether they're going to point to the

24  terminal disclaimer and ask the jury to find that that

25  means these claims are -- that 1 -- that Claim 1 of the

1   '430 is representative of all these claims.

2        We've cited a bunch of case law that's collected

3   in SimpleAir v. Google, and it's also in Ortho Pharm. in

4   our briefs, that say terminal disclaimers do not mean

5   patentably distinct.  They -- they are not evidence of

6   that.  And there's all sorts of reasons for that.

7        The only real push-back we've had is the -- the

8   Defendants have seized on some language in SimpleAir, and

9   the language they've seized on is this:  Thus, a terminal

10  disclaimer is a strong clue that a patent examiner and, by

11  a concession, the applicant, thought the claims in the

12  continuation lacked a patentable distinction over the

13  patent.

14       So --

15       THE COURT:  Over the parent.

16       MR. MADDOX:  Over the parent, I beg your pardon.

17  Yes, Judge.

18       And so you see this strong clue language

19  throughout their briefs.

20       The very next sentence is:  But as our precedent

21  indicates, that strong clue did not give rise to a

22  presumption that a patent subject to a terminal disclaimer

23  is patentably and distinct from its parents patents.

24       There is no case that says a terminal disclaimer

25  is a strong clue of a lack of patent distinctness.  There

1   is basically this dicta that says, hey, well, it might say

2   what people thought, but as far as we can tell, no case,

3   including SimpleAir, has accepted evidence of terminal

4   disclaimers as substantive proof of patent distinctness.

5          And so in light of what -- the position they took

6   in their summary judgment motion, we brought this motion in

7   case it's going to come up in front of the jury.

8          THE COURT:  All right.  Let me hear Defendant's

9   response.

10          MR. WIETJES:  Your Honor, Jason Wietjes for the

11  Defendant.

12          Very simply, Your Honor, this question is very

13  similar, I think, to a lot of the questions that we're

14  talking about in terms of what happened before the Patent

15  and Trademark Office and what is relevant in the context of

16  these 101 determinations.

17          Here, as part of this analysis, as the -- the

18  Court is very well aware, one of the issues is the

19  commensurate scope of the claims for the purposes of

20  determining whether or not a given claim or a group of

21  claims or here, all of the asserted claims claim similar

22  subject matter for purposes of this 101 analysis.

23          Again, we are not saying that the -- the fact

24  alone that terminal disclaimers were filed is dispositive

25  of that issue, but it's certainly something relevant.  It's

 1   a discourse that the applicants had with the Patent Office.

 2   It's -- it's probative as to the Patent Office's view as to

 3   the scope of those claims.  And the jury should be entitled

 4   to consider the full scope of the prosecution before the

 5   Patent Office and attribute what weight it deems proper to

 6   those terminal disclaimers in its analysis of what the

 7   commensurate scope of the claims is in the 101 context.

 8         Your Honor, we -- we think it would be -- it's two

 9   sides of the same coin.  While the -- the patentee and the

10   Plaintiff is certainly entitled and -- and justly entitled

11   to argue the presumption of validity of the patent in

12   bringing its case, but the full record before the Patent

13   Office, then, is also just as relevant.  And everything

14   that happened during prosecution and all of the patent

15   examiner's rejections and actions taken in the case are

16   likewise evidence of that record and are fair for

17   consideration by the jury.

18         THE COURT:  All right.  I gather Defendants can

19   represent to the Court, in light of that argument, that

20   they are not in word or deed going to imply that the

21   terminal disclaimer, to the extent it comes in during the

22   trial, is in and of itself dispositive of this issue.

23         MR. WIETJES:  That's correct, Honor -- Your Honor.

24   That argument will not be made, nor will that

25   representation be made.

```
 1        THE COURT:  All right.  Well, in light of that
 2  understanding that the entirety of the prosecution history
 3  is important to this particular area of inquiry, and also
 4  understanding that you are going to see the issue of
 5  representativeness addressed in detail in the 101 opinion
 6  that I'm working on now, and I know what that's going to
 7  say, and you don't know what it's going to say, I'm going
 8  to deny this motion in limine.
 9        MR. WIETJES:  Thank you, Your Honor.
10        THE COURT:  All right.  The next is issue is
11  Plaintiff's Motion in Limine No. 7.  My understanding,
12  counsel, is that in light of other matters, this is now
13  considered moot; is that correct?  Plaintiff's No. 7?
14        MR. MADDOX:  Can we have a word on the subject?
15        THE COURT:  Do you believe it is moot, or do you
16  believe it's not moot?
17        MR. SON:  Yes, Your Honor, it is moot.
18        THE COURT:  Defendants, do you concur?
19        MR. HEIDRICK:  Yes, Your Honor.
20        THE COURT:  Now, having established it's moot, is
21  there some reason it needs to be addressed, Mr. Maddox?
22        MR. MADDOX:  No, Your Honor.  I beg your pardon.
23        THE COURT:  Okay.  Then that will be --
24  Plaintiff's MIL No. 7 will be denied as moot.
25        That brings us to Plaintiff's Motion in Limine No.
```

1   8.   This has to do with the previously invalidated

2   DataTreasury patents.

3           Let me hear from Plaintiff on this, please.

4           MR. SON:   Anthony Son for PPS Data.

5           The fact that the DataTreasury patent had been

6   invalidated should be excluded from this trial under both

7   402 and 403.   As Your Honor had noted earlier with respect

8   to Dr. Ugone and the motion -- Plaintiff's -- I'm sorry,

9   Defendant's motion to strike Dr. Ugone, Dr. Ugone will not

10  be opining related to the DataTreasury agreement that

11  exists between -- or had existed between DataTreasury and

12  Net Deposit Incorporated, which was the prior company to

13  PPS Data.

14          In light of that, for them to now offer testimony

15  regarding the DataTreasury patents and the fact that the

16  DataTreasury patent was subsequently invalidated and

17  affirmed by the Federal Circuit is wholly irrelevant to any

18  issue in this case.

19          Neither expert -- technical expert has done any

20  analysis or provided any opinion related to the

21  DataTreasury patent.   They have not done any analysis with

22  respect to the claims of the DataTreasury patent and

23  compared them to the complaint -- to the claims of the PPS

24  Data patents that are being asserted today.

25          The sole purpose at this point, I imagine, for

1  trying to bring in the evidence that the DataTreasury

2  patents were -- were somehow invalidated under 101 grounds

3  would be to prejudice the jury, believe that because a

4  patent had been invalidated by 101 grounds and those

5  DataTreasury patents were used to assert that -- were

6  asserted against the same product, that the jury may then

7  be led erroneously that the PPS Data claims must also be

8  invalid.

9       That is improper under the law.  You can't use a

10  third-party patent in that regard -- in that manner.

11       In their opposition, they tried to make a couple

12  of arguments.  One, that the -- that the DataTreasury

13  patent covered the same type of product at issue in this

14  lawsuit and that somehow that renders it relevant.

15       That's a flawed argument because there are --

16  there can be multiple patents that cover the same products

17  but are not prior art to one another.

18       There's never been a prior art argument made with

19  respect to the DataTreasury patents.  They were never

20  disclosed in their invalidity contentions as being prior

21  art.  Dr. Michalson never even discusses the DataTreasury

22  patents in his expert -- expert report.  It goes to

23  absolutely no issue here.

24       So for that reason, we think that the jury's

25  confusion here to introduce this type of evidence would be

1  highly prejudicial.  It would be confusing and misleading.

2         THE COURT:  All right.  Thank you, counsel.

3         Let me hear from Defendant in response.

4         MR. WIETJES:  Your Honor, Jason Wietjes for the

5  Defendant.

6         Here -- here, Your Honor, I think the -- the

7  requisite starting point for this analysis is the fact that

8  PPS Data's predecessor entity entered into a license

9  agreement with DataTreasury, subject -- the subject of that

10 agreement being the DataTreasury patents.  For purposes of

11 this here, I'll just refer to those as DataTreasury

12 patents.  It's a pretty detailed agreement.

13        They've presented and argued to this Court, and

14 this was in response to the motion to strike certain

15 portions of Dr. Ugone's expert report relying on the

16 DataTreasury patent.  They've represented and argued that

17 that patent was relevant to the hypothetical negotiation,

18 and subsumed in that argument they've represented that the

19 DataTreasury patents are technically comparable to the

20 patents asserted in this case.

21        And so, Your Honor, this goes to, again, that

22 question of what is routine and conventional.  If -- if

23 those patents were, in fact, technically comparable to

24 these patents, as PPS Data has argued and represented to

25 this Court, those patents have an earlier priority date and

1    pre-date the PPS Data patents asserted in this case.

2           So based upon that, the notion is that that

3    proves or at least is evidence of the routine and

4    conventional nature of the claims asserted against Jack

5    Henry.

6           That's the foundation of -- of the evidence and

7    the testimony that would be elicited surrounding that.

8           THE COURT:  Do you dispute Plaintiff's argument

9    that none of the expert witnesses and their resulting

10   reports have established a comparability and equivalents

11   between the DataTreasury patents and the patents at issue

12   in this case?

13          MR. WIETJES:  That's true, Your Honor.  The

14   technical experts have not undertaken that analysis.  This

15   would come up, I believe, in -- it would depend on what

16   Dr. Shamos's testimony was in this regard, but the fact

17   that they've -- they're on record as saying that these --

18   these patents are technologically comparable, I think he

19   should have to answer for that in -- in cross-examination

20   that gets to the heart of this routine/conventional

21   question.

22          THE COURT:  So let me see if I understand your

23   argument.

24          Are you telling me that because of some earlier

25   argument before the Court only in pre-trial, that the

1    Plaintiffs have made some kind of binding admission of

2    comparability or similar -- similarity here that opens the

3    door to the DataTreasury testimony, or, alternatively, are

4    you telling me that if during the course of the trial a

5    witness for the Plaintiffs makes that statement, that then

6    the door would be open to the kind of testimony which would

7    push back on that and would show the ultimate invalidity of

8    the DataTreasury patents?  There are two different things

9    here, and I'm trying to be clear on exactly what you're

10   talking about.

11        MR. WIETJES:  I understand your question.

12        And the argument is not that it's a door opening

13   evidentiary or a door opening piece of evidence.  It's an

14   affirmative cross-examination line of questioning is

15   what -- what we are anticipating here, Judge.

16        THE COURT:  Now, refresh my recollection, but to

17   the extent Plaintiffs have made that kind of representation

18   to the Court, my recollection is such was done only in the

19   context of the damages case, not as to the technical

20   aspects of the case or as to the invalidity question.

21        Do you disagree with that?  And to the extent you

22   don't disagree with that, why would that kind of

23   representation only as to damages open the door or properly

24   permit this kind of testimony as to a wholly separate

25   inquiry such as invalidity?

1          MR. WIETJES:  First, Your Honor, I do not disagree

2     with you -- with the first statement that you made.

3          THE COURT:  So I guess you don't disagree means

4     you do agree?

5          MR. WIETJES:  I would agree -- I would agree with

6     you that the expert --

7          THE COURT:  We'll get the double negative out of

8     the way.

9          MR. WIETJES:  Thank you.  To -- to answer the

10    second part of your inquiry, we don't think they can have

11    it both ways.  If they -- for purposes of the damages case,

12    if they want to say these are comparable so that they can

13    establish a reasonable royalty based on that license, then

14    we should be able to ask their technical expert if he

15    agrees with that.

16         And to the extent he disagrees with that, then we

17    think that's probative as to the routine and conventional

18    nature of this.

19         THE COURT:  Anything further?

20         MR. WIETJES:  Nothing further, Your Honor.

21         THE COURT:  In light of that discussion, does

22    Plaintiff have anything else to add to this before we move

23    on?

24         MR. SON:  Very quick, Your Honor.

25         The discussion related to the technical

1   comparability for a hypothetical negotiation standpoint

2   applying the Georgia-Pacific factors is different than the

3   question with respect to the validity of whether something

4   is routine and conventional.  The comparison that was made

5   and the arguments that were made with respect to

6   Dr. Ugone's testimony about his licenses -- and keep in

7   mind, he never argued that they were technically comparable

8   for that purpose.

9          Dr. Ugone's testimony was always that this is a --

10  the fact that Net Deposit, the prior company to PPS Data,

11  entered into a license agreement in 2005 with DataTreasury

12  is a fact that's relevant to the minds of the hypothetical

13  negotiators.  Both Jack Henry and Net Deposit or PPS Data

14  in the case, in 2007 during the hypothetical negotiation,

15  would know about that.

16         The fact that it replied to a remote deposit

17  captured product, which is the same type of product here,

18  that was the scope of the analysis.  There was no admission

19  or discussion made with respect to a technical

20  comparability with respect to the claims.

21         And, in fact, the claims are different here.

22  Their -- their expert, Dr. Michalson -- Dr. Carter for

23  damages disagrees with the technical comparability issue

24  and relied on discussions that he had with in-house people

25  over at Jack Henry to that point.

1          So we think that there -- there is significant

2   difference.

3          Dr. Shamos is not going to be offering testimony

4   related to the DataTreasury patent.  He did not offer any

5   opinions related to the DataTreasury patent in his expert

6   report with respect to either infringement or validity.

7   That's PPS Data's expert.  And they admit that

8   Dr. Michalson does not either.  This DataTreasury patent is

9   simply irrelevant.

10          THE COURT:  Well, correct me if I'm mistaken,

11   there was earlier in this case a motion by Defendants to

12   strike the portions of Dr. Ugone's report that address the

13   DataTreasury patents, that that was withdrawn by Defendants

14   because Plaintiffs agreed Dr. Ugone was not going to

15   address the DataTreasury patents in his testimony; is that

16   accurate?

17          MR. SON:  That is -- that is correct, Your Honor.

18          THE COURT:  So as to damages, the Defendant didn't

19   want Dr. Ugone to talk about the DataTreasury patents, but

20   now as to validity and technical issues, they do want to go

21   into the DataTreasury patents because of their later

22   invalidity?

23          I'm going to grant this motion.  I think that the

24   basis for Defendants to go into it has not been

25   established, and there's not a tech -- a technical

1  comparison.  And the likelihood of confusion with the jury

2  regarding other patents that have been held invalid without

3  a technical establishment of comparability is -- is

4  dangerous, at best.

5           This -- this motion is granted.

6           All right.  Next is Plaintiff's Motion in Limine

7  No. 9.  That also appears to the Court to now be, based on

8  the comments of counsel, moot; is that correct?  Check your

9  notes and please let me know on the record.

10          MR. SON:  Yes, Your Honor, that is -- that is

11  moot.  Anthony Son for PPS Data.

12          MR. HEIDRICK:  Jay Heidrick for Defendant.  Yes,

13  Your Honor.

14          THE COURT:  All right.  Then that will be denied

15  as moot, both sides confirming that that is, in fact, the

16  case.

17          Okay.  That brings us to the surviving Defendant's

18  motions in limine.  My understanding is that Defendant's

19  Motion in Limine No. 2 has been withdrawn; is that correct,

20  Defendant?  And Plaintiff?

21          MR. SABA:  Your Honor, there is one more PPS Data

22  motion that I don't think we've covered.  I don't know

23  whether --

24          THE COURT:  There's another Plaintiff's motion in

25  limine that's been missed?

1          MR. SABA:  Yes, it is Motion No. 6, which is in

2    the same category as Jack Henry's Motion No. 5 regarding

3    pre-suit damages and marketing.

4          THE COURT:  And I have that, Mr. Saba.  I have

5    that on my list.  I just have it pushed back to the end

6    because there's overlap between both sides.  So we will get

7    to it.

8          MR. SABA:  Understood.  Thank you.

9          THE COURT:  So let's return to Defendant's Motion

10   in Limine No. 2.  Do both sides agree this has been

11   withdrawn?

12         MR. SON:  Anthony Son for PPS Data.

13         That is my understanding, Your Honor.

14         THE COURT:  Mr. Heidrick, what's Defendant's

15   posture?

16         MR. HEIDRICK:  Yes, Your Honor.

17         THE COURT:  Okay.  Then the Court will note that's

18   been withdrawn, no longer before the Court.

19         Next is Defendant's Motion in Limine No. 4.  This

20   shows, at least in my notes, counsel, to still be in

21   dispute.  But also my indication is that it rises and falls

22   with the motion to strike Docket No. 79, which has already

23   been dealt with and was denied.

24         If, in fact, it does rise and fall with that prior

25   ruling, is this still at issue?

1              MR. SON:  Your Honor, Anthony Son for PPS Data.

2         We believe that that motion was also withdrawn.

3              THE COURT:  Defendant's Motion in Limine No. 4?

4              MR. SON:  Correct.  That's the one with -- as I

5    understand it, that is the one directed to Dr. Michalson

6    being qualified to testify or being competent, whether we

7    can reference that at trial.

8              THE COURT:  Mr. Heidrick, what's Defendant's

9    posture?

10             MR. HEIDRICK:  We concur with that, Your Honor.

11             THE COURT:  All right.  Then I'll note that it's

12   been withdrawn.  I simply did not have that notation before

13   me.  Thank you for that clarification.

14             All right.  That brings us to what I will classify

15   as overlapping motions in limine, which we'll take up

16   concurrently.

17             Based on what I have before me, it appears that

18   there is a disputed Defendant's Motion in Limine No. 1 --

19   excuse me, Defendant's Motion in Limine No. 1, Plaintiff's

20   Motion in Limine No. 3.  The notation I have are that those

21   are withdrawn; is that correct?  Defendant's No. 1 and

22   Plaintiff's No. 3?

23             MR. SON:  Your Honor, on behalf of PPS Data,

24   Anthony Son.  Again, that is my understanding, those have

25   been withdrawn.

 1          MR. HEIDRICK:  We concur.  Jay Heidrick on behalf

 2  of Jack Henry.

 3          THE COURT:  All right.  Then I'll note that

 4  Defendant's Motion in Limine 1 is withdrawn, and

 5  Plaintiff's Motion in Limine 3 is withdrawn.

 6          I also have a note that Defendant's -- yeah, I've

 7  said that.  Never mind.

 8          All right.  That brings us to the pre-suit damages

 9  issue which takes up and includes Defendant's Motion in

10  Limine No. 5 and Plaintiff's Motion in Limine No. 6.  These

11  appear to be still in dispute.  To the extent they are, let

12  me hear from both sides concurrently on these.

13          Let's start with Plaintiff, and then I'll hear

14  from Defendant.

15          MR. SABA:  Your Honor, Kaveh Saba on behalf of

16  Plaintiff, PPS Data.

17          THE COURT:  Please proceed.

18          MR. SABA:  I'll proceed with PPS Data's Motion

19  No. 6 if that's okay with the Court.

20          THE COURT:  It is, but I want to hear from you on

21  both --

22          MR. SABA:  Absolutely.  I'll start with this one,

23  and then get to the -- to the other motion.

24          So the critical fact with respect to PPS Data's

25  motion, which I believe Jack Henry has conceded, is that

1   Jack Henry has failed to even try to satisfy its burden of

2   production of identifying any specific product it believes

3   to have been unmarked and that practiced the claims prior

4   to now.

5            It didn't raise it in its pleadings.  It didn't

6   raise it after we responded to an interrogatory on marking

7   and disclosed all of our licenses.  It never said anything

8   to us at any point during fact discovery.  And, in fact,

9   Jack Henry's counsel, during discovery, had told us that

10  the relevant period was six years pre-complaint.  And

11  that's Docket No. 117-3.

12           Jack Henry never pushed back that somehow the

13  sales data shouldn't go all the way back to January 2012,

14  never bothered to ask the licensees that it subpoenaed

15  about anything regarding marking, never pointed to any such

16  products during discovery, expert discovery even, and never

17  moved for summary judgment on this issue.

18           Under the Arctic Cat case, which I'm sure the

19  Court is familiar with, the Federal Circuit made it clear

20  that the accused infringer bears an initial burden of

21  production, and that is to put the patentee on notice that

22  he or his authorized licensees sold specific unmarked

23  products which the alleged infringer believe practiced the

24  patent.

25           Jack Henry simply never did that here.  It

1  operated this entire case as if the pre -- the damages

2  period was the full six years before filing of the

3  complaint.

4       So what Jack Henry -- I think what their response

5  is, well, we're raising it now.  That's simply not good

6  enough.  We've got less than a few weeks left to trial.

7  PPS Data could not possibly do the investigation, the

8  discovery we would have had Jack Henry actually raised this

9  at any point in the case.

10      The scope of products they're pointing to are

11  basically any products covered by any number of -- any

12  forward licenses and with respect to Net Deposit, any of

13  its products that were -- that were sold over a decade ago.

14  We don't have any opportunity to test their theory,

15  whatever that may be, on the licensees to conduct discovery

16  on them, whether they were marking, whether they reasonably

17  believe that they don't need to mark because they were not

18  within the scope of the claims.

19      We don't have the opportunity to go to the current

20  owner of the Net Deposit product which has been sold

21  multiple times over to confirm that that product was, in

22  fact, marked.  And we didn't even have an opportunity

23  during expert discovery to deal with this issue.

24      All their expert, Dr. Carter, said -- his entire

25  report was focused on the January 2012 start date for

1   damages.  He presented a couple of bare calculations on

2   damages starting at the time of the complaint, January

3   2018.

4          When we asked him about this at his deposition, he

5   said:  I don't really have a basis for this.  I was just

6   told to provide the calculation.

7          None of that is raising the issue, and we believe

8   this is exactly the type of deprivation of any meaningful

9   opportunity to conduct discovery that Your Honor precluded

10  as too late in the Lake Cherokee versus Marvell

11  Semiconductor case that we cited, 964 F.Supp. 2d. 653.  And

12  in that case, the preclusion, based on similar facts, was

13  so clear, that the Court issued it sua sponte.  And that

14  was in response to Defendant's motion for summary judgment

15  on the issue.  We believe the result should be the same

16  here.

17         THE COURT:  And you're telling me, counsel, that

18  the Defendants have not raised in any manner prior to this

19  motion in limine the propriety of the pre-suit damages

20  issue?

21         MR. SABA:  Correct.  I would also like to point

22  out the two cases that Jack Henry cited in its response to

23  us to say -- to support the proposition that somehow it's

24  okay to raise it at trial.

25         The first is the Arctic Cat decision itself that

1   Jack Henry cited in its response at Page 10.  We don't

2   think that's correct.  The Federal Circuit itself pointed

3   to Defendant's expert testimony that showed specific

4   products that he had reviewed and he had determined

5   practice the patents.

6           So it was clearly raised during the expert

7   discovery and presumably during fact discovery to get the

8   information that expert needed.

9           The Federal Circuit further remanded the case and

10  told the District Court to consider whether additional

11  discovery is necessary.  The District Court granted

12  additional limited discovery on the marking issue.  All of

13  this is to say that this is clearly a highly fact intensive

14  issue.  It requires specific discovery and testing of the

15  theories that need to be disclosed earlier, and that's

16  exactly why the Arctic Cat case put in the initial --

17  clarified the initial burden of production on the Defendant

18  so that we can have a chance to do that.

19          Jack Henry also points to the Semcon versus Huawei

20  case as somehow saying that the Defendant can raise this

21  issue for the first time on summary judgment.  But what

22  their brief ignores is that another Defendant in that very

23  case, Texas Instruments, had raised marking against the

24  patentee all along.  So the patentee had been on notice.

25  They were prepared to address it.  They had been preparing

1  their case all along.  That's not remotely the case here.

2          And, in fact, in that case, the Court said that

3  for other patents for which the Defendant, Huawei, did not

4  specifically satisfy its initial burden of production but

5  only a bare calculation of post-suit damages, there was no

6  burden for the patentee to prove compliance at trial

7  because the alleged infringer had failed to meet its

8  burden.  That's exactly the case here.

9          One final point on -- on this motion is that we

10 don't even believe that Jack Henry has met its burden to

11 identify what the Arctic Cat case requires, specific

12 unmarked products that it believes to practice the patent

13 at the motion in limine stage.

14         And with respect to Net Deposit, it doesn't even

15 point to any specific product.  And, frankly, that's not

16 all that surprising here given that there is no discovery

17 from either side on this issue.

18         So we don't see how Jack Henry could even stand up

19 at trial and plausibly say that it has a genuine belief of

20 specific unmarked products in the past that it believes to

21 have practiced the patents.

22         And so this is exactly the type of case that in

23 Arctic Cat -- that Arctic Cat was trying to avoid with the

24 burden of production to avoid such fishing expeditions and

25 gamesmanship, and we -- we would ask that the Court

1  preclude Jack Henry from arguing against pre-suit damages

2  here.

3       And unless the Court has questions on that motion,

4  I'll -- I'll address Jack Henry's motion.

5       THE COURT:  No, that appears to be more or less

6  the mirror image of what you've just given me, but go

7  ahead.

8       MR. SABA:  Well, it -- Jack Henry's motion in

9  limine is about pleading, and that's actually -- I think,

10  can be and should be readily dismissed under the law of

11  this Court, the Federal Circuit, and other District Courts.

12  The law is clear that pleading compliance with 287, it's

13  sufficient to say that infringement has been willful and

14  knowledge of the patents has been in place without

15  reference to the pre-complaint.

16       So I -- I -- for example, the Avid Identification

17  versus Philips Electric case of the Western District,

18  allegations that the Defendant willfully and deliberately

19  infringed were sufficient without any specific reference

20  before the complaint -- I'm sorry, that's this -- this

21  Court.  The Western District of Texas, same thing.  Applied

22  Materials versus Muto Technology, knowledge of the patents

23  from at least the filing of the complaint was sufficient.

24       That's exactly what we've got here.  We have

25  allegations as to every patent of notice of no later than

1  the filing of this complaint, in addition to willful and

2  deliberate infringement allegations.  That's a direct match

3  as a matter of formalism.

4         There's also the practical issue which I do

5  believe is -- is somewhat of a mirror issue, which is that

6  we don't think that Jack Henry can genuinely say that it

7  believed pre-suit damages to be outside the scope of this

8  case.  There was no Rule 12 motion.  Jack Henry propounded

9  an interrogatory on marking.  If it believed marking to be

10  out of this case, there would be no reason to do that.

11         We -- in email correspondence about discovery,

12  Jack Henry's counsel represented that the relevant period

13  is six years before filing.  Everyone has operated under

14  the understanding that pre-suit damages are alleged all

15  along.

16         And I should point out that, in fact, the

17  reason -- the way Jack Henry's motion came about is we

18  exchanged proposed motions.  We included a marking motion.

19  The next day Jack Henry said:  We're considering a marking

20  motion of our own.

21         I don't raise that to say that somehow it's

22  improper or it's in violation of the rules, but it does go

23  to show that this didn't appear to be an issue that Jack

24  Henry was raising.  In fact, it didn't raise it ever.  And

25  it only raised it once we proposed our motion to preclude

1    them.

2          And so for that reason, as well if -- if for

3    whatever reason the pleading were, you know, technically

4    insufficient, which we don't think is the case under the --

5    under the law, we would ask for leave to amend to cure that

6    to simply match what is the actual operation and

7    understanding in this case throughout.

8          THE COURT:  All right.  Anything further?

9          MR. SABA:  No, Your Honor.

10         THE COURT:  All right.  I'll hear from Defendant

11   in response then.

12         MR. HEIDRICK:  Thank you, Your Honor.  Jay

13   Heidrick on behalf of the Defendant.

14         I'd like to first begin with the issue of the

15   pleading aspect of it, Your Honor, because on one hand,

16   they're telling you that we properly pled this issue of

17   pre-marked damages.  And, on the other hand, they're

18   telling you that we had no idea this was going to be an

19   issue in the case, despite the fact that the law is clear.

20   It's their burden to both plead and prove the aspect of

21   pre-suit marking.  So --

22         THE COURT:  As I understood the argument, it was

23   not that they believe they had properly pled pre-suit

24   damages.  They didn't understand until the -- this

25   particular pair of motions in limine were filed that

1   Defendants asserted that they didn't have a basis to

2   recover pre-suit damages and that there was a marking issue

3   raised by the Defendant, which clearly is the Defendant's

4   burden to raise that issue once a proper pleading has been

5   put forward.

6        MR. HEIDRICK:  Yes, they're -- they're -- what

7   they're telling you, Your Honor, is that they -- that the

8   Defendants did not raise this issue soon enough, so,

9   therefore, they had no duty to go -- or ability to go get

10  information on these issues.

11       But I think what gets lost in translation here,

12  Your Honor, is that it's their burden of proof to show

13  compliance to both plead and prove it.  So they have a duty

14  to both plead and prove it, Your Honor, just like they do

15  with infringement, just like they do with damages.  And

16  that should be part of a reasonable pre-suit investigation

17  that we are going to have to plead and prove this.

18       As far as the specific identification of products,

19  Your Honor, and that's really what it goes down to is

20  they're telling us -- telling you that Jack Henry didn't

21  identify a specific number of products that are relevant

22  here.

23       We sent them an interrogatory on the issue to

24  which they objected to and they had -- they identified no

25  product.  We took their designee, Your Honor, through each

1  of the license agreements in -- in his deposition and asked

2  him, for example -- this is at Page 50 of his deposition:

3  What Wausau products did PPS Data believe were covered

4  under this agreement?

5          I don't know.

6          Next -- as to Diebold:  What Diebold products did

7  PPS Data believe were covered under this agreement?

8          I don't recall.

9          And question:  And I guess in the general sense

10 were -- is it your understanding that there were Diebold

11 products that were covered by this agreement?

12         Yes.

13         And are the licensed patents required to

14 manufacture and sell those products?

15         Answer:  I do not -- I'm not -- I don't know what

16 Diebold -- it's a Diebold thing.

17         RDM, same thing.  What products are covered under

18 this license?

19         I don't know.

20         Are the licensed patents required to manufacture

21 and sell RDM's products?

22         I don't know.  I don't know their products.

23         So, Your Honor, the problem here is we went

24 through each one of the licenses on that, and so we've

25 asked an interrogatory on the specific and -- products

1  that -- that it -- that it sold that would be subject to

2  marking.  They didn't identify a product.

3          We asked their designee:  Which products are

4  covered by this license?  He didn't know.

5          And so for us -- what we did with our motion in

6  limine, then we identified the products that were subject

7  to the pleadings that were publicly available that we could

8  see and that were set forth in license agreements.  But for

9  the issue of they haven't identified -- they haven't met

10  their additional burden of production to identify any

11  specific products, well, they haven't told us any specific

12  products.  They don't know what specific products are --

13  are subject to that.

14          And it is their burden to show compliance with the

15  marking.  And how -- I'm -- I'm at a loss how we can

16  identify what specific products we claim should be marked

17  when they can't even identify what products are subject to

18  the license for that.

19          So as to the pleading issue, Your Honor, Mr. Saba

20  referenced the Federal Circuit decision and the Western

21  District of Texas decision as to the allegations of

22  willfulness are sufficient.  Well, they've withdrawn their

23  willfulness allegation, Your Honor.  So if they've

24  withdrawn their willfulness allegation in this case, then

25  they've withdrawn it for all purposes.

1        Additionally, in the pre-trial order that was

2   submitted to the Court, this is -- was -- was submitted

3   after we filed the motions in limine, after we raised this

4   issue, after we informed them of it, there's nothing in

5   that that addresses compliance with 287.

6        So even after this has gone forward, Your Honor,

7   there's still nothing that -- that addresses this from a

8   pleading standpoint.

9        And the Federal Circuit law is clear that it is

10  their burden to plead and prove.  We've sought discovery on

11  what products are subject to licenses.  We've got nothing

12  in return.

13       Therefore, we believe that -- that does shift

14  the -- that -- that we have met our burden of production,

15  and it is their duty to show at trial, if Your Honor find

16  that they have pled it first, then it's their duty to show

17  at trial the license agreements that they're introducing,

18  that those -- that the products subject to them have been

19  properly marked, as we've identified in our motion in

20  limine.

21       THE COURT:  Anything further?

22       MR. HEIDRICK:  No, Your Honor.

23       THE COURT:  All right.

24       MR. HEIDRICK:  Oh, I do have one thing, Your

25  Honor, if I may.

1          THE COURT:  Yes.

2          MR. HEIDRICK:  This is not an affirmative defense

3   that -- that can be waived.  It is a burden of proof that

4   the -- that the Plaintiff has on this.  So it's not like

5   something of you -- we haven't raised an affirmative

6   defense as part of our answer or a subject like that.  It

7   is they had -- they have an affirmative burden to both

8   plead and prove compliance with the marking at trial with

9   the products that we've identified, Your Honor.

10         And that's all.  Thank you.

11         THE COURT:  Well, with regard to these two

12  overlapping motions in limine, the Court's persuaded that

13  the Plaintiffs properly pled the issue if by no other means

14  than raising the willfulness issue in their original

15  complaint.

16         At the time they raised their willfulness issue in

17  their original complaint, Defendants had an obligation to

18  assert a failure to mark under 287 if they took that

19  position.

20         Defendants did not assert a failure to mark.  Had

21  they asserted a failure to mark, then Plaintiffs would have

22  had to come back and offer proof of either marking or

23  actual knowledge.  That can't be done without notice that

24  the marking defense is being raised by the Defendant.  And

25  it certainly can't be done when the first time that comes

1  up is motion in limine practice at the end of the

2  development of the case and on the eve of the trial of the

3  case.

4        This is much like an issue that this Court dealt

5  with, although it was assigned to my Magistrate Judge in

6  the Freeny versus Fossil matter.  There, Judge Payne

7  properly held that the Defendant had an obligation to put

8  the Plaintiff on notice of its marking contentions, and had

9  they done that, the Plaintiff could have had a fair chance

10  to develop evidence to show that it had complied with the

11  marking statute.  Failure to put them on notice until late

12  in the trial process was effectively an attempt to ambush

13  the other side.

14        And without -- without assigning mental state or

15  motive or maliciousness, it's clear this did not arise

16  until late, late in -- in the trial process.  And

17  Defendants failed in light of proper -- a proper pleading

18  initially urged by Plaintiff, Defendants failed to assert

19  and raise and meet its duty to raise the marking defense

20  under Section 287.

21        And without that and without an opportunity to

22  prepare a response and evidence as called for under the

23  marking statute, it's unfair to hold Plaintiffs to that

24  failure to offer proof at this late date.

25        Also, the local rules -- the local patent rules of

 1   this district require both parties to make a full

 2   disclosure of their theories of the case and the issues

 3   that they believe are properly judiciable before the jury.

 4   Defendants never raised the marking statute in compliance

 5   with their disclosure obligations under the local rules of

 6   this Court.

 7           Consequently, I'm going to grant PPS Data's MIL

 8   No. 6, and I'm going to deny Jack Henry's MIL No. 5.

 9           Also, counsel, I did not mention earlier -- and it

10   was probably an oversight on my part -- but the Defendants'

11   MIL No. 3 regarding exceeding the scope of an expert

12   report, that motion in limine appears, from my notes, to

13   have been withdrawn by the Defendants.

14           I need to confirm on the record that that is

15   accurate in the case, or we need to go back and take it up.

16           Defendants, have you withdrawn Defendant's Motion

17   in Limine No. 3?

18           MR. HEIDRICK:  Jay Heidrick.  Yes, Your Honor.

19           THE COURT:  Okay.  Then that will be noted as

20   having been withdrawn.

21           Now, having covered that, it appears, at least,

22   again, from my notes, that the Court has taken up and

23   considered and ruled on all the live motions in limine

24   asserted by either party.

25           Is either party aware of live motion in limine

1   issues that have not been dealt with by the Court or

2   otherwise withdrawn or recognized as moot in some way been

3   dealt with?

4          MR. SON:  Anthony Son for PPS Data.

5          Your Honor, we're not aware of any live motions in

6   limine.

7          THE COURT:  Mr. Heidrick, are you aware of

8   anything we haven't covered with regard to motion in limine

9   practice?

10         MR. HEIDRICK:  I'm not aware of anything, Your

11  Honor.

12         THE COURT:  Thank you.  Now, it was also my

13  understanding, counsel, based on our prior pre-trial

14  hearing and the notices and communications that have taken

15  place between then and now that both sides were of the

16  opinion that with clear rulings from the Court on the

17  motions in limine, that there would be no need for the

18  Court to take up and hear individual disputes with regard

19  to pre-admission of exhibits in the case.

20         Am I correct in understanding that in light of

21  these limine rulings, the parties can submit an agreed and

22  undisputed list of pre-admitted exhibits to the Court, and

23  we don't need to open the door to argument with regard to

24  any individual disputed exhibits?

25         MR. SON:  Anthony Son for PPS Data again.  Yes,

 1   Your Honor.  I think that we can be -- we are in a position

 2   now, in light of your rulings, to be -- dismiss such an

 3   exhibit list.

 4          THE COURT:  Do you concur with that, Mr. Heidrick?

 5          MR. HEIDRICK:  Yes, Your Honor.  It's my

 6   understanding there are no objections from either side to

 7   exhibits.

 8          THE COURT:  All right.  Well, with that clarified

 9   on the record, then I'm going to direct both sides to meet

10   and confer and to the extent it's not already been done to

11   submit to the Court, and particularly to the courtroom

12   deputy, a list of exhibits that are pre-admitted by

13   agreement of the parties and without dispute so that we can

14   have a defined and clearly set forth universe of

15   pre-admitted exhibits in the Court's possession and known

16   to both parties before the trial begins.

17          With that established and agreed upon list of

18   pre-admitted exhibits, there will be no need to make a

19   formal offer during the course of the trial.  Either side

20   may draw from that list of pre-admitted exhibits freely and

21   without predicate in use before the jury.

22          It is my practice, to the extent you're not

23   already aware of this, but it is my practice that in this

24   regard, there is a need to keep a running record of what

25   has actually been used before the jury from the list of

1    pre-admitted exhibits, as opposed to those pre-admitted

2    exhibits that do not see the light of day before the jury

3    and are not ever used or in any way published before the

4    jury as a part of the trial.

5           So my practice in that regard is we begin the

6    trial with a clearly defined universe of pre-admitted

7    exhibits.  Then beginning on the second day of the trial,

8    before I bring in the jury, I'll ask a representative for

9    each side to go to the podium and read into the record the

10   list -- the items from the list of pre-admitted exhibits

11   that they have used in the preceding day's portion of the

12   trial.  I'll hear from Plaintiff, and I'll hear from

13   Defendant.

14          And I will do that each morning before I bring in

15   the jury so that on a rolling basis, we can keep clear in

16   the record what has been used before the jury from the list

17   of pre-admitted exhibits and is, in fact, an admitted

18   exhibit and a part of the evidence in the case and separate

19   that from those pre-admitted exhibits that are not used

20   during the course of the trial, are not seen or published

21   to the jury, and are not evidence or admitted exhibits in

22   the case.

23          And as I say, I'll do that on a rolling basis each

24   day throughout the trial, beginning on the morning of the

25   second day before I bring in the jury.

1          Is everybody clear on the Court's intended

2    procedure in that regard?  Does anybody have any questions

3    about how I intend to do that?

4          Plaintiff?

5          MR. SON:  Not for -- not on behalf of PPS Data,

6    Your Honor.

7          THE COURT:  Defendant?

8          MR. HEIDRICK:  No, Your Honor.  Jay Heidrick.

9          THE COURT:  All right.  Now, you need to meet and

10   confer and get the agreed upon and undisputed list of

11   pre-admitted exhibits identified and communicated to the

12   Court.  I don't see any reason why you can't have the

13   remainder of the week.  It probably won't take you that

14   long, but that needs to be filed with the Court with a copy

15   furnished to the courtroom deputy not later than noon on

16   Friday of this week.

17         Mr. Heidrick?

18         MR. HEIDRICK:  Your Honor, is that just the list

19   or the actual exhibits?

20         THE COURT:  That's the -- that's the list of

21   pre-admitted exhibits by designated exhibit number and

22   description.  However, I'm going to refer everybody to

23   Ms. Lockhart, and before the trial starts, she's going to

24   want original copies of those documents so that she can

25   manage them and keep up with them throughout the trial.

1   And whatever Ms. Lockhart tells you, you can take it as

2   being from -- from me, just as well as from her.

3          But as of Friday of this week, at noon, I just

4   want a definitive list that identifies those pre-admitted

5   exhibits.  I hope that answers your question.

6          MR. HEIDRICK:  Yes, Your Honor.  Thank you.

7          THE COURT:  All right.  Having covered now both

8   the motions in limine and the issue of pre-admitted

9   exhibits and having previously dealt with the dispositive

10  motions, again, you're waiting on me for a fulsome and

11  complete opinion regarding the 101 issue, which you'll have

12  later this week, are there any other matters that either

13  Plaintiff or Defendant's aware of that we need to take up

14  and address as part of the pre-trial practice that we

15  haven't covered so far?

16         Is there anything else you're aware of, Mr. Son,

17  that we need to go back and cover?

18         MR. SON:  Not -- no, Your Honor.

19         THE COURT:  How about Defendants?

20         MR. HEIDRICK:  No, Your Honor.

21         THE COURT:  All right.  Then based on all that,

22  I'll consider that this concludes the pre-trial hearing in

23  this case.  And we'll go forward with our existing trial

24  date.

25         It is my intention for the clerk to play the

1  patent video from the Federal Judicial Center to the venire

2  panel before jury selection.  I've gone over my intentions

3  with regard to voir dire and jury selection with you

4  earlier.

5         So unless there's something further, that will

6  complete the pre-trial hearing today.

7         The Court stands in recess.

8         COURT SECURITY OFFICER:  All rise.

9         (Hearing concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          <u>CERTIFICATION</u>

2

3          I HEREBY CERTIFY that the foregoing is a true and

4   correct transcript from the stenographic notes of the

5   proceedings in the above-entitled matter to the best of my

6   ability.

7

8

9    <u>/S/ Shelly Holmes</u>    _____         <u>8/27/19</u>
     SHELLY HOLMES, CSR, TCRR               Date
10  OFFICIAL REPORTER
    State of Texas No.: 7804
11  Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25