**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| PPS DATA, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.  2:18-CV-00007-JRG** |
| | § | |
| JACK HENRY & ASSOCIATES, INC., | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is the Motion for Summary Judgment of Invalidity Under 35 U.S.C. § 101 ("the Motion") filed by Defendant Jack Henry & Associates, Inc. ("JHA"). (Dkt. No. 81). Having considered the Motion, and for the reasons set forth herein, the Court finds the Motion should be and hereby is **DENIED**.

## I.    Factual and Procedural Background

Plaintiff PPS Data, LLC ("PPS Data") alleges direct infringement of Claims 1, 7, 19, and 25 of U.S. Patent No. 7,181,430 ("the '430 Patent"), Claims 1–6 and 9 of U.S. Patent No. 7,216,106 ("the '106 Patent"), Claims 1, 12, and 14 of U.S. Patent No. 7,440,924 ("the '924 Patent"), and Claims 1 and 12 of U.S. Patent No. 7,624,071 ("the '071 Patent") (collectively, the "Asserted Claims" and "Asserted Patents"). The Asserted Patents are all part of the same patent family and share a common specification. The '430 Patent claims priority to an application filed on April 28, 2000. The '106 Patent is a continuation-in-part of the application that resulted in the '430 patent. The '071 Patent and '924 Patent are divisionals of the '430 Patent.

The Asserted Claims are system and method claims directed towards a technological architecture for electronic check deposit processing. Prior art systems for check processing

1

required a customer to come to a traditional bank or bank branch facility. '430 Patent at 1:14–27. At the bank of first deposit—the financial institution where the check is initially dropped off—the bank would perform "Magnetic Ink Character Recognition" or "MICR" capture to gather deposit information such as a "maker bank number, the account number, a check serial number," the deposit amount, and other information related to processing the check. *Id.* at 6:4–7. Then, unless the check was an "on us"[1] check, the bank of first deposit would then physically transmit the paper check to the "maker bank" or the Federal Reserve Bank for post-deposit processing and ultimately clearance. *Id.* at 1:14–27. Upon receipt of these checks, these latter banks would again process the checks and perform MICR capture, re-gathering the same information that was initially gathered by the bank of first deposit. *Id.* 1:15–37.

These prior art systems had a number of substantial drawbacks for customers and for banks. Customers had to physically travel to banks or bank branches in order to process their checks. *Id.* Customers also faced substantial uncertainty about whether a check would actually clear, since the prior art systems offered no way to verify that a check—even once deposited—was drawn on an account holding sufficient funds to cover that debit. *Id.* at 1:47–50. Similarly, banks themselves had limited means of determining whether the check draw on an account at another bank had sufficient funds to pay the check, or whether the account was closed or otherwise frozen. *Id.* at 2:4–11. Banks also had limited tools to enforce deposit limits, since a customer could ostensibly deposit different checks at different branches in order to evade deposit limits. *Id.* at 2:50 –54.

Additionally, banks had to incur the physical infrastructure costs of being tethered to paper-based financial instruments. *Id.* at 1:28–61. Both the risk of damage to physical copies of financial

---

[1] The Asserted Patents describe an "on us" check as one where the account from which the check is drawn exists at the same banking institution as the bank of first deposits. '430 Patent at 6:10–12. Such checks were "on us," rather than on others, in the parlance of the Asserted Patents. *Id.* When a check was debited against an account held by a third-party bank, that bank is termed a "maker bank." *Id.*

instruments and the difficulty of secured storage for such instruments were burdens on banks. *Id.* Similarly, banks who received the check after the bank of first deposit had to maintain the technological infrastructure to perform MICR capture in order to re-process the check once it physically arrived, in order to re-capture and re-catalogue the information embodied in the paper check. *Id.* In practice, this process was inefficient as it required significant physical, financial, and human resources. *Id.*

The Asserted Patents are directed towards a "new process" that "involves inventive computer-based software that can be used at financial institution locations and locations remote from financial institution offices for capturing deposits." *Id.* at 2:12–15. Claim 1 of the '430 Patent, which JHA contends is representative of the Asserted Claims,[2] recites:

1. A method for deposit processing at a central system a plurality of checks deposited at a remote site with accompanying deposit information, comprising:

> the central system receiving deposit information for a plurality of different deposit transactions, with the deposit information including for each of the different deposit transactions a deposit account designation, electronic check data and check image data for at least one check to be deposited, wherein the central system is separate from MICR capture, deposit accounting, cash management, and float processing systems for a bank of first deposit and wherein the deposit account designation for each of at least a subset of the plurality of the deposit transactions is to a different bank of first deposit;

> the central system transmitting the electronic deposit data and optionally the check image data for each different deposit transaction of the subset of the plurality of the deposit transactions to a respective different one of the banks of first deposit;

> the central system performing at least one of sorting the received deposit information and error checking the received deposit information before transmission to any of the MICR capture, deposit accounting, cash management, and float processing systems of each of the different banks of first deposit designated in the respective deposit account designations in the deposit information; and

---

[2] The Parties dispute whether Claim 1 of the '430 Patent is representative of the remaining Asserted Claims. The Court takes this issue up in Part II.

> the central system transmitting electronic check data and the check image data directly or indirectly to a maker bank or a Federal Reserve Bank or a correspondent bank in a transmission having a transmission path that bypasses the MICR capture, deposit accounting, cash management, and float processing systems of the bank of first deposit for that deposit transaction.

*Id.* at 18:17–51. The Asserted Patents indicate that using a digital rather than paper version of the check was inventive and advantageous relative to the state of the prior art in April 2000, which is the undisputed priority date for the Asserted Patents. The specification explains:

> The present invention has been designed to reduce the issues associated with the physical handling of paper items by financial institutions and to improve the collections of associated funds by processing electronic images of checks as opposed to the slower method of sending paper checks through the traditional check clearing routes. Not withstanding [*sic*] the premise for the inventive processes to use electronic images of items to facilitate processing and clearing of items, it would also be desirable for the present invention to accommodate the current use of paper items and all other commonly accepted methods for clearing checks until such time as the use of electronic images becomes a common accepted practice for clearing checks.

*Id.* at 1:66–2:11. The Asserted Patents offer a number of innovations that eliminate known drawbacks in prior art systems.  With respect to customers, at the time of patenting, the Asserted Patents offered "a bearer of a check the convenience to 'deposit' a check at a facility, such as a home or office, that is not a traditional bank or bank branch facility." *Id.* at 1:39–42. The preponderance of benefits, however, benefitted banks. Distinct from the prior art systems at the time, the Asserted Patents facilitate "remote depositing and processing a check" in a manner "that does not require the physical routing of the actual check in order to accomplish the various post-deposit processing of a check." *Id.* at 1:43–47.  This technological innovation in the form of "post-deposit processing" is captured by the "MICR" bypass limitations, which limit the Asserted Patents to scenarios where the follow-on banks are freed from—and may "bypass"—repetition of the initial check deposit process conducted at the "remote site." *Id.* at 7:9 –11.

4

The invention embodied in the Asserted Patents also "improv[es] the collection time involved with the funds represented by the check . . . ." *Id.* at 1:47–50. The Asserted Patents also confer a variety of logistical benefits, including "reducing expenses associated with the transportation costs involved in sending the checks" "reducing the check storage expenses incurred by the bank of first deposit" "reduce the staffing, facilities (i.e., physical buildings), and equipment required to accept and process physical checks." *Id.* at 1:51–61.

JHA filed the instant Motion seeking summary judgment that the claims are invalid under 35 U.S.C. § 101 for claiming patent-ineligible subject matter. While the Motion was pending, the Federal Circuit decided *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161 (Fed. Cir. 2019), which held that a patent directed towards "crediting a merchant's account as early as possible while electronically processing a check" was invalid under § 101. *Id.* at 1166. This Court ordered targeted supplemental briefing to address how best to implement *Solutran*.

In response to JHA's Motion, PPS Data contends that its patents are valid under § 101 and that, in any case, summary judgment should be denied because JHA has not demonstrated that Claim 1 of the '430 Patent is representative of the remaining Asserted Claims. The Court addresses representativeness and subject-matter eligibility in turn.

## II.  Representativeness

The parties dispute whether Claim 1 of the '430 Patent is representative of the fifteen Asserted Claims contained in the four Asserted Patents. After a review of precedent, the Court concludes that the Federal Circuit has never expressly addressed the legal framework for addressing disputes about representative claims. In many patent cases, "the parties agree to treat a claim as representative" in order to crystalize and streamline the relevant disputes for resolution by the court. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018). However, in a

5

sizeable number of cases, the parties dispute whether a given claim is representative of the remaining claims.

As a matter of first impression, the Court finds that a burden-shifting framework is appropriate for determining claim representativeness. The initial burden of persuasion rests on the defendant to identify a rationale for treating a given claim or claims as representative of other asserted claims.[3] This burden flows from two statutory requirements: first, that each claim must be presumed independently valid, and second, that the defendant bears the burden to overcome that presumption. *See* 35 U.S.C. § 282.

Section 282 requires courts to the presume that each claim is valid independently from the other claims in the patent. *Id.* It provides that "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim." *Id.* (emphasis added); *accord* 35 U.S.C. § 253 ("Whenever a claim of a patent is invalid the remaining claims shall not thereby be rendered invalid."). Absent a basis to overcome the presumption of independence, the plain text of § 282 requires courts to analyze the validity of each claim individually.

In addition to creating the presumption of independent validity, § 282 places the burden of overcoming that presumption on the defendant. Specifically, § 282 expressly allocates "the burden of establishing invalidity of a patent or any claim thereof" to "the party asserting such invalidity." *Id.* (emphasis added); *see also Aqua Prod., Inc. v. Matal*, 872 F.3d 1290, 1305 (Fed. Cir. 2017) ("In district court, the party asserting invalidity of a patent claim bears the burden of establishing

---

[3] The Court uses the phrase "defendant" because it is ordinarily the defendant who raises a validity challenge. However, for the purpose of clarity, the Court confirms that this analysis applies to any party relying on representativeness to challenge the validity of a patent. For example, a defendant could allege counterclaims for patent infringement, and in such a case, the plaintiff would bear the initial burden on representativeness.

invalidity. . . . That burden of proof never shifts to the patent owner.") (citing 35 U.S.C. § 282(a)); *SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 375 (Fed. Cir. 1983) ("[T]he presumption [imposed by § 282] places the burden of going forward, as well as the burden of persuasion, upon the party asserting invalidity.").

Accordingly, when a defendant seeks to invalidate multiple claims based only on allegations relating to a subset of those claims, the defendant must justify treating that subset as representative of the other claims.

The party asserting invalidity may overcome the presumption of independent validity by offering a substantial rationale for treating a claim as representative of other asserted claims. While the specific factual justifications for representativeness will necessarily vary from case to case, precedent offers a number of instructive guideposts in conducting the representativeness inquiry. In all cases, the representativeness inquiry must be "directly tethered to the claim language."[4] *See Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed. Cir. 2019). Courts must thus avoid "overgeneralizing claims" in a manner that might avoid pertinent distinctions between the claims simply because—at a high level of abstraction—there are some similarities between the allegedly representative claim and the remaining claims. *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016).  Similarly, a claim is not representative merely because it generally deals with the same subject matter as the other asserted claims. *Id.* Further, courts should not treat a claim as "representative simply because it is an independent claim." *Berkheimer*, 881 F.3d at 1365.

---

[4] PPS Data argues that the Court should reject JHA's representativeness argument because JHA failed to provide a chart illustrating how each limitation of each Asserted Claim is represented by Claim 1 of the '430 Patent. While a claim-by-claim chart may certainly add force to a claim of representativeness, no particular form of proof is required for the defendant to meet its burden on representativeness. Instead, JHA may proffer its justifications in whatever form it sees fit, so long as its justifications furnish a prima facie basis for its claim of representativeness. As explained herein, the prose analysis offered by JHA is sufficient to carry its burden to demonstrate representativeness with respect to all claims except those contained in the '106 Patent.

In general, claims in one patent will not represent claims in another patent because patents must contain distinct inventions. *Novartis Pharm. Corp. v. Breckenridge Pharm. Inc.*, 909 F.3d 1355, 1362 (Fed. Cir. 2018). The doctrine of "obviousness-type double patenting" is "designed to foreclose 'claims in separate applications or patents" that are either the same, or are "so alike that granting both exclusive rights would effectively extend the life of patent protection" for the earlier-filed patent. *Id.* ("Prohibiting double patenting prevents a patentee from obtaining *sequential patents on the same invention and obvious variants*, to thereby effectively manufacture a timewise extension of its patent exclusivity through a later-expiring patent.") (emphasis added). "Federal courts have applied the principles of obviousness-type double patenting for over a century to restrict a patent owner's patents on an invention and obvious variants to one . . . patent term." *Id.* (quoting *Takeda Pharm. Co. v. Doll*, 561 F.3d 1372, 1375 (Fed. Cir. 2009)); *accord James v. Campbell*, 104 U.S. 356, 381 (1881) ("It is hardly necessary to remark that the patentee could not include in a subsequent patent any invention embraced or described in a prior one . . . ."). Since different patents must generally contain patentably distinct inventions, it follows that the claims in one patent will not usually represent all of the inventive concepts embodied in the claims of another patent. *See Novartis Pharm,* 909 F.3d at 1362. Accordingly, absent a case-specific justification, courts should generally not find a claim in one patent representative of other claims in other patents. *See id.*

In summary, to meet its burden, the defendant must conduct an analysis tethered to the claim language, to show that there are no legally relevant distinctions between the claim identified as representative and the remaining asserted claims.[5] A failure to make such a prima facie showing

---

[5] The distinctions which are legally relevant will vary based on the context in which representativeness is evaluated. For example, distinctions which are legally relevant to an indefiniteness challenge—but irrelevant to a subject-matter eligibility challenge—will not preclude the court from relying on a representative claim in the eligibility context. Accordingly, a claim which may be representative in context of one dispute may not be representative in context of

will defeat a claim of representativeness and will confine the relief sought by the defendant to the claims expressly analyzed.

Once the defendant has proven a prima facie case demonstrating representativeness, the burden shifts to the plaintiff to identify limitations that are present in the asserted claims but that are not represented by the allegedly representative claim. "[I]f the patentee does not present any meaningful argument for the distinctive significance of any claim limitations," then the Court has discretion to treat the allegedly representative claim as representative. *Berkheimer*, 881 F.3d at 1365; *accord MaxLinear*, 880 F.3d at 1377. By contrast, if the plaintiff identifies legally distinctive limitations, then any claims which contain those limitations are excluded from the scope of the relief sought by the defendant and must be distinctively addressed, typically in supplemental motion practice. *See Berkheimer*, 881 F.3d at 1365; *accord MaxLinear*, 880 F.3d at 1377.

This framework ensures that courts comply with the procedural due process rights of patentees. "Patents convey . . . a specific form of property right—a public franchise." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1375 (2018). Further, "[p]atents . . . are surely included within the 'property' of which no person may be deprived . . . without due process of law." *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 642 (1999) (citing *Brown v. Duchesne*, 19 How. 183, 197 (1856); *Consolidated Fruit–Jar Co. v. Wright*, 94 U.S. 92, 96 (1876)). Accordingly, since it is well-settled that patents are "property for purposes of the Due Process Clause" of the Fifth and Fourteenth Amendments, patents "are 'entitled to protection as any other property' . . . ." *Oil States Energy*, 138 S. Ct. at 1379 (citing *Seymour v. Osborne*, 11 Wall. 516, 533 (1870)).

---

another. *Cf. MaxLinear, Inc. v. CF CRESPE LLC*, 880 F.3d 1373, 1377 (Fed. Cir. 2018) ("If the differences between the unadjudicated patent claims and adjudicated patent claims do not materially alter the question of invalidity, collateral estoppel applies.").

The Fifth and Fourteenth Amendments prohibit a deprivation of property rights—including patent rights—without due process of law. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569–70 (1972). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Courts must thus be cautious to avoid "depriv[ing] a litigant of an adequate day in court" by invalidating a property interest that is not truly presented before the Court. *See Aspex Eyewear, Inc. v. Zenni Optical Inc.*, 713 F.3d 1377, 1382 (Fed. Cir. 2013) (citing *In re Freeman*, 30 F.3d 1459, 1465 (Fed. Cir. 1994)). Since the limitations in a claim constitute the "metes and bounds" of the patentee's property interest, using a narrower claim to represent—or invalidate—a legally distinctive claim would artificially limit the scope of the patentee's property rights. *See Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 927 F.3d 1333, 1342 (Fed. Cir. 2019). Professor Patricia Campbell explains how this artificial limitation may constitute a denial of due process:

> Consequently, a patent owner who is forced to proceed on the basis of representative claims may assert . . . [a denial of] due process of law. Compare the situation where a plaintiff sues defendant for two separate breaches of contract and five unrelated tort claims, and the trial court insists that the outcome of the entire case will be determined by a limited trial on only one contract breach and one tort. There is little chance that the appellate courts would tolerate such a result.

Patricia E. Campbell, Representative Patent Claims: Their Use in Appeals to the Board and in Infringement Litigation, 23 Santa Clara High Tech. L.J. 55, 78–79, 79 n.160, 82–83 (2006). By contrast, due process concerns are less likely to be present when the claims are "closely related and overlap considerably" such that the patentee's property interests are fully and fairly represented, and the patentee is thus not deprived "of an adequate day in court." *Id.* at 78–79; *Aspex Eyewear*, 713 F.3d at 1382. The risk of a procedural due process deprivation accordingly

grows with increases in the degree of legal distinctiveness between the allegedly representative claim and the other asserted claims. *See id.* at 78–79; *Aspex Eyewear,* 713 F.3d at 1382.

For this reason, in close cases, courts should err on the side of finding a claim is not representative, because a mistake has constitutional consequences. An incorrect decision finding a claim representative—when in fact, it is not—is not only a trespass upon the statutory rights of the patentee, but works against the rights secured to all Americans by the Constitution itself. U.S. Const. amend. 5; U.S. Const. amend. 14 § 1. The converse scenario—where a court finds no representativeness based on a claim that, in fact, is representative—presents no comparable counterweight. This also reinforces the rationale to err against finding representation in less than clear cases. While incremental increases in judicial economy might be claimed and are important to be pursued where practicable, such benefits should never come at the cost of constitutionally secured rights. *Cf. Mathews*, 424 U.S. at 343–45. Unless a court finds the issue of representativeness to be clear, it should conduct—and require the parties to conduct—an individualized analysis of the claims at issue.

In context of this case, JHA identifies a number of case-specific justifications that support a finding of representativeness in this case. First, JHA claims that the Asserted Patents are directed towards substantially the same "subject matter" as Claim 1 of the '430 Patent, and alleges that the Asserted Claims are "grounded by the same meaningful limitations." (Dkt. No. 81 at 15) (conducting a limitation-by-limitation analysis). JHA further notes that the Asserted Patents share a common specification, and are subject to terminal disclaimers—limiting the Asserted Patents to the term of the '430 Patent—that were submitted by the patentee in order to overcome an obviousness-type double patenting rejection from the Patent and Trademark Office. (*Id.*) Finally, JHA contends that PPS Data's expert conceded that Claim 1 of the '430 Patent "would be

representative at a conceptual level." (*Id.* at 4 ¶ 16) (citing Dkt. No. 81-18 (Deposition of Dr. Michael Shamos, PPS Data's Infringement Expert)).

PPS Data responds that JHA fails to show that Claim 1 of the '430 Patent is representative of the Asserted Claims. PPS Data argues that JHA provides no more than "a collection of generalized descriptions of the asserted claims," and fails to include a claim chart illustrating how each element of each claim is appropriately represented by Claim 1. (Dkt. No. 91 at 8). PPS Data further claims that "the Federal Circuit has long held that terminal disclaimers are not substantive evidence regarding the merits of double-patenting rejections based on alleged similarity of claims." (*Id.*) (citing *SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1168–69 (Fed. Cir. 2018)).

In addition to arguing that JHA has failed to meet its initial burden on representativeness, PPS Data also identifies a group of limitations in the '160 Patent that it affirmatively contends are not represented by Claim 1 of the '430 Patent. Claim 1 of the '160 Patent recites:

1. A computer-readable medium comprising a program product for deposit processing at a central system a plurality of checks with accompanying deposit information, comprising:

> at least one computer-readable medium having computer readable program code embodied therein or among them if more than one medium, to be executed by a computer, the computer readable program code, when executed, capable of causing a machine to perform the following method steps;

> the central system receiving deposit information for a plurality of different deposit transactions, with the deposit information including for each of the different deposit transactions a deposit account designation in a bank of fist deposit, electronic check data and original check image data for at least one check to be deposited, wherein the central system is separate from MICR capture, deposit accounting, cash management, and float processing systems for the bank of first deposit;

> *a computer at the central system comparing at least one deposit parameter that is not an account number to an individual customer limit in advance of transmitting any of the deposit information to the bank of first deposit;*

> *sending a communication if the individual customer limit is exceeded;*

*the central system performing at least one of sorting the received deposit information and error checking the received deposit information in advance of transmitting any of the deposit information to the bank of first deposit;*

the central system transmitting at least some of the deposit information for each different deposit transaction to the bank of first deposit;

the central system transmitting electronic check data and check image data directly or indirectly to the maker bank, or to a Federal Reserve Bank or a correspondent bank, or to a print site for ultimate delivery in hard copy to a maker bank, with this transmitting bypassing the MICR capture, deposit accounting, cash management, float processing or other systems of the bank of first deposit.

'106 Patent at 24:15–57 (emphasis added to the distinctive limitations). JHA concedes that "claims 1-6, 9 and 10-11 of the '106 patent contain additional limitations concerning monitoring and enforcement of deposit limitations that are not found in claim 1 of the '430 patent" but falls back on its general arguments about overlapping subject matter and terminal disclaimer. (Dkt. No. 104 at 2).

Applying the foregoing framework to the claims in this case, the Court concludes that Claim 1 of '430 Patent represents some, though not all, of the remaining fifteen Asserted Claims. Specifically, the Court finds that Claim 1 of the '430 Patent is representative of Claims 7 19, and 25 of the '430 Patent; Claims 1, 12, and 14 of the '924 Patent; and Claims 1 and 12 of the '071 Patent. The Court concludes that Claim 1 of the '430 Patent is not representative of Claims 1–6 and 9 of the '106 Patent.

The Court concludes that JHA met its initial burden on representativeness for three reasons. First, all four patents are subject to a terminal disclaimer made by the patentee to overcome an obviousness-type double patenting rejection from the United States Patent and Trademark Office ("the USPTO"). The terminal disclaimer offers support for the Court's conclusion regarding representativeness because it "is a strong clue that a patent examiner and, by concession, the applicant, thought the claims in the continuation lacked a patentable distinction over the parent."

*SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1168 (Fed. Cir. 2018). While "that strong clue does not give rise to *a presumption* that a patent subject to a terminal disclaimer is patentably indistinct from its parent patents," a terminal disclaimer "is still very relevant to that inquiry." *Id.* (emphasis added). Since the claims in the subsequent patents are subject to a terminal disclaimer, the terminal disclaimer is some evidence tending to show representativeness.

Of course, a terminal disclaimer does not end the inquiry, because "there is no prohibition on broadening claims in continuation patents subject to a terminal disclaimer. So unlike the case of reexamined claims, claims of terminally-disclaimed continuation patents could 'provide larger claim scope to a patentee than the patentee had under' the parent patent." *Id.* at 1166–67. The existence of a terminal disclaimer is simply some relevant evidence available to the Court for consideration.

Second, all four patents share a common specification. A common specification is some additional indication of representativeness, because claims must be supported by a written description of the invention in the specification. *See Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 963 (Fed. Cir. 2002) (citing 35 U.S.C. § 112). If claims are supported by the same written description, the probability of overlap between claimed material is higher than if the claims are supported by separate specifications.

However, a common specification—by itself or even in combination with a shared terminal disclaimer—is not enough to show that a claim in one patent is representative of any other claims. *SimpleAir*, 884 F.3d at 1166 (rejecting shared specification and terminal disclaimer as a basis for finding claim preclusion because "'it is the claims of the patent which define the invention'") (quoting *Altoona Publix Theatres, Inc. v. Am. Tri-Ergon Corp.*, 294 U.S. 477, 487 (1935)). While the specification must offer a written description sufficient to support the claimed invention, a

14

specification might describe multiple, distinct inventions. *See Bourns, Inc. v. United States*, 537 F.2d 486, 492 (Ct. Cl. 1976) ("[T]he claims may be multiplied either because there are multiple facets to the invention and claims to the separate parts and subparts are necessary to protect the invention . . ."). Further, even when multiple claims are addressed towards a single invention, the claims might still be directed towards capturing multiple different *elements* of the same claimed invention. *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) ("[P]ractice has long recognized that 'claims may be multiplied . . . to define the metes and bounds of the invention in a variety of different ways.'") (alteration in original).  As a result, multiple claims directed towards the same invention may still be distinctive such that they are not capable of being represented by any single claim. Accordingly, a common specification is *some* evidence tending to support representativeness, but it is not conclusive.

Third, the Court is persuaded that JHA's substantive technical analysis of the claims is closely tethered to the claim language. In all cases, the court must make a representativeness determination by reference to the claim language, which is interpreted in light of the specification, as well as any claim construction previously conducted by the court. JHA explains that the elements in Claim 1 of the '430 Patent are not distinct in any sense relevant to the relief sought in its motion for summary judgment, and PPS Data does not effectively dispute this argument. JHA also points to deposition evidence from PPS Data's own expert indicating that the claims cover essentially the same invention. This concession of technical overlap is material to the Court's analysis.

The cumulative effect of these three justifications—terminal disclaimer, common specification, and particularized analysis tethered to the claim language—is that JHA has met its burden to initially show representativeness. Accordingly, the burden shifts to PPS Data to identify

15

legally distinctive elements in the patents-in-suit that are not represented by the claim identified by JHA. The Court concludes that PPS Data has met this burden only as to the '106 Patent.

The '106 Patent is the only patent for which PPS Data identifies a group of limitations that it argues are not represented by Claim 1 of the '430 Patent. As noted above, these limitations are addressed to determining "at least one deposit parameter" at a time "in advance of transmitting any of the deposit information"; "sending a communication if the individual customer limit is exceeded"; and either "sorting" or "error checking the received deposit information in advance of transmitting" it to a bank of first deposit. By identifying these limitations and explaining their materiality to the eligibility inquiry, PPS Data has met its burden to identify specific elements that are not represented by Claim 1 of the '430 Patent.

JHA's primary argument against the relevance of the monitoring limitations is that they are immaterial to the eligibility analysis. JHA makes two arguments. First, to allege that monitoring limitations are categorically ineligible, JHA cites *Joao Bock Transaction Sys., LLC v. Jack Henry & Assocs., Inc.*, 76 F. Supp. 3d 513, 517 (D. Del. 2014), *aff'd*, 803 F.3d 667 (Fed. Cir. 2015), which found ineligible limitations that JHA contends are similar. The Court finds that *Joao Bock* does not control this case.

As an initial matter, *Joao Bock* was decided and affirmed in a Rule 36 order[6] prior to the Federal Circuit's decision in *Berkheimer*. It is clear that *Berkheimer* constituted a change in law. *Joao Bock* itself confirms the effect of *Berkheimer*, when the court emphasized that it was coming to a purely legal conclusion, untethered from factual considerations. *See id.* ("Whether a claim is

---

[6] The Rule 36 affirmance from the Federal Circuit in *Joao Bock* offers little guidance, because the Federal Circuit has instructed district courts not to treat such affirmances as an adoption of the reasoning of the decision under review. *See Quad Envtl. Techs. Corp. v. Union Sanitary Dist.*, 946 F.2d 870, 874 (Fed. Cir. 1991) ("We stress that such unpublished opinions are not to be taken as our adoption of the district court's reasoning; affirmance could have been on any ground appropriate to the case.").

drawn to patent-eligible subject matter under 35 U.S.C. § 101 is a threshold inquiry to be determined as a matter of law in establishing the validity of the patent.").

Further, *Joao Bock* relied expressly upon affirmative concessions in the patent specification that the relevant limitations were conventional at the time of patenting. *Id.* at 522 ("The bank processing software is described in the specification . . . . The central processing computer 103 may utilize any of the **widely known data processing and/or software routines**, which are known to those skilled in that art, in order to process transaction requests and/or authorizations involving the use of the respective account(s) and/or related card(s).") (emphasis in original). No such concessions are present in this case—and in fact, these patents expressly set forth affirmative allegations of unconventionality.

Finally, the *Joao Bock* patents claim priority to a date substantially later than the patents at issue in this case. The state of the art inevitably shifts over time and may shift very quickly and significantly in the electronic arts. While the monitoring limitations in *Joao Bock* may not have been eligible when examined under the legal framework applicable at the time, the Court here finds that there is a factual question regarding whether deposit monitoring was conventional at the time the Asserted Patents were filed.

Second, JHA analogizes generally to cases where the Federal Circuit has held information sorting limitations to be ineligible. JHA's analogy is misplaced. In other contexts where similar limitations have been found ineligible, those limitations merely speed up an information exchange process. Here, however, these limitations give banks an effective tool to guard against improperly deposited checks, a substantial problem in the banking industry. Far from merely automating conventional activity, deposit monitoring is a technological improvement in the essential nature of paper-based check deposit processing. The inventive advantages of this technological

17

improvement are many and well-described in the Asserted Patents. Since PPS Data has justified treating these limitations as distinctive, the Court finds they are not represented by Claim 1 of the '430 Patent.

### III.   Patent-Eligible Subject Matter

#### A.   Summary Judgment Standard

The Court evaluates a motion for summary judgment under the law of the Fifth Circuit. *See Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 405 (Fed. Cir. 2018) ("We review the district court's grant of summary judgment under regional circuit law."). In the Fifth Circuit, "[s]ummary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Warren v. Fed. Nat'l Mortg. Ass'n*, 932 F.3d 378, 382 (5th Cir. 2019) (citing Fed. R. Civ. P. 56(a)). Put another way, since the movant bears the burden on summary judgment, the movant's failure to wholly foreclose the existence of genuine disputes of material fact will preclude summary judgment. *See id.*; Fed. R. Civ. P. 56(a).

"A fact is material if it would affect the outcome of the case, and a dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* (quoting *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018)) (internal quotation marks omitted). "Evidence at the summary judgment stage must be viewed in the light most favorable to the non-moving party, and reasonable inferences must be drawn in that party's favor." *Id.* (citing *Fisk Elec. Co. v. DQSI, L.L.C.*, 894 F.3d 645, 650 (5th Cir. 2018)). While the Court is not required to search the record for facts not expressly addressed by the parties, material factual disputes that are readily apparent from the "underlying facts contained in the affidavits, depositions, and exhibits of record" will preclude summary judgment. *Greenwich Ins. Co. v.*

18

*Capsco Indus., Inc.*, No. 18-60032, 2019 WL 3773450, at *2 (5th Cir. Aug. 12, 2019). In the context of patent litigation, the patents-in-suit are exhibits of record because they are "considered to 'merge[] into the pleadings' . . . ." *Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 743, 755 (Fed. Cir. 2019) (applying First Circuit law); *accord Ironshore Europe DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 763 (5th Cir. 2019) (requiring the Court to review "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint" in evaluating a motion to dismiss under Rule 12).

The amount of evidence necessary to create a dispute of fact is impacted by the substantive evidentiary burden of proof at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). "[A] higher burden of proof should have a corresponding effect on the judge when deciding whether to send the case to the jury" or to grant summary judgment. *Id.* In a context where a party must prove its claims by clear and convincing evidence, "the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions . . . ." *Id.* at 255.

> This conclusion is mandated by the nature of this determination. . . . Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant: It makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards.

*Id.* at 254–55. Though escaping a precise formulation, clear and convincing evidence "has been described as evidence which produces in the mind of the trier of fact an ***abiding conviction*** that the truth of a factual contention is '***highly probable***.'" *Miller v. Dep't of Justice*, 842 F.3d 1252, 1257–58 (Fed. Cir. 2016) (quoting *Price v. Symsek*, 988 F.2d 1187, 1191 (Fed. Cir. 1993)); *see also Colorado v. New Mexico*, 467 U.S. 310, 316 (1983).

Recognizing the "corresponding effect" of the defendant's "higher burden of proof," the Court finds that a nonmovant has at least two ways to successfully resist a motion for summary judgment by a movant who bears the burden of proof by clear and convincing evidence.[7] *See Anderson*, 477 U.S. at 254 ("Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden."). First, the nonmovant can offer evidence which creates some uncertainty about the truth of the movant's allegations, such that there is a dispute as to whether a fact-finder's conviction would be "abiding." *See Miller*, 842 F.3d at 1257–58; *Colorado*, 467 U.S. at 316. Second, evidence which has the potential to reduce the movant's contentions from "highly probable" to any lesser level of probability will suffice to defeat summary judgment. *See Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 101 (2011) ("[O]ne otherwise an infringer who assails the validity of a patent fair upon its face bears a heavy burden of persuasion, and fails unless [the party's] evidence has more than a dubious preponderance." (quoting *Radio Corp. of Am. v. Radio Eng'g Labs.*, 293 U.S. 1, 8 (1934) (alteration in original))).

Thus, to succeed on summary judgment, the movant must completely foreclose any material factual disputes about either the "abiding" or "highly probable" nature of its allegations. *See id.*; *Miller*, 842 F.3d at 1257–58; *Colorado*, 467 U.S. at 316. Conversely, when the nonmovant shows that an issue is not completely clear, or that there is a dispute as to the convincingness of the movant's evidence, summary judgment is inappropriate. *See Microsoft Corp.*, 564 U.S. at 101; *Miller*, 842 F.3d at 1257–58; *Colorado*, 467 U.S. at 316.

---

[7] Courts must take care to ensure that application of the "standard of proof is more than an empty semantic exercise." *Addington v. Texas*, 441 U.S. 418, 425 (1979). In the context of a motion for summary judgment, taking the Supreme Court's instruction seriously means recognizing the impact of "clear and convincing evidence" on the amount of proof required to create a genuine dispute of material fact. *See id.* Where the defendant's burden is higher, less proof will be required to oppose it at summary judgment. *See id.*; *Anderson*, 477 U.S. at 253.

With these guiding principles in mind, the Court turns to the substance of the patentable subject-matter inquiry.

B. *Alice* Step 1[8]

The Federal Circuit's recent decision in *Solutran, Inc. v. Evalon, Inc.*, 931 F.3d 1161 (2019) compels a finding that the Asserted Patents are directed towards an abstract idea. Specifically, The Court finds the Asserted Claims are directed towards the abstract idea of "electronic check deposit processing." Though there are a number of factual differences between the Asserted Claims and the claims discussed in *Solutran*, as discussed below, the Court finds that the Federal Circuit's analysis in *Solutran* disposes of the *Alice* Step 1 inquiry.

C. *Alice* Step 2

At the second step of the *Alice* inquiry, courts examine whether the claim limitations "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018) (quoting *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014)) (alteration in original). For example, when "the claimed technology 'overrides the routine and conventional sequence of events'" in order to provide a technological benefit, it is eligible at *Alice* Step 2. *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1304 (Fed. Cir. 2019) (quoting *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258 (Fed. Cir. 2014)).

When examining the issue of conventionality, courts must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional

---

[8] The only thing clear about the appropriate test for patent-eligible subject matter is that it is unclear. Appellate courts and district courts alike have called for intervention and clarification from the Supreme Court or the Congress. *See, e.g., Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 927 F.3d 1333, 1335 (Fed. Cir. 2019) (Lourie, J., concurring); *id.* at 1337 (Hughes, J., concurring); *id.* (Dyk, J., concurring); *id.* at 1344 (Chen, J., concurring); *id.* at 1352 (Moore, J., concurring); *id.* at 1363 (Newman, J., dissenting); *id.* at 1370 (Stoll, J., dissenting); *id.* at 1371 (O'Malley, J., dissenting). This Court joins that chorus..

elements 'transform the nature of the claim' into a patent eligible application." *Id.* at 1367 (quoting *Alice*, 573 U.S. at 217). Consideration of the unique and inventive results of the "ordered combination" of elements—even *individually known* elements—is essential, since "inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418–19 (2007). For this reason, inventions that are comprised of elements that are individually well-known in the prior art can still satisfy *Alice* Step 2 if the "ordered combination" of those elements embodies an inventive concept. *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016) ("The 'inventive concept' may arise in one or more of the individual claim limitations *or in the ordered combination of the limitations*.") (emphasis added).

 "The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). Only "[w]hen there is no genuine issue of material fact regarding whether the claim element or claimed combination is well-understood, routine, [and] conventional to a skilled artisan in the relevant field" can eligibility "be decided on summary judgment as a matter of law." *Id.* at 1368. "Whether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art. The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional." *Id.* at 1369.

As with any other invalidity defense, the defendant must prove that a patent is invalid for claiming patent-ineligible subject matter by clear and convincing evidence. *Berkheimer*, 881 F.3d at 1368 (Fed. Cir. 2018) (citing *Microsoft*, 564 U.S. at 95 (quoting 35 U.S.C. § 282)). Accordingly,

22

at the summary judgment stage, this requires the movant defendant to completely foreclose any factual disputes about either the "abiding" or "highly probable" nature of its conventionality allegations. *See Microsoft*, 564 U.S. at 101; *Miller*, 842 F.3d at 1257–58; *Colorado*, 467 U.S. at 316. If the court finds that there is evidence which creates some uncertainty about whether the claims are "well-understood, routine, and conventional," the Court must deny summary judgment. *See Microsoft*, 564 U.S. at 101; *Miller*, 842 F.3d at 1257–58; *Colorado*, 467 U.S. at 316. Similarly, if there is evidence which may reduce the likelihood that the claims are "well-understood, routine, and conventional" from "highly probable" to any lesser level of probability, the Court must deny summary judgment. *Microsoft*, 564 U.S. at 101; *Miller*, 842 F.3d at 1257–58; *Colorado*, 467 U.S. at 316.

The Court finds that there is a genuine dispute of material fact with respect to three inventive concepts: the MICR bypass limitations, the deposit monitoring limitations,[9] and the ordered combination of claim limitations. PPS Data has submitted both expert evidence and intrinsic evidence from the specification of the Asserted Patents that suffices to create a question of fact.

### 1. Factual Assertions in the Specification Addressed to Inventiveness are Competent Summary Judgment Evidence

Factual assertions in the specification addressed to inventiveness are competent summary judgment evidence. The Federal Circuit routinely relies on factual assertions in patent specifications not only as *some* evidence, but *conclusive* evidence of inventiveness. *Solutran, Inc.*, 931 F.3d at 1168; *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776

---

[9] The deposit monitoring limitations are materially relevant to the inventiveness inquiry for the reasons set out by the Court. *See supra* Part II. Since the technological advantages of deposit monitoring are relevant to the ordered claims as a whole, the Court addresses them in its eligibility analysis.

F.3d 1343, 1349 (Fed. Cir. 2014) ("This limitation merely describes generic optical character recognition technology, *which CET conceded was a routine function of scanning technology at the time the claims were filed*."); *cf. Berkheimer v. HP Inc.*, 881 F.3d 1360, 1370 (Fed. Cir. 2018) ("[S]ummary judgment was improper, given the fact questions created by the specification's disclosure.").The Federal Circuit's practice is supported by common sense. There are a number of reasons to find that factual claims in the specification are sufficient to create a factual dispute about either the "abiding" or "highly probable" nature of the defendant's eligibility allegations, such that summary judgment is inappropriate.

First, the salient nature of the factual statements in the specification about inventiveness bolsters their credibility. Factual representations about the state of the art, and about the inventiveness of core elements claimed by the patent, are particularly likely to be scrutinized for accuracy by the USPTO. Broad representations about the state of the art are likely to be scrutinized because they are easy to evaluate and disprove. For example, the claim that the banking industry had overwhelmingly not adopted electronic check deposit processing or MICR bypass structures would be easy to disprove if such claims were untrue. Similarly, factual representations about inventiveness are central considerations in whether a patent will be allowed over a rejection for anticipation, obviousness, and eligibility. In other words, both types of factual assertion are likely to be central to the prosecution and "ongoing negotiations" between the patentee and the USPTO. *See Shire Dev., LLC v. Watson Pharm., Inc.*, 787 F.3d 1359, 1365 (Fed. Cir. 2015). The intense scrutiny afforded to those types of statements bolster their reliability. Particularly in light of the presumption of regularity—which supports an inference that the USPTO appropriately scrutinized the factual statements in the specification—statements in the specification offer credible evidence of inventiveness. *See, e.g., PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1366

(Fed. Cir. 2007) (imposing a presumption of regularity "due to a qualified government agency presumed to have done its job").

Second, numerous safeguards ensure the reliability of factual statements made in the specification. A broad range of sanctions, ranging from a finding of inequitable conduct to assertions of malpractice, are a reliable deterrent to making false statements of fact. *See, e.g.*, *Regeneron Pharm., Inc. v. Merus N.V.*, 864 F.3d 1343, 1351 (Fed. Cir. 2017), *cert. denied* 139 S. Ct. 122 (2018) (affirming finding of inequitable conduct and rendering patents unenforceable for a patentee who made false "factual representations" about the state of the art); *Gunn v. Minton*, 568 U.S. 251 (2013) (permitting malpractice suits based on patent-related conduct). For example, a finding of inequitable conduct based on false "factual representations" with respect to "***a single claim*** renders the entire patent unenforceable." *Regeneron*, 864 F.3d at 1350 (emphasis added) (citing *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1288 (Fed. Cir. 2011)). "Moreover, the taint of a finding of inequitable conduct can spread from a single patent to render unenforceable other related patents and applications in the same technology family. . . . Thus, a finding of inequitable conduct may endanger a substantial portion of a company's patent portfolio." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1288 (Fed. Cir. 2011). An inequitable conduct finding may even "spawn antitrust and unfair competition claims." *Id.* In other words, patentees face severe deterrents against making false factual statements in the specification. These deterrents strongly incentivize the patentee to make only defensible and accurate statements in the specification. The incentive to include only truthful statements is itself a justification to rely on factual statements in the specification—particularly those targeted to critical issues like the state of the art or the nature of the invention embodied in the patent.

Third, several of the traditional justifications for crediting intrinsic evidence in the context of claim construction apply to the reliability of factual statements made in the specification.[10] Intrinsic evidence has the "virtue of being created at the time of patent prosecution," "for the purpose of explaining the patent's scope and meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005). Intrinsic evidence is less susceptible to the taint of hindsight bias than other forms of evidence. *Id.*; *see also In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1079 (Fed. Cir. 2012) (explaining that hindsight bias produces unreliable opinions because it is easy to "construct a selective version of the facts that confirms" a pre-determined conclusion about inventiveness based on the knowledge "that the inventor succeeded in making the patented invention"). Further, factual statements in the specification are made subject to the review of the USPTO, which can decline to allow a patent whose specification includes factually false statements about inventiveness or the art.  *Id.*

By contrast, "extrinsic evidence consisting of expert reports and testimony is generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Phillips*, 415 F.3d at 1318. This post-hoc extrinsic evidence is inevitably assembled from "a virtually unbounded universe of potential extrinsic evidence," and may result in unreliable cherry-picking since "each party will naturally choose the pieces of extrinsic evidence most favorable to its cause." *Id.* (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.")). The cumulative "effect of that bias can be exacerbated" in context of motions for

---

[10] Of course, some of the justifications for crediting intrinsic evidence—particularly those related to patent-specific lexicography and public notice—are specific to the claim construction context and do not bear on the objective truthfulness of statements in the specification. However, a number of other justifications—in particular those related to bias resulting from hindsight, evidentiary cherry-picking, the absence of cross-examination, and the anticipation of litigation—apply with equal force to the § 101 inquiry.

summary judgment or judgment on the pleadings because the documentary evidence or "opinion

is offered in a form that is not subject to cross-examination." *Id.* (citing *Senmed, Inc. v. Richard–*

*Allan Med. Indus., Inc.*, 888 F.2d 815, 819 n. 8 (Fed. Cir. 1989)).

Accordingly, the Court concludes that the specification is a source of intrinsic evidence

that is relevant to the eligibility inquiry and may be competent to resist summary judgment.

### 2. The Intrinsic Evidence Is Sufficient to Create a Factual Question with Respect to Eligibility

The MICR bypass[11] limitations furnish an inventive concept that is embodied in the claims

of the Asserted Patents. As noted in the introduction, the Asserted Claims require that MICR

capture occur at a "remote location," and are limited to factual situations in which the subsequent

"transmission path" for the electronic check data "bypasses the MICR capture, deposit accounting,

cash management, and float processing systems of the bank of first deposit for that deposit." '430

Patent at 18:17–52.

By bypassing the traditional post-deposit processing systems, the "claimed technology

'overrides the routine and conventional sequence of events'" in order to provide an inventive

benefit to banks. *See SRI Int'l*, 930 F.3d at 1304 (quoting *DDR*, 773 F.3d at 1258). Unlike the then-

conventional course of events, wherein each bank that processes a deposited check would have to

perform MICR capture—and thus must maintain the physical technological infrastructure to

perform MICR capture—the Asserted Claims obviate that process and allow banks to rely on the

electronic check information resulting from the electronically deposited check. The MICR bypass

---

[11] The Parties use the phrase "MICR bypass" to describe the entire set of bypassed systems required by the Asserted Claims, and for consistency with the Parties, the Court adopts that terminology. However, the bypass of *all* of the systems described in the Asserted Claims—systems for MICR, deposit accounting, cash management, and float processing—remains pertinent to the Court's analysis. "MICR bypass" is thus a stand-in for the inventive bypass limitations contained in the Asserted Claims, not a limitation on the Court's substantive analysis to only the bypass of "MICR" systems specifically.

limitations thus do not merely automate conventional activity—they fundamentally and technologically improve it. The specification provides ample evidence that MICR bypass was "a new system" that was distinct from the prior art. Accordingly, the MICR bypass limitations are an inventive concept for which there is sufficient evidence to compel a denial of summary judgment.

The intrinsic evidence also makes clear that the ordered combination of elements in the Asserted Claims was unconventional in the prior art. Prior art systems were build on "handling, storing and returning paper checks to the maker." '430 Patent at 1:33–34. The Asserted Claims, by contrast, were a wholesale overhaul of that conventional approach to check processing, and instead constituted a "new system centered on electronic information that does not require the use of paper items for any purpose." *Id.* at 1:34–37. Unlike prior art systems, which were ineffective at guarding against fraudulent or insufficient deposits, the ordered combination of elements in the Asserted Claims significantly augmented monitoring—and preventing—such improper checks. The Asserted Claims also materially improve the technological efficiency of the check depositing process. Unlike prior art systems that required infrastructure for processing, transporting, and physically securing physical checks, the Asserted Claims streamline the check processing system in a way that obviates the need for such infrastructure.

The intrinsic evidence expressly addresses the state of the art, noting that the present invention may need to accommodate "the current use of paper items" unless and "until such time as ***the use of electronic images becomes a common accepted practice*** for clearing checks." *Id.* at 2:4–11. Put another way, at the time of patenting, "the use of electronic images" in the specific manner set forth in the Asserted Claims had not "become[] a common accepted practice for clearing checks," much less a "well-understood, routine, and conventional" practice in the relevant financial industries.

In *Solutran*, the Federal Circuit expressly left open the eligibility of patents that claim this type of technological improvement. *Solutran*, 931 F.3d at 1167 n.2 ("Solutran does not contend that using a digital rather than paper version of the check . . . is inventive."). The ordered combination of elements in the Asserted Claims—supported by intrinsic evidence from the specification—illustrates that at the time of patenting, "using a digital rather than paper version of the check . . . is inventive." *Solutran*, 931 F.3d at 1167 n.2. The combination of remote deposit, MICR bypass, and deposit monitoring embodied in the claims is a "particular manner" of electronic check depositing that effectuates a categorically and technologically distinctive shift in the manner that check processing was previously done by financial institutions. *See Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1362–63 (Fed. Cir. 2018) (recognizing that a "particular manner" of processing "a limited set of information" in order to make "a specific improvement over prior art systems" constituted an inventive concept).  In view of these inventive concepts, supported by the intrinsic evidence, the Court finds that summary judgment is inappropriate.

### 3. *Solutran* Does Not Support A Contrary Result

JHA relies heavily on *Solutran* to argue that this Court should grant summary judgment that the Asserted Claims are ineligible for patent protection. The Court is mindful of the Federal Circuit's guidance in *Solutran*, and relies on *Solutran* to find that the Asserted Patents are directed towards an abstract idea under *Alice* Step 1. However, the Court also finds that *Solutran* is factually distinguishable at *Alice* Step 2. *Solutran* is addressed to substantially *broader claims* in a patent that affirmatively *conceded conventionality* and which was situated in a *later state of the art*. By contrast, the Asserted Patents are addressed to *particularized claims* that *expressly rejected conventionality* and innovated against a *wholly different state of the art*.

First, *Solutran* is addressed to patents that claim priority to a substantially later—and more mature—state of the art. The Asserted Patents in *Solutran* claim priority to 2006, at which point electronic check deposit processing had become ubiquitous. *Solutran*, 931 F.3d at 1166–69. By contrast, the Asserted Patents in this case were crafted and disclosed at the turn of the millennium, at a point when the electronic check deposit industry was still very much nascent—if existent at all. *See supra* Section III.C.2.

Particularly in view of the rapid advancement of the electronic arts, this difference of six years is important. The six years from 2000 to 2006 is the difference between brick cellphones and the iPhone, and between dial-up and broadband. There is a genuine dispute of material fact about the differences in the state of the art between 2000 (and the Asserted Patents) and 2006 (and the *Solutran* patent) sufficient to find that the latter does not foreclose factual examination of the former.

Second, *Solutran* relied on the patentee's affirmative concessions—both in litigation and in the specification—that the patent asserted therein involved merely conventional steps. *Solutran* repeatedly emphasized these concessions as the basis for its decision:

> In its background, the '945 patent explains that "***there has been an industry transition to the electronic processing of checks[, including] the recordation of the data*** ... presented by the check into a digital format \*1167 which can then be transferred electronically." *Id.* at col. 1, ll. 53–57, col. 1, ll. 61–62. ***It had become standard for the merchant to capture the check's transaction amount and MICR data at the point of purchase.*** *Id.* at col. 4, ll. 52–58, FIG. 1. Further, the patent's background explains that ***verifying the accuracy of the transaction information stored in the digital file against the check was already common***.[2] *Id.* at col. 2, ll. 13–15.

*Id.* at 1166–67 (alterations in original) (emphasis added).

> Moreover, ***the specification states, and Solutran does not dispute, that the steps of the claim are conventional processes for processing checks electronically***.

*Id.* at 1168 (emphasis added).

> ***As we noted above, the background of the '945 patent describes each individual step in claim 1 as being conventional.*** Reordering the steps so that account crediting occurs before check scanning (as opposed to the other way around) represents the abstract idea in the claim, making it insufficient to constitute an inventive concept.

*Id.* at 1169 (emphasis added). By contrast, the Asserted Patents include no such disclaimer and in fact affirmatively allege unconventionality. The intrinsic evidence of unconventionality is sufficient to distinguish *Solutran* on this score as well.

### IV.   <u>Conclusion</u>

The Court finds that JHA's Motion for Summary Judgment of Invalidity Under 35 U.S.C. § 101 (Dkt. No. 81) should be and hereby is **DENIED**. With respect to representativeness, JHA has not demonstrated that Claim 1 of the '430 Patent represents the claims of the '106 Patent, which is accordingly excluded from the scope of JHA's Motion. With respect to eligibility, JHA has failed to foreclose all genuine disputes of material fact about whether the claim limitations were well-understood, routine, and conventional at the time of patenting. PPS Data's intrinsic evidence of unconventionality is sufficient to prevent JHA from carrying its burden on summary judgment.

**So ORDERED and SIGNED this 6th day of September, 2019.**

_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE