```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE EASTERN DISTRICT OF TEXAS

 3                       MARSHALL DIVISION

 4   PPS DATA, LLC                 )(

 5                                 )(    CIVIL ACTION NO.

 6   VS.                           )(    2:18-CV-07-JRG

 7                                 )(    MARSHALL, TEXAS

 8                                 )(    SEPTEMBER 9, 2019

 9   JACK HENRY & ASSOCIATES, INC.)(    9:21 A.M.

10          TRANSCRIPT OF VOIR DIRE OF THE JURY PANEL

11                       MORNING SESSION

12      BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP

13                  UNITED STATES DISTRICT JUDGE

14   APPEARANCES:

15   FOR THE PLAINTIFF:

16   MR. ANTHONY SON
     MR. STEVE MADDOX
17   MR. KAVEH SABA
     MR. MATT RUEDY
18   MADDOX EDWARDS, PLLC
     1900 K Street, NW, Suite 725
19   Washington, DC 20006

20
     COURT REPORTER:    Shelly Holmes, CSR, TCRR
21                      Official Court Reporter
                        United States District Court
22                      Eastern District of Texas
                        Marshall Division
23                      100 E. Houston
                        Marshall, Texas  75670
24                      (903) 923-7464

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
```

```
1   FOR THE DEFENDANT:

2

3   MR. JAY E. HEIDRICK
    POLSINELLI PC
    900 W. 48th Place, Suite 900
4   Kansas City, MO  64112

5

6   MR. JASON A. WIETJES
    POLSINELLI PC
    2950 N. Harwood St., Suite 2100
7   Dallas, TX 75201

8

9   MR. JASON MAZINGO
    THE MAZINGO FIRM, PC
    102 N. College, Suite 1033
10  Tyler, TX 75702

11

12  MR. RANDAL S. ALEXANDER
    POLSINELLI PC
    150 N. Riverside Plaza, Suite 3000
13  Chicago, IL 60606

14

15  MR. ADAM DANIELS
    POLSINELLI PC
    2049 Century Park E, Suite 2900
16  Los Angeles, CA 90067

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2          COURT SECURITY OFFICER:  All rise.
 3          THE COURT:  Thank you.  Be seated, please.
 4          Good morning, ladies and gentlemen.  Thank you for
 5   being here.
 6          My name is Rodney Gilstrap, and I am the Chief
 7   United States District Judge for the United States District
 8   Court for the Eastern District of Texas.
 9          I live here in Marshall.  I've lived here in
10   Marshall since 1981 when I came here to practice law right
11   out of law school.
12          I have a confession to make.  I was not born in
13   Texas.  I was born in Florida, but I got to Texas as quick
14   as I could to attend both college and then law school at
15   Baylor University.
16          I'm married, and I have two grown children.  My
17   wife owns and operates a retail floral business here in
18   Marshall.
19          And I tell you these things because in a few
20   minutes, I'm going to ask each of you to tell me similar
21   information about each of you.  And I think you're entitled
22   to know as much about me as I'm about to find out about
23   each of you all.
24          We're about to engage in the selection of a jury
25   in a civil case involving allegations of patent
```

1   infringement, but before we go any further, I want to

2   briefly review with you how we came to have a jury trial

3   system in civil cases like the one that you're here for

4   today.

5          If you go back in ancient history and if you begin

6   with the Pentateuch, the first five books of the Old

7   Testament, you'll find that the ancient Jewish Nation

8   empaneled juries to decide issues relating to property

9   ownership and property value.

10         The ancient Greeks began using a jury system in

11  about 1500 BC.  The Romans, as they did with many things,

12  copied the jury system from the Greeks, and the Romans

13  implemented the jury system throughout their empire.  It

14  was the Romans that brought the jury system to what is

15  today Great Britain when they conquered that island in the

16  4th Century AD.

17         So by the 12th century AD, the jury -- the jury

18  trial system had been in place in Great Britain for 800

19  years.

20         But then in the 12th century AD, a tyrannical king

21  came to the throne of Great Britain named King John, and

22  King John began to prevent certain practices that had been

23  well established in that country for centuries.  Among

24  those, he set about to discontinue using the jury trial

25  system.

```
 1          Because of that and other disputes, King John

 2   ended up in a confrontation with his nobles that took that

 3   country to the verge of civil war.  But that civil war was

 4   avoided because they reached a settlement of their

 5   disputes, the King and his nobles, and that settlement was

 6   set forth in a document that they all signed and wrote --

 7   wrote and signed, I should say, and it was entered into at

 8   a place called Runnymede.

 9          And the document that resolved those disputes and

10   restored and clarified the right to trial by jury in Great

11   Britain is called the Magna Carta.  In fact, ladies and

12   gentlemen, 28 of the 50 United States have adopted in their

13   own state constitutions that portion of the Magna Carta

14   verbatim that guarantees the right to jury trials and jury

15   trials in a civil case such as this.

16          So you can see that when our Founding Fathers, as

17   British colonists, came to and were born and raised in the

18   British colonies that are now America, the concept of the

19   jury trial system and the jury trial system in civil cases

20   was well ingrained.  And, in fact, the jury trial system

21   flourished in the British colonies of North America for

22   over a hundred years.

23          But then another tyrannical king came to the

24   throne of Great Britain.  This time his name was King

25   George, III.  And like King John, King George, III, began
```

1    to frustrate and prevent the jury trial system.

2           As a matter of fact, ladies and gentlemen, when

3    Thomas Jefferson sat down to write the Declaration of

4    Independence, which spells out the specific grounds

5    requiring our country to separate from and become its own

6    independent nation, the efforts of King George, III, to

7    frustrate and prevent the jury trial system in these

8    colonies is one of the specific reasons set forth in the

9    Declaration of Independence that required in the -- in the

10   patriots' views of that day a necessity to separate and

11   become our own independent nation.

12          Because that was one of the -- one of the issues

13   leading to our Declaration of Independence, because it was

14   a critical part of everyday life in this part of the world

15   for over a hundred years before our Declaration of

16   Independence, it was important enough, ladies and

17   gentlemen, to be included in our United States

18   Constitution.

19          As a matter of fact, the right to a jury trial in

20   a civil case is set forth and preserved in the Seventh

21   Amendment to the U.S. Constitution, which is part of those

22   first 10 amendments that you all know to be called the Bill

23   of Rights.

24          The Seventh Amendment, along with all the other

25   first 10 amendments, were ratified in 1791.  So since 1791,

1   for well over 200 years, every American citizen has had a

2   constitutional right to submit their disputes in civil

3   matters -- matters to the judgment and the decision of a

4   jury of ordinary citizens such as yourselves.

5           So by you being here and reporting for jury duty

6   and presenting yourself to be selected to serve on a jury

7   in a civil case, you're doing a very real part to preserve,

8   protect, and defend our Constitution.

9           I always tell citizens who appear for jury duty,

10  such as you've done this morning, that in my personal

11  opinion, jury service is the second highest form of public

12  service that any American citizen can render.

13          In my personal view, the highest form of public

14  service are those young men and women who wear the uniform

15  of our armed services.

16          But I want all of you to understand that in a very

17  real sense, you are doing important -- important and

18  significant public service by being here today and

19  presenting yourself as summonsed to appear for jury

20  selection.

21          Now, ladies and gentlemen, when the lawyers in

22  this case address you later this morning, they're going to

23  ask you various questions, and I want you all to understand

24  that they're not seeking to pry into your private affairs

25  unduly.  In other words, they're not attempting to be nosy.

1   They are attempting to gather relevant, probative

2   information to help select a fair and an impartial jury to

3   hear the evidence in this case.  And they're entitled to

4   ask the questions that they'll be asking you this morning.

5          I don't know if it will happen today, and I will

6   tell you it rarely does, but every once in a great while,

7   someone on a jury panel is asked a question that they

8   believe is so personal and so private that they would

9   rather not answer that question in front of the remaining

10  members of the jury panel.

11         If that should happen, again, it's not likely, but

12  if it should happen, I want each of you to understand you

13  have the option to simply say, should that occur, that

14  you'd like to discuss that with Judge Gilstrap.  And if

15  that's your answer, then I'll afford a time for you to

16  answer that question outside of the presence of everyone

17  else on the panel.  But, as I say, that -- that does not

18  come up very often.

19         The important thing, ladies and gentlemen, is for

20  each of you to remember that as long as you give full,

21  complete, and truthful answers to the questions that are

22  asked, then there are no wrong answers to the questions

23  you'll be asked this morning.

24         Now, the trial in this case will begin today after

25  the jury is selected and seated, and I expect that it will

```
 1   continue through Friday of this week.  In other words, I
 2   expect this trial to take the entire week that we have
 3   before us.  But I expect to be through by our -- toward the
 4   end of Friday.
 5         That means any of you that are selected to serve
 6   on this jury will need to be available throughout the
 7   remainder of this week.
 8         So with that in mind, I need to ask those of you
 9   on the panel if there are any of you who have a prepaid,
10   non-refundable vacation that doesn't allow you any
11   flexibility, that would start this week.  I need to ask if
12   there are any of you that have a surgical procedure
13   scheduled for yourselves or an immediate member of the
14   family that's dependent upon you.
15         If there's some very serious reason that would
16   prevent you from being able to be here all week, then I
17   need to know about that.  If there's anybody that falls in
18   that category, would you please raise your hand and let me
19   make a note of it?
20         All right.  Keep your hands up, please.
21         No. 6.  I see nobody else in the jury box.
22         No. 15.  Thank you, sir, you can put your hand
23   down.
24         No. 28 I see.
25         No. 24 I see.
```

```
 1              Anybody else?  Six, 15, 24, and 28.

 2              All right.  Thank you.

 3              At this time, I'm going to call for announcements

 4    in the case of PPS Data, LLC versus Jack Henry &

 5    Associates, Inc.  This is Civil Case No. 2:18-CV-007.

 6              And, counsel, if you'd give your -- as you give

 7    your announcements, if you would introduce the other

 8    members of your trial team and any corporate representative

 9    that you have seated with you at counsel table.  We'll

10    begin with the Plaintiff.

11              What says the Plaintiff?

12              MR. SON:  Good morning, Your Honor.  Anthony Son

13    on behalf of PPS Data.  I am joined here today by my

14    colleague, Mr. Steven Maddox, Mr. Kaveh Saba, Mr. Matthew

15    Ruedy, and our corporate representative, the president of

16    PPS Data, Mr. Jeffrey Johnson.

17              THE COURT:  Thank you.

18              What says the Defendant?

19              MR. MAZINGO:  Your Honor, Jason Mazingo here on

20    behalf of Jack Henry & Associates, Inc., and with me, Your

21    Honor, are Mr. Jay Heidrick, Mr. Jason Wietjes, Mr. Randy

22    Alexander, and Mr. Adam Daniels.  And with us, we have our

23    client representative, Mr. Bill Phillips.

24              THE COURT:  All right.  Thank you, counsel.

25              Ladies and gentlemen, as I've told you, this is a
```

1  civil case regarding a United States patent.  And at a very

2  high level, what the Plaintiff is claiming in this case is

3  that its patent has been infringed by the Defendant, and

4  the Plaintiff is seeking money damages because of that

5  alleged infringement.

6       The Defendant denies that it is infringing the

7  Plaintiff's patent, and the Defendant contends that the

8  Plaintiff's patent is invalid.

9       Now, what I've just said and what I've just told

10  you is a very informal, high-level description of this case

11  in layman's terms.  I know that you have all seen the video

12  this morning prepared by the Federal Judicial Center.  And

13  having seen that, you already know more about patent cases

14  than most people in East Texas do when they report for jury

15  duty.

16       Now, as I've said, the lawyers for both sides will

17  question the panel shortly to gather information in order

18  to exercise their peremptory challenges to complete the

19  process of selecting a fair and impartial jury to hear the

20  evidence and to try this case.

21       Again, there are no wrong answers to any of the

22  questions you're going to be asked as long as your

23  responses are full, complete, and truthful.

24       As I noted, the lawyers are entitled to ask the

25  questions that they'll ask for that purpose to secure a

1   fair and impartial jury, and they're not here to pry into

2   your personal affairs improperly.

3           If for any reason a question should be asked that

4   I don't think is proper, I assure you, ladies and

5   gentlemen, I will stop the lawyer asking that question.

6           However, these are experienced trial lawyers.  I

7   don't expect that to happen.  But I want you to know I will

8   be mindful if it should occur.

9           One thing I want to call to your attention before

10  the lawyers address you and ask their questions because

11  they may ask you about your willingness and ability to

12  apply this if you're selected on the jury is what we call

13  the burden of proof.

14          In a patent case like this, the jury may be called

15  upon to apply two different burdens of proof.  The jury may

16  apply the burden of proof known as the preponderance of the

17  evidence and a second burden of proof known as clear and

18  convincing evidence.

19          Now, when responding to any potential questions

20  from the lawyers about the burden of proof, I need to

21  instruct you that when a party has the burden of proof on

22  any claim or defense by a preponderance of the evidence, it

23  means that the jury must be persuaded by the credible or

24  believable evidence that that claim or defense is more

25  probably true than not true.  I'll say that again, more

probably true than not true.

Sometimes this is talked about as being the greater weight and degree of credible testimony.

Let me give you an example.  I think everybody on the panel can see in front of me and in front of our court reporter the statue of the Lady of Justice.  This ancient statue has been around for hundreds and hundreds of years.

It depicts justice, and you'll notice that she's blindfolded.  In her right hand lowered at her side she holds the unsheathed sword of justice.  You'll note in her left hand she holds elevated above her the Scales of Justice, and those scales are equal and perfectly balanced.

And that's where these parties should start out at the beginning of this trial, in the same position and equally balanced.

However, over the course of the trial, both the Plaintiff and the Defendant will present their evidence to the jury, and you should think about that as going -- as evidence being placed on one side or the other side of those scales, depending on who offers it, either the Plaintiff or Defendant.

And when all the evidence is in, the jury is going to be asked certain questions, and if the party who has the burden of proof on any question by a preponderance of the evidence, if you will look at those scales in your mind and

1  think where are they now, given that they started out equal

2  and balanced, if those scales should tip in favor of the

3  party that has the burden of proof by the preponderance of

4  the evidence, then they've met that burden of proof, even

5  if those scales tip ever so slightly.

6        Remember, the preponderance of the evidence is

7  more probably true than not true.

8        Now, on the other hand, the jury is also going to

9  be asked to apply the second burden of proof I've mentioned

10  to you called clear and convincing evidence.

11        Clear and convincing evidence means that the jury

12  has an abiding conviction that the truth of the parties'

13  factual contentions are highly probable.  I'll say that

14  again, an abiding conviction that the truth of the parties'

15  factual contentions are highly probable.

16        The clear and convincing evidence standard, the

17  clear and convincing burden of proof, is a higher standard

18  than the preponderance of the evidence.  It requires more

19  proof, more evidence.

20        If a party who has the burden of proof by clear

21  and convincing evidence completes this trial and the jury

22  is asked a question and that question calls for the party

23  who has asserted that matter to prove it by clear and

24  convincing evidence, then those scales that hold all the

25  evidence for and against must tip in that party's favor,

1    and they must tip definitely in that party's favor.  It is

2    not adequate that they tip ever so slightly.

3         Again, an abiding conviction that the truth of the

4    party's factual contentions are highly probable.

5         Now, neither of these two burdens of proof, ladies

6    and gentlemen, should be confused with a third burden of

7    proof that I'm sure you've all heard about in the media and

8    on television and in the movies called beyond a reasonable

9    doubt.

10        Beyond a reasonable doubt is a burden of proof

11   that is applied in criminal cases only, and it has no

12   application whatsoever in a civil case like this.  Beyond a

13   reasonable doubt is higher than clear and convincing

14   evidence, and clear and convincing evidence is a higher

15   burden of proof than the preponderance of the evidence.

16        Now, I give you these instructions in case some of

17   the lawyers in questioning you this morning ask about your

18   ability and willingness to apply these two burdens of

19   proof, the preponderance of the evidence and clear and

20   convincing evidence, in this case if you're selected to

21   serve as a juror.

22        Now, before the lawyers begin their questioning,

23   I'm going to ask each of you at this point to now give me

24   as much information about each of yourselves as I gave you

25   about myself when we started a few minutes ago.

1    You should all see on the screens in front of you

2  and you should have laminated copies of nine specific

3  questions that I'm going to ask each of you to answer.

4    And we're going to do this one at a time beginning

5  with Jury Panel Member No. 1 and then we'll go through

6  numerically all the way through the end to Panel Member No.

7  28.

8    Let me explain how we're going to do this, ladies

9  and gentlemen.  When we get to each member of the panel one

10  at a time, I'm going to ask you to stand, the Court

11  Security Officer is going to bring you a handheld

12  microphone, and I'm going to ask you to hold that

13  microphone close, use it, and then answer those nine

14  questions.  And if you'll direct your answers toward these

15  lawyers at the two counsel tables, they're the ones that

16  need to hear the answers to those questions.

17    Once you've answered those nine questions, if you

18  will, then pass the microphone to the next member of the

19  panel, have a seat, and then that member will stand and go

20  through the same process all over again.

21    Also, after we've done this and the general

22  questioning takes place by the lawyers with regard to the

23  panel, if you're asked a specific question, I'm going to

24  request that you respond in the same way, and that is to

25  stand, wait for the handheld microphone, and then use that

1   handheld microphone in answering your question.

2          Believe it or not, this is a large courtroom, and

3   there are a lot of people in here, and it's important that

4   the lawyers hear your answers to these questions.  So

5   that's why I'm going to ask each of you to stand and use

6   the handheld microphone in answering both these questions

7   and any other questions you may be asked as a part of the

8   process this morning.

9          So, with that, I'll ask our Court Security Officer

10  to take the microphone to Ms. Perkins, Panel Member No. 1.

11         And, Ms. Perkins, if you'd stand and answer those

12  nine questions for us, please.

13         JUROR PERKINS:  My name is Keyonna Perkins.  I

14  stay here in Marshall, Texas.  I have one child.  I

15  currently work at Longview Regional Medical Center, and I'm

16  a registered nurse, and I have worked there for four

17  months.

18         My educational background, I have an associate's

19  degree in nursing.  I am not married.  And, no, I have not

20  served on any jury services.

21         THE COURT:  All right.  Thank you, ma'am.  If

22  you'll hand the microphone to Panel Member No. 2,

23  Ms. Booker.

24         JUROR BOOKER:  My name is Dottie Booker.  I live

25  in Marshall, Texas.  I have no children.  I'm unemployed.

 1   I have an associate's at -- from TSTC.  I'm not married.

 2   And I did serve on a civil jury.

 3          THE COURT:  And let me ask you, Ms. Booker, before

 4   we go on to the next person, when did you serve on a civil

 5   jury, and where was that?

 6          JUROR BOOKER:  It was here in Marshall, but it's

 7   been some years ago.

 8          THE COURT:  Was it in this court, or was it in

 9   state court?

10          JUROR BOOKER:  It was the one that was down --

11          THE COURT:  At the other courthouse?

12          JUROR BOOKER:  Yes, sir.

13          THE COURT:  State court.  And you don't remember

14   how long ago it's been?

15          JUROR BOOKER:  It's been some years.

16          THE COURT:  Okay, thank you, ma'am.

17          Next is No. 3, Ms. Gasper.

18          JUROR GASPER:  My name is Karen Gasper.  I live in

19   Elysian Fields, Texas.  I have one child that's in college

20   at Texas A&M.

21          I work for Mahaffey Law Firm in Carthage, Texas.

22   I've been there about a year, but I've worked for law

23   offices in Shreveport.  I have a high school education.

24          I'm married.  My husband's name is Benny Gasper,

25   Jr.  He works at Frymaster in Shreveport.  He's been there,

1  excuse me, over 30 years.

2        And I have never served on a jury.

3        THE COURT:  Okay.  Thank you very much, ma'am.

4        Next, Mr. Hughey.

5        JUROR HUGHEY:  My name is Earl Hughey.  I have --

6  Longview, Texas.  I have four children, four adult

7  children.  Five grandchildren.

8        I have worked for LeTourneau University.  I'm

9  retired.  I was an advancement officer.  I've worked there

10 for 15 years.  I have a master's degree.

11       My wife's name is Mary.  She's a retired teacher

12 from Longview Independent School District for 10 years.

13       And I was on a criminal case in Dallas probably 20

14 years ago.

15       THE COURT:  Thank you, sir.

16       Next is No. 5, Ms. Gonzalez.

17       JUROR GONZALEZ:  My name is Paula Gonzalez.  I

18 live in Longview, Texas.  I have a 26-year-old son.  I do

19 not work now.  My last job was at D & H Insurance.  And

20 I -- and I was laid off from there in 2010.  I have four

21 years of college, but I did not finish.  I did not

22 graduate.

23       My spouse's name is Oscar Gonzalez.  He works at

24 Eastman Chemical.  He's worked there for 40 years.

25       And I have never served on a jury.

1          THE COURT:  Thank you, ma'am.  If you'll hand the

2    microphone to Ms. Mendez, No. 6.

3          JUROR MENDEZ:  Good morning.  My name is Dorothy

4    Mendez.  I'm from Longview, Texas.  I have three grown

5    children.  I work at Neiman Marcus.  Accounting for 22

6    years.  I have some college degree.  I'm not married.  I

7    haven't served on any civil cases.

8          THE COURT:  Have you ever served on a criminal

9    case?

10         JUROR MENDEZ:  No, sir.

11         THE COURT:  Okay.  Thank you, then.

12         No. 7, Ms. Troboy.

13         JUROR TROBOY:  My name is Mary Troboy.  I'm from

14   Big Sandy, Texas.  I work at Big Sandy ISD.  I've worked

15   there 12 years.  I'm the business manager.  I have a

16   bachelor's degree from the University of Texas at Tyler.

17         My husband's name is William Troboy.  He works for

18   General Dynamics, and he's worked there about 10 years.

19         I've never served on a jury prior to this time.

20         THE COURT:  All right.  Thank you, ma'am.

21         Next will be No. 8, Ms. Pritchett.

22         JUROR PRITCHETT:  My name is Jana Pritchett, and I

23   live in Gilmer, Texas.  I have two children.  I work at

24   Union Hill ISD.  I'm a teacher there, second grade.  This

25   is my first year in that district, my 10th year of

1    teaching.  I graduated from UT Tyler.

2            My husband's name is Tim Pritchett.  He works at

3    McKaig in Gladewater.  Let's see, he's probably worked

4    there a little over a year.  And I've never served on a

5    jury.

6            THE COURT:  All right.  If you'll pass the

7    microphone to No. 9, Ms. Crumpler.

8            JUROR CRUMPLER:  My name is Melinda Crumpler.  I

9    live in Atlanta, Texas.

10           THE COURT:  Ma'am, would you hold the microphone

11   closer so I can hear you?

12           JUROR CRUMPLER:  Okay.  My name is Melinda

13   Crumpler.  I live in Atlanta, Texas.  I have two boys.

14   They're grown; they're not boys, they're men.  I am a

15   housewife.  I have worked there for over 30 years.  I have

16   a GED.

17           My spouse's name is Joe Crumpler.  He works at

18   GPI.  He is an instrument electrician.  He has worked there

19   for over 30 years.

20           I have served on a civil jury here in Marshall.

21   It's been more than five years ago.

22           THE COURT:  Was it in this court, or was it in

23   state district court?

24           JUROR CRUMPLER:  I think it was here.

25           THE COURT:  All right.  And you say it's been more

1   than five years ago?

2           JUROR CRUMPLER:  I believe so.

3           THE COURT:  Do you remember anything about what

4   the case was about?

5           JUROR CRUMPLER:  A guy was suing either Walmart or

6   Sam's because boxes fell on him.

7           THE COURT:  Okay.  Thank you very much, ma'am.

8           Next is Panel Member No. 10, Ms. Norman.

9           JUROR NORMAN:  Yes, my name is Dorinda Norman.

10  I'm from Linden, Texas.  I have a 30-year-old daughter and

11  17-year-old son.  I work for Higginbotham Insurance.  I've

12  been there since June.  I'm not married, and I've never

13  served on a jury.

14          THE COURT:  All right.  Thank you.

15          No. 11, Ms. Miles.

16          JUROR MILES:  My name is Ruth Miles.  I have four

17  children, and they're 44, 42, 40, and 38; two boys, two

18  girls.  Disabled.  And I have -- my education was tenth

19  grade.  I went to GED class, but I never finished.

20          My spouse is Walter Miles.  He work at Master

21  Craft, and he's been there a little over five years.  And I

22  was on jury duty in 2000 and -- I believe 2003 or 2004, one

23  of those.

24          THE COURT:  And where was that, ma'am?

25          JUROR MILES:  At the other courthouse.

1          THE COURT:  Here in Marshall?

2          JUROR MILES:  Yes, here in Marshall.

3          THE COURT:  Thank you, ma'am.  If you'll hand the

4    microphone to No. 12, Mr. Craig.

5          JUROR CRAIG:  My name is Benjamin Craig.  I live

6    here in Marshall, Texas.  I got two daughters.  I work for

7    American Electric Power Company, mechanical maintenance

8    supervisor.  I've been there 37 years.  I have some

9    college.

10         My spouse's name is Sandy.  She's the director of

11   children's ministry at First United Methodist Church.

12   She's been there about 12 years.

13         And I've served on a state civil case here about

14   10 years ago.

15         THE COURT:  All right, sir.  Thank you.

16         Next is No. 13, Ms. Collins.

17         JUROR COLLINS:  Hi.  My name is Vanita Collins.  I

18   have one son.  I work for Blue Cross Blue Shield.  I'm in

19   the appeals department.  I've been there 17 years.  I have

20   some college.

21         My husband's name is Bill Collins.  He works for

22   East Texas Baptist University.  He's the building manager

23   for their building just down the block.  He's been there

24   almost 30 years.

25         And I was chosen for a civil service, but they

1  settled out of court.  So we really only heard about it,

2  but didn't do anything else.

3         THE COURT:  Okay.  How long ago was that, ma'am?

4         JUROR COLLINS:  Oh, gosh, almost 20 years.

5         THE COURT:  Okay.  Thank you.

6         Next is No. 14.

7         JUROR PETRIMOULX:  My name is Norm Petrimoulx.  I

8  live in Atlanta, Texas.  I have been married twice.  My

9  first wife, we had three children.  I married my second

10 wife, and she had four.  So at one point we had seven kids

11 in the house.

12        My place of employment is Texas Department of

13 Transportation.  I'm a heavy equipment operator.  I've been

14 there for eight years.  I have a high school education.

15        My spouse's name is Tina.  She works at the Rabbit

16 Patch in Atlanta, Texas, and she's a kitchen manager.

17 She's worked there for a year.

18        And I have no prior jury service.

19        THE COURT:  Tell me what the Rabbit Patch in

20 Atlanta, Texas is, please, sir.

21        JUROR PETRIMOULX:  It's a little hamburger place.

22        THE COURT:  Okay.  Thank you.

23        JUROR PETRIMOULX:  You're welcome.

24        THE COURT:  Next is No. 15, Mr. Gay.

25        JUROR GAY:  My name is William Gay.  I have three

1  children; two boys, one girl.  I'm not employed right now.

2  I have a high school education.  And I'm divorced.  And

3  have never been on a jury duty.

4       THE COURT:  Tell me what your last employment was,

5  what kind of work you did.

6       JUROR GAY:  I was ex-fab.  It's explosive

7  ordnance.  We disassembled it and actually shoot it down.

8       THE COURT:  All right, sir.  Thank you.  If you'll

9  hand the microphone to No. 16, Ms. Kopech.

10       JUROR KOPECH:  My name is Tabbetha Kopech.  I live

11  in Daingerfield, Texas.  I have two grown children.  I work

12  for a state judge in Arkansas.  I'm the court reporter.

13  I've worked there for 16 years.  High school graduate.

14       My spouse's name is Michael Kopech.  He is a

15  lawyer in the Daingerfield/Mt. Pleasant area.  He's been

16  doing that for about 30 years.

17       And I've never served.

18       THE COURT:  And does your husband practice patent

19  law to any extent?

20       JUROR KOPECH:  He does not.

21       THE COURT:  Okay.  Thank you, ma'am.

22       JUROR KOPECH:  You're welcome.

23       THE COURT:  No. 17, Mr. Bates.

24       JUROR BATES:  My name is Charlie Bates.  I live in

25  Jefferson, Texas.  I have three teenage children.  I

1   currently work for New Diana ISD where I teach English,

2   11th and 12th grade.  This is my fourth year there.  I have

3   a master's degree.

4         And my wife's name is Kandice.  She works for an

5   online social media evaluator -- I think it's Appen.  She's

6   worked there for about a year.  And I have served on two

7   criminal cases in Jefferson, Texas.

8         THE COURT:  Never a civil case?

9         JUROR BATES:  No, sir.

10         THE COURT:  Thank you.

11         No. 18, Mr. Bliss.

12         JUROR BLISS:  My name is Michael Bliss.  I live

13   here in Marshall, Texas.  I don't have any children.  I

14   work for MISD.  I've been there 12 years.  High school

15   education.

16         My wife's name is Alana Bliss.  She works for the

17   Comfort Suites as a receptionist.  And I've never done jury

18   duty.

19         THE COURT:  All right, sir.  Thank you.

20         Next will be No. 19, Ms. Bailey.

21         JUROR BAILEY:  My name is Jeanette Bailey.  I live

22   here in Marshall.  I have two grown sons.  I don't work

23   now, but previously was out at Josey Ranch for 11 years.  I

24   have a high school diploma.

25         My husband's name is Dane.  He just lost his job,

 1    and he was a water meter reader for 11 years.

 2            And I've served on a civil here in this -- in

 3    state about 15 years ago.

 4            THE COURT:  And what did you do at Josey's Ranch

 5    when you were there?

 6            JUROR BAILEY:  Out in the kitchen.

 7            THE COURT:  Okay.  Thank you, ma'am.

 8            Next is No. 20, Mr. Hinerman.

 9            JUROR HINERMAN:  My name is David Hinerman.  Live

10    in Naples, Texas.  Got three kids.  Work for Hughes Springs

11    Independent School District.  Director of maintenance and

12    transportation.  Been there about 17 years.  Got a high

13    school education.

14            Spouse's name is Tammy.  She works for Winnsboro

15    ISD.  This is her first year there.

16            And I worked on -- trial on a criminal case in

17    Linden, Texas, about three years ago.

18            THE COURT:  Never served on a civil case?

19            JUROR HINERMAN:  No, sir.

20            THE COURT:  Thank you very much.

21            No. 21, Mr. Byrd.

22            JUROR BYRD:  My name is Audis Byrd.  I live in Big

23    Sandy, Texas.  I have three grown children.  I currently

24    work at ACB Energy.  We do consulting engineer work.  I've

25    worked there about eight years.  I have a BS in mechanical

1  engineering from Louisiana Tech.

2          My spouse is Debra K. Byrd.  She worked for EOG.

3  She retired right now.  She worked there about 10 years.

4          I've served on one jury which was a criminal jury

5  in Harris County, and they took a plea bargain before we

6  set the jury.

7          THE COURT:  And tell me what your wife's

8  employment is again.

9          JUROR BYRD:  She's retired.  She worked EOG.  She

10  has an accounting degree.

11          THE COURT:  EOG.  Okay.  Thank you, sir.

12          No. 22 is next, Ms. Turner.

13          JUROR TURNER:  My name is Joann Turner.  I live in

14  Jefferson, Texas.  I have two grown children; son and a

15  daughter.  My place of employment is Jefferson Independent

16  School District.  I'm a DAEP instructor/technology, and

17  I've worked there four years.  And I have an associate's

18  degree from East Texas Baptist University and am pursuing

19  my bachelor's degree from University of Texas A&M,

20  Commerce.  My spouse is deceased.

21          And I served on a civil right here in this

22  courtroom 20 years ago, and it was settled before we could

23  go to -- to the jury.

24          THE COURT:  So you didn't return a verdict in that

25  case?

1          JUROR TURNER:  No, sir.

2          THE COURT:  Thank you, ma'am.

3          No. 23, Mr. Verner.

4          JUROR VERNER:  My name is Doug Verner.  Live in

5     Gladewater, Texas.  I have three children.  I'm currently

6     retired or unemployed, depending on your point of view, I

7     guess.  I worked there for 14 years as a plant manager.

8          THE COURT:  Where was that, sir?

9          JUROR VERNER:  Longview, Texas.

10          THE COURT:  At what business?

11          JUROR VERNER:  Weatherford International.

12          THE COURT:  Thank you.

13          JUROR VERNER:  Some college.

14          My spouse's name is Joy.  She is retired or

15     unemployed.  She worked at Good Shepherd Hospital for eight

16     years as a unit clerk.  And I have no -- never served on a

17     jury.

18          THE COURT:  All right.  Thank you very much.

19          Next is Panel Member No. 24, Ms. Billingsley.

20          JUROR BILLINGSLEY:  My name is Valerie

21     Billingsley.  I'm from Gilmer.  I have five grown children.

22     I work for Med-Shop Total Care in -- as a billing

23     specialist for a medical equipment company.  I've been

24     there 18 years.  I have about a year and a half of college.

25          My spouse's name is Billy.  He works for Ore City

1   ISD as maintenance supervisor.  And he's been there in that

2   industry for about 40 years.  And I was on a criminal case

3   in Upshur County about 10 years ago.

4           THE COURT:  Thank you, ma'am.

5           No. 25 is next, Mr. Powers.

6           JUROR POWERS:  Yes, my name is Patrick Powers.

7   I'm from Gilmer, Texas.  I have two grown children - I say

8   grown, they're college age.  My employment, I own The

9   Med-Shop Pharmacy in Gilmer, independent pharmacist.

10  Worked there for -- owned it for 15 years.  I have a

11  college education.  I have a Bachelor of Science in

12  pharmacy from the University of Louisiana, Monroe.

13          My spouse's name is Debbie Powers.  She actually

14  works for The Med-Shop Pharmacy, too.  Before that, she was

15  in pharmaceutical sales for Meda Pharmaceuticals and Eli

16  Lilly Company.  She's worked there for eight years at the

17  pharmacy.

18          And I have not served on a jury before.

19          THE COURT:  Thank you, sir.

20          No. 26 is next, Mr. Miles.

21          JUROR MILES:  I'm Larry Miles.  And I live in

22  Omaha, Texas.  I got one son.  And I work for U.S. Steel.

23  Been there on and off since '93.  Got a GED.  I'm single.

24  And I served on a criminal case in Mt. Pleasant about 25

25  years ago, probably.

1          THE COURT:  Never on a civil case?

2          JUROR MILES:  No.

3          THE COURT:  Thank you.

4          Next is No. 27, Dr. Mohamed-Santa.

5          JUROR MOHAMED-SANTA:  My name is Mirza

6    Mohamed-Santa.  And I live here in Marshall.  I have one

7    child.  He's a lawyer in Virginia -- tax lawyer.  My place

8    of employment is --

9          THE COURT:  And, sir -- sir, could you hold the

10   microphone a little closer?

11         JUROR MOHAMED-SANTA:  My place of employment is

12   Marshall Family Practice Associates, and I'm a manager

13   there.  I've worked there for about 10 years.  My

14   educational background, I have bachelor's degree, master's,

15   Ph.D, and a law degree.

16         My spouse's name is Odette.  My spouse's

17   employment, she's a medical doctor, family physician.  And

18   she's been there -- is partner and owner of the Marshall

19   Family Practice for about 15 years.

20         And I've had no previous dealings with civil or

21   criminal cases.

22         THE COURT:  All right, sir.  Thank you very much.

23   If you'll hand the microphone to Panel Member No. 28,

24   Ms. Snowden.

25         JUROR SNOWDEN:  My name is -- my name is Katherine

1   Snowden.  I live in Cass County, outside of Atlanta.  I

2   have two grown children and one grandson.  I am a dental

3   hygienist.  I work at Pinnacle Implants & Periodontics in

4   Texarkana and in Longview.  I have been in this office

5   about three and a half years, but I've been a hygienist for

6   42.  I have an Associate of Science in dental hygiene from

7   East Tennessee State University.

8          My husband's name is Charles Snowden.  He is

9   retired from the USDA Natural Resources Conservation.  He

10  worked there for 32 years.  And I was picked for a criminal

11  jury, I think it was a check forgery case, in the early --

12  or some time in the '80s, and it was settled before we got

13  to jury trial.

14         And I would like to make a comment.  I think I

15  misconstrued the -- the question earlier about the surgery

16  schedules.  My mother-in-law has just been put into hospice

17  care, and my husband is in East Tennessee with her there.

18  And I think I just heard that wrong on the question --

19  misunderstood.

20         THE COURT:  Is there something about your

21  mother-in-law being in hospice care in Tennessee that would

22  keep you from being available to serve on this jury?

23         JUROR SNOWDEN:  If she were to pass away between

24  now and when -- you know, the end of the week, that does

25  not look likely, but it's a possibility.

1              THE COURT:  Okay.  Thank you, ma'am.

2         Thank you, ladies and gentlemen, for that

3    information.

4         And I need to say a couple more things to you

5    before I turn the questioning over to the lawyers.

6         The jurors that are actually selected to serve on

7    the jury in this case will serve in the role as the judges

8    of the facts, and the jury selected will make the sole and

9    ultimate determination about what the facts are in this

10   case.

11        Now, my job as the Judge is to rule on questions

12   of law, evidence, and procedure that arise during the

13   trial, to oversee the flow of the evidence, and to maintain

14   the decorum of the courtroom.

15        Also, I want to say a couple things to you about

16   our judicial system that I hope will put things in a proper

17   perspective for you.

18        In every jury trial, besides the actual Plaintiff

19   and Defendant themselves, there are always three

20   participants; the jury, the Judge, and the lawyers.

21        With regard to the lawyers, I think it's important

22   for each of you to understand that our judicial system is

23   an adversary system, which simply means that during a

24   trial, each party will seek to present their respective

25   case to the jury in the very best light possible.

1          Now, it's no surprise to any of you that lawyers

2    are often criticized in the media and in the public.  And

3    the Court's observed that at least to some degree, that

4    criticism is a result of a basic misunderstanding of our

5    adversary system in which the lawyers act as advocates for

6    the competing parties.

7          And as an advocate, a lawyer is ethically and

8    legally obligated to zealously assert his client's position

9    under the rules of our adversary system.  And by presenting

10   the best case possible on behalf of their clients, the

11   lawyers hopefully will enable the jury to better weigh the

12   relevant evidence, to determine the truth, and to arrive at

13   a just verdict based on that evidence.

14         This system of justice, this adversary system of

15   justice that serves our country, has served us well for

16   over 200 years, and America's lawyers have been, continue

17   to be, and will be an indispensable part of that process.

18         So, as we go forward with this trial, even though

19   it's possible that from time to time I might frown or

20   grumble at the lawyers during the trial of the case, it's

21   simply because I'm trying to make sure that their advocacy

22   doesn't get outside the boundaries of our adversary system

23   and our rules of procedure.

24         But please keep in mind, ladies and gentlemen,

25   they're just doing their jobs, and it's important for you

1    to be aware of that in the proper context as we go forward.

2              Also, ladies and gentlemen, I want you to

3    understand that throughout the course of the trial, I am

4    going to do my very best to make sure that none of you have

5    any idea about what I think about the evidence because

6    evaluating the evidence and from that determining the facts

7    in this case is the job of the jury.  It is not my job as

8    the Judge.

9              That being the case, no one selected on this jury

10   should take any expression that they see or think they see

11   or any comment that they hear or think they hear as coming

12   from me as an indication about what the jury should

13   consider in making its determination about the ultimate

14   facts in this case.

15             All right.  With that, Plaintiff, you may address

16   the panel.  Would you like a warning on your time,

17   Mr. Maddox?

18             MR. MADDOX:  Yes, please, Your Honor.

19             THE COURT:  Tell me what kind of a warning you

20   would like, sir.

21             MR. MADDOX:  Five minutes.

22             THE COURT:  I'll warn you with five minutes

23   remaining.  You may proceed.

24             MR. MADDOX:  Thank you.

25             Excuse me.

1          Good morning, ladies and gentlemen.  My name is

2    Steven Maddox.  And together with my colleagues who you met

3    earlier, we're going to be representing the Plaintiff in

4    this case, PPS Data.  First of all, I'd like to thank you

5    so much for everything you've already done and are about to

6    do.

7          What you've done in filling out those

8    questionnaires is incredibly generous for you to take time

9    before your actual service to provide that information, and

10   the most wonderful thing about those questionnaires is that

11   your answers were candid, and that is really what we're

12   going to be looking for today, candid answers.

13         A little bit about me.  I am not from Texas.  It

14   happens sometimes.  But I come from Maryland, and I went to

15   school in Virginia, and I'm married, and my wife and I have

16   a son 14 years old who had his first day of high school on

17   the day I left to come here.  He phoned me that night, and

18   very excited that he got a locker, so things are looking up

19   for him.  We live outside Washington, D.C.

20         I am old enough, and many of you are, too, to have

21   picked up a few preferences over the years.  Some would

22   call them biases, not in the sense of racism or anything

23   like that, but in the sense of we've all been around the

24   block.  We all kind of know what we like and what we don't

25   like.

1          We've all been in situations so the next time

2   around we see that kind of brewing, we say, I think we know

3   how that's going to go.

4          And you can tell from my size, I have a bias

5   against vegetables.  I have a bias towards steak and pasta.

6   If you ask me to be a food critic or to judge a food

7   competition, there is no doubt that the chef who came in

8   with the best tasting brussel sprouts you've ever had is

9   going to have an uphill battle with me.

10          I also have -- am old enough now to be basically

11   kind of biassed against any new rock music that comes out.

12   I put myself through school playing bluegrass.  I used to

13   play in Austin in a hole in the wall and other places.

14          And so, again, if I was asked to try to be

15   absolutely a hundred percent neutral about whether some

16   music was good or should be bought or purchased, I would

17   try my best, as I'm sure you would, but I would be starting

18   a little bit to one side.

19          And that's some of the questions I asked you today

20   and the attorneys for the Defendant asked you.  We're

21   trying to learn those.  It is no sin to have a preference

22   or a leaning.  It's not about criticizing anyone for that.

23   We just really would like to know what those leanings are,

24   and we'll try to figure out if they have some bearing on --

25   on the case, and so that's why we're here today.

1           Now, as you know, this is going to be a patent

2      case and, excuse me, I can tell you it's going to be a

3      patent case concerning the check processing, that is what

4      banks do once you take a check to a bank and you deposit

5      it, or an ATM, what have you, what happens to the check

6      after that, what the bank has to do eventually to get it to

7      the check writer's bank.  And you'll see it's -- it's quite

8      complex, and -- and there's a lot of technology involved.

9           So what I would like to do first is to ask you

10     whether -- and I'll just go down the list of jurors,

11     whether you consider yourself very comfortable, somewhat

12     comfortable, or just a little comfortable with the

13     technical aspects of computers and networks.

14           Ms. Perkins, very, somewhat, or a little?

15           Oh, I'm sorry.

16           JUROR PERKINS:  I would consider myself

17     comfortable.

18           MR. MADDOX:  Okay.  Ms. Booker?

19           JUROR BOOKER:  Somewhat comfortable.

20           MR. MADDOX:  Ms. Gasper.

21           JUROR GASPER:  Comfortable.

22           MR. MADDOX:  Mr. Hughey.

23           JUROR HUGHEY:  Somewhat.

24           MR. MADDOX:  Ms. Gonzalez.

25           JUROR GONZALEZ:  Somewhat.

```
 1              MR. MADDOX:  Ms. Mendez.

 2              JUROR MENDEZ:  Comfortable.

 3              MR. MADDOX:  I'm sorry, what was that?

 4              JUROR MENDEZ:  Comfortable.

 5              MR. MADDOX:  Comfortable, thank you.

 6              JUROR TROBOY:  Comfortable.

 7              MR. MADDOX:  Thank you.

 8              Give that to Ms. Pritchett.

 9              JUROR PRITCHETT:  I would say somewhat

10    comfortable.

11              MR. MADDOX:  Thank you.

12              Ms. Crumpler.

13              JUROR CRUMPLER:  I'd say somewhat comfortable.

14              JUROR NORMAN:  I'm comfortable.

15              MR. MADDOX:  Thank you.

16              JUROR MILES:  Somewhat.

17              MR. MADDOX:  Somewhat comfortable.  Thank you.

18              JUROR CRAIG:  Comfortable.

19              MR. MADDOX:  Thank you.

20              JUROR COLLINS:  Comfortable.

21              MR. MADDOX:  Mr. Petrimoulx.

22              JUROR PETRIMOULX:  Not comfortable.

23              MR. MADDOX:  I'm sorry?

24              JUROR PETRIMOULX:  Not comfortable.

25              MR. MADDOX:  Not comfortable, understood.  Thank
```

1   you.

2           JUROR GAY:  Somewhat comfortable.

3           MR. MADDOX:  Thank you.

4           JUROR KOPECH:  Can I clarify?  The inner workings

5   with the computer -- say it again.

6           MR. MADDOX:  The technical aspects of computers

7   and -- and networks.  Do you have a sense of how -- how

8   networks work and -- and computers talk to each other and

9   that type of thing?

10          JUROR KOPECH:  I would say not very comfortable.

11          MR. MADDOX:  Okay.  Thank you.

12          JUROR BATES:  Comfortable.

13          MR. MADDOX:  Thank you.

14          JUROR BLISS:  Somewhat comfortable.

15          MR. MADDOX:  Thank you.

16          JUROR BAILEY:  Somewhat comfortable.

17          JUROR HINERMAN:  Not comfortable.

18          MR. MADDOX:  Thank you.

19          JUROR BYRD:  Comfortable.

20          MR. MADDOX:  Thank you.

21          JUROR TURNER:  Comfortable.

22          JUROR VERNER:  Somewhat comfortable.

23          MR. MADDOX:  Thank you.

24          JUROR BILLINGSLEY:  Comfortable.

25          MR. MADDOX:  Thank you.

1        JUROR POWERS:  I'm comfortable.

2        MR. MADDOX:  Thank you.

3        JUROR MILES:  Not very comfortable.

4        MR. MADDOX:  Thank you.

5        JUROR MOHAMED-SANTA:  Comfortable.

6        MR. MADDOX:  Thank you.

7        JUROR SNOWDEN:  Somewhat to not comfortable.

8        MR. MADDOX:  Okay.  Okay.  Thank you very much.

9        My colleagues are writing this down, and we'll

10  take these -- I'd like to ask a few individuals some

11  questions, if I may.

12        Ms. Pritchett, there you are, in your

13  questionnaire about your strong feelings about lawsuits, do

14  you feel -- it's a question whether there's a moral issue

15  involved?

16        JUROR PRITCHETT:  I guess it would depend on

17  what -- what the lawsuit was.

18        MR. MADDOX:  Okay.  Well, this lawsuit is going to

19  be about a patented invention, patented by one company, and

20  it's suing the other company to say you infringed our

21  patent.  There's no criminal or moral or ethical judgment

22  here.  This is a business dispute.

23        Do you feel that you have a strong feeling about

24  that?

25        JUROR PRITCHETT: I mean, I guess a lot of

1  knowledge would be needed to -- to make that, but just, you

2  know, to make sure that someone that legitimately had a

3  reason to say, yes, this was my invention or, no, it

4  wasn't.

5          MR. MADDOX:  Okay.  And if -- if you've -- if

6  you've found someone who did say -- you believe that this

7  was their invention, would you then have a problem with

8  them enforcing their patent in court?

9          JUROR PRITCHETT:  No, I mean, not with the right,

10 you know, evidence that supported it.

11         MR. MADDOX:  Okay.  Thank you very much.

12         Ms. Gonzalez?

13         JUROR GONZALEZ:  Yes.

14         MR. MADDOX:  Hello.

15         Do you feel that lawsuits is basically everyone

16 looking for easy money, and the lawyers, as well?  We need

17 candor.

18         JUROR GONZALEZ:  In a lot of cases, I do feel that

19 way.

20         MR. MADDOX:  Sure.  What kind of cases are you

21 thinking about when you think about that?

22         JUROR GONZALEZ:  Well, there's so many of these

23 lawyers on TV, personal injury, that sort of thing.

24         MR. MADDOX:  Uh-huh.

25         JUROR GONZALEZ:  And having been a claims adjuster

1   for an insurance company, I've just seen a lot of that with

2   car accidents.

3          MR. MADDOX:  Uh-huh.

4          JUROR GONZALEZ:  And, you know, people running to

5   an attorney when they got bumped in the -- you know, trying

6   to get money.

7          MR. MADDOX:  Sure.  Well, we all -- we all

8   experience life for a long time and it informs us.

9          Do you think you kind of start here with -- that

10  it's a lawsuit, that you kind of start kind of one step

11  removed as a result of this, kind of like, lawsuits

12  generally, many of them I have problems and hesitancy

13  about?  Is that where you kind of start?

14         JUROR GONZALEZ:  Well, I kind of feel like that

15  there are so many lawsuits that are frivolous.

16         MR. MADDOX:  Uh-huh.

17         JUROR GONZALEZ:  That -- and -- and a lot of them

18  go back to my dealings with being a claims adjuster.

19         MR. MADDOX:  Sure --

20         JUROR GONZALEZ:  And car accidents and all that

21  kind of stuff.

22         MR. MADDOX:  How many years were you a claims

23  adjuster?

24         JUROR GONZALEZ:  About -- a little over four

25  years.

 1          MR. MADDOX:  So a lot?

 2          JUROR GONZALEZ:  No, that's not a lot.  They

 3  closed our office in Longview.

 4          MR. MADDOX:  Well, thank you very much.

 5          May I ask Mr. Gay a question, Juror 15?

 6          You -- you have a sort of a starting point that

 7  people are kind of sue happy.  There are too many lawsuits

 8  in this country?

 9          JUROR GAY:  Yes, sir.

10          MR. MADDOX:  And just how did you get to that

11  belief, generally?

12          JUROR GAY:  Just watching, you know, like stuff on

13  TV or --

14          THE COURT:  You're going to have to speak up,

15  Mr. Gay.

16          JUROR GAY:  Just basically watching stuff on TV

17  and just some experiences I've seen out of divorces --

18          MR. MADDOX:  Right.

19          JUROR GAY:  -- and things like that.

20          MR. MADDOX:  And did you say you were divorced?

21          JUROR GAY:  Yes, sir.

22          MR. MADDOX:  And how -- how recent was that?

23          JUROR GAY:  This year.

24          MR. MADDOX:  And there was a trial in that?

25          JUROR GAY:  Yes, sir.

1          MR. MADDOX:  I understand.  So would it be fair to

2  say that you kind of skeptical of how many lawsuits there

3  are and maybe this one isn't a real non-frivolous suit?

4          JUROR GAY:  Yes.

5          MR. MADDOX:  Thank you, sir.

6          JUROR GAY:  Yes, sir.

7          MR. MADDOX:  Now, we've had -- I talked to a

8  couple people who in their questionnaires indicated their

9  candid feelings about lawsuits.  And is there any -- is

10 there anyone else who didn't express that kind of thing in

11 their questionnaire, but who really kind of feels that?

12 And having heard from people that you're not alone, would

13 like to -- would like to discuss it with me, raise your

14 hand.  No?  Okay.  All right.

15         May I speak with Ms. Snowden?  Ms. Snowden, do you

16 have strong feelings about lawsuits?

17         JUROR SNOWDEN:  In general.  I think the least

18 little thing happens, somebody stumps their toe, and they

19 think, oh, I can get money out of this.  You know, and it's

20 just -- most -- for the most part, they're all well and

21 good, but there's a lot of things that seem too minute to

22 worry with.

23         MR. MADDOX:  Are you kind of thinking of like

24 personal injury things or other kinds of lawsuits?

25         JUROR SNOWDEN:  Personal injury, and then just --

1    the least little thing -- I mean, people decide they want

2    to get -- see if they can make some money off of it.

3            MR. MADDOX:  Uh-huh.  And so do you kind of bring

4    that sort of starting point to your jury service today?

5            JUROR SNOWDEN:  Well, infringement laws and that

6    kind of stuff, from what I've learned this morning, and I

7    don't know -- I'm not very knowledgeable in that field --

8            MR. MADDOX:  Uh-huh.

9            JUROR SNOWDEN:  -- you know, lawsuits have their

10   place, but there's a lot of things that people just tend to

11   over -- overdo.

12           MR. MADDOX:  Thank you very much.

13           May I speak with Juror 20, Mr. Hinerman -- I'm

14   sorry, Hinerman?

15           Mr. Hinerman, do you have a view that the damages

16   awards in the lawsuits are out of control?

17           JUROR HINERMAN:  Yes, sir, I do.

18           MR. MADDOX:  Okay.  And how did you come to that?

19           JUROR HINERMAN:  Again, just what I see on TV and

20   hear on the radio.

21           MR. MADDOX:  Okay.  So would it be your assumption

22   that Plaintiff in general in lawsuits is looking for more

23   money than they really should be entitled to?

24           JUROR HINERMAN:  I believe so, yes.

25           MR. MADDOX:  And do you think you would -- some

1    part of you at least would want to apply that presumption

2    to Plaintiff in this case?

3         JUROR HINERMAN:  I've never really looked at it in

4    this particular instance.

5         MR. MADDOX:  Okay.  Thank you very much.

6         Now, when it comes to invention and innovation,

7    which is what patents are about, you can kind of think of

8    it as the idea and the solution -- the big idea and then

9    how do you make it work in the real world.

10        I'd like to poll you once again and say, if you

11   had to choose between which part is more important, the big

12   idea or getting it done in the real world, which would you

13   say is more important to innovation and invention?

14        May we poll the jury again?  Where did the

15   microphone go?  Sorry.  Could we start with Juror No. 1?

16        JUROR PERKINS:  I would work in the real world.

17        MR. MADDOX:  Thank you.

18        JUROR BOOKER:  I would think how -- how it works

19   in the real world, actually getting it working.

20        MR. MADDOX:  Thank you.

21        JUROR GASPER:  The real world.

22        MR. MADDOX:  Thank you.

23        JUROR HUGHEY:  Big idea.

24        MR. MADDOX:  Thank you.

25        JUROR GONZALEZ:  I'm kind of torn.

```
1              THE COURT:  Please stand up.
2              MR. MADDOX:  Torn --
3              THE COURT:  Please stand -- please stand up.
4              JUROR GONZALEZ:  Oh, I'm sorry.
5              MR. MADDOX:  If you can't decide, that's fine.
6              JUROR GONZALEZ:  Yeah, I'm kind of torn on that
7  one.
8              MR. MADDOX:  Thank you very much.
9              JUROR MENDEZ:  The big idea.
10             MR. MADDOX:  Thank you.
11             JUROR TROBOY:  The big idea would be important.
12             MR. MADDOX:  Thank you.
13             JUROR PRITCHETT:  I think it would be getting it
14 to work in the world.
15             MR. MADDOX:  Thank you.
16             JUROR CRUMPLER:  Making it work in the world.
17             JUROR NORMAN:  Making it work in the world.
18             JUROR MILES:  Making in world -- work in the
19 world.
20             JUROR CRAIG:  Making it work in the real world.
21             JUROR COLLINS:  Making it work.
22             MR. MADDOX:  Thank you.
23             JUROR PETRIMOULX:  Also, making it work.
24             MR. MADDOX:  Thank you, sir.
25             JUROR GAY:  Making it work.
```

```
 1              MR. MADDOX:  Thank you.

 2              JUROR KOPECH:  The idea.

 3              MR. MADDOX:  Thank you.

 4              JUROR BATES:  Making it work in the real world.

 5              MR. MADDOX:  Thank you very much.

 6              JUROR BLISS:  Making it work in the real world.

 7              MR. MADDOX:  Thank you.

 8              JUROR BAILEY:  Making it work in the real world.

 9              MR. MADDOX:  Thank you.

10              JUROR HINERMAN:  Making it work in the world.

11              MR. MADDOX:  Thank you.

12              JUROR BYRD:  I think it's the idea.

13              MR. MADDOX:  Thank you.

14              JUROR TURNER:  Making it work in the real world.

15              MR. MADDOX:  Thank you.

16              JUROR VERNER:  I would say that the big idea and

17    the solution being kind of equal footing.

18              MR. MADDOX:  Thank you very much.

19              JUROR BILLINGSLEY:  The big idea.

20              MR. MADDOX:  Thank you.

21              JUROR POWERS:  Making it work in the real world.

22              JUROR MILES:  I'll take both of them.

23              JUROR MOHAMED-SANTA:  I'd like to straddle the

24    fence in both, the big idea and making it work.  Ideas just

25    don't occur in a vacuum.  It must work.
```

1          MR. MADDOX:  Of course.  Thank you.

2          JUROR SNOWDEN:  Making it work in the real world.

3          MR. MADDOX:  Thank you very much.

4          Your Honor, would it be okay if I ask for a show

5    of hands and then follow up?

6          THE COURT:  You may do that?

7          MR. MADDOX:  Would you raise your hand if you have

8    ever dealt in the U.S. Patent Office.

9          JUROR HUGHEY:  We can't hear you.

10         MR. MADDOX:  I beg your pardon.  Would you raise

11   your hand if you have ever dealt with the United States

12   Patent Office?

13         Okay.  So that's Jurors No. 23 -- may I start with

14   you, sir, Mr. Verner --

15         JUROR BYRD:  I'm 21.

16         MR. MADDOX:  Okay, 21.  We'll start there.

17   Mr. Byrd, do you have some patents or a patent?

18         JUROR BYRD:  I do have patents, 13.  Two in work

19   right now.

20         MR. MADDOX:  Wow.  And were you involved in the

21   process of applying for the patents?

22         JUROR BYRD:  Through an attorney.

23         MR. MADDOX:  Through an attorney.  And how long

24   did it take?

25         JUROR BYRD:  Usually it takes three years to get a

1    patent issued.

2           MR. MADDOX:  Right.

3           JUROR BYRD:  I mean, the development of it is

4    probably six or eight months, putting it together.

5           MR. MADDOX:  Did you form any impressions as to

6    the competency of the Patent Office, one way or the other?

7           JUROR BYRD:  Well, I mean, there's lots of going

8    back and forth on different ideas.  Sometimes you have to

9    explain specifically what you mean about that.  Sometimes

10   they try to reject claims that you can get through if you

11   consistently explain it, maybe re-word it a little bit.

12          MR. MADDOX:  In the end did you get most of the

13   patents you applied for?

14          JUROR BYRD:  Most of them, yes.  Probably three or

15   four, five didn't go through.

16          MR. MADDOX:  Thank you very much.

17          Could you give the microphone to Juror No. 23,

18   please?

19          Mr. Verner, did you apply for a patent, sir?

20          JUROR VERNER:  With the company -- I worked for

21   Weatherford, and I was in the engineering office.  And I

22   was part of -- there was a couple of us that got together

23   and came up with a solution that the -- of course, the

24   corporate lawyer actually did the -- all the footwork with

25   the -- to get the patent through.

```
 1          MR. MADDOX:  Were you -- so were you involved with

 2   the Patent Office or was that done by the lawyers?

 3          JUROR VERNER:  Only -- only indirectly through --

 4   through the lawyers.

 5          MR. MADDOX:  Did you form any impression one way

 6   or the other as to -- --

 7          JUROR VERNER:  No, not particularly.

 8          MR. MADDOX:  -- the Patent Office?

 9          I believe there was one other.

10          JUROR BYRD:  I want to clarify.  I didn't work

11   directly with the Patent Office.  I did work through an

12   attorney with all the claims and all.

13          MR. MADDOX:  Yes, sir.  Thank you.

14          There was one more, I believe.

15          JUROR MOHAMED-SANTA:  I haven't worked with the

16   USPTO directly.  My invention was done by a lawyer.

17          MR. MADDOX:  I'm terribly sorry, could you say

18   that again?

19          JUROR MOHAMED-SANTA:  I didn't work with the

20   United States Patent Office directly.  I worked with a

21   lawyer for my patent.

22          MR. MADDOX:  Overall, did you feel like it was a

23   good experience?

24          JUROR MOHAMED-SANTA:  Not really.  I have quite a

25   number of inventions now, and I'm working directly with
```

1  companies.  I'm trying to avoid the entire process of going

2  through the patent service, and see if I can sell the

3  invention directly.

4      MR. MADDOX:  If you recall, were there times when

5  you thought the Patent Office was being unreasonable?

6      JUROR MOHAMED-SANTA:  No.  It's just that it takes

7  almost a lifetime to get anything through to fruition these

8  days.

9      MR. MADDOX:  Yes.  Thank you very much.

10      JUROR MOHAMED-SANTA:  Okay.

11      MR. MADDOX:  May I ask a question of Ms. Gasper?

12      JUROR GASPER:  Yes, sir.

13      MR. MADDOX:  Hi.  You work at a law firm and have

14  worked at law firms?

15      JUROR GASPER:  Yes, sir.

16      MR. MADDOX:  Yes.  Have -- have any of them been

17  involved with patent litigation?

18      JUROR GASPER:  No, sir.

19      MR. MADDOX:  And have you been involved with

20  litigation?

21      JUROR GASPER:  Have I been involved?

22      MR. MADDOX:  For instance, with the trial work you

23  assisted them in?

24      JUROR GASPER:  Oh, I've worked with the defense

25  attorneys and plaintiff attorneys working for trials.

1        MR. MADDOX:  Uh-huh.  And would that experience in

2   any way sort of tilt you one way or the other as you sit

3   for a jury here?  Plaintiff/Defendant kind of thing.  You

4   said it was a defense firm.

5        JUROR GASPER:  Well, I worked for a plaintiff and

6   a defense firm.

7        MR. MADDOX:  Okay.

8        JUROR GASPER:  So it depends on...

9        MR. MADDOX:  So you've been on both sides?

10       JUROR GASPER:  Yes, sir.

11       MR. MADDOX:  Okay.  Thank you very much.

12       Ms. Norman, did you -- did you work at a bank at

13  some point?

14       JUROR NORMAN:  Yes, sir, I did.

15       MR. MADDOX:  And what did do you at the bank?

16       JUROR NORMAN:  I was a customer service rep.

17       MR. MADDOX:  So what kind of things would you

18  handle?

19       JUROR NORMAN:  Any complaints coming in, opening

20  up any accounts, subbing, checking.

21       MR. MADDOX:  Okay.  Thank you very much.

22       JUROR NORMAN:  Uh-huh.

23       MR. MADDOX:  Ms. Collins, Juror 13.

24       JUROR COLLINS:  Yes, sir.

25       MR. MADDOX:  Did you work at a bank as well?

1             JUROR COLLINS:  I did, yes.

2             MR. MADDOX:  And what did you do there?

3             JUROR COLLINS:  Started as a teller, ended up

4   being in customer service.

5             MR. MADDOX:  Oh, okay.  And how long ago was that

6   approximately?

7             JUROR COLLINS:  25 years ago.

8             MR. MADDOX:  Okay.

9             JUROR COLLINS:  Way before any technology like

10  this.

11            MR. MADDOX:  Okay.  All right.  Thank you very

12  much.

13            Bear with me one moment.  Thank you.

14            Ms. Turner, you -- you worked in a bank?

15            JUROR TURNER:  Yes, I did in bookkeeping.

16            MR. MADDOX:  Bookkeeping.  And how long ago was

17  that?

18            JUROR TURNER:  It's been 15 years ago.

19            MR. MADDOX:  Okay.  About how long did you work

20  there for?

21            JUROR TURNER:  Three years.

22            MR. MADDOX:  Three years.  Thank you very much.

23            Now, if I may ask for another show of hands, Your

24  Honor.

25            Is there anyone in this pool that has reason to

1    doubt the Patent Office does what it's supposed to do?

2         Okay.  Thank you.

3         Ms. Kopech.

4         THE COURT:  Mr. Maddox, would you mind trying to

5    speak up a little bit?  I hear you, but I'm straining to

6    hear you.

7         MR. MADDOX:  I'm sorry.

8         Ms. Kopech, you worked as a paralegal?

9         JUROR KOPECH:  Yes.

10        MR. MADDOX:  Any patent cases?

11        JUROR KOPECH:  No.

12        MR. MADDOX:  Were they litigation or corporate

13   law?

14        JUROR KOPECH:  Litigation.

15        MR. MADDOX:  Were you always associated with one

16   side or the other, or do you feel you were on both sides?

17        JUROR KOPECH:  I would say most of my work was

18   with defense firms.

19        MR. MADDOX:  Uh-huh.  And what kinds of cases were

20   those?

21        JUROR KOPECH:  One that would be known would be

22   the toxic tort litigation at Lone Star Steel.

23        MR. MADDOX:  All right.  And these are --

24        JUROR KOPECH:  Gas cases, I mean, just --

25        MR. MADDOX:  Corporate litigation, companies

```
 1   against each other.

 2          JUROR KOPECH:  Yes.

 3          MR. MADDOX:  Yes, I see.  And do you feel the time

 4   you spent there would sort of -- you think you could still

 5   put that aside and follow the Judge's instructions to be

 6   neutral?

 7          JUROR KOPECH:  Yes.

 8          MR. MADDOX:  Okay.

 9          JUROR KOPECH:  My husband does mainly plaintiff

10   work.

11          MR. MADDOX:  Right.

12          JUROR KOPECH:  Back when there was plaintiff work

13   to be done, yeah.

14          MR. MADDOX:  Is it plaintiff patent work?

15          JUROR KOPECH:  But -- does not, no.

16          MR. MADDOX:  Okay.

17          JUROR KOPECH:  No dealings with patents

18   whatsoever.

19          MR. MADDOX:  Thank you very much.

20          JUROR KOPECH:  You're welcome.

21          THE COURT:  You have five minutes remaining,

22   counsel.

23          MR. MADDOX:  Thank you.

24          Mr. -- Mr. Bliss, I have a note here that perhaps

25   you think lawsuits are not always fair.
```

1          JUROR BLISS:  Yes.

2          MR. MADDOX:  And could you tell me what you mean

3   by that?

4          JUROR BLISS:  I just don't think they're always

5   fair.

6          MR. MADDOX:  In that you think the -- they're not

7   fair against or for whom?

8          JUROR BLISS:  It could be either way.  It's -- in

9   my opinion, it's all up to the interpretation of these

10  people, and they may not necessarily be fair.

11         MR. MADDOX:  I see.  I see.  But if you were on

12  the jury, you would do your best to follow the Judge's

13  instructions?

14         JUROR BLISS:  Yes.

15         MR. MADDOX:  Okay.

16         I have nothing further, Your Honor.

17         THE COURT:  All right.  Thank you, counsel.

18         Mr. Mazingo, you may address the panel on behalf

19  of the Defendant.

20         MR. MAZINGO:  Thank you, Your Honor.

21         THE COURT:  Would you like a warning on your time?

22         MR. MAZINGO:  I would, five minutes as well.

23         THE COURT:  All right.  You may proceed when

24  you're ready.

25         MR. MAZINGO:  Thank you, Your Honor.

 1          May it please the Court.

 2          Ladies and gentlemen, good morning.  My name is

 3  Jason Mazingo, and you've already heard that I represent

 4  the Defendant, Jack Henry & Associates, along with my

 5  colleagues, and they are the Defendant in this suit.

 6          And before I get started, I want to echo the Court

 7  and Mr. Maddox's comments and just say we appreciate your

 8  participation here.  This case is important to my client,

 9  and so we appreciate you taking the time to be here, and as

10  Mr. Maddox said, you know, to sit down and do the

11  questionnaire, which we know it took time, and took time

12  away from your schedule with your family.

13          We appreciate you taking the time to do that,

14  especially when we were asking for information that I'm

15  certain you thought was -- was probably none of our

16  business.

17          Now, I want to do what -- what Mr. Maddox and --

18  and Judge Gilstrap did before me, and just introduce myself

19  to you.

20          I do have the good fortune of being from Texas.  I

21  live over in Tyler, and I practice law over there at this

22  point.

23          I grew up in Brownsboro, which is about 75 miles

24  from here just out west on Highway 31, and some of you may

25  know Brownsboro because it has a bit of a reputation as

1    being a speed trap on the way to Waco or wherever that you

2    might go between Tyler and the interstate down there.

3         So I grew up out there.  I live, like I said, in

4    Tyler at this point with my wife, who I've been married to

5    for 17 years, and my kids, who are 10, 8, and 5, and our

6    Golden Retriever Annie.

7         And I tell people all the time I have a special

8    affinity for Annie because Annie actually listens to what I

9    say, and Annie actually tries to do what I'm asking her to

10   do, and my kids aren't are not quite so good at doing that.

11        Now, the rest of this process, I'll admit, is a

12   little awkward, right, we're trying to talk to each other

13   and get information that's difficult.  You're answering

14   questions in front of a group of strangers that you just

15   don't know, and we're going to do the best we can to -- to

16   just have a conversation, I hope.

17        I teach business law out at UT Tyler, and I tell

18   my -- my students every semester, it is awkward when I ask

19   a question and we all sit there and don't say anything.

20        But I used to teach 11th grade Sunday school, so I

21   can sit and look for a long time because nothing is more

22   awkward than 11th grade Sunday school, right?  So we can

23   hopefully avoid some of that awkwardness if we can just

24   chat a little bit here this morning, and I'm hoping that's

25   what we're able to do.

1          Now, the first kind of set of questions I want to

2    ask you about are really related to me mostly because I

3    practice law here in this area, so I've been practicing in

4    East Texas for 13 years.  So, not surprisingly, that means

5    I've been involved in all different kinds of things, and so

6    I want to make sure that none of you have had any

7    interaction with me that I just don't recall.

8          Anybody recall ever having been opposite me in a

9    litigation or any kind of negotiation or anything like

10   that?

11         Okay.  So we're all friends at this point, still.

12   I'm glad to see that.

13         So have I ever threatened any of you with suit or

14   have you been sued by me?

15         Okay.  All right.  Well, that's good.

16         Have you had any other interaction with me that

17   you can recall that might make you predisposed to dislike

18   my client?

19         Okay.  What about my client?  We -- we asked about

20   our respective clients in the questionnaire, and I think

21   everybody who answered said they were not familiar with

22   Jack Henry & Associates.  But since that time, have any of

23   you kind of had your memory jogged, and perhaps now you

24   might remember some interaction with -- with Jack Henry or

25   its products?  Anybody?

1            Juror No. 7.

2            JUROR TROBOY:  I believe bank confirmations and I

3    put -- I noted that --

4            THE COURT:  Ma'am, ma'am, if -- wait until you get

5    the microphone, please.

6            JUROR TROBOY:  Sorry.

7            THE COURT:  Go ahead.

8            JUROR TROBOY:  I think it was bank confirmations

9    and balance confirmations, but I'm not a hundred percent

10   sure.  The name seemed familiar.

11           MR. MAZINGO:  Okay.  You're not a hundred percent

12   sure.  And would the experience that you had with those

13   products have any impact on the way you viewed this

14   litigation at all?

15           JUROR TROBOY:  No.

16           MR. MAZINGO:  Okay.  All right.  Thank you,

17   Ms. Troboy.

18           Now, my co-counsel, I introduced them to you a

19   awhile ago, all work for a law firm called Polsinelli.  And

20   Polsinelli has offices all over the country, but it has two

21   offices here in Texas, one in Dallas, and one in Houston.

22           Have any of you had any interaction with my

23   co-counsel's law firm that you can recall?  Anybody who has

24   been a paralegal or anything like that, have you had any

25   interaction with them?

1          Okay.  So nobody can recall any interaction with

2     them, okay.

3          Now, I anticipate that we'll have a couple of

4     witnesses that are also semi local.  Mr. Bill Phillips is

5     sitting right here.  We introduced him awhile ago.

6     Mr. Phillips lives in Prosper, which is sort of north of

7     Dallas.  Have any of you ever had any interaction that you

8     can recall with Mr. Phillips?

9          Okay.  We also have one more -- I say semi local

10    business.  Mr. Jeff Boyd, Mr. Boyd lives in Plano.  Any

11    chance any of you know an individual named Jeff Boyd from

12    Plano?  Okay.  All right.

13         And I know it was unlikely, but I wanted to get

14    those questions out of the way and just make sure that --

15    that we were on the same page.

16         Now, I want to spend the rest of our time really

17    getting to know you a little bit.  I don't believe I have

18    any questions that are going to cause the kind of

19    embarrassment that Judge Gilstrap talked about a few

20    minutes ago.  But if you do, certainly just let me know and

21    we can -- we an approach the bench whenever Judge Gilstrap

22    tells us that we can.

23         And keep in mind just like Mr. Maddox said, we're

24    not here to judge your outlook or your beliefs.  We all

25    create and accumulate these kind of minor biases over time

1   based on our -- our life experiences and things like that.

2           But maybe an analogy will help us kind of

3   understand where -- where we're coming from on this.  Do

4   any of you have kids who play competitive sports?

5           Ms. Kopech.

6           JUROR KOPECH:  Not a kid.

7           MR. MAZINGO:  Now, what -- what sport does your

8   child play?

9           JUROR KOPECH:  My son is a profession baseball

10  player.

11          MR. MAZINGO:  I thought he was.  Does he pitch for

12  the Red Sox?

13          JUROR KOPECH:  He got traded to the White Sox.

14          MR. MAZINGO:  That's right.  So when your son was

15  playing sports as a -- as a child -- he -- he played

16  baseball as a child, I assume?

17          JUROR KOPECH:  Yes, he did.

18          MR. MAZINGO:  Now, if his team was in the finals

19  of a big tournament, do you think you'd be the right person

20  to be the umpire behind the plate judging whether he was

21  throwing balls or strikes?

22          JUROR KOPECH:  Yes, they should have put me there.

23          MR. MAZINGO:  Okay.  So now, in truth, do you

24  think you should have been the person standing behind the

25  plate?

```
 1              JUROR KOPECH:  Absolutely not.

 2              MR. MAZINGO:  And why is that?

 3              JUROR KOPECH:  Because I would have called all of

 4   his pitches strikes.

 5              MR. MAZINGO:  Every one one of them was a strike?

 6              JUROR KOPECH:  Every one of them.

 7              MR. MAZINGO:  Okay.  Even if you tried your

 8   hardest to be impartial with him on the mound, it would

 9   have been impossible; is that right?

10              JUROR KOPECH:  Probably so.

11              MR. MAZINGO:  And so even though you did the very

12   best you could, people on the other team would call the

13   integrity of the game into question if you were the umpire

14   behind the plate?

15              JUROR KOPECH:  Probably.

16              MR. MAZINGO:  Okay.  So that's -- that's kind of

17   what we're talking about here, just a bias that might lead

18   you in one direction or the other.  And no bias is too --

19   too minor for you to tell us about.  So we just want to --

20   to get as much information as we can from you about that.

21              Now, Mr. Maddox told you and -- and Judge Gilstrap

22   told you that this case is about patent infringement.  My

23   client is being accused of patent infringement.

24              And we've talked a little bit about inventions and

25   the PTO and those things, but is there anyone here who has
```

 1   invented something or you believe you have had an original

 2   idea that you had taken by someone else, whether you

 3   patented that idea or not?  Anybody believe they've had an

 4   idea that was taken from them by someone else?

 5           Okay.  So nobody.

 6           Now, I want to just ask you kind of a series of

 7   questions that maybe you can answer just by raising your

 8   hand.

 9           How many of you would agree with the idea that the

10   free market does a pretty poor job of picking winners and

11   losers?

12           Okay.  How many of you think the government should

13   intervene in the economy more frequently?

14           Okay.  How many of you agree that most new

15   innovations are new and unique and don't build off of prior

16   ideas?

17           How many of you would agree that a government

18   agency generally makes the right decisions?

19           You all think government agencies make the wrong

20   decisions?  All 28 of you?  I heard somebody murmuring.

21   I'm happy to hear comment.

22           Mr. Powers?

23           JUROR POWERS:  If it's run by the government --

24           THE COURT:  Mr. Powers, you're going to have to

25   wait for the microphone, sir.  Let me remind everybody.

1          JUROR POWERS:  I got myself in trouble again --

2    running my mouth again.

3          THE COURT:  That's okay.  Answer the question.

4          JUROR POWERS:  The government's usually not run

5    correctly or efficiently, shall I say.

6          MR. MAZINGO:  Okay.  Anybody else feel the same

7    way as Mr. Powers?

8          JUROR MOHAMED-SANTA:  Yeah, just -- you have to

9    look at the 20 trillion dollars we are in debt and maybe

10   200 trillion in liabilities from the government, and you

11   ask yourself.

12         MR. MAZINGO:  So yours is more a broad criticism

13   of the government in general; is that a fair assessment?

14         JUROR MOHAMED-SANTA:  Yes.

15         MR. MAZINGO:  Thank you, Mr. Mohamed-Santa.

16         How many of you would agree that it is uncommon

17   for a company that owns a patent to overstep its patent

18   rights?  Who thinks that's uncommon?  Anybody?

19         I can see you're processing my question.

20         So who would agree that it is uncommon for a

21   company that owns a patent to overstep those rights?

22   Anybody have a view on that?  Nobody?

23         Mr. Byrd, do you have a view on that?

24         JUROR BYRD:  Yeah.  It all has to do with the

25   integrity of the people that's running the company.  A

1    company has no soul, but it has the same rights as the

2    citizens of the United States.  But that company is made up

3    of a bunch of different people, so it all depends on who's

4    running the company because that soul is whoever is running

5    that company.  So it's all about individual integrity.

6            MR. MAZINGO:  So would you say it's common or

7    uncommon for a patentholder to exceed their rights or

8    overstep their rights?

9            JUROR BYRD:  I'd say it depends on the individual.

10   I mean, for me, it's -- I'm not ever overstepping my rights

11   on my patent.  But I believe that -- depending on the

12   company and what individuals are there, what they'll do.  I

13   can't speak for that on a percentage basis.

14           MR. MAZINGO:  I understand that.  Thank you,

15   Mr. Byrd.

16           How many of you would agree that the patent

17   process helps innovation of new products?

18           Mr. Mohamed-Santa?

19           JUROR MOHAMED-SANTA:  Yeah.  Yeah, I agree with

20   that.

21           MR. MAZINGO:  You agree that the patent process

22   helps innovation?

23           JUROR MOHAMED-SANTA:  Yes.  Yes, sir.  I think

24   it's -- sets clearly defined rights to investors and allows

25   them to enter the marketplace in a very secure way.

1          MR. MAZINGO:  Thank you.

2          Oh, I'm sorry, Mr. Byrd.

3          JUROR BYRD:  I -- I don't think it helps

4    innovation.  I believe it's only there to document it,

5    but -- innovation.  And it is basically a tax from the

6    government on your idea to give you the right to cease and

7    desist for the idea that you have.

8          MR. MAZINGO:  Okay.

9          JUROR BYRD:  And it's not of any value until it's

10   tried in a court of law.  It's a tax up to that point.

11   That's my belief.

12         MR. MAZINGO:  Only a tax up to that point?

13         JUROR BYRD:  Well, it -- it's your right to go and

14   say cease and desist and you pay for that, but it's not a

15   valid patent until it's been tried in a court of law.  As

16   long as people respect it and say that it's -- and they

17   cease and desist, then it's a value at that point.

18         MR. MAZINGO:  Okay.

19         JUROR BYRD:  But it's not truly valuable until you

20   try it in a court of law.

21         MR. MAZINGO:  Okay.  And is there somebody else

22   who answered over here?

23         Juror No. 12?

24         THE COURT:  Let me just stop -- let me just stop.

25         Mr. Powers, if you're going to answer more

questions, that's perfectly fine, but you don't need to walk out into the aisle of the courtroom. Just stand where you are if you're going to answer the question.

I'm sorry, Mr. Byrd, I meant.

JUROR POWERS: That's Mr. Byrd. I'm Mr. Powers.

THE COURT: I understand. Just stay where you are.

Go ahead.

JUROR CRAIG: I do believe the patent process -- the question, I believe, was did it help innovate. I believe it helps -- protects the innovation.

MR. MAZINGO: Anybody else feel the same way as Mr. Craig?

Mr. Byrd?

Now, obviously, the Court has gone to some trouble to bring you all down here. How many of you believe that because we're here, the Court has gone to the trouble of bringing you here, and we're here at the courthouse, how many of you think that my client, Jack Henry, must have done something wrong? Does anybody assume that at this point? Nobody?

How many of you would believe that the fact that PPS Data has a patent alone would be enough to entitle them to money from Jack Henry? Anybody believe that?

Okay. Now, we -- we got some questionnaires back,

1   and I want to -- I want to go through a couple -- a few

2   specific questions if I can.

3          Luckily, Mr. Maddox has done a good job of

4   exploring a lot of these areas, so we have a lot of the

5   information, I think, that I would probably be asking for

6   you already.

7          So can I -- can I talk to Mr. Byrd for just one

8   second?

9          JUROR BYRD:  Yes, sir.

10          MR. MAZINGO:  Now, Mr. Byrd, I noticed in your

11   questionnaire, and you told us earlier that you have -- I

12   think you said 13 patents; is that right?

13          JUROR BYRD:  Yes.

14          MR. MAZINGO:  Did -- did your questionnaire tell

15   us that you also have some pending applications, as well?

16          JUROR BYRD:  I have pending applications, as well.

17          MR. MAZINGO:  Okay.  And how many pending

18   applications do you have?

19          JUROR BYRD:  That's a good question.  I know two

20   that I filed in the last year.  And then I've had some

21   that's been lingering out there.  And I don't know if the

22   people that I'm on with are pursuing those patents.

23          MR. MAZINGO:  Okay.  What technology do the

24   patents generally relate to that you already have?

25          JUROR BYRD:  Oil and gas services.

1          MR. MAZINGO:  Can you be just a tad more specific?

2          JUROR BYRD:  The last two I'm filing have to do

3    with hydraulic fracturing and new technology around that,

4    both on chemistry and the equipment.

5          MR. MAZINGO:  Okay.  Did you say chemistry and

6    equipment?

7          JUROR BYRD:  Yeah.  Not chemical patent but

8    application of chemistry.

9          MR. MAZINGO:  I understand.  Thank you.

10          Now, have you been involved in the enforcement of

11    any of the patents on which you're a named inventor?

12          JUROR BYRD:  No.

13          MR. MAZINGO:  Okay.  You haven't been involved in

14    litigation at all?

15          JUROR BYRD:  I have been as a witness when

16    Halliburton -- I worked for Halliburton for 25 years.  We

17    were sued on a patent -- or on a chemical, and I worked

18    with the attorneys' team from a technical standpoint for

19    that case.

20          MR. MAZINGO:  And -- and approximately how long

21    ago was that suit?

22          JUROR BYRD:  Probably the late '90s.  BJ Services

23    versus Halliburton.

24          MR. MAZINGO:  BJ Services?

25          JUROR BYRD:  I think they were awarded right at a

1   hundred million.

2          MR. MAZINGO:  And was that -- did you say that was

3   or was not related to one of your patents?

4          JUROR BYRD:  No, it had nothing to do with my

5   patents.

6          MR. MAZINGO:  You were just a fact witness?

7          JUROR BYRD:  Yeah, I happened to be the local

8   technology manager for Halliburton at that time, so I was

9   involved in the suit from a technical standpoint.

10         MR. MAZINGO:  And what -- what was your role in

11  that suit, if you can tell us?

12         JUROR BYRD:  We gathered information about what we

13  had done, where we had done it, and the things that we had

14  done, and put that together for the legal team.

15         MR. MAZINGO:  So if we go back to our analogy of a

16  few minutes ago about the umpire and about Ms. Kopech

17  umpiring her son's tournament games, is there a chance that

18  because you're a patentholder and you've been involved in

19  some patent litigation, that you might tend to favor PPS

20  Data -- PPS Data in this case?

21         JUROR BYRD:  I don't know that -- it depends on

22  what the facts are.  I mean, there should be a clear

23  definition of the claims and what the differences are.  I

24  don't know that that biases me, but it might.

25         MR. MAZINGO:  It might?  It might bias you in

1  favor of PPS Data or in favor of the Defendant?

2       JUROR BYRD:  I mean, I don't see it as biassing

3  me, but, you know --

4       MR. MAZINGO:  So you think as you sit here today

5  you can be a neutral arbiter of the facts?

6       JUROR BYRD:  I think I will look at the facts and

7  weigh the facts as I see them.

8       MR. MAZINGO:  Okay.  Thank you, Mr. Byrd.

9       Mr. Mohamed-Santa, can I talk to you for just a

10  moment, perhaps?

11       JUROR MOHAMED-SANTA:  Yes, sir.

12       MR. MAZINGO:  You indicated in your questionnaire

13  that you have either inventions that have been patented or

14  that have -- have not yet been patented; is that correct?

15       JUROR MOHAMED-SANTA:  Yes.

16       MR. MAZINGO:  Are they patented?

17       JUROR MOHAMED-SANTA:  Yes.  There is one true --

18  LSU, and a faculty member that had a chemical that -- that

19  we patented.

20       THE COURT:  Sir, you're going to have to hold that

21  microphone closer.

22       JUROR MOHAMED-SANTA:  Yes.

23       MR. MAZINGO:  And can you -- can you repeat -- I

24  think I caught that you were at S -- at LSU at the time; is

25  that right?

1      JUROR MOHAMED-SANTA:  LSU, Baton Rouge.  I

2  developed a chemical that was patented through their

3  attorney there.

4      MR. MAZINGO:  Okay.  Do you have any pending

5  application -- applications, as well, or just that one

6  patent?

7      JUROR MOHAMED-SANTA:  That one.  I'm mulling

8  over -- when I went through the process, it's so tiresome.

9  But, like I said, I'm trying to circumvent the whole

10  process by actually going to manufacturers and see if they

11  will just buy the inventions outright.  I have three or

12  four of them sitting on my desk right now.

13      MR. MAZINGO:  Okay.  Now, if we go back to the

14  analogy we had earlier of Ms. Kopech umpiring her son's

15  baseball games, do you think that you would be a good

16  umpire of the facts in this case, given that you're a

17  patentholder yourself?

18      JUROR MOHAMED-SANTA:  Yes or no.  Recently, I've

19  kind of developed a mindset that Plaintiff attorneys seems

20  to be running after a lot of companies in the country.  The

21  recent case with Roundup, for instance, really hurt me as a

22  chemist.  And I use Roundup quite a lot around my house.

23  And the fact that the Plaintiff attorney won that case

24  makes me really question what's going on with lawsuits of

25  that nature.

```
 1              MR. MAZINGO:  Okay.

 2              JUROR MOHAMED-SANTA:  So, generally, I developed a

 3   kind of view that Plaintiff attorneys are out, quote,

 4   unquote -- I'm not finding the right language -- destroy

 5   American business and in -- in the process actually harm

 6   our standards of living, vis-a-vis our 401(k)s and

 7   investments and stuff like that.  A lot of it, like I said,

 8   comes back to Roundup.  A lot of things that are not right.

 9              MR. MAZINGO:  Okay.

10              JUROR MOHAMED-SANTA:  Again, that's a bias, but I

11   can easily lay it aside and present it with the facts in

12   this case.

13              MR. MAZINGO:  So you think you can lay your bias

14   aside and be an impartial judge of the facts in this case?

15              JUROR MOHAMED-SANTA:  I'm a scientist and I think

16   I know all the facts --

17              MR. MAZINGO:  All right.  Thank you,

18   Mr. Mohamed-Santa.

19              THE COURT:  And let me stop everybody right here.

20   We are not going to have lawyers and juror panel members

21   talking at the same time.  You're going to have to wait for

22   the other one to finish.  You gentlemen both talked over

23   each other.  Everybody -- I can't hear when two people are

24   talking.  The court reporter can't write down when two

25   people are talking.  One at a time, please.
```

1          And I've asked Mr. Mohamed-Santa twice to hold the

2     microphone closer.  I cannot hear you at this far end of

3     the courtroom unless you hold that microphone closer.  The

4     court reporter can't hear you unless you hold the

5     microphone closer.

6          All these instructions I give you, ladies and

7     gentlemen, have an important purpose behind them.  Please

8     follow them.

9          Continue, counsel.

10         MR. MAZINGO:  Thank you, Your Honor.

11         Now, can I talk to Mr. Verner for just one second?

12         JUROR VERNER:  Yes, sir.

13         MR. MAZINGO:  Now, Mr. Verner, you indicated in

14    your questionnaire and then I think a few minutes ago in

15    questioning from Mr. Maddox, that you have an invention; is

16    that correct?

17         JUROR VERNER:  Yes, part of a team that invented a

18    mechanical hold-down device.

19         MR. MAZINGO:  Okay.  And do you know if a patent

20    has been sought on that device?

21         JUROR VERNER:  We hold a patent on it.

22         MR. MAZINGO:  You do hold a patent on it?

23         JUROR VERNER:  Yes.

24         MR. MAZINGO:  Okay.

25         JUROR VERNER:  Or Weatherford does.  I would

1    just -- my name is on the patent.

2            MR. MAZINGO:  You're a named inventor on the

3    patent?

4            JUROR VERNER:  Yes, sir.

5            MR. MAZINGO:  Is that the only invention on which

6    you have a patent?

7            JUROR VERNER:  Yes, sir.

8            MR. MAZINGO:  Do you have other inventions on

9    which you have sought a patent?

10           JUROR VERNER:  No.

11           MR. MAZINGO:  Okay.  Do you think that going back

12   to our analogy with Ms. Kopech, do you think you can be a

13   neutral arbiter of the facts in this case?

14           JUROR VERNER:  Yes.

15           MR. MAZINGO:  Okay.  Okay.  I want to go back to a

16   few of you, if I can, who said you had been on juries in

17   response to Judge Gilstrap's question about jury service,

18   and I want to talk to those of you who were -- who actually

19   were on a jury that went to trial and -- and reached a

20   verdict.

21           How many of you went to trial and reached a

22   verdict?  In a civil case?

23           Okay.  Juror No. 2, Ms. Booker, can you -- can you

24   tell us about the -- the -- that case?  I've forgotten what

25   you said the facts were.  How long ago was the case?

1          JUROR BOOKER:  It's been awhile.

2          MR. MAZINGO:  Quite a few years ago, you said,

3   right?  And it was over in the state courthouse, right?

4          JUROR BOOKER:  Yes.

5          MR. MAZINGO:  And do you recall anything about the

6   facts of the case at all?

7          JUROR BOOKER:  It was a traffic-violation-type

8   case.

9          MR. MAZINGO:  Okay.  So no -- there was no request

10  for money damages in that case; is that right?

11         JUROR BOOKER:  No.

12         MR. MAZINGO:  Okay.  So it was a speeding ticket

13  or ran a red light or something of that nature?

14         JUROR BOOKER:  Yes.

15         MR. MAZINGO:  Okay.  Thank you very much, ma'am.

16  I appreciate it.

17         Anybody else been on a civil jury that went to

18  trial and reached a verdict?

19         Okay.  Ms. Bailey.

20         JUROR BAILEY:  It was a ticket, and we reached a

21  verdict in it because the -- the defendant, am I right,

22  that's the one that did it?  The guy who speeded admitted

23  that he was speeding and wanted us to find him not guilty.

24         THE COURT:  You have five minutes remaining,

25  Counsel.

1            MR. MAZINGO:  Thank you, Your Honor.

2            So no request for money in that case.  It was a

3    speeding case, and he admitted to speeding, so you found

4    him guilty of speeding?

5            JUROR BAILEY:  Yes.

6            MR. MAZINGO:  Okay.  Thank you, Ms. Bailey.

7            Anybody else, I thought I recalled one more

8    person, who was on a jury?

9            Yes, ma'am.  Ms. Miles?  You were on a civil jury

10   in the state courthouse; is that right?

11           JUROR MILES:  Yes, it was -- it was a boyfriend

12   and a girlfriend, and -- and the girlfriend did all the

13   lying, and the guy came out innocent because it was just --

14   wasn't right.

15           MR. MAZINGO:  Okay.  So was there a request for

16   money, or was it a criminal case where somebody was charged

17   with a crime?

18           JUROR MILES:  It was charged with a crime.

19           MR. MAZINGO:  Okay.  Okay.  Thank you very much,

20   Ms. Miles.

21           Now, is it Mr. Petrimoulx?

22           JUROR PETRIMOULX:  Yes, sir.

23           MR. MAZINGO:  Can I talk to Mr. Petrimoulx for

24   just a second?

25           Sir, you indicated in your questionnaire that you

1    had very negative opinions about the technology that we --

2    we asked about, which was being able to deposit a check

3    using your phone.  Can you explain why that might be?

4            JUROR PETRIMOULX:  There's so many forgers out

5    here, and so many people trying to take every -- every dime

6    that you've got that I don't trust any of that.  You know,

7    even the phone people, everybody's calling you for money,

8    everybody's got their hand in your pocket.

9            MR. MAZINGO:  So you have concerns about the

10   security of that; is that correct?

11           JUROR PETRIMOULX:  Yes.

12           MR. MAZINGO:  Okay.  Is there anybody else who

13   would agree with Mr. Petrimoulx?

14           Juror No. 20?  Mr. Hinerman?

15           JUROR HINERMAN:  Yes, sir.

16           MR. MAZINGO:  Can you -- can you -- is your

17   concern the same as Mr. Petrimoulx's?

18           JUROR HINERMAN:  Yes, it is.

19           MR. MAZINGO:  Security?

20           JUROR HINERMAN:  I believe hackers and stuff with

21   the phones, I think they'll start targeting that, as well.

22           MR. MAZINGO:  Okay.  Okay.  Thank you,

23   Mr. Hinerman.

24           Now, Mr. -- Mr. Bliss, you indicated in your

25   questionnaire that you had a somewhat negative attitude

1    about banks.  Can you tell us kind of how that came about?

2         JUROR BLISS:  I -- I just think that we all work

3    hard for our money and that they work equally as hard to

4    get it.

5         MR. MAZINGO:  Okay.  Based on that opinion and

6    going back to our analogy with Ms. Kopech, do you think you

7    can be an honest arbiter of the facts in this case knowing

8    that my client provides banks with software?

9         JUROR BLISS:  I believe so.

10         MR. MAZINGO:  You think you can?

11         JUROR BLISS:  Yes.

12         MR. MAZINGO:  Okay.  I appreciate that, Mr. Bliss.

13         Now, the last question I wanted to ask is the same

14    question that we asked on the questionnaire, which was, is

15    there anything else that we should know about you that

16    might make you not a good juror for this case?  Maybe make

17    you not a good umpire?  Anything at all, no matter how

18    major or minor?

19         Okay.  Well, ladies and gentlemen, I appreciate,

20    again, your time.  I know it must be troublesome to have to

21    sit there for a bunch of strangers and answer questions

22    from strangers, but I appreciate you doing that, and my

23    client appreciates it.  Thank you very much.

24         THE COURT:  All right.  Counsel, approach the

25    bench, please?

1           (Bench conference.)

2           THE COURT:  These are our microphones.  Please

3   don't bump them.

4           MR. MAZINGO:  Yes, Your Honor.

5           THE COURT:  Does Plaintiff have any challenges for

6   cause?

7           MR. MADDOX:  Juror No. 20.

8           THE COURT:  20.  Anyone else?

9           MR. MADDOX:  Juror No. 15, Gay.  Juror No. 5,

10  Gonzalez.  That's it.

11          THE COURT:  All right.  Does Defendant have any

12  challenges for cause?

13          MR. MAZINGO:  We do not, Your Honor.

14          THE COURT:  Okay.  I have 5, 15, and 20 challenged

15  by Plaintiff.  I also have No. 6, No. 15, as well, and

16  No. 24 that have indicated they may have scheduling issues,

17  as well as 28.  I really don't think we're going to get to

18  24 or 28.  But...

19          MR. SON:  Your Honor, you're indicating about the

20  hardship people?

21          THE COURT:  People who have indicated that they

22  may not be able to be here for the entire week if they're

23  selected.

24          MR. SON:  I have 6, 15, 24, and 28.  That's what I

25  have.

```
 1            THE COURT:  Yes.  Even if all three of the
 2   Plaintiff's challenges for cause are granted, that doesn't
 3   get us to Juror Panel Member No. 24.  I see no reason to
 4   hold back 24 and 28 to discuss their scheduling problems
 5   since there's no way we reach them.
 6            Does anybody have any objection to me letting them
 7   recess with the rest of the panel?
 8            MR. MAZINGO:  I do not, Your Honor.
 9            MR. MADDOX:  No, Your Honor.
10            MR. MAZINGO:  28 has a serious problem, it sounds
11   like.
12            THE COURT:  All right.  That means I'll hold back
13   5, 6, 15, and 20.  The rest I'm going to recess.  And then
14   we'll bring these folks up one at a time, and I'll talk to
15   them here.
16            MR. MAZINGO:  Okay.  Thank you, Your Honor.
17            MR. MADDOX:  Thank you.
18            THE COURT:  If you'll take a seat, then you can
19   come back up when I bring up the first juror.
20            MR. MAZINGO:  Thank you, Your Honor.
21            (Bench conference concluded.)
22            THE COURT:  All right.  Ladies and gentlemen, I'm
23   going to excuse most of you for a recess.  Those of you
24   that I do excuse, I'll ask you to exit through the double
25   doors in the back of the courtroom.  I'm also going to ask
```

1   that you stay in the courthouse.  Don't leave the building.

2          If you go out those double doors and you take a

3   left and go around the corner, you find two important

4   things, the water fountain and the restroom.  So they're

5   there during the recess if you need them.

6          Also, ladies and gentlemen, those of you on

7   recess -- or about to go on recess, I should say, I want to

8   remind you, you have heard absolutely no evidence in this

9   case.  What the lawyers tell you in this case is not

10  evidence.

11         So while you're on recess, if you'd like to, visit

12  with those of you that are on the panel, feel free to have

13  conversation.  Feel free to get to know each other.  But

14  don't talk about anything that's happened in the courtroom

15  this morning.

16         Talk about this wonderfully cool Texas summer

17  we're having.  Talk about college football games that

18  either you won or lost over the weekend.  Talk about

19  whatever you'd like to talk about.

20         Let Ms. Kopech tell you about the White Sox and

21  her son, whatever.  But don't discuss anything that's

22  happened in the courtroom this morning.

23         And I will have you back in here for -- to resume

24  after that recess as soon as possible, but there are a few

25  of you I'm going to ask to stay behind and not exit the

1    courtroom for recess with the rest of the panel and they

2    are Panel Member No. 5, Ms. Gonzalez; Panel Member No. 6,

3    Ms. Mendez; Panel Member No. 15, Mr. Gay; and Panel Member

4    No. 20, Mr. Hinerman.

5         Everyone else I'm going to excuse for recess, and

6    those of you that are staying behind, if you'll simply move

7    out of the way and let everyone else pass by you, I'll ask

8    you to stay in your same seats after everyone else has

9    left.

10        Those of you that I have not called out to stay

11   behind are excused for recess.

12        (Jury panel out.)

13        All right.  Please be seated.

14        Counsel, approach the bench.

15        (Bench conference.)

16        THE COURT:  You should make sure there's a pathway

17   where the panel members can get up here to see me, and you

18   should not stand right in front of these microphones

19   because that's where I'm going to talk with the panel

20   members.

21        (Open court.)

22        THE COURT:  All right.  Ms. Gonzalez, would you

23   come up and join us, please?

24        (Bench conference continued.)

25        THE COURT:  Come right up here.  Thank you, ma'am.

```
 1              These are our microphones, if you and I can just
 2    talk quietly up here together.
 3              JUROR GONZALEZ:  Okay.
 4              THE COURT:  During the discussions with the
 5    lawyers this morning, there was quite a bit of discussion
 6    with you about your experience as a claims adjuster --
 7              JUROR GONZALEZ:  Yes.
 8              THE COURT:  -- for insurance companies.  And you
 9    made several comments about seeing a lot of what you
10    thought were frivolous claims or bogus claims that had been
11    asserted over the time you were a claims adjuster.
12              JUROR GONZALEZ:  Yes.
13              THE COURT:  The question is, is that experience
14    going to keep you from treating both the Plaintiff and the
15    Defendant equally and fairly in this case?  Is it going to
16    create a bias in your mind against Plaintiffs who make
17    claims or a bias in your mind in favor of Defendants who
18    defend against claims because of your prior experience in
19    the insurance industry and as a claims adjuster?
20              If it is, this is the time to find out.  If it's
21    not and you can treat both sides fairly and impartially,
22    then that's also the time to find out.
23              So I need to -- I need to have you tell me and --
24    and counsel for the parties where you are.  And I know that
25    you didn't have any claims for patent claims.
```

1          JUROR GONZALEZ:  Right.  Right.  Exactly.

2          THE COURT:  I know the claims are going to be

3   different, but we still have a Plaintiff who sued the

4   Defendant, and the Plaintiff is still seeking money

5   damages.

6          JUROR GONZALEZ:  Exactly.  As a whole, I have a

7   little bit of a problem with lawsuits and just feel that

8   probably three-fourths of them are frivolous.

9          THE COURT:  Okay.

10         JUROR GONZALEZ:  And that does not mean that this

11  one is.

12         THE COURT:  But you bring that bias with you?

13         JUROR GONZALEZ:  I do have a little bit of a

14  bias --

15         THE COURT:  Okay.

16         JUROR GONZALEZ:  -- toward them.

17         THE COURT:  And the question is -- and we all have

18  biases --

19         JUROR GONZALEZ:  Correct.

20         THE COURT:  -- you know, Ms. Gonzalez, about

21  things based on our prior experiences, and that's very,

22  very common.

23         JUROR GONZALEZ:  Of course.

24         THE COURT:  The question is, can you set that

25  aside, and can you treat both of these parties equally and

1  fairly?  And once you've heard all the evidence, when you

2  get back in the jury room to decide how to answer the

3  questions on the verdict form, is the fact that Plaintiff

4  is suing Defendant for money damages and your experience in

5  your life, having dealt with claims as an adjuster, is that

6  going to influence how you answer those questions?  Is that

7  going to have an impact, whether it's small or large, I

8  need to know whether you can completely set it aside or

9  whether you are concerned that, to whatever degree, it may

10  influence your ability to treat both sides fairly?

11  That's -- that's really the bottom line, and only you can

12  answer that.

13         JUROR GONZALEZ:  I would hope I could set it

14  aside.  I cannot say 100 percent.

15         THE COURT:  Okay.  All right.

16         Mr. Son, do you have questions of Ms. Gonzalez?

17         MR. SON:  No, Your Honor.

18         THE COURT:  Mr. Maddox, do you have questions?

19         MR. MADDOX:  No, Your Honor.

20         THE COURT:  Okay.  Mr. Mazingo, do you have any

21  questions?

22         MR. MAZINGO:  I don't, Your Honor.

23         THE COURT:  Okay.  Ms. Gonzalez, thank you for

24  your candor.  I'm going to ask you to join the rest of the

25  group outside for recess.

```
 1            JUROR GONZALEZ:  Okay.

 2            THE COURT:  Just don't discuss anything we've

 3   talked about in here.

 4            JUROR GONZALEZ:  Okay.

 5            THE COURT:  Thank you, ma'am.

 6            MR. MAZINGO:  Thank you, ma'am.

 7            (Juror exits courtroom.)

 8            (Bench conference continued.)

 9            THE COURT:  All right.  I'm going to excuse

10   Ms. Gonzalez for cause.

11            (Open court.)

12            THE COURT:  Ms. Mendez, would you come up and join

13   us, please?

14            (Bench conference continued.)

15            Good morning.

16            JUROR MENDEZ:  Good morning.

17            THE COURT:  If you'd step up, these are our

18   microphones, Ms. Mendez.

19            JUROR MENDEZ:  Okay.

20            THE COURT:  You indicated early in the process

21   today that if you were selected to serve on the jury and

22   the trial goes through the entire week of this week, that

23   you might have some kind of a scheduling or other problem

24   that would make it difficult -- seriously difficult for you

25   to be here all week.  Can you tell me about that?
```

1          JUROR MENDEZ:  Yes.  I just had knee surgery two

2     months ago.  And my therapy is I have to get up and walk,

3     so sitting down for three, four hours, it's already

4     hurting.

5          THE COURT:  Okay.

6          JUROR MENDEZ:  So I got to get up and walk around.

7          THE COURT:  Okay.  Well, if you're selected to

8     serve on the jury, I can tell you that over the course of

9     the next several days during trial, I generally don't go

10    more than an hour and a half or so without having a recess.

11         JUROR MENDEZ:  Okay.

12         THE COURT:  And if you were selected on the jury

13    and your hip started to hurt, there'd be nothing wrong, and

14    I would give you permission to be able to stand up in

15    place --

16         JUROR MENDEZ:  Okay.

17         THE COURT:  -- if you needed to.

18         JUROR MENDEZ:  It's my knee.

19         THE COURT:  So, with that, would there be any

20    other reason you couldn't be here?

21         JUROR MENDEZ:  No.

22         THE COURT:  Okay.  All right.  Ms. Mendez, I'm

23    going to let you join the rest of the panel outside in

24    recess.  Just don't discuss anything we've talked about in

25    here.

1          JUROR MENDEZ:  Okay.

2          THE COURT:  Thank you, ma'am.

3          JUROR MENDEZ:  Okay.  Thanks.

4          (Juror exits courtroom.)

5          (Bench conference continued.)

6          THE COURT:  All right.  Counsel, I am not going to

7    excuse Ms. Mendez.

8          MR. MAZINGO:  Understood, Your Honor.

9          (Open court.)

10          THE COURT:  Mr. Gay, would you join us, please?

11          (Bench conference continued.)

12          THE COURT:  Good morning.

13          JUROR GAY:  Good morning.

14          THE COURT:  These are our microphones.  If you and

15    I can just talk quietly up here.

16          JUROR GAY:  Yes, sir.

17          THE COURT:  Two things I need to visit with you

18    about, Mr. Gay.

19          Number one, you testified this morning that you

20    were skeptical, I'll put it, of lawsuits; that you felt

21    like a lot of them weren't meritorious.

22          This is, obviously, a lawsuit where a Plaintiff

23    has sued a Defendant.  Plaintiff is asking the Defendant to

24    pay them money.

25          JUROR GAY:  Yes, Your Honor.

```
 1          THE COURT:  And you haven't heard any evidence
 2   yet, but I can tell you, it's going to be a substantial
 3   amount of money.  Does your prior opinion about lawsuits,
 4   given that that's what we have here, is that going to in
 5   any way keep you from being completely fair to both sides
 6   and impartial, or do you have any doubts that you can treat
 7   both the Plaintiff and the Defendant equally?
 8          JUROR GAY:  I can treat them equally.
 9          THE COURT:  Okay.  You can -- you can listen to
10   the evidence, and you can base your decision solely on the
11   evidence?
12          JUROR GAY:  Yes, sir.
13          THE COURT:  And whatever your prior opinions one
14   way or the other, you're not going to let that influence
15   what your ultimate decisions are, but you'll make sure just
16   the evidence guides your thoughts on those?
17          JUROR GAY:  Yes, sir.
18          THE COURT:  Okay.  Fair enough.  I appreciate
19   that.
20          Secondly, you indicated early today that if you
21   were selected and the trial goes the entire week, which I
22   expect it will, that you might have a problem being able to
23   be available the entire week.  Can you tell me about that?
24          JUROR GAY:  Wednesday, my mom is going to Little
25   Rock.  She's got to have stents put in, and I'm the one
```

1    carrying her up there and staying with her.

2          THE COURT:  Is she dependent on you to get her

3    there and be with her?

4          JUROR GAY:  Yes, sir.

5          THE COURT:  Is there anybody else that if you were

6    selected on this jury could easily step in and provide

7    that?

8          JUROR GAY:  No, sir, because everybody works, and

9    I'm the one that's not working right now.

10         THE COURT:  Okay.  And is this at a hospital or at

11   a clinic or where is this --

12         JUROR GAY:  It's at a hospital, Little Rock,

13   Arkansas Heart Association.

14         THE COURT:  Okay, sir.  All right.  Mr. Gay, I'm

15   going to let you join the rest of the group outside.

16         JUROR GAY:  Okay.

17         THE COURT:  Just don't discuss anything we've

18   talked about in here.

19         JUROR GAY:  Yes, sir.

20         THE COURT:  Thank you.

21         JUROR GAY:  Thank you.

22         (Juror exits courtroom.)

23         (Bench conference continued.)

24         THE COURT:  Okay.  I'm going to overrule the

25   challenge for cause with regard to Mr. Gay, but in light of

1    his personal circumstances and his mother's heart surgery

2    dependent upon him, I'm going to excuse him based on his

3    hardship, not based on cause.

4            MR. MAZINGO:  Understood, Your Honor.

5            THE COURT:  He -- he is excused.

6            (Open court.)

7            THE COURT:  Mr. Hinerman, would you come up,

8    please?

9            (Bench conference continued.)

10           THE COURT:  Good morning, sir.  These are our

11   microphones.  If you and I can talk briefly up here

12   together, Mr. Hinerman.

13           During the questioning today, you indicated that

14   you thought some or perhaps many damage awards were out of

15   control in lawsuits.  And you also said, I think -- excuse

16   me, that Plaintiffs often ask for more than they're

17   entitled to.

18           JUROR HINERMAN:  Yes, sir.

19           THE COURT:  And that's perfectly fine.  There's

20   nothing wrong with that.  And everybody is entitled to

21   their opinion.  We all come to this process with our

22   preconceived notions and ideas and our thoughts and biases.

23   I promise you, I come to it with mine, as well.

24           The question is, both of these parties are

25   entitled to equal treatment, and they're entitled to being

1  treated impartially such that only the evidence that comes

2  in during the trial determines what the outcome is going to

3  be.

4        The question I have is, given your opinions that

5  you've voiced this morning about damage awards being

6  excessive and Plaintiffs asking for more than they're

7  entitled to, do you think if you're selected to serve on

8  this jury, you can treat both the Plaintiff and the

9  Defendant fairly and impartially?

10        Can you listen to the evidence and let only the

11  evidence determine what your decision is in this case, or

12  is your opinion that you've expressed this morning, is it

13  going to play any role whatsoever in that process?

14        Or asked another way, can you tell me that you'll

15  put whatever prior opinions you have completely out of your

16  mind and base your decision in this case, if you're on the

17  jury, solely on the evidence?  What do you think?

18        JUROR HINERMAN:  As far as waiting it out, I have

19  no problem with that.  But, like I said, as far as coming

20  up with a set amount, I just believe lawsuits are way too

21  much money, as far as what's awarded.  It's just like the

22  gentleman behind me, you know, when Halliburton was sued, a

23  hundred million dollars, to me, that's just ridiculous.

24        THE COURT:  And if the Plaintiff in this case were

25  going to ask the jury for millions of dollars in damages,

1  maybe close to a hundred million dollars in damages, you

2  just wouldn't see any way that that could be --

3         JUROR HINERMAN:  I would have a hard time awarding

4  that.

5         THE COURT:  Okay.  No matter what the evidence is?

6         JUROR HINERMAN:  No matter what the evidence is.

7         THE COURT:  Okay.  All right.

8         Mr. Maddox, do you have any questions for

9  Mr. Hinerman?

10        MR. MADDOX:  No, Judge.

11        THE COURT:  Mr. Mazingo, do you have any

12  questions?

13        MR. MAZINGO:  No, Your Honor.

14        THE COURT:  Mr. Hinerman, I'm going to let you

15  join the rest of the panel outside for recess.  Just don't

16  discuss anything we've talked about in here.

17        JUROR HINERMAN:  Yes, sir.

18        (Juror exits courtroom.)

19        (Bench conference continued.)

20        THE COURT:  All right.  I'm going to excuse

21  Mr. Hinerman for cause.

22        I'm going to leave 24 and 28 out based on their

23  scheduling, because we're not going to reach them.

24        Each side gets four peremptory challenges.  I'm

25  going to seat eight jurors.  That's 16.  And I've excused

```
 1   5, and I've excused 15.  That should get us through 18.  I

 2   don't think we would reach No. 20 anyway.

 3           MR. MAZINGO:  No.

 4           THE COURT:  So if you gentlemen will strike your

 5   lists through No. 18, and get them to the courtroom deputy.

 6           How long do you need to strike your lists?

 7           MR. MADDOX:  Can we have 15 minutes?

 8           THE COURT:  That's not a problem.  I tell you,

 9   it's 20 minutes after.  I'll give you until -- I'll give

10   you until a quarter till.  That's 25 minutes.  That should

11   be plenty --

12           MR. MAZINGO:  Great.  Thank you.

13           MR. MADDOX:  And do you want a list, one, two,

14   three, four?

15           THE COURT:  I want you to show your peremptory

16   challenges.

17           MR. MADDOX:  Okay.

18           THE COURT:  The courtroom deputy should have a

19   form for you to fill out.

20           MR. MADDOX:  Okay.

21           THE COURT:  You can take that back to the

22   courtroom deputy.

23           MR. MADDOX:  Okay.

24           MR. MAZINGO:  Do you have assigned places you want

25   us to go, Your Honor?
```

1            THE COURT:  The jury room is available right now,

2    and then the attorney conference room outside the double

3    doors.

4            MR. MAZINGO:  If that's okay with you --

5            THE COURT:  Find a place that's available.

6            MR. MAZINGO:  Thank you, Judge.

7            MR. HEIDRICK:  Thank you, Judge.

8            (Bench conference concluded.)

9            THE COURT:  All right.  While counsel exercise

10   their peremptory challenges, the Court will stand in

11   recess.

12           COURT SECURITY OFFICER:  All rise.

13           (Recess.)

14           (Jury Panel in.)

15           COURT SECURITY OFFICER:  All rise.

16           THE COURT:  Be seated, please.

17           All right.  Ladies and gentlemen, if you will

18   listen carefully as your name is called, please come

19   forward and take your seat in the jury box.

20           Let me explain that we're going to seat eight

21   jurors in this case.  I'd like the first four who are

22   called to be on the front row of the jury box, and the

23   second four, five, six, seven, and eight to be on the

24   second row of the jury box.

25           And, obviously, we have more than eight seats in

100

1    the jury box, so to ensure that the jury is centrally

2    located in the box, if the first person who's called to

3    serve on the jury would go down the front row and stand in

4    front of the third chair from the end and leave two empty

5    chairs past you, then the other three will line up behind

6    that first juror.

7         And then when the fifth juror goes to the second

8    row, if they will do the same thing and line up behind

9    Juror No. 1 on the front row, that will put two rows of

10   four centered in the box.  And if everybody will remain

11   seated -- excuse me, remain standing until all eight

12   members of the jury are in place.

13        So, with that, I'll ask Ms. Lockhart, our

14   courtroom deputy, to call the names of the eight members of

15   the panel who have been selected to serve as jurors in this

16   case.

17        COURTROOM DEPUTY:  Keyonna Perkins, Dottie Booker,

18   Dorothy Mendez, Mary Troboy, Jana Pritchett, Melinda

19   Crumpler, Dorinda Norman, and Vanita Collins.

20        THE COURT:  Thank you.  Please be seated.

21        Those of you that were not selected to serve on

22   this jury, I'm about to excuse you, but before you leave

23   the courtroom, I want to take a moment and tell each of you

24   how much the Court appreciates the sacrifice that you've

25   made to be here this morning.

101

```
1              I'm well aware of the fact that every one of you,
2    even though you weren't selected to serve on this jury, had
3    other important places to be and other important things to
4    do this morning, rather than to put those things aside and
5    come to federal court and present yourself for jury duty.
6    You've all done that.  You've all made that sacrifice.
7              And even though you weren't selected to serve on
8    this jury, you have performed very real and valuable public
9    service by being here, and the Court thanks you sincerely
10   for taking the time out of your daily lives and -- and
11   putting off your own personal demands and obligations to be
12   here and to put yourself forward as citizens willing to
13   serve on this jury.
14             Ladies and gentlemen, quite honestly, the Court
15   could not discharge its constitutional obligations to
16   conduct jury trials like this one if citizens such as
17   yourselves did not come forward and answer the summons and
18   appear and present yourself for jury duty.
19             So even though you were not selected to serve, let
20   me thank you, and the Court staff joins me, and the parties
21   and counsel join me in thanking you for being here,
22   because, quite honestly, what you've done is important
23   enough to be recognized and it's significant and the Court
24   recognizes that and thanks you.
25             I hope if your summonsed again at some point down
```

1  the road, you'll come with the same good attitude that

2  you've exhibited this morning.

3          If any of you need any kind of notification for an

4  employer as to where you've been, Ms. Clendening in the

5  clerk's office will be happy to help you.  I can promise

6  you she will be waiting outside those doors to retrieve

7  those very valuable buttons and numbers from you.  So don't

8  take those home with you.  Make sure that she gets them

9  back from you.  If you have any questions,

10  Ms. Clendening -- Ms. Clendening in the clerk's office will

11  be more than happy to help you.

12          Again, thank you very much, ladies and gentlemen,

13  for your public service by being here today.

14          With that, those of you not selected to serve on

15  this jury are excused at this time.

16          (Jury panel out.)

17          THE COURT:  All right.  If everyone would be

18  seated, please.

19          And at this time, I'll ask the eight members of

20  our jury to stand, and I'll ask our courtroom deputy,

21  Ms. Lockhart, to administer the oath to you as jurors.

22          (Jurors sworn.)

23          THE COURT:  Please be seated.

24          Ladies, let me just start out by saying this, I

25  have never had an all-female jury before.  I've tried over

1   80 jury trials since I've been on the court.  I'm sure I'm

2   going to say out of pure habit once or twice or more than

3   once or twice during this trial, ladies and gentlemen of

4   the jury.  If I slip up, please just forgive me.  I'll try

5   to make sure I'm accurate.  But I can tell you already, I

6   know I'm going to mess it up at some point.

7        I'm about to excuse you for lunch, and I have just

8   a couple short instructions to give you, and then I'm going

9   to excuse you for lunch.

10        I also want you to know that lunch is being

11   provided by the Court for you during this jury trial, and

12   it will be brought to you each day in the jury room.  You

13   will not have to leave the courthouse and go out and find a

14   place in Marshall to have lunch and get back to the

15   courthouse.  That will save us time.  It will be convenient

16   and save you time, as well.  So you can plan on lunch being

17   provided for you each day while you're here on jury duty.

18        Also, ladies and gentlemen, during the lunch break

19   today, please -- see I already did it.  Ladies, please make

20   sure that during the lunch break today that you find a

21   moment to give Ms. Clendening a working cell phone number

22   for you.  There is always a possibility that we might need

23   to get you at some point between trial days, or something

24   might come up that's unexpected, and I'd like her to have a

25   good working cell phone number for you.

1           And while -- while I'm talking about cell phones,

2   I'm going to ask you, starting tomorrow, not to bring your

3   cell phones or any electronic devices into the courthouse.

4           If you are expecting some important email for a

5   business matter or some reason why you need to be connected

6   electronically, leave your cell phone in your car.  There

7   will be breaks during the day and over the lunch hour where

8   you can check an email or text message in your vehicle if

9   you need to, but don't bring your cell phones into the

10   courthouse at all, not in the jury room, not in the

11   courthouse.

12           Counsel have the ability to have electronic

13   devices with them during the trial.  That's because those

14   are tools that they use during the trial process.  Although

15   I can tell you if their cell phones disrupt the trial in

16   any way, my practice is to confiscate them.  So they're on

17   notice not to let them be disruptive.

18           But I'm going to ask you not to bring your cell

19   phones back into the courthouse starting in the morning.

20   And then for the remainder of the day, leave them in the

21   jury room and don't bring them back into the courtroom.

22           Also, ladies and gentlemen -- I'm sorry.  Also,

23   members of the jury, I'll try it that way.  Members of the

24   jury, do not discuss this case with anyone.  That is one of

25   several instructions you're going to hear repeated from me

1  throughout the trial, and it's the first one I give you

2  because it is very, very important.  This case must be

3  tried and decided -- decided based solely and only on the

4  evidence that comes in during the course of the trial under

5  oath from the witness stand and subject to

6  cross-examination, as well as those documents that I have

7  reviewed and admitted into evidence as exhibits.

8          That must be the sole universe of the evidence and

9  information that you draw upon to answer the questions that

10  you'll be asked to answer at the end of the trial that will

11  constitute your verdict in this case.

12          Therefore, it is absolutely essential that you not

13  communicate or discuss with anyone anything about this

14  case.  And that includes, members of the jury, among the

15  eight of yourselves.  You are not to discuss the evidence,

16  you are not to discuss anything about the trial until all

17  the evidence is complete.  And at the time that I instruct

18  you to retire to the jury room and to deliberate upon your

19  verdict in this case, until that point, you must not

20  discuss or communicate with each other in any way about

21  this trial or any of the matters that take place in the

22  courtroom.

23          At the time that all the evidence has been

24  presented and when I instruct you to retire to the jury

25  room and to deliberate on your verdict, then, members of

1   the jury, it becomes your duty to discuss the evidence and

2   the case with each other, but until that time, you must not

3   communicate or discuss this case with anyone, including the

4   eight of yourselves.

5           And I promise you, unless you live alone, when you

6   get home tonight, wherever you live, unless you live by

7   yourself, when you walk in that door, whoever is there, the

8   first thing they're going to say is, tell me what happened

9   in federal court in Marshall today.

10          Well, don't even try to answer that question,

11  because even if you try to, you're going to necessarily

12  almost invariably violate the instruction I've given you.

13          And if you were to violate that instruction and if

14  you were to communicate in any way about this case with

15  anyone and, therefore, violate my instruction that the sole

16  source of the information you must have before you to

17  consider when you answer the questions in the verdict form

18  must come from this -- this trial, if you were to violate

19  that in any way, that would jeopardize the entire process,

20  and it's entirely possible that we might have to start over

21  with a brand new jury, and there would be immense expense

22  and waste that would take place.

23          So this is a critical instruction, and because

24  it's so important, you're going to hear me repeat it just

25  about every time you either sit down or get up out of those

107

1   chairs in the jury box.  So just prepare yourselves to hear

2   that from me over and over again throughout the trial

3   because it is that essential and fundamental to the

4   process.

5          And when I say don't communicate about the case

6   with anyone, that means much more than just conversation

7   with another person face-to-face.  For those of you that

8   are users of social media, social networks, whether it be

9   Facebook or Instagram or Twitter or whatever it might be,

10  do not communicate through those mediums in any way about

11  this trial or about this case.  Do not post, do not tweet,

12  do not do any of those things.  That is communicating just

13  as if you were having a conversation with someone

14  face-to-face.

15         Also, in that same vein, I'm instructing you not

16  to do any research of any kind.  Do not go on the Internet

17  and look up either of these parties, do not look up any of

18  the technology that you're going to hear about during the

19  course of the trial.

20         Again, the sole source of the information you

21  should draw upon to answer the questions in the verdict

22  form at the end of the trial must be limited to the sworn

23  testimony that comes in from the witness stand over the

24  course of the trial and subject to cross-examination, as

25  well as those documents that I have scrutinized and

1    admitted into evidence under the Rules of Evidence as

2    exhibits in the case.

3           That must be the sole source and the sole universe

4    of the information that your verdict is based upon, and

5    that's why you must not communicate with anyone about the

6    case in any fashion.  That's why you must not discuss the

7    case among yourselves until you have heard all of the

8    evidence, and that's why you must not do any independent

9    research of any kind whatsoever.

10          And, quite frankly, ladies, that's why I'm asking

11   you not to bring your cell phones or tablets or devices

12   with you to the courthouse after today because if they're

13   not there, you're not tempted to do any research or violate

14   my instructions in any way.

15          And when I say research, I'm not limiting it to

16   online research.  If you're like me and like to use an

17   encyclopedia off a shelf the old-fashioned way, don't do

18   any research of any kind.

19          Don't seek any information from any source about

20   anything related to this case such that, again, the sole

21   source of the information that you will have to draw upon

22   when the trial is at the point where you will consider your

23   verdict is only the sworn testimony from the witnesses and

24   the exhibits that the Court's admitted over the course of

25   the trial.

1          Also, members of the jury, I don't think it's

2   likely to happen, but this is an important case, and there

3   is a lot at stake for both the Plaintiff and the Defendant.

4   There are no small or insignificant cases that make it to a

5   jury trial in a United States District Court.

6          Therefore, it is possible -- I don't think it's

7   likely, but it is possible that some outside third person

8   or outside party might try to contact you, might try to

9   influence how you will vote to decide what the verdict is

10  in this case.

11         If that should happen, if you should feel that

12  anybody in any way has made an inappropriate or improper

13  attempt to communicate with you about this case, then you

14  should notify Ms. Clendening immediately.  She will tell

15  me, and the Court will deal with it.  Again, I don't think

16  it's likely, but it is within the realm of possibility, and

17  I need to make you aware of it.

18         Additionally, over the course of this coming week

19  and this trial, there are going to be times that invariably

20  you're going to pass on the front steps on the sidewalk

21  coming or going or in the hallways one or more of the

22  lawyers for the Plaintiff or the Defendant, one or more of

23  the witnesses, one or more of their staff.  When that

24  happens, they're not going to speak to you, they're not

25  going to smile and say good morning, how are you doing?

1    They're not going to be friendly or engaging or launch into

2    a conversation with you because I've instructed them not

3    to.

4            So when you pass anybody connected with this case

5    on either side or you have any close contact with them

6    either on the sidewalk, in the parking lot, coming and

7    going at any time and they don't speak and they're not

8    friendly, don't think they're being rude.  Don't hold that

9    against them because they're simply doing what I've

10   instructed them to do.

11           And I've done that because there must be no

12   communication from any other source during this trial for

13   you to discharge your obligation as jurors except the

14   instructions I give you in the courtroom and the testimony

15   that you hear under oath from the witnesses and the

16   exhibits that are admitted into evidence over the course of

17   the trial.

18           It all comes back to that same fundamental

19   foundational proposition, and that's why it's very common

20   that you'll hear me repeat this admonition over and over

21   again not to communicate or discuss the case with anyone in

22   any way.

23           All right.  Ladies and gentlemen -- all right.

24   Ladies of the jury, your lunch should be waiting for you in

25   the jury room.  It is about 10 minutes after 12:00.  At

1   approximately 10 minutes until 1:00, we'll reconvene, and

2   I'll have some additional instructions for you.  And then

3   we'll proceed to hear opening statements from both the

4   Plaintiff and the Defendant.

5           After the opening statements have been made, then

6   the Plaintiff will begin their case-in-chief and will call

7   their first witness.

8           Again, follow all the instructions that I've given

9   you, including not to discuss the case among yourselves,

10  and with that, you're excused to the jury room for lunch.

11          COURT SECURITY OFFICER:  Rise for the jury.

12          (Jury out.)

13          THE COURT:  All right.  Be seated, please.

14          Do either Plaintiff or Defendants have any

15  questions or anything to raise with the Court before we

16  proceed to recess for lunch?

17          Anything from Plaintiff?

18          MR. SON:  Nothing from the Plaintiffs, Your Honor.

19          THE COURT:  Anything from Defendant?

20          MR. MAZINGO:  Nothing from Defendant, Your Honor.

21          THE COURT:  Mr. Maddox, when you speak from the

22  podium to the jury in the future, speak louder.

23          MR. MADDOX:  Yes, sir.

24          THE COURT:  You're a tall person.  You're further

25  away from that microphone than short people like I am.  You

1    need to speak louder.

2            MR. MADDOX:  Yes, sir.

3            THE COURT:  And, Mr. Mazingo, you need to slow

4    down.  You speak much too fast.

5            MR. MAZINGO:  Yes, Your Honor.

6            THE COURT:  I didn't want to interrupt either of

7    you gentlemen during the voir dire process, but while I

8    have you outside of the jury's presence, let me just remind

9    you.  Mr. Mazingo, slow down; Mr. Maddox, speak up.

10            With that, we stand in recess until 12:50 for

11    lunch.

12            COURT SECURITY OFFICER:  All rise.

13            (Recess.)

14

15                        CERTIFICATION

16

17            I HEREBY CERTIFY that the foregoing is a true and

18    correct transcript from the stenographic notes of the

19    proceedings in the above-entitled matter to the best of my

20    ability.

21

22

23    /S/ Shelly Holmes_____                9/9/19____
      SHELLY HOLMES, CSR, TCRR                 Date
24    OFFICIAL REPORTER
      State of Texas No.: 7804
25    Expiration Date: 12/31/20