1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF TEXAS

3                  MARSHALL DIVISION

4  PPS DATA, LLC                )(

5                               )(    CIVIL ACTION NO.

6  VS.                          )(    **2:18-CV-07-JRG**

7                               )(    MARSHALL, TEXAS

8                               )(    SEPTEMBER 12, 2019

9  JACK HENRY & ASSOCIATES, INC.)(    8:27 A.M.

10                 TRANSCRIPT OF JURY TRIAL

11      BEFORE THE HONORABLE CHIEF JUDGE RODNEY GILSTRAP

12                UNITED STATES DISTRICT JUDGE

13 APPEARANCES:

14 FOR THE PLAINTIFF:

15 MR. ANTHONY SON
   MR. STEVE MADDOX
16 MR. KAVEH SABA
   MR. MATT RUEDY
17 MADDOX EDWARDS, PLLC
   1900 K Street, NW, Suite 725
18 Washington, DC 20006

19

   COURT REPORTER:    Shelly Holmes, CSR, TCRR
20                    Official Court Reporter
                      United States District Court
21                    Eastern District of Texas
                      Marshall Division
22                    100 E. Houston
                      Marshall, Texas  75670
23                    (903) 923-7464

24 (Proceedings recorded by mechanical stenography, transcript
   produced on a CAT system.)
25

FOR THE DEFENDANT:

MR. JAY E. HEIDRICK
POLSINELLI PC
900 W. 48th Place, Suite 900
Kansas City, MO  64112


MR. JASON A. WIETJES
POLSINELLI PC
2950 N. Harwood St., Suite 2100
Dallas, TX 75201


MR. JASON MAZINGO
THE MAZINGO FIRM, PC
102 N. College, Suite 1033
Tyler, TX 75702


MR. RANDAL S. ALEXANDER
POLSINELLI PC
150 N. Riverside Plaza, Suite 3000
Chicago, IL 60606


MR. ADAM DANIELS
POLSINELLI PC
2049 Century Park E, Suite 2900
Los Angeles, CA 90067

P R O C E E D I N G S

1
2          (Jury out.)

3          COURT SECURITY OFFICER:  All rise.

4          THE COURT:  Be seated, please.

5          Are the parties prepared to read into the record

6    those items from the list of pre-admitted exhibits used

7    during yesterday's portion of the trial?

8          MR. SON:  PPS Data does not have any exhibits to

9    read into the record.

10          THE COURT:  You didn't use any items from the list

11    of pre-admitted exhibits during yesterday's portion of the

12    trial, Mr. Son?

13          MR. SON:  No.

14          THE COURT:  How about Defendant?

15          MR. MAZINGO:  We do, Your Honor.  Mr. Alexander

16    will read those in.

17          THE COURT:  Let's proceed.

18          MR. ALEXANDER:  Yesterday, Defendant submitted the

19    following defense trial exhibits:  2, 7, 15, 65, 89, 111,

20    132, 258.

21          THE COURT:  All right.  Do Plaintiffs have any

22    objection to that rendition by the Defendant?

23          MR. SON:  No -- no objection.

24          THE COURT:  All right.  Thank you, counsel.

25          Before I bring the jury in and begin my final

1  instructions to the jury, I want to remind those present,

2  particularly our friends in the gallery, that in the

3  Court's view, the Court's final instructions to the jury

4  and counsel's closing arguments are the most serious part

5  of a very serious process.

6         Therefore, I especially do not want any

7  distractions during my final instructions or counsel's

8  closing arguments that might divert the jury's attention

9  from what's going on.

10        Consequently, if you need to do something in the

11  gallery, if you need to get something, if you need to take

12  something out, if you need to come or go, if you need to

13  shift or rattle papers, do it now.  Don't do it once I

14  bring the jury in and we start the final instructions and

15  closing arguments.

16        I want everybody completely still and completely

17  attentive without any disruptions whatsoever.

18        And it goes without saying that once we have a

19  verdict and I read that verdict into the record, there are

20  to be no reactions from anyone in the courtroom.  I know

21  you understand that, but I just want to emphasize it one

22  last time.

23        Are there any questions or issues that need to be

24  raised by either party before I bring the jury in and

25  proceed with the Court's final instructions or charge to

1   the jury that have not been previously taken up?

2        Does Plaintiff have anything else?

3        MR. SON:  No, Your Honor.

4        THE COURT:  Do Defendants?

5        MR. HEIDRICK:  Your Honor, our paralegal is out in

6   the hallway.  Would you like for me to go get him now

7   before --

8        THE COURT:  I don't want he or she coming and

9   going.  He's been pretty active through this trial coming

10   and going, and I don't want that during closing.

11        MR. HEIDRICK:  If I may go get him.

12        THE COURT:  Let's do that now.

13        MR. HEIDRICK:  Thank you, Your Honor.

14        THE COURT:  Mr. Maddox, the Plaintiff has 28

15   minutes total for closing arguments.  Would you like a

16   warning on your first closing argument when a certain

17   amount of time has been used?

18        MR. MADDOX:  Yes, please, Your Honor.

19        THE COURT:  What would you like me to warn you?

20        MR. MADDOX:  May I have a warning at 17 minutes?

21        THE COURT:  When you have used 17 minutes.

22        MR. MADDOX:  Yes, sir, when I have used 17

23   minutes.

24        THE COURT:  I will do that.

25        MR. MADDOX:  Thank you.

1      THE COURT:  And, Mr. Heidrick, what kind of
2  warning, if any, would you like for Defendant's closing
3  argument?

4      MR. HEIDRICK:  I would like five minutes, Your
5  Honor, please.

6      THE COURT:  Five minutes before the time ends?

7      MR. HEIDRICK:  Five minutes, yes, please, sir.

8      THE COURT:  Okay.  All right.  Unless there's
9  something further, let's bring in the jury, Mr. Elliott.

10      COURT SECURITY OFFICER:  All rise.

11      (Jury in.)

12      THE COURT:  Good morning, members of the jury.
13  Welcome back, and please be seated.

14      Members of the jury, you've now heard all the
15  evidence in this case, and I'm now going to instruct you on
16  the law that you must apply.

17      I want you to understand each of you are going to
18  have your own printed copy of these final jury
19  instructions.  That being the case, you're welcome to take
20  notes as I give you these instructions, but there's no real
21  need to because you'll have your own printed copy to review
22  when you retire to deliberate.

23      It's your duty to follow the law as I give it to
24  you.  On the other hand, and as I've previously said, you,
25  the jury, are the sole judges of the facts in this case.

Do not consider any statement that I have made over the course of the trial or might make during these instructions as an indication to you that I have any opinion about the facts in this case.

You're about to hear closing arguments from the attorneys for the parties. Statements and arguments of the attorneys, let me remind you, are not evidence, and they are not, ladies, instructions on the law. They're intended only to assist you in understanding the evidence and the parties' competing contentions.

A verdict form has been prepared for you, and you will take this verdict form with you to the jury room while you deliberate. And when you have reached a unanimous decision as to the verdict, you will have your foreperson fill in the blanks in the form reflecting your unanimous answers to those questions, then your foreperson will date it and sign it on the final page. You'll then advise the Court Security Officer that you have reached a verdict.

Each answer in the verdict form should be answered by you from the facts as you find them to be. Do not decide who you think should win this case and then answer the questions to reach that result. Again, your answers and your verdict must be unanimous.

Now, in determining whether any fact has been proven in this case, you may, unless otherwise instructed,

consider the testimony of all the witnesses regardless of who may have called them, and you may consider the effect of all the exhibits received and admitted into evidence, regardless of who may have introduced or presented them.

You, the jurors, are the sole judges of the credibility and believability of each and every witness, and you're the sole judges of the amount of weight and effect to be given to each portion of the evidence in this case.

As I've previously told you, the attorneys in this case are acting as advocates for their competing parties and as to their competing claims, and they have a duty to raise objections when they believe evidence is offered throughout the course of the trial that should not be admitted under the rules of the Court.

In those cases where I have sustained an objection to a question that was addressed to a witness, you must disregard the question entirely, and you may draw no inferences from its wording or speculate about what the witness would have said if I had allowed them to answer the question.

On the other hand, if an objection was overruled, then you're to treat the answer and the question just as if no objection had been made, that is, like any other question and answer.

Now, at certain times throughout the course of the trial, it's been necessary for the Court to talk with the lawyers here at the bench outside of your hearing or by asking you to retire to the jury room and talking with them when you were outside of the courtroom. This happens during trials because there are things that occasionally come up that do not involve the jury.

You should not speculate about what was said during any of those discussions that took place outside of your presence.

Now, members of the jury, there are two types of evidence that you may consider in properly finding the truth as to the facts in this case.

One is direct evidence, such as the testimony of an eyewitness.

The other is indirect or circumstantial evidence, that is, the proof of a chain of circumstances that indicates the existence or the nonexistence of certain other facts.

As a general rule, you should know that the law makes no distinction between direct evidence and circumstantial evidence, but the law simply requires that you, the jury, find the facts based on the evidence presented, both direct and circumstantial.

Now, certain testimony in this case has been

1 presented to you through depositions.  A deposition is the

2 sworn, recorded answers to questions asked to a witness in

3 advance of the trial.

4       If a witness can't be present in person to

5 testify, then the witness's testimony may be presented

6 under oath in the form of a deposition.

7       As I've told you earlier before the trial began,

8 the attorneys representing both sides in this case

9 questioned these deposition witnesses under oath.  At that

10 time, a court reporter was present, the witness was sworn

11 and placed under oath, they were asked questions, and their

12 answers, together with those questions, were transcribed

13 and recorded.

14       You've seen the deposition testimony presented by

15 way of a video recording, and you've seen deposition

16 testimony presented through live readings by the attorney

17 and an individual playing the role of the witness.

18       Both of these forms of dep -- deposition testimony

19 are entitled to the same consideration by you, the jury, as

20 testimony given by a live witness appearing in person and

21 testifying during the trial from the witness stand in open

22 court.

23       Accordingly, you should judge the credibility and

24 importance of deposition testimony to the best of your

25 ability just as if the witness had appeared in person and

1    testified in open court.

2           Now, while you should consider only the evidence

3    in this case, you should understand, members of the jury,

4    that you are permitted to draw such reasonable inferences

5    from the testimony and exhibits that you feel are justified

6    in the light of common experience.

7           Said another way, you may make deductions and

8    reach conclusions that reason and common sense lead you to

9    draw from the facts that have been established through the

10   testimony and the evidence in this case.

11          However, you should not base your decisions on any

12   evidence not presented by the parties in open court during

13   this trial, including your own personal experiences with

14   checks or banking.

15          Now, unless I instruct you otherwise, you may

16   properly determine that the testimony of a single witness

17   is sufficient to prove any fact, even if a greater number

18   of witnesses may have testified to the contrary if after

19   considering all of the other evidence, you believe that

20   single witness.

21          When knowledge of a technical subject may be

22   helpful to the jury, a person who has special training and

23   experience in that technical field, called an expert

24   witness, is permitted to state his or her opinions on those

25   technical matters to the jury.

1    However, you're not required to accept those

2  opinions.  As with any other witness, it is solely up to

3  you to decide who you believe and who you don't believe and

4  whether or not you want to rely on their testimony.

5    Now, certain exhibits have been shown to you over

6  the course of the trial that were simply illustrations.  We

7  call these types of exhibits demonstrative exhibits or

8  sometimes just demonstratives for short.

9    Demonstrative exhibits are a party's depiction,

10  picture, or model to describe something involved in the

11  trial.  If your recollection of the evidence differs from

12  the demonstratives, you should rely on your recollection.

13    Remember, demonstratives, which are sometimes

14  called jury aids, are not evidence, but the witness's

15  testimony during which a demonstrative is used by the

16  witness is evidence.

17    Now, in any legal action, facts must be proven by

18  a required amount of proof or evidence known as the burden

19  of proof.

20    The burden of proof in this case is on the

21  Plaintiff for some issues, and it's on the Defendant for

22  other issues.  There are two different burdens of proof

23  that you will apply in this case.  One is the preponderance

24  of the evidence, the other is clear and convincing

25  evidence.

The Plaintiff in this case, PPS Data, LLC, who you've heard referred to throughout the trial both as the Plaintiff and simply as PPS Data, has the burden of proving patent infringement by a preponderance of the evidence. PPS Data also has the burden of proving damages for any patent infringement by a preponderance of the evidence.

A preponderance of the evidence means evidence that persuades you that the claim is more probably true than not true. Sometimes this is talked about as being the greater weight and degree of credible testimony.

Now, the Defendant in this case, Jack Henry & Associates, Inc., who you've heard referred to throughout the trial as either the Defendant or Jack Henry, has the burden of proving patent invalidity by clear and convincing evidence.

Clear and convincing evidence means evidence that produces in your mind an abiding conviction that the truth of the party's factual contentions are highly probable.

Now, although proof to an absolute certainty is not required, the clear and convincing evidence standard requires a greater degree of persuasion than is necessary for the preponderance of the evidence standard.

If the proof, members of the jury, establishes in your mind an abiding conviction in the truth of the matter, then the clear and convincing evidence standard has been

1 met.

2 Now, these standards are different from what

3 you've heard about or learned during criminal proceedings

4 where a fact has to be proven beyond a reasonable doubt.

5 On a scale of the various standards of proof, as

6 you move from preponderance of the evidence on one end,

7 where proof need only be sufficient to tip the scales in

8 the favor of the party proving that fact, to the other end

9 of the spectrum of beyond a reasonable doubt, where a fact

10 must be proven to a very high degree of certainty, you can

11 think of clear and convincing evidence as being between

12 those two ends of the spectrum.

13 Now, in determining whether any fact has been

14 proven by a preponderance of the evidence or by clear and

15 convincing evidence, you may, unless otherwise instructed,

16 consider the stipulations, the testimony of all the

17 witness -- witnesses, regardless of who called them, and

18 all the exhibits received into evidence during the trial,

19 regardless of who may have produced them.

20 Now, as I did at the start of the case, I'm going

21 to first give you a summary of each side's contentions in

22 this case, and I'll then provide you with detailed

23 instructions on what each side must prove to win on each of

24 its contentions.

25 As I've previously told you, this case concerns

1    one United States patent, U.S. Patent No. 7,216,106, which

2    you've heard referred to throughout the trial as the '106

3    patent.  You've also heard it called the patent-in-suit or

4    perhaps the asserted patent.

5         Patent Claims 1 through 6 and 9 of the '106 patent

6    are what is at issue in this case.  You've heard them

7    referred to throughout the trial as the asserted claims.

8         Plaintiff claims that Claims 1 through 6 and Claim

9    9 of the '106 patent were infringed by the Defendant, and

10   the Plaintiff is seeking money damages because of that

11   infringement.

12        The Defendant denies that it has infringed any of

13   the asserted claims, Claims 1 through 6 and Claims 9 --

14   Claim 9 of the '106 patent.  And the Defendant contends

15   that these claims are invalid.

16        It's your job, members of the jury, to decide

17   whether the Plaintiff has proven that the Defendant has

18   infringed any of the asserted claims and whether the

19   Defendant has proven that any of the asserted claims are

20   invalid.

21        Infringement and -- and invalidity are separate

22   questions and should be considered and answered separately.

23        If you decide that the asserted claims have been

24   infringed and are not invalid, then you'll need to decide

25   what amount of money damages, if any, to award to the

1    Plaintiff to compensate it for that infringement.

2            Now, as I did at the beginning of the trial, I

3    gave you some general information about patents and the

4    patent system at the beginning of the trial that was

5    relevant to this case.  I'm now going to give you more

6    detailed instructions about how the patent laws of our

7    country relate to this case.

8            Before you can decide many of the issues in this

9    case, you will need to understand the role of the patent

10   claims.

11           The patent claims are the numbered sentences at

12   the end of the patent.  The claims are important because

13   it's the words of the claims that define what a patent

14   covers.

15           The figures, the drawings, and the text and the

16   rest of the patent provide a description or examples of the

17   invention, and they provide a context for the claims.  But

18   it is the claims that define the breadth of the patent's

19   coverage.

20           Each claim is effectively treated as if it were a

21   separate patent, and each claim may cover more or may cover

22   less than any other claim.

23           Accordingly, what a patent covers depends, as a

24   result, on what each of its claims cover.

25           Claims may describe methods or products, such as

machines or processes for making or for using a product.

In this case, the asserted claims are -- are computer-readable medium claims. The claims at issue here describe a computer-readable medium for a method for remote deposit of checks.

Now, patent claims may exist in two forms referred to as independent claims and dependent claims. This case involves one independent claim, Claim 1 of the '106 patent, and six dependent claims, Claims 2 through 6 and Claim 9 of the '106 patent.

An independent claim does not refer to any other claim of the patent. An independent claim sets forth all the requirements that must be met in order to be covered by that claim.

As a result, it's not necessary to look at any other claim to determine what an independent claim covers. Again, Claim 1 in this case is the only independent claim.

A dependent claim, on the other hand, does not by itself recite all the requirements of the claim but refers to another claim for some of its requirements.

In this way, the claim depends from another claim. A dependent claim incorporates all of the requirements of the claim to which it refers or from which it depends. The dependent claim then adds its own additional requirements.

So to determine what a dependent claim covers,

it's necessary to look at both the dependent claim itself

and any other claim from which it refers, or as we

sometimes say, from which it depends.

All the claims at issue in this case, except

Claim 1, are dependent claims.  Each patent claim sets

forth in words a set of requirements in a single sentence.

The requirements of a claim are usually divided

into parts or steps called limitations.  Sometimes they're

called elements.

If a device, system, apparatus, or instrumentality

satisfies each of these requirements in the claim's

sentence, then it is said that the device, system,

apparatus, or instrumentality is covered by the claim,

falls under the claim, or infringes the claim.

For example, a claim that covers the invention of

a table may recite a tabletop, four legs, and glue that

secures the legs to the tabletop.  In this example, the

tabletop, the legs, and the glue are each separate

limitations or elements of the claim.

Now, the beginning portion or preamble of a claim

often uses the word "comprising."  The word "comprising,"

as used in the preamble, means including or containing.

When comprising is used in the preamble, a product that

includes all the limitations or elements of the claim, as

well as additional elements, is covered by the claim.

1          For example, a claim to a table comprising --

2    comprising a tabletop, legs, and glue would be infringed by

3    a table that includes a tabletop, legs, and glue even if

4    the table also includes wheels on the ends of the table's

5    legs -- that is, other things.

6          If a product is missing even one element or

7    limitation of a claim, it does not meet all the

8    requirements of the claim and is not covered by the claim.

9    And if a product is not covered by the claim, it does not

10   infringe that claim.

11         Now, you first need to understand each claim term

12   in order to decide whether or not there is infringement of

13   a claim and to decide whether or not the claim is invalid.

14         The law says that it's my role to define the terms

15   or the language of the claims, and it's your role to apply

16   my definitions to the issues that you've been asked to

17   decide in this case.

18         Therefore, as I explained to you at the start of

19   the case, I have already determined the meanings of certain

20   claim language, and I've provided a chart showing you those

21   constructions or definitions in your juror notebooks.

22         My definitions of certain claim terms, as well as

23   certain definitions that have been agreed to by the

24   parties, are set forth in that chart in your juror

25   notebooks.  You must accept these definitions of these

words from the claims as being correct.

It's your job to take these definitions and apply them to all the issues that you're deciding, including the issues of infringement and invalidity.

During your deliberations, you must apply the meanings of those defined claim terms as I have supplied them to you and as set forth in your juror notebooks.

Now, for any of the words in the claims for which I have not provided you with a definition, you should apply their plain and ordinary meaning -- meaning, as understood by one of ordinary skill in the art, which is to say, in the field of the technology of the patent at the time of the alleged invention of the '106 patent.

The meaning of the words of the patent claims must be the same when deciding issues of infringement and when deciding issues of invalidity.

My interpretation of the language from the claims should not be taken by you as an indication that I have a view regarding the issues of infringement or invalidity. The decisions regarding infringement and invalidity are yours to make.

I'll now instruct you on specific rules that you must follow to determine whether a Plaintiff has proven that Defendant has infringed Claims 1 through 6 and Claim 9 of the '106 patent.

1          To prove infringement, the Plaintiff, PPS Data,

2    must persuade you that it is more likely than not that

3    Defendant, Jack Henry & Associates, has infringed these

4    asserted claims.  You must decide whether Defendant has

5    made, used, sold, or offered to sell within the United

6    States a product or a service covered by the asserted

7    claims.

8          You must compare the asserted claims to the

9    accused products and services to determine whether every

10   requirement of the claim is included in the accused

11   products.

12         To prove infringement, Plaintiff must prove by a

13   preponderance of the evidence that the Defendant made,

14   used, sold, or offered to sell within the United States an

15   accused product that includes each and every element or

16   limitation of the asserted claims.

17         In determining whether an accused product

18   infringes the asserted claims, you must compare the accused

19   product with each requirement as recited in the claims.

20   The proper comparison is between the language of the claims

21   and the accused products.

22         A claim requirement is present if it exists in the

23   accused product, as I've explained the language of the

24   requirement to you, or if I did not explain it to you, as

25   would be understood by one of ordinary skill in the art.

1        If the accused product omits even one single

2 requirement of a claim, then you must find that the accused

3 product does not infringe the claim.

4        The Plaintiff in this case has asserted multiple

5 claims against the Defendant.  For purposes of determining

6 infringement, each claim is to be effectively treated as if

7 it were a separate patent, with infringement determined

8 separately on a claim-by-claim basis.

9        As a result, what a patent covers is -- or rather,

10 what a patent covers in total is ultimately dependent upon

11 what each of its claims cover.

12        Additionally, for purposes of determining

13 infringement, the only correct comparison that you should

14 make is between the language of the asserted claims and the

15 accused products of the Defendant.  That is important.

16        In determining infringement, you are not required

17 to find that the Defendant intended to infringe the claims

18 of the patent-in-suit.  A Defendant may infringe a patent

19 without any intent to infringe the patent or without any

20 knowledge that the patent, in fact, exists.

21        Additionally, to infringe a claim, which merely

22 recites the capability to perform a claimed function, an

23 accused device need only be capable of operating in the

24 described manner.

25        In fact, depending on the claims, an accused

1  device may be found to infringe if it is reasonably capable

2  of satisfying the claim limitations, even though it may

3  also be capable of non-infringing modes of operation.

4       In the context of this case, the term "capable of"

5  means that the accused products must have program code

6  present that satisfies the claim limitations.

7       Now, the question of invalidity of a patent claim

8  is determined from the perspective of a person of ordinary

9  skill in the art in the field of the claimed invention as

10 of the time of the invention.

11      In deciding the level of ordinary skill in the

12 field of the invention, you should consider all the

13 evidence introduced in -- at trial -- at trial, including,

14 but not limited to, the levels of education and experience

15 of the inventors and other persons actively working in the

16 field, the types of problems encountered in the field,

17 prior art solutions to those problems, rapidity with which

18 innovations are made, and the sophistication of the

19 technology.

20      You, members of the jury, are to decide the level

21 of ordinary skill in the art at the time of the invention.

22      Now, the Defendant also contends that the '106

23 patent is invalid because it claims subject matter that is

24 not eligible for patent protection.

25      A patent claim is not eligible for protection if

the patented claims involve no more than the performance of
activities which a person of ordinary skill in the art
would have considered well-understood, routine, and
conventional at the time the patent application was filed.

The patent application for the '106 patent was
filed on April the 28th, 2000.

In determining whether a patent claim involves the
performance of well-understood, routine, and conventional
activities, you may consider statements made in the
patent's specification, as well as evidence of the prior
art.

In patent law, a system, device, method,
publication, or patent that pre-dated the patent claim at
issue is called prior art.

Prior art may include items that were publicly
known or that have been used or offered for sale or
references, such as publications or other patents, that
disclose the claimed invention or elements of the claimed
invention.

To be prior art, the item or reference must have
been made, known, used, published, patented, or filed as a
patent application before the application date of the '106
patent.

To succeed on its claim for invalidity, the
Defendant must show by clear and convincing evidence that

the elements of the asserted claims, when taken

individually or when taken as an ordered combination,

involve only activities which a person of ordinary skill in

the art would have considered to be well-understood,

routine, and conventional as of April the 28th, 2000, which

is the application date for the '106 patent.

Whether a particular technology was

well-understood, routine, and conventional goes beyond what

simply was known in the prior art.  The mere fact that

something is disclosed in a piece of prior art does not

mean that it was well-understood, routine, and

conventional.

At the same time, the specification of the '106

patent may be such evidence, if you find that the

specification shows that the elements of the asserted

claims were well-understood, routine, and conventional.

If you award damages in this case, they must be

adequate to compensate the Plaintiff for any infringement

of the asserted claims that you may find.  You must not

award the Plaintiff more damages than are adequate to

compensate for the infringement, nor should you include any

additional amount for purposes of punishing the Defendant.

Damages are not meant to punish an infringer.

Your damages award, if you reach that issue in this case,

should put the Plaintiff in approximately the same

financial position that it would have been in had the infringement not occurred.

Plaintiff has the burden to establish the amount of its damages by a preponderance of the evidence. In other words, members of the jury, you should award only those damages that the Plaintiff establishes that it, more likely than not, suffered as a result of the Defendant's infringement of the claims of the '106 patent, the asserted claims of the '106 patent.

While the Plaintiff is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty. Plaintiff is not entitled to damages that are remote or speculative.

The patent laws specifically provide the damages for infringement may not be less than a reasonable royalty.

A reasonable royalty is the amount of royalty payment that a patentholder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time immediately prior to when the infringement first began.

In considering this hypothetical negotiation, you should focus on what the expectations of the patentholder and the alleged infringer would have been had they entered into an agreement at that time and had they acted reasonably in their negotiations.

1          In determining this, you must assume that both

2    parties believed the '106 patent was valid and infringed

3    and both parties were willing to enter into an agreement.

4          The reasonable royalty that you determine must be

5    a royalty that would have resulted from the hypothetical

6    negotiation and not simply a royalty that either party

7    would have preferred.

8          In this case, the Plaintiff seeks a reasonable

9    royalty.  A reasonable royalty may be in the form of a lump

10   sum where the patent owner receives a single, upfront

11   payment as a royalty payment.  You must be careful to

12   ensure that the award is no more or no less than the value

13   of the patented invention.

14         The patent law does not allow you to use the value

15   of an entire product or a service or the value of the

16   entire market to determine damages unless you find that the

17   Plaintiff has proven that the patented feature of the

18   product drives consumer demand for the entire product or

19   service.

20         Evidence of things that happened after

21   infringement first began can be considered in evaluating

22   the reasonable royalty, but only to the extent that the

23   evidence aids in assessing what the royalty would have

24   resulted -- what royalty would have resulted from the

25   hypothetical negotiation.

1    In determining the reasonable royalty, you should
2  consider all the facts known and available to the parties
3  at the time infringement began.

4    Some of the kinds of factors that you may consider
5  in making your determination are:

6    (1) the royalties received by the patentee for the
7  licensing of the patent-in-suit, proving or tending to
8  prove an established royalty;

9    (2) the commercial relationship between the
10  licensor and licensee, such as, whether they are
11  competitors in the same territory in the same line of
12  business or whether they are inventor and promoter;

13    (3) the utility and advantages of the patent
14  property over the old modes or devices, if any, that have
15  been used for working out similar results;

16    (4) the established profitability of the product
17  made under the patent, its commercial success, and its
18  current popularity;

19    (5) the nature of the patented invention, the
20  character of the commercial embodiment of it as owned and
21  produced by the licensor, and the benefits to those who
22  have used the invention;

23    (6) the extent to which the infringer has made use
24  of the invention and any evidence probative of the value of
25  that use;

1          (7) the portion of the realizable profit that

2     should be credited to the invention as distinguished from

3     non-patented elements, the manufacturing process, business

4     risks, or significant features or improvements added by the

5     infringer.

6          Now, members of the jury, no one of these factors

7     is dispositive, and you can and you should consider all the

8     evidence that's been presented to you in this case on each

9     of these factors.

10          You may also consider other factors which, in your

11    mind, would have increased or decreased the royalty the

12    infringer would have been willing to pay and the

13    patentholder would have been willing to accept acting as

14    normally prudent business people as a part of this

15    hypothetical negotiation.

16          The law requires that any damages awarded to the

17    Plaintiff correspond to the value of the alleged invention,

18    not to the value of features of Defendant's accused

19    products that are not covered by the '106 patent.  This is

20    particularly true where, as here, the accused product has

21    multiple features and multiple components.

22          Should you find any amount of damages to be due as

23    compensation for infringement, then you should only award

24    those damages which occurred from and after but not before

25    January the 10th, 2012.

1          Now, with these instructions, members of the jury,

2     we're now ready to hear closing arguments from the

3     attorneys in this case.

4          Mr. Maddox, Plaintiff may now present its first

5     closing argument to the jury.

6          MR. MADDOX:  Thank you, Your Honor.

7          THE COURT:  You may proceed when you're ready.

8          MR. MADDOX:  Ready, Your Honor.

9          Good morning.  I would like to begin by thanking

10    you on behalf of Danne Buchanan, PPS Data, for NetDeposit,

11    and from me and the trial team for your time and your

12    attention and the work we saw you putting in every day in

13    your books and paying attention.

14          You were thrown into this patent world, which must

15    have seemed strange.  You were very devout.  You were given

16    special meanings for words when they appeared in a patent

17    that may be different than they appear in the outside

18    world.  And then for the last three days, you listened to

19    hours of testimony about check processing, not the most

20    interesting topic in the world.

21          So thank you for hanging in there through all of

22    that.

23          This is my last chance to speak with you.  And by

24    now, you know well that what matters is the evidence you

25    saw and heard and not what the lawyers say.

1          So I'm not going to speechify at you, but I'm

2     going to review with you some of the evidence that we think

3     is going to be important and useful in your deliberation

4     process.

5          In our case, you heard from four witnesses.  There

6     were some smaller witnesses, but four main witnesses.

7          And the first one you heard from was Mr. Danne

8     Buchanan.  He was the inventor.  He's the one who came up

9     with a way to unchain banks from paper checks and planes,

10    trains, and automobiles, and MICR reader/sorters and that

11    sort of thing.

12         He figured out the architecture that allowed banks

13    to do everything they needed to do, subject to all the

14    regulations and business requirements.  Everything they did

15    with paper checks, but to do it with electronic data and

16    images, and to do it all faster, cheaper, and safer.

17         From the evidence you heard, you can see that his

18    was the first such system.  He was the pioneer.  Others had

19    been experimenting with images, like Mr. Garrett, and

20    scanners and different parts of the process, but

21    Mr. Buchanan was the first one to pull it all together and

22    make it work in the real world for banks.

23         From the very first step of the bank -- of the

24    check being deposited at a remote site, to the very last

25    step of the check image and check data being presented to

1  the Federal Reserve Bank or the maker bank to get paid, and

2  to make everything in between meet the bank's requirements

3  for accounting and operations, as well as regulatory

4  requirements.

5       Now, that was a big deal, not because some lawyer

6  is standing here and saying it was a big deal and not even

7  because Mr. Buchanan stood here and said it was a big deal.

8       You know this is a big deal because Jack Henry's

9  internal documents that we showed you during the trial say

10 so.  Indeed, it was a big deal even years after the

11 invention in 2000.

12      You may recall the testimony of Mr. Moland, who

13 had a blog he published for the company, and testified that

14 RDC, remote deposit capture, was regarded as revolutionary

15 in 2005.  That's even five years later.  Mr. Buchanan was

16 way ahead of his time.

17      You also heard the corporate representative for

18 Jack Henry, Mr. Phillips, testified that in the mid-2000s,

19 well after the invention, Jack Henry's customers came to

20 Jack Henry and said, you need to get into this -- this RDC

21 field, it is going to be a big deal.  2005 it was still

22 going to be a big deal.

23      Mr. Buchanan was before his time.

24      Then you met Mr. Jeff Johnson, and he's the

25 president of PPS Data today, and he worked with

Mr. Buchanan.  And he told you a bit about NetDeposit's
growth and establishment as the technological leader in the
2000s, and he took you through NetDeposit's successful
settlements with other players in the field for compromised
royalties.

And then we got you into the patent itself with
Dr. Michael Shamos.  And Dr. Shamos is the only expert
witness in this case who is not only an expert in computers
but an expert in the application of computers to e-commerce
and electric payment options.

For nearly 20 years he has taught a course
specifically in electronic payment solutions at Carnegie
Mellon University and at the University of Hong Kong.  He
founded and built the e-commerce department at his
university.

Now, this is in contrast with Dr. Michalson
because Dr. Michalson has no experience or expertise in the
application of computers to check processing, electronic
payments, e-commerce, or e-banking.  His expertise is a
pure computer science expertise, sort of like Mr. Boyd's
expertise was a computer -- well, sort of like Mr. --
Mr. Boyd testified about code, but when it came to the real
world of banking like when a check clears, he was kind of
clueless.

So the first thing that Dr. Shamos did was he took

you through the Jack Henry products that we say infringe the product -- infringe the patent.

And here they are. You've heard them many times. I will not recite them for you again. But these are the six products. And when we talk in the trial and talk in closing, these are -- we call them the accused products. They're all RD -- all RDC products of Jack Henry.

Then Dr. Shamos began at the beginning of Claim 1 with exactly what it took to infringe.

May I have PTX -- thank you.

And he started you with this language here, and he took you through a computer-readable medium having a program code, and when it's executed, that program code, when executed, capable of causing a machine to perform the following method steps.

So that it's a -- a system run by a program code, and the system itself has to be capable of doing these steps.

You'll note that there's no code in our claim. In fact, there's no code -- and I mean that almost looked like gibberish that Dr. Michalson talked about. There's no code anywhere in the patent.

There's functionality. There's requirements. There's system requirements. There's system sequencing, what -- whatever. There's many things, but there's no

code.

So what we're saying is it's not any particular kind of transaction that is the infringing thing here. What is infringing is that Jack Henry's EPS system is a computer system run by code that one -- when executed, does -- is capable of doing these things.

It's Jack Henry's EPS system that infringes. It is an infringing system. And, as you heard the Judge say, any time you make, use, or sell an -- a patented invention, that's infringement.

They used this system many, many times over. They use an infringing system many times over.

The evidence you heard about what this system was capable when up and running, what it was programmed to be capable of, was fairly extensive.

And Dr. Shamos took you through Jack Henry's system, and he explained this was not his proof on the elements, but this was his background that you had the remote site, the central site, and then over there the maker banks. And the central site separate from the remote site, et cetera.

And then Dr. Shamos got into the element-by-element analysis of the claims. For instance -- may I have PTX-2, Column 24? Yes.

I'm going to talk mostly about two elements or

1  limitations that seem to be the center of the dispute most

2  in trial.

3        This first limitation I have here, we can call

4  this the first transmitting limitation.  You heard a lot

5  about transmissions, and there have to be two.  This is the

6  first one.

7        And you can see, it says:  The central system

8  transmitting at least some of the deposit information of

9  each different deposit transaction to the bank of first

10 deposit.

11        Now, Dr. Shamos took you through this, and he

12 showed you where in Jack Henry's own product manual, own

13 user manual, it says:  This is how you can transmit deposit

14 data to the bank of first deposit.

15        May I have PDX-189?

16        This, in fact, was a slide he showed you, but this

17 EPS financial institution reports -- you can see it.  It

18 says:  Several reports are available that allow financial

19 institution users to monitor transaction activity, review

20 intraday and historical information, et cetera.

21        And the next slide.

22        He showed you some more excerpts from the user

23 manual.  This was direct evidence of what the system is

24 capable of, according to Jack Henry itself.

25        But in addition to Dr. Shamos, each and every one

1    of Jack Henry's witnesses on cross-examination admitted

2    that the EPS system was capable of transmitting such

3    deposit information to the bank of first deposit.

4            For instance, we had Mr. Boyd from Day 2.

5            So the financial institution's EPS account is

6    where the financial institution will see what checks have

7    been processed by EPS, right?

8            Yes.

9            And, again, Mr. Boyd -- I beg your pardon.  28 of

10   14.  There we go.

11           Mr. Boyd, I asked in your deposition:  Can you

12   see -- you can read down a little bit.  It says:  So, yes.

13   In the EPS account, we have the record of when the

14   merchant, you know, deposited these transactions into the

15   EPS -- into the financial institution's EPS account.

16           We can go on to Mr. Moland, Day 2.

17           I beg your pardon.  That seems to be

18   Dr. Michalson.  May we have Mr. Moland?  Here we are.

19           And another thing a financial institution can do

20   through its offered EPS access portal is to receive various

21   reporting on its customers' check transactions, right?

22           Yes.

23           Even Dr. Michalson admitted this.

24           And you can see here in his testimony, I asked him

25   about this.  I said:  So what you're talking about is

1  deposit information for the bank of first deposit?  And I

2  asked him:  Doesn't the EPS system have the capability, the

3  way it's programmed, to transmit that deposit data back to

4  the first -- bank of first deposit?

5          And he said:  Well, no, not as part of the deposit

6  process.  And then there was some objections, and

7  eventually the Judge restated the question of:  It's a

8  straightforward question.  Does the system have that

9  capability?  You need to answer that question.

10         And he said:  Well, yeah, it is possible to get

11 information about deposits back from the system, yes.

12         And then I asked him:  And that information is

13 transmitted to the bank of first deposit, yes?

14         And he said:  It is.  It is sent in response to a

15 user request.

16         And I said:  Only in response to a user request?

17 Do you know?

18         And he said:  Well, I believe for some entities,

19 it can be sent on a periodic basis.

20         So the system is capable of that, as well?

21         Yes.

22         EPS.  Jack Henry's system was clearly capable of

23 transmitting deposit information to the bank of first

24 deposit, both through the portal and through the reports.

25         Frankly, how could it have been otherwise.

1   There's no way banks of first deposit would just send off

2   millions of dollars of checks to Jack Henry and say, well,

3   I hope you tell me about them some day.  Obviously, this

4   is -- this is quite capable -- this is a capability of the

5   system.

6           Now, the second disputed limitation -- may I have

7   PTX-2?

8           It comes from the claim, and you can see it here.

9   The central system -- system, transmitting electronic check

10  data and check image data directly or indirectly to the

11  maker bank or to the Federal Reserve.

12          This is the part of the process where the check

13  image and data gets basically presented for payment.  So,

14  frankly, of course, the system does that.

15          And, again, Dr. Shamos provided you with documents

16  and the testimony from Jack Henry's employees that

17  confirmed this.  And, again, every single Jack Henry

18  witness admitted on cross -- cross-examination that the EPS

19  system, as programmed, was capable of transmitting these

20  electronic check data and check image in what were called

21  Check 21 files.

22          And, in fact, there was talk about them being

23  called Fed files because they're going to the Fed.

24  Transmitting these Check 21 files to the Federal Reserve or

25  the maker banks.

May I have Mr. Boyd's testimony from Day 2?

Question:  Mr. Boyd, for banking customers, the Check 21 file with an EPS computer environment may be sent to a paying bank to clear the check, right?

That's correct.

Okay.  That's the maker bank.

And Mr. Boyd's next testimony:  One of the outputs is to the direct to Fed, which is the Federal Reserve Bank, right?

Mr. Boyd:  That's correct.

So Jack Henry's EPS system has the capability of taking Check 21 files and sending them direct to Fed, right?

For direct to merchants, yes.

May I have Mr. Moland's testimony?

Question:  One downstream process after EPS has created the Check 21 files is to send the Check 21 files to, for example, a Federal Reserve Bank?

Yes.

And Mr. Moland's testimony again:  Sure.  But do you know that EPS can send it to, meaning the Check 21 transactions, to a Federal Reserve Bank?

Yes.

Even Dr. Michalson, I asked him:  The Check 21 file produced by the EPS system can only go to one place,

1    correct?

2         Correct.

3         And that can be the Federal Reserve Bank?

4         It can be.

5         It can be the maker bank?

6         It can be one of a variety of different banks.

7         So it can be the maker bank?

8         Yes, if it knew what the maker bank was.

9         And this is a system that is capable of sending

10   the check image and -- and data to either -- directly or

11   indirectly to a Federal Reserve Bank or a maker bank.

12        THE COURT:  You've used 17 minutes, counsel.

13        MR. MADDOX:  Thank you.

14        Finally, Dr. Shamos gave the evidence from Jack

15   Henry's own description of its EPS system about the -- the

16   repeated list of internal systems, the MICR reader, cash

17   deposit system, et cetera.  And he explained why and how.

18   And you may recall his slides.

19        The central system in his system was -- which is

20   the Kansas site, was separate from the bank of first

21   deposit's MICR system, accounting system, cash system,

22   float processing system.  They were all separate.  That was

23   the whole point of the invention, that they get bypassed

24   and not used.

25        You then heard from Dr. Keith Ugone, who I hope

you think did a good job explaining some of the factors
His Honor just discussed with you.

And I should point out that Dr. Ugone's testimony
is not rebutted by any expert. They could not find an
expert to come here and say, no, Dr. Ugone got it wrong.
It shouldn't be 1.4 billion transactions. They couldn't
find an expert to come here and say, no, Dr. Ugone got it
wrong. It shouldn't be a penny.

And so they also couldn't find an expert to come
here and say, and so, Dr. Ugone got it wrong. It should
not be $14 million. There's no evidence to that. We'll
hear attorney argument about it, but there's no evidence.

Now, finally, let's talk about the code -- the
source code. This was a red herring from the beginning.

And you were finally going to get the payoff from
this long promised code thing from Dr. William Michalson.

And you may recall, he said: Ah, I have the code
that shows it cannot infringe. And he took you through a
bunch of snippets.

And he said: Well, this code does this, and it
doesn't have anything to do with it.

But then he finally got to one, and he said:
Well, this code, MOVEit, it was called, can send the
Check 21 file either to a maker bank or to the Federal
Reserve, but not both.

1        And that's as well may be.  You wouldn't have

2 checks sent to multiple places to get paid.  But that's not

3 the same thing at all as saying the system was not capable

4 of sending the Check 21 files to the Federal Reserve or to

5 a maker bank.  It's not at all.

6        What's really kind of happening here is Jack Henry

7 knows its internal documents, and its own employees'

8 testimony describes all the functionality in the patent.

9        So they've been sort of trying to sell you this

10 notion that it's not enough that their system is capable of

11 performing the things in the patent.  Somehow PPS Data has

12 to go to the code and show you the code that makes it

13 happen.

14        But that's not what the patent claims.  The patent

15 claims a system that is capable of performing these

16 functions, period.

17        As you saw, the patent is not a code claim.  It's

18 not a programming product.  The system, any system, is

19 capable, if it's -- if a system is capable of doing

20 something, it's because there's been programming put into

21 it to do it.

22        You may recall my last question to Dr. Michalson

23 on cross-examination was whether he could tell me if the

24 Microsoft Word, word processing, was capable of performing

25 spell check.

1    And he said:  Yes, it is.

2    And he did that without looking at the code,

3  because he had direct evidence of the functionality.

4  Either he had read the manual or he had used it.

5    That's what Dr. Shamos has here, direct evidence

6  of the functionality in Jack Henry's user manuals,

7  documents, and the testimony of its own employees.

8    Finally, one note, Dr. Michalson's

9  non-infringement opinions about the other claims, 2 through

10  6 and 9, all come down to, well, if you don't infringe

11  Claim 1, therefore, you can't infringe the rest.  So if you

12  find infringement of Claim 1, there's no evidence of

13  non-infringement of the rest of them, and you should find

14  infringement on all of them.

15    We suggest that Dr. Shamos's testimony, especially

16  when corroborated by all the J -- the Jack Henry employee

17  testimony, makes it very much more than likely that there

18  was infringement in this case.

19    Thank you.

20    THE COURT:  Defendant may now present its closing

21  argument to the jury.

22    Mr. Heidrick, you may begin when you're ready.

23    MR. HEIDRICK:  Thank you, Your Honor.

24    Jay Heidrick on behalf of Defendant, Jack Henry.

25    I first want to begin thanking you, ladies of the

1  jury, for your time and your attention as well.  As

2  Mr. Maddox said, you've heard a lot of different stuff this

3  week about a lot of different things in a place that seems

4  foreign to a lot of people who don't normally practice here

5  like we do every day.

6         I think, as attorneys, we probably take for

7  granted that things that we're comfortable with and things

8  that we do and that are just normal nomenclature to us are

9  foreign to you, and so we take for granted things that we

10 maybe should take more time to explain or things that we

11 should offer you more explanation on and give you that

12 courtesy.

13        And I'm certain that's -- we failed at that this

14 week at times.  And despite that, you've been incredible in

15 your attention and your effort with this, and I really

16 thank you for that.

17        And I'd also like to thank Judge Gilstrap and his

18 staff, as well as opposing counsel, for making a trial go

19 really smoothly this week, as well.

20        There are two issues for you to remember here.

21 The first is that Jack Henry does not infringe the patent,

22 and second, is that the patent is invalid.  Those are the

23 two over -- overarching issues that you just have to

24 remember as you hear the evidence, as you do your

25 deliberations, as you hear me talk.  The patent is invalid,

1  Jack Henry does not infringe.

2      I'd like to go back to Monday when I had the

3  opportunity to meet you for the first time, and I gave you

4  a preview of what this case was going to entail, and that's

5  the first thing I told you, is that we do it differently.

6  We don't do what -- what PPS Data's patent says.

7      And I also told you how PPS Data is moving its

8  fence, how it's breaking its deal with the Patent Office

9  and trying to cover Jack Henry's products; that the Patent

10 Office gave it a very narrow, delineated, and then scope of

11 the invention, and it's trying to expand that.

12     And we've seen that during this trial.  And we

13 just heard from Mr. Maddox who said -- showed you Claim 1

14 of the claim that says computer-readable program code, and

15 two breaths later said this isn't about code.  The claim

16 says code in it.  The Judge's instructions said code.  This

17 case is all about code.

18     Let's look at Mr. Buchanan, the first witness PPS

19 Data called.  And what did he tell you?

20     He testified that his invention changed the

21 industry.  He talked about how it allowed customers to

22 deposit checks remotely rather than having to come into the

23 bank and how it revolutionized everything.  He talked about

24 the fraud monitoring and how it prevented fraud on checks.

25     But you remember when I asked him a very simple

1  question, where does the term remote site appear in the

2  claims of the patent?  The Judge just instructed you the

3  claims of the invention.  Not the figures, not the

4  descriptions.  The claims.

5       And I asked him, where does the term remote site

6  appear in your -- in your claim?  And he kind of hemmed and

7  hawed and said, well, I can show you where it's at in the

8  figures.  And I said, no, where is it at in the claims?  He

9  couldn't show you because it's not there.

10      And then I asked him, can you tell me where the

11 term fraud monitoring is and he kind of hemmed and hawed

12 again.  He said that, you know, he wasn't really familiar

13 with the patent claims.  He actually said he'd have to talk

14 to his patent lawyer or something like that.

15      He claims to have invented this revolutionary

16 technology, but he doesn't know what's in his own claims,

17 what's in his own invention, the legal scope of his

18 invention.

19      And as you know just by reading plain English, the

20 terms remote and fraud monitoring that Mr. Buchanan talked

21 about don't appear anywhere in the claims.  The claims are

22 the true legal fence line.

23      NetDeposit may have come up with a great idea, a

24 great business idea, but that business idea that it tried

25 to develop is not what is legally protected by the patent.

1  They're trying to expand what's in their claim.  They're

2  breaking their deal with the government to try and cover a

3  business idea that's just simply not there.

4         Another thing I told you about on Monday is that

5  PPS Data would not be able to carry its burden of proof to

6  show infringement because Jack Henry doesn't infringe.  It

7  does it differently.

8         I want to show you the Judge's instructions that

9  he just read, and you'll have a packet of these.

10        Can I have the ELMO, please?

11        This is the first thing that's important.  The

12  highlighted version.  If the accused product omits even a

13  single requirement of the claim, then you must find that

14  the accused product does not infringe that claim.

15        That's what I told you on Monday.  One difference

16  is all it takes.

17        Mr. Maddox talked about "capable of" and said this

18  is not a source code claim.  This -- the code doesn't

19  matter.  The Judge's instructions tell you otherwise.

20        In the context of this term, "capable of" means

21  the accused products must have program code present that

22  satisfies the limitations.

23        Once you read these instructions and apply them to

24  the facts of the case, your decision is really easy.  Why?

25  Because the instructions say that PPS Data must prove that

the accused products have actual program code in them that satisfy every limitation of the claim.

Remember, it's the claim limitations that determine infringement. PPS Data has zero proof of any program code that is present in the accused instrumentalities, much less code that satisfies every limitation.

Conversely, Dr. Michalson showed you and explained to you not only that Jack Henry doesn't infringe but how it can't infringe.

PPS Data can't show you the necessary evidence. Game over. The code wins.

But let's talk a little bit about what PPS Data did try to show you. And I was -- as I was thinking about this last night of how to relay this to you, the thing that kept popping into my mind was a few weeks ago I took my seven-year-old son to see Spiderman, the new Spiderman movie.

At the end of the movie, Spiderman defeats the villain. And he goes back to New York, and he's swinging through Times Square with Mary Jane. And, all of a sudden, they see this video in Times Square of Spiderman being the villain, of doing something wrong.

And everyone is looking up. And, Spiderman, why would you do this? And what had happened was, there was

another villain who had been recording Spiderman the entire
time and had spliced out different things and taken
snippets of little things and strung them all together and
was able to create a video that made it look like Spiderman
was doing something wrong.

And I went back after I thought of that, and I
looked at Dr. Shamos's presentation from Tuesday, all these
manuals that they say exist.  And I looked at his citations
from the sections where he tried to explain how Jack
Henry's products infringe.

And you may have noticed this, too.  But
Dr. Shamos relied on user manuals, 10 different manuals
that he pieced together for his infringement analysis.  He
didn't show you a single manual and take you through it.

He took a little bit from here, a little bit from
there, threw in some deposition quotes, into this big
mixing bowl.  Voila, "capable of."

I promise you that if someone was recording me
this entire week, you could take pieces of what I said
throughout the entire week and you could create a recording
that says -- that makes it sound like I'm saying Jack Henry
infringes.  I would never say that, you know that, and I
didn't say that.

But if you get enough small pieces of stuff from
everywhere, you can create any picture you want.  But that

1  picture isn't always the truth.

2         I told you on the first day, too, the claim

3  requires two transmissions, one to the bank of first

4  deposit.  And PPS Data used this piecemeal approach to

5  argue that a reporting function that may never leave Jack

6  Henry and is sent to a customer is a transmission to the

7  bank of first deposit.

8         But they never tied anything up with that.  They

9  didn't show you that the reporting is part of the deposit

10  transactions.

11         As the Judge said, the preamble is limiting in

12  this case.  The preamble talks about deposit processing.

13  They didn't show you how this reporting function is part of

14  the deposit processing process.  They didn't show you how

15  the reporting is done and how a bank goes about to get --

16  get it by the claim.

17         These -- the reports that they're relying on are

18  only created after the deposit processing is done.  You

19  know why?  Because there's nothing to report until the

20  process is completed.  You cannot create the report until

21  the deposit is done.  They didn't tell you that.

22         And let's take this in -- one of the things

23  Judge Gilstrap read to you in his instructions is common

24  sense, and that is something that probably too much gets

25  lost a lot of times in cases.

1          And let's take their argument to this legal -- or

2     to its logical conclusion.  Let's use common sense.

3          This is from Dr. Shamos's presentation, Kevin

4     Moland.  It talks about, if a customer wanted to access

5     check information of any transactions with that bank, it

6     could, right?

7          Answer, I believe that's true.  I don't know

8     that -- yes, yes, it can.

9          So under this scenario, deposit process is

10    completed, it's done.  There is this reporting function

11    that sits out there.

12         Six months later a customer wants to log in

13    through the portal, wants to pull up, did the check I sent

14    to my nephew clear last?  I can't recall when that was.

15    Looks at it, downloads it, maybe even prints it.  According

16    to them, looking at it six months later is part of that

17    deposit process.

18         That's not common sense.  And even what Mr. Maddox

19    just showed you with the slides before, if you read the

20    language in there, it talks about the financial

21    institution's user can -- can look up -- the user can pull

22    these down, the user can get these reports.  That's the

23    user using that, not the bank.  Not at least what he just

24    showed you.  It's nothing more than the box score after the

25    game is over.

1          Now, let's contrast that with Jack Henry's case.

2     We showed you one manual.  That was representative of all

3     the products.  We started, and you remember, there was

4     probably -- there was like a log-in screen, and Mr. Wietjes

5     asked Dr. Michalson, is this the source code?

6          He said, no, this is what you see. It's the HTML

7     representation of it.

8          And so we went there and we showed you how a user

9     would log in, where she would put her user name and

10    password in.

11         And then we stopped, and it got kind of jumbled

12    because we were going back and forth.  We said Step 1,

13    here's where you log in.  Step 2, here's the source code

14    that shows that.  Here's the next step in the -- in the

15    process.  Here's the source code.  Here's the next step.

16    Here's the source code.  And we went through all of that

17    with one manual.

18         Dr. Michalson showed you how the Check 21 file

19    goes to one location, one transmission.  Why didn't

20    Dr. Shamos just look at the source code?  That's exactly

21    what the claim says.  Program code.  And we made it

22    available to him.  But he testified that he didn't need it.

23         If you recall his testimony, one of the first

24    things he talked about was how massive the written file was

25    in this case and how he had to scour over all of the --

1  through the manuals and paper that Jack Henry produced and

2  PPS Data even scoured the Internet making print-offs that

3  he had to review all those things.

4  　　　　And when he was asked by PPS Data's counsel as to

5  why he didn't just look at the source code, he said, I

6  didn't need to.  I had all the stuff in the manuals that I

7  needed.  I didn't need to go back and look at things.

8  Okay.  Well, let's use a little more common sense here.

9  　　　　So rather than just spending a few hours on a

10  claim that talks about program code to go -- rather than

11  just spend a few hours to go look at the code, Dr. Shamos

12  spent days, weeks, however long, scouring through all these

13  manuals to find snippets of what he could use.  He chose to

14  spend that time, instead of just seeing what the code says.

15  　　　　Why is that?  Why go through all that work to

16  review those things when you could have just looked at the

17  code?  Because he didn't want to.  He knew if he went and

18  looked at the code and said -- and he didn't like what it

19  said, there was no getting around that.

20  　　　　But he knew that if he could take the manuals and

21  perform the Spiderman analysis, take a little bit from

22  here, little bit from there, throw in some depos, throw it

23  in the mixing bowl, throw it all together, and say, look,

24  "capable of," he knew he couldn't get out of it if he

25  looked at the code.

It took Dr. Shamos three hours and 122 slides to spell out his infringement theory, and he still couldn't show it.

It took Jack Henry's expert, Dr. Michalson, 25 minutes, one manual, and four -- four to five citations to the source code to explain to you why Jack Henry can't infringe.

And when PPS Data examined him about the source code, it wasn't about the content of the code. It wasn't about his analysis of the code. They just asked him why he didn't review all of the code. It was over a million lines of code here. They knew they couldn't challenge the content of the code. That's why they didn't go after it.

The jury instructions say that PPS Data must show you that the accused instrumentalities have program code present that satisfy the claim limitations.

Like I told you on Monday, the code always wins. PPS Data has no code. Jack Henry has the code. Jack Henry wins.

PPS Data also has not shown you a single infringing transaction.

Would you -- the next slide.

You may recall this. This is the hypothetical where I took Dr. Shamos through the on-us items, and this is where I said: We both bank at First State Bank, and I

1   write you a check and you use Jack Henry's systems to

2   deposit at First State Bank.  And the check goes to First

3   State Bank, and it goes out of my account and into his.

4   And there's only one bank that's used.

5           Let's go to the next slide, please.

6           And after I took Dr. Shamos through this analysis,

7   I asked him if this type of on-us transaction would meet

8   the limitations of Claim 1.  And he said:  It would not

9   meet the limitations of Claim 1 because it's an on-us

10  transaction.

11          Well, I wanted to make sure this wasn't a

12  hypothetical situation, that this wasn't something that we

13  were just dealing with in a vacuum.

14          And I said:  Does Jack Henry process transactions

15  like this?

16          He said:  I would assume they do.

17          Then we talked a little bit about the Fed and

18  why -- why would someone for an on-us transaction send

19  something to the Fed.

20          And he said:  They wouldn't.

21          And I said:  Can you name a single Jack Henry bank

22  client that instructs Jack Henry to send the file to the

23  Fed as opposed to send it back to us for on-us items?

24          And he said:  No, I can't.

25          So he admits that on-us items don't meet the

1   limitations of Claim 1.  He admits Jack -- those

2   transactions are processed by Jack Henry.

3         We also talked about the bank or non-bank -- the

4   direct merchant clients, which you also saw in Mr. Boyd's

5   testimony.  I talked about that with Dr. Shamos.  And we

6   went through and we talked about the merchant customers and

7   how those don't have contracts directly with Jack Henry.

8         And he admitted he didn't do a separate analysis

9   for those.  He didn't do the basic work required.

10         We took element-by-element, and we talked about

11   whether or not there would be a bank of first deposit.  And

12   he said -- he admitted that if there is no bank of first

13   deposit, then Claim 1 cannot be met because there is no

14   transmission to the bank of first deposit.

15         You may recall on Monday, too, that I said it

16   would be interesting to see if PPS Data can show you a

17   single transaction, a single transaction flow that went

18   through that checked every box, or if Jack Henry could show

19   even a single customer that checked every box.  They were

20   sitting in the courtroom with all of us.  They heard that.

21         And what did we see?  We saw pieced together

22   manuals.  We saw snippets of testimony.  I would think that

23   if Jack Henry's system was capable of infringing, as they

24   say, and there are 1.4 billion transactions at issue, as

25   they say, that they could have shown you one that checks

1 every box.

2          We did.  We showed you how the on-us items don't

3 infringe.  How is it that Jack Henry was able to do that

4 but PPS Data wasn't?  It's easy.  The code -- the code

5 wins, Jack Henry doesn't infringe.

6          Also on Monday, I talked to you a little bit about

7 the terms that we used in this case and making sure that we

8 keep bank of first deposit correct because there are a lot

9 of foreign terms in this case and making sure that we're

10 using the terms of the patent and not in terms of how those

11 are used in every day business.

12          Again, they were here the entire time.  They heard

13 me say it.  And what did we hear from PPS Data?  Did you

14 hear the delineations about how a particular bank term is

15 used in a particular transaction or how it's used to

16 delineate anything other than an overarching 50,000-foot

17 level?

18          But my concerns were real.  Here's an example of

19 what happened on Tuesday.

20          On the left is Dr. Shamos's testimony.  There was

21 some testimony that was read into the -- into the record.

22 And one of them was from Ms. Malini Boddu.  She's a

23 programmer with Jack Henry.  And Dr. Shamos relied on this

24 during his direct testimony.  And in Malini's -- or in

25 Ms. Boddu's testimony, she talked about how there is a file

1  that is sent to the bank.

2        And then in the direct testimony, Dr. Shamos was

3  asked:  And the reference to the bank there, what is that

4  referencing?

5        And he said:  Oh, the maker bank.

6        I said -- and we went on on cross-examination, if

7  you look at that on the right, I asked him where he got

8  that.  How could he testify that that was the maker bank

9  versus what was read?

10       At the very end, I asked him:  So this very well

11  could be the bank client that we just talked about, as

12  well, couldn't it?

13       I suppose it could.

14       This is just another one of many examples of PPS

15  Data grabbing for any piece it can put together, another

16  example of it trying to move its fence.

17       Let's talk a little bit about the separate from

18  the bank of first deposit that was at issue yesterday.  And

19  you may recall this took up the bulk of Dr. Michalson's

20  testimony or his cross-examination, at least, yesterday.

21       And according to Claim 1, the central system has

22  to be separate from the enumerated systems for a bank of

23  first deposit.

24       And Dr. Michalson opined that Jack Henry works on

25  behalf of the bank of first deposit.  It works for the bank

of first deposit.  Therefore, the systems that are at
Jack Henry are not separate from those systems for a bank
of first deposit.

"For" is not a construed claim term in this case.
And Judge Gilstrap instructed you that you should apply the
ordinary and plain meaning as seen by one of a person of
ordinary skill in the art.

The word "for" is not the word "of."  For example,
I would much rather make a meal for a friend than I would
make a meal of a friend.  "For" and "of" are different.

This is just another reason why Jack Henry does
not infringe.

I want to look at the damages issue now.  We'll
talk a little bit about that and talk about
Judge Gilstrap's instructions to you on that angle.

And here's the first instruction.

May I have the ELMO, please?  Thank you.

The first thing is that the -- PPS Data is not
required to prove its damages with mathematical precision.
It must prove them with reasonable certainty.  The
Plaintiff is not entitled to damages that are remote or
speculative.

And that's important because when we read the
next -- I'm trying to get them both on the same page for
you here.

1    This is important on the remote and speculative,

2  because the law requires that any damages awarded to

3  Plaintiff correspond to the value of the alleged invention,

4  not to the value of features of Defendant's accused

5  products that are not covered by the '106 patent.

6    This is particularly true where, as here, the

7  accused product has multiple features and multiple

8  components.

9    THE COURT:  You have five minutes remaining,

10  counsel.

11    MR. HEIDRICK:  Thank you, Your Honor.

12    As the instruction says, you can't award damages

13  that are speculative.  We talked earlier that Dr. Shamos

14  admits that at least some of the transactions don't

15  infringe Claim 1.  Therefore, if they don't infringe

16  Claim 1, they can't infringe the dependent claims.

17    So we asked Dr. Shamos --

18    If we could switch back, please.  Thank you.

19    -- which actual transactions did he say infringe?

20    He said:  Well, it's capable of.

21    And I said:  Which transactions are claiming

22  actually infringe here -- out of the 1.4 billion, which

23  ones?

24    And he said:  I didn't do a damage report.

25    And I said:  Can you tell the ladies and gentlemen

1  of the jury -- I messed that up -- how many transactions

2  are processed in the infringing manner, which you just

3  testified to about earlier?

4          So his pieced together infringement claim, how

5  many transactions actually infringe?

6          Same answer:  No.

7          So since he's not a damages guy, we waited for

8  their damages guy.

9          And we asked him:  So you haven't done any

10  analysis of your own about transactions that infringe in

11  this situation or if any do; is that correct?

12          And he said:  I would agree with you.  I'm not the

13  technical person.

14          We asked the technical person.  He said:  It's a

15  damages issue.  We asked the damages guy.  He said:  It's a

16  technical issue.

17          What does that mean?  It means they haven't shown

18  any transactions that infringe.  They haven't shown proof

19  of any damages.  And they also haven't done it because they

20  haven't shown infringement.

21          I want to talk briefly about the invalidity of the

22  '106 patent.  And as Judge Gilstrap said, this is our

23  burden, and we accept it.  And it's our burden by clear and

24  convincing evidence.

25          And it means you have to look at the claim

1  elements alone and in ordered combination.  If you look at

2  the individual limitations of every claim, you'll see that

3  it's just general computer components functioning in their

4  ordinary operating ways, things that they've been doing

5  forever.

6         No one claims they invented the computer.  Ron

7  Titus admitted they did not invent transmission methods.

8  Everything in this patent existed as of April 2000.

9         So then we looked at the combination.  We put them

10  all together.  And we say:  Was this invented?  Was this

11  routine and conventional?

12         No.

13         The issue of separate from, you can take a check

14  processing system that existed at a bank as of April 2000,

15  all the same components, same processes, same software,

16  everything, move it across the street, and it's separate

17  from.  That's their inventive concept.

18         Talk -- you heard a little bit about the comparing

19  elements.  Jerry Garrett testified as to SuperImage, how

20  that was routine and conventional.  And 30 banks.  He

21  talked about the -- the functions that it performed, how it

22  performed -- it was in supermarkets.  How remote --

23  accessing remote information was not new.  Sending check

24  images was not new.

25         Ron Titus testified yesterday, you -- if you have

1 information, you can send it wherever you want.

2          I want to talk real briefly about the verdict form

3 here.

4          How is my time, Your Honor?

5          THE COURT:  You have two minutes, more or less.

6          MR. HEIDRICK:  Thank you.

7          Here's the verdict form.

8          Did PPS Data prove by a preponderance of the

9 evidence that Jack Henry directly infringed any claim of --

10 any asserted claim of the '106 patent?

11          The answer here is no.

12          Did Jack Henry prove by clear and convincing

13 evidence that the patent is invalid?

14          The answer to every claim here is yes.  Jack Henry

15 didn't infringe.  The patent is invalid.

16          PPS Data told you Jack Henry infringed.  Jack

17 Henry showed you it didn't.

18          As I told you on Monday, this case is very

19 personal to Jack Henry and to me.  For two years, we've

20 litigated this case, waiting for this day to come before

21 you and get the justice we've been seeking.

22          I'm done.  I have nothing more to give.  No more

23 arguments I can make.  Nothing more I can do.  I'm giving

24 it to you now.  And I trust in you when you review the

25 evidence, when you apply the Judge's instructions, that you

1  will come to the correct result and find that Jack Henry

2  does not infringe, that the patent is invalid.

3      It has truly been an honor to try this case before

4  you this week.  On behalf of myself, our trial team, and

5  most importantly, Jack Henry, thank you.

6      THE COURT:  All right.  Plaintiff may now present

7  its final closing arguments.

8      Mr. Maddox, you have six minutes and 15 seconds

9  remaining.

10     MR. MADDOX:  Thank you, Judge.

11     THE COURT:  I'll warn you at two minutes

12 remaining?

13     MR. MADDOX:  That'd be lovely.  Thank you.

14     THE COURT:  You may proceed.

15     MR. MADDOX:  Okay.  So a few things.  The

16 fundamental problem with what you just heard is, where is

17 the code?  Where is code?

18     It is undisputed.  No one has ever disagreed that

19 the only way a computer system does something or can do

20 something is if the computer programmer tells it to.

21     Your iPhone or your phone does a whole bunch of

22 things.  That's because there's code in it telling it to do

23 something.  In fact, in his opening, Mr. Heidrick talked

24 about how the code controls the computer.  Right.  The code

25 controls the program.

1    And then when you see the program and it does
2  these functions, it's because the code is telling it to.
3  No one has said otherwise.  No one would ever say otherwise
4  because computers and software don't have their own free
5  will.

6    Let's look at the Judge's instructions here,
7  similar to what Mr. Heidrick put up there.

8    And as I indicated just a half-hour ago, the
9  patent is written in such a way that it's not transactions.
10 It's not things done and the nature of the transactions.
11 It's the use of the infringing system.

12    And Judge Gilstrap instructed you, in fact,
13 depending on the claims, an accused device -- the system --
14 may be found to infringe if it is reasonably capable of
15 satisfying the claim limitations, even though it may also
16 be capable of non-infringing modes of operation.

17    So even if you mistake Mr. Heidrick's
18 hypotheticals of what if there's no bank of first deposit
19 at all or what if it's on-us or -- or what if the customer
20 wants us to send it to Finland -- I mean, it doesn't
21 matter.  They -- their system is infringing, and they used
22 it over and over and over and over.

23    We are not claiming transmissions -- transactions.
24 We are claiming the system.

25    With respect to invalidity, you heard an attorney

1  tell you it was routine, conventional, and well-known.  You

2  didn't hear Dr. Michalson say that.  You didn't hear

3  Dr. Michalson say any combination of the claim limitations

4  were routine, conventional, or well-known.

5          Don't mistake what attorneys say for actual

6  evidence from competent experts, even -- it's not a

7  he said/she said.  Dr. Michalson didn't say it at all.  He

8  dared not because it's so obviously not true.

9          But the point is, the evidence in the record,

10  there is none.  The only evidence that came in was

11  Mr. Garrett, who, frankly, a very credible witness.  Nice

12  man.  And he was one of those people who was experimenting

13  with bits and pieces of the process, but you heard that his

14  system still used a MICR reader to do its thing.

15          And you also heard the images didn't go to the

16  Fed, they went other places, too -- for storage and

17  research and other things.

18          And you also heard -- like I said, a very nice

19  man, but he had approximately 30 banks -- he had two banks

20  in 1995 -- not really clear in 2000.  But even if he had 30

21  banks in 2000, and as he said, there were about eight to

22  10,000 banks in the United States, that comes to about .3

23  percent of the market.  .3 percent of the banks out there

24  does not make something routine, ordinary, and conventional

25  in the banking industry.

1          There's really no question to us that you cannot

2    have clear and convincing evidence without expert testimony

3    saying this is the combination and here is why it's

4    routine.

5          THE COURT:  Two minutes remaining.

6          MR. MADDOX:  You don't have any of that, nor based

7    on Mr. Garrett.

8          In the end -- oh, I beg your pardon.  May I have

9    PTX-288?

10          Here is the exhibit where -- where Dr. Ugone got

11    his transaction data.  And you will see Check 21, there's

12    no breakdown of Check 21.  So even if it mattered what the

13    transactions were, they didn't give us the information to

14    distinguish them.

15          But you'll note that they used the EPS system for

16    ACH transactions and other transactions.  Even though they

17    used our infringing system, we only asked for damages on

18    the Check 21 transactions.  We were being conservative.

19          Finally, in the end, do think back to the opening,

20    do think back to what we told you we thought the evidence

21    would show, and think about whether the evidence did show

22    that.  And also recall the extent to which basically the

23    response was indignation and counter accusation.

24          We've all in life dealt with someone, whom when

25    you confronted them with it, gets very indignant and very

1   accusatory and starts talking a mile an hour.  This is

2   Jack Henry's defense.  There really is none.  Its

3   employees, its testimony, its user manuals, and common

4   sense left you no other choice.

5         Thank you.

6         THE COURT:  Members of the jury, I'd like to now

7   give you a few final instructions before you begin your

8   deliberations.

9         You must perform your duty as jurors without bias

10   or prejudice as to any party.  The law does not permit you

11   to be controlled by sympathy, prejudice, or public opinion.

12         All parties expect that you will carefully and

13   impartially consider all the evidence, follow the law as I

14   have given it to you, and reach a just verdict regardless

15   of the consequences.

16         Answer each question in the verdict form from the

17   facts as you find them to be in this case, following the

18   instructions that the Court has given you.  As I've said,

19   do not decide who you think should win and then answer the

20   questions accordingly.

21         I remind you, your answers and your verdict must

22   be unanimous.

23         You should consider and decide this case as a

24   dispute between persons of equal standing in the community,

25   of equal worth, and holding the same or similar stations in

1    life.

2          This is true in patent cases between corporations,

3    partnerships, individuals.  A patent owner is entitled to

4    protect its rights under the laws of the United States.

5    This includes bringing a suit in a United States District

6    Court for money damages for infringement.

7          The law recognizes no distinction among types of

8    parties.  All corporations, partnerships, organizations,

9    and individuals stand equal before the law, regardless of

10   their size, regardless of who owns them, and all such

11   entities are to be treated as equals.

12         Now, when you retire to the jury room to

13   deliberate on your verdict, you will each, as I've told

14   you, have a copy of these final jury instructions to take

15   with you.

16         If during your deliberations you desire to review

17   any of the exhibits which the Court has admitted into

18   evidence and which you've seen during the trial, then you

19   should advise me by a written note delivered to the Court

20   Security Officer, and I will then send that exhibit or

21   those exhibits to you.

22         Once you retire, you should first select your

23   foreperson and then conduct your deliberations.  If you

24   recess during your deliberations, follow all the

25   instructions that the Court has given you about your

1  conduct throughout the trial.

2        After you have reached a unanimous verdict, your

3  foreperson is then to fill in the verdict form with the

4  answers that reflect your unanimous decisions.  Sign the

5  verdict form, date it, and then advise the Court Security

6  Officer you have reached a verdict.

7        Do not reveal your answers until such time as

8  you're discharged, unless otherwise directed by me, and you

9  must never disclose to anyone, not even to me, your

10 numerical division on any question.

11       Any notes that you've taken over the course of the

12 trial are aids to your memory only.  If your memory should

13 differ from your notes, then you should rely on your memory

14 and not your notes.  The notes are not evidence.

15       A juror who has not taken notes should rely on her

16 own independent recollection of the evidence and should not

17 be unduly influenced by the notes of other jurors.  Notes

18 are not entitled to any greater weight than the

19 recollection and -- or impression of each juror who took

20 them about the testimony and the evidence.

21       If during your deliberations you want to

22 communicate with me at any time, you should give a message

23 or a question written by the jury foreperson to the Court

24 Security Officer who will then bring it to me.  I will then

25 respond as promptly as possible either by writing or by

1  having you brought back into the courtroom where I can

2  address you orally.

3          I will always first disclose to the attorneys in

4  the case your question and my response before I answer any

5  question.

6          After you've reached a verdict and I've discharged

7  you as jurors, I want you to understand you're not required

8  to talk with anyone about your service in this case unless

9  the Court orders otherwise.

10          By the same token, at that point, when you've

11  returned a verdict and I have accepted it and I have

12  discharged you as jurors, then you are completely free to

13  talk about the case with anyone that you choose to talk

14  about the case with.  The choice will be up to you and you

15  alone at that point in time.

16          I'm now going to hand one clean copy of the

17  verdict form and eight copies of these final instructions

18  to the jury to the Court Security Officer to deliver to you

19  in the verdict -- or, excuse me, to deliver to you in the

20  jury room.

21          Members of the jury, you may now retire to the

22  jury room to deliberate.  We await your verdict.

23          COURT SECURITY OFFICER:  All rise.

24          (Jury out.)

25          COURT SECURITY OFFICER:  Be seated, please.

1          THE COURT:  Counsel, while the jury deliberates,

2     you are welcome to wait here in the courtroom or elsewhere

3     in the courthouse.  You are also free to wait at any

4     offsite location.

5          In the event you're going to be outside of the

6     building, you should make sure that my staff has a good,

7     working cell phone number where we can call you in the

8     event we receive a note or at the time we receive a return

9     of the verdict.

10         With that and awaiting either a note from the jury

11    or a return of their verdict, the Court stands in recess.

12         COURT SECURITY OFFICER:  All rise.

13         (Recess.)

14         (Jury out.)

15         COURT SECURITY OFFICER:  All rise.

16         THE COURT:  Be seated, please.

17         Counsel, we've received a note from the jury.  And

18    I thought I brought two copies out here so that each side

19    could have a copy.

20         Let's go make a copy of that, please.

21         COURTROOM DEPUTY:  Okay.

22         THE COURT:  I'll have a copy in just a minute for

23    each side to see and look at.  In the meantime, I'll read

24    the note to you.  I'll also indicate for the record that

25    I've marked this note in the upper right-hand corner with

1  a 1 and a circle to identify it as the first note from the

2  jury in regard to this trial.

3       This note reads as follows:  Could we get the

4  following items for the jury?

5       1.  KP-1 [sic] spreadsheet.

6       2.  Large drawing stand.

7       3.  Robert Ledbetter deposition.

8       4.  Jack Henry flowchart.

9       Thank you, comma, Mary Troboy.

10       So it appears Ms. Troboy, who was Juror No. 4, is

11  the foreperson.

12       Now, if lead counsel for both parties will

13  approach, I have a copy of the actual note for you each to

14  look at.

15       MR. SON:  Thank you.

16       THE COURT:  My intention is to send this easel in

17  the courtroom with the markers to them that will address

18  Item No. 2.

19       I'd like you all to consult with each other and

20  see if you can agree on what the KP-1 [sic] spreadsheet is.

21  I believe it must be an exhibit used during the trial.

22       The Jack -- the Robert Ledbetter deposition,

23  obviously, I cannot send to them, and I have a response

24  prepared.  In a moment I'll go over it with you.

25       And the Jack Henry flowchart I am assuming is a

1  demonstrative, and if it is, obviously I can't send a

2  demonstrative to the jury.

3         Let me go off the record and let counsel consult

4  with each other briefly as to both what the KP-1 [sic]

5  spreadsheet is and confirming that the Jack Henry flowchart

6  addresses a demonstrative that was used.

7         We're off the record.

8         (Off the record discussion.)

9         THE COURT:  Let's go back on the record.

10         While we've been off the record, I have conferred

11  with counsel with regard to the jury's note and the request

12  set forth therein.  It is my understanding that responding

13  to the jury's note, both parties are agreeable that the

14  requests for the KPI spreadsheet in the jury's note relates

15  to Exhibit PTX-288.  And with the agreement of both

16  parties, I intend to send that exhibit back in response to

17  the jury's Note No. 1.

18         I think everyone is in agreement that the large

19  easel in the courtroom will be sent back to the jury with

20  the markers and the tray below it in response to their

21  request for a large drawing stand.

22         My -- my proposed response to the jury with regard

23  to the Robert Ledbetter deposition, indicating I cannot

24  send the jury deposition testimony and they have to rely on

25  the memory -- their memory of all the testimony during the

1　trial, including testimony presented by deposition, appears

2　to be agreeable to the parties.

3　　　　And with regard to the fourth request identified

4　in the jury's note as Jack Henry flowchart, the parties

5　appear to be in agreement that that's represented by PT --

6　Exhibit PTX-288, which is a spreadsheet of 10 distinct

7　tabs, and while off the record, all 10 tabs have been

8　printed, and a printed copy of PTX-288, as I intend to send

9　it back to the jury, has been given to both sides, and they

10　seem satisfied that that is the entirety of the spreadsheet

11　and corresponds with the jury's request.

12　　　　Consequently, I will read for the record the

13　written response I intend to send to the jury, and then

14　I'll ask both sides to offer a comment about whether they

15　have any objections or agree to this written response.

16　　　　My intended response to the jury in response to

17　Jury Note No. 1 is as follows:

18　　　　Members of the jury, in response to your Jury Note

19　No. 1, please find the following:

20　　　　One, the KPI spreadsheet, which you requested,

21　appears to be PTX-288, which I've printed and am sending to

22　you.  If this is not what you requested, please let me know

23　by a second separate note.  If this is what you wanted,

24　then no follow-up note to me is necessary, and I will

25　assume this exhibit addresses your request.

1        Two, I am sending you a large easel with markers

2   for your use as you requested.

3        Three, you also asked for, quote, the Robert

4   Ledbetter deposition, close quote.  I cannot send this to

5   you.  You will have to rely on your memory of witness

6   testimony presented at trial, both from live witnesses in

7   open court and from deposition witnesses presented to you

8   as part of the trial.

9        Four, as to the, quote, Jack Henry flowchart,

10  close quote, I am sending you Exhibit PTX-43.  If this is

11  not what you requested, please let me know by a second

12  separate note.  If this is what you wanted, then no

13  follow-up note to me is necessary, and I will assume this

14  exhibit addresses your request.

15       Coupled with that, I will send the jury PTX-43 and

16  the printed version of PTX-288 and direct the Court

17  Security Officer to deliver the easel from the courtroom

18  and the accompanying markers to the jury.

19       Does that response -- let me ask on the record for

20  a response from the parties as Court's intended response to

21  Jury Note No. 1.  Does Plaintiff have -- have any objection

22  to this response, both in written form and together with

23  what will accompany it -- accompany it going to the jury?

24       MR. SON:  Plaintiff does not object.

25       THE COURT:  Does Defendant have any objection?

```
 1              MR. HEIDRICK:  No, Your Honor.
 2              THE COURT:  All right.  Then I'll hand the note --
 3    the actual note from the jury, which I've marked No. 1, to
 4    the courtroom deputy.  I'll hand the written response to
 5    the jury with PTX-43 and PTX-288 to the Court Security
 6    Officer.  I'll direct him to deliver that to the jury.  And
 7    I'll direct him to deliver the easel and markers in the
 8    courtroom to the jury.
 9              With that, counsel, awaiting either another note
10    from the jury or a verdict, we stand in recess.
11              COURT SECURITY OFFICER:  All rise.
12              (Recess.)
13              (Jury out.)
14              COURT SECURITY OFFICER:  All rise.
15              THE COURT:  Be seated, please.
16              Counsel, we've got a second note from the jury.
17              As a matter of fact, we've got some artwork from
18    the jury.
19              I will read you what's on the note.  I'll hand it
20    then to the courtroom deputy, and I'll grant leave to
21    Mr. Son and Mr. Heidrick to approach and look at it.
22              I'm going to mark it in the upper right-hand
23    corner with a 2 for identification purposes.
24              This note says:  Please send the diagram showing
25    Jack Henry check processing flowchart.  Thank you, Mary
```

1  Troboy.

2          I'll hand this to Ms. Lockhart.

3          Counsel, if you want to come look at it, it looks

4  like to me it relates to a demonstrative that was probably

5  used during the trial.

6          MR. HEIDRICK:  Demonstrative.

7          MR. SON:  Demonstrative.

8          THE COURT:  So while you're here, let me hand you

9  a proposed response that I'm going to send to the jury.

10          This response would say:  Members of the jury, in

11  response to your Jury Note No. 2, this drawing which you

12  requested was a demonstrative used with one or more

13  witnesses during the trial.  As I explained in my final

14  jury instructions to you, demonstratives are not evidence,

15  but the testimony given by a witness who uses a

16  demonstrative is evidence.  Accordingly, you should -- you

17  will have to rely on your memory of any testimony given by

18  any witnesses while using or addressing this particular

19  demonstrative.

20          Any objection from either Plaintiff or Defendant

21  about me sending that response back to the jury?

22          MR. SON:  No objection from the Plaintiff.

23          MR. HEIDRICK:  No objection, Your Honor.

24          THE COURT:  All right.  I'm signing an original

25  copy of that response.  I'll hand it to the Court Security

1    Officer and direct that he deliver it to the jury.

2         I will also hand a duplicate original signed, to

3    the courtroom deputy for inclusion in the papers of this

4    cause.

5         Pending another note or the return of a verdict,

6    we stand in recess.

7         COURT SECURITY OFFICER:  All rise.

8         (Recess.)

9         (Jury out.)

10        COURT SECURITY OFFICER:   All rise.

11        THE COURT:  Be seated, please.

12        All right.  Counsel, I've received the following

13   note from the jury:

14        We have a unanimous verdict.

15        It's signed Mary Troboy, who is apparently the

16   foreperson of the jury.

17        I'll hand the original note to the courtroom

18   deputy, and I'll direct the Court Security Officer to bring

19   in the jury.

20        COURT SECURITY OFFICER:  All rise.

21        (Jury in.)

22        THE COURT:  Members of the jury, please be seated.

23        Ms. Troboy, I understand that you're the

24   foreperson of the jury; is that correct?

25        THE FOREPERSON:  Yes, sir.

1          THE COURT:  Has the jury reached a verdict?

2          THE FOREPERSON:  Yes, Your Honor.

3          THE COURT:  Would you please hand the completed

4   and signed verdict form to the Court Security Officer who

5   will bring it to me?

6          Members of the jury, ladies and gentlemen, I'm

7   going to announce the verdict at this time into the record.

8   I'd like each member of the jury to listen very carefully,

9   because after I've announced the verdict publicly, I'm

10  going to ask each of you if this is your verdict so that we

11  can confirm on the record that it is, in fact, the

12  unanimous verdict of all eight members of the jury.

13         Turning to the verdict form, wherein on Page 3 is

14  located Question 1.

15         Did PPS Data prove by a preponderance of the

16  evidence that Jack Henry directly infringed any of the

17  asserted claims of the '106 patent?

18         The answer of the jury is:  No.

19         Turning to Question 2 in the verdict form.

20         Did Jack Henry prove by clear and convincing

21  evidence that from the perspective of a person of ordinary

22  skill in the art, the asserted claims of the '106 patent

23  only include activities that were well-understood, routine,

24  and conventional as of April the 28th, 2000?

25         Thereunder all seven asserted claims are listed,

1  the jury's answer is the same for all seven asserted

2  claims, and the jury's answer for each claim is:  Yes.

3         Question 3, pursuant to the Court's instructions

4  in the verdict form, is not answered and is left blank.

5         The last page of the verdict form is dated with

6  today's date, September the 12th, 2019, and is signed by

7  Mary Troboy as foreperson of the jury.

8         Members of the jury, let me poll you and make sure

9  on the record that this is the unanimous verdict of all

10  eight members of the jury.

11         If this is your verdict, as I have read it, would

12  you please stand?

13         (Jury polled.)

14         THE COURT:  Please be seated.

15         Let the record reflect that all eight members of

16  the jury immediately rose and stood in response to the

17  Court's question to poll the jury, and the Court finds that

18  this is the unanimous verdict of all eight members of the

19  jury.

20         The Court accepts the verdict, and I'll deliver

21  the original verdict form to the courtroom deputy at this

22  time.

23         Members of the jury, this now completes the trial

24  in this case.  From the very beginning, I've instructed you

25  repeatedly about not discussing the case with anyone and

1 not discussing it among yourselves until you retired to

2 deliberate.

3          I'm releasing you from those obligations now, and

4 I'm releasing you from all the obligations you have as

5 jurors in this case.  I'm discharging you from that

6 position.

7          Now, I know that the lawyers in the case would be

8 interested in hearing from you if you're interested in

9 talking to them.  Here's how that works in this court, and

10 it's been this way here for -- ever since I started

11 practicing law in East Texas, and that's been over 35 years

12 ago.

13          If you want to discuss your service in the case

14 with anyone, including any of the members of either trial

15 team, you're certainly free to do that.  But you will have

16 to initiate the discussion.  They cannot come up to you and

17 initiate a discussion with you about your service as

18 jurors.

19          But if you'd like to talk with them, I'm

20 confident, even though it's hot, they will probably be

21 standing outside on the front sidewalk when you leave the

22 courthouse, so you'll have the opportunity to walk by them.

23 And if you are interested, stop and talk with them.

24          They will not initiate a conversation with you.

25 And if you're not interested in talking to them, then you

1   simply walk right by, don't stop, don't start a

2   conversation.  It's your decision, and your decision only.

3        Also, members of the jury, I'm going to ask -- I'm

4   going to ask Mr. Son and Mr. Heidrick to give me a cell

5   phone number, and I will give you those cell phone numbers

6   in the jury room in a minute.  And if either of you want to

7   call either of them and talk about your service in the

8   case, tomorrow, next week, next month, whenever it's

9   convenient for you, you'll have their number, and you can

10  call them.  They will not have your numbers.  They will not

11  call you.

12       The -- the bottom line is you have to initiate a

13  discussion.  You can talk to anybody you want to about your

14  service in this case.  You don't have to talk to anybody

15  about your service in this case.  It's your decision and

16  your decision only.

17       Also, ladies, I want you to understand how much

18  the Court appreciates your service in this case.  Even

19  though this is Thursday and we didn't have to go through

20  Friday, it's been a significant burden on each of you and a

21  sacrifice to serve as jurors in this case, and that

22  sacrifice is not lost on any of us.

23       And we are all aware as members of the third

24  branch of government, the judiciary, that we would be

25  unable to discharge our constitutional mandate without

1  citizens like you being willing to make the sacrifice

2  you've made in this case.

3         Some of you have driven, from where I can see,

4  that you live 30, 40 miles, maybe more, each way each day.

5  You've been here promptly.  You've done everything the

6  Court's asked you to do, and I cannot thank you enough for

7  your service in this case.

8         As a matter of fact, I have a favor to ask of you,

9  and I do this in every case.  But my favor is I'd like you

10 to take a few minutes and meet me in the jury room and let

11 me come into the jury room.  I'd like to shake each one of

12 your hands.  I'd like to look you in your eye and tell you

13 personally how much I appreciate your service in this case.

14        I promise I won't keep you.  I promise it will be

15 short.  But if you would afford me that privilege, I would

16 consider it a privilege and an honor to thank you

17 personally for your service.

18        You're not obligated to do that, but I promise if

19 you will allow me that honor, it will be very short.

20        Members of the jury, that completes the trial of

21 this case.  You are discharged from your responsibility as

22 jurors.

23        The Court accepts the jury's verdict, and the

24 Court stands in recess.

25        I'll meet you in the jury room.

1          COURT SECURITY OFFICER:  All rise.

2          (Jury out.)

3          THE COURT:  As I said, counsel, that completes the

4    trial of this case.  You are excused.

5          (Court adjourned.)

6

7                    CERTIFICATION

8

9

10         I HEREBY CERTIFY that the foregoing is a true and

11   correct transcript from the stenographic notes of the

12   proceedings in the above-entitled matter to the best of my

13   ability.

14

15

16   _/S/ Shelly Holmes_____              9/12/19_____
     SHELLY HOLMES, CSR, TCRR                 Date
17   OFFICIAL REPORTER
     State of Texas No.: 7804
18   Expiration Date: 12/31/20

19

20

21

22

23

24

25